```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MARYLAND

 3                        NORTHERN DIVISION

 4   UNITED STATES OF AMERICA,      ) CRIMINAL
                                    ) NO. DKC-20-038
 5             Plaintiff,           )
                                    )
 6   v.                             )
                                    )
 7   PHILANDER ALEXANDER SPRUILL,   )
                                    )
 8             Defendant.           )

 9              TRANSCRIPT OF REARRAIGNMENT PROCEEDINGS
             BEFORE THE HONORABLE DEBORAH K. CHASANOW
10                 UNITED STATES DISTRICT JUDGE
             FRIDAY, SEPTEMBER 23, 2022; 11:06 A.M.
11                      GREENBELT, MARYLAND

12   APPEARANCES:

13   FOR THE PLAINTIFF:

14             OFFICE OF THE UNITED STATES ATTORNEY
               BY:  JOAN C. MATHIAS, ESQUIRE
15             36 S. Charles Street
               4th Floor
16             Baltimore, Maryland  21201
               (410) 209-4850
17
     FOR THE DEFENDANT:
18
               LAW OFFICE OF GERALD C. RUTER PC
19             BY:  GERALD C. RUTER, ESQUIRE
               9411 Philadelphia Road
20             Suite O
               Baltimore, Maryland  21237
21             (410) 238-8000

22

23
     OFFICIAL COURT REPORTER:
24   Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227

25       ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***
```

1          THE DEPUTY CLERK:  May I have your attention, please.

2   The United States District Court for the District of Maryland

3   is now in session.   The Honorable Deborah K. Chasanow

4   presiding.

5          THE COURT:  Good morning.

6          (Counsel reply, "Good morning, Your Honor.")

7          THE COURT:  Please be seated, please.

8       Ms. Mathias.

9          MS. MATHIAS:  Good morning, Your Honor.

10      Calling United States vs. Philander Spruill, Criminal

11   Case No. DKC-20-38.   We are here today for a guilty plea.

12       I am Cassie Mathias on behalf of the United States.

13          MR. RUTER:  Your Honor, shall I remain seated?

14          THE COURT:  Yes, please.

15          MR. RUTER:  Your Honor, on behalf of Mr. Philander

16   Alexander Spruill, we are here for a rearraignment as to Count

17   One.

18       Good morning, Your Honor.

19          THE COURT:  Good morning.

20       Good morning, Mr. Spruill.

21          THE DEFENDANT:  Good morning.

22          THE COURT:  Okay.  Yes.  We will all remain seated

23   and close to microphones.  We are wearing masks.  The rule that

24   applies is that if you are fully vaccinated, you may remove

25   your mask when speaking if you want to, but you don't have to.

1   But regardless, we do need to stay close to microphones so that

2   we can all hear each other, and obviously let me know if people

3   can't hear anything.

4       I am told that despite the fact that we have been

5   together in courtrooms, we had not done the due process order

6   for Mr. Spruill.

7           MR. RUTER:  I think that's right, Judge.

8           THE COURT:  Okay.  So I am going to do it.

9       Mr. Spruill, some time ago, back in October of 2020,

10  Congress enacted a new law that requires a judge to do

11  something in every criminal case the first time that all the

12  attorneys are together with the Court in a courtroom.  So this

13  is not unique to your case.  It's something that applies for

14  everyone.  So I just want to tell you that before I do it so it

15  doesn't cause you any concern.

16      But let me explain.  The law requires the Court to

17  announce and to remind the government that it has an obligation

18  in every criminal case to disclose to the defense any

19  information or material that it might have that is favorable to

20  a defendant as it relates either to guilt or innocence or

21  possibly to sentencing.  The failure to abide by that

22  obligation can result in serious consequences, such as

23  excluding evidence, adverse jury instructions, dismissal of

24  charges, and what have you.

25      Ms. Mathias, I am asking you whether, on behalf of the

```
 1   government, you understand and always have understood that

 2   obligation?

 3              MS. MATHIAS:  We have.  Yes, Your Honor.

 4              THE COURT:  And do you believe you have adhered to it

 5   in this case?

 6              MS. MATHIAS:  We have, Your Honor.

 7              THE COURT:  Okay.  Mr. Ruter, do you have any reason

 8   to question those assertions?

 9              MR. RUTER:  I do not.

10              THE COURT:  Okay.  The law also requires,

11   Mr. Spruill, that I sign an order to commemorate that I have

12   done that, and that's what I am signing now and giving to the

13   clerk.

14         Do you have any questions about that?

15              THE DEFENDANT:  No, ma'am.

16              THE COURT:  No.  Okay.  Very good.

17         Do we need to read the entire -- what are we dealing with

18   here? -- the third superseding indictment?  Do you need a

19   moment?

20              MR. RUTER:  Your Honor, just one second, please.

21              THE COURT:  Sure.  Of course.

22         (Counsel conferring with client.)

23              MR. RUTER:  Judge, thank you so much.  We do waive

24   the reading of the indictment.  I can assure you that myself

25   and Mr. Spruill have gone over the indictment in detail more
```

 1  than one time.

 2          THE COURT:  Okay.  Very good.

 3      We are going to read parts of it as we move forward, but

 4  as a preliminary, we are not going to reread the entire thing.

 5      Mr. Spruill, I need you to address your attention to

 6  Ms. Smith.  She's our courtroom deputy clerk.  She's going to

 7  place you under oath and ask you some preliminary questions.

 8          THE DEPUTY CLERK:  Please raise your right hand.

 9      PHILANDER ALEXANDER SPRUILL, DEFENDANT, SWORN

10          THE DEPUTY CLERK:  Thank you.  You may put your hand

11  down.

12      Please state your full name for the record.

13          THE DEFENDANT:  Philander Alexander Spruill.

14          THE DEPUTY CLERK:  What is your age?

15          THE DEFENDANT:  31.

16          THE DEPUTY CLERK:  In what year were you born?

17          THE DEFENDANT:  1991.

18          THE DEPUTY CLERK:  On March 14th, 2022, you appeared

19  before United States District Judge Chasanow for the purpose of

20  arraignment, at which time you entered a plea of not guilty to

21  Counts One, Five, Six, and Seven of the third superseding

22  indictment.

23      Do you wish to change your plea at this time?

24          THE DEFENDANT:  Yes.

25          THE DEPUTY CLERK:  How do you wish to plead?

1          THE DEFENDANT:  Guilty to Count One.

2          THE DEPUTY CLERK:  The plea is guilty to Count One

3   and not guilty to Counts Five, Six, and Seven of the third

4   superseding indictment.  Is that correct?

5          THE DEFENDANT:  Yes.

6          THE DEPUTY CLERK:  Thank you.

7          THE COURT:  Okay.  Mr. Spruill, I am going to be

8   asking additional questions because I must make certain that

9   you understand fully what it means to plead guilty and that you

10  are doing so voluntarily.  You are answering these questions

11  under oath.

12     Do you understand that?

13         THE DEFENDANT:  Yes, ma'am.

14         THE COURT:  If anything is unclear, would you let me

15  know?

16         THE DEFENDANT:  Yes, ma'am.

17         THE COURT:  And if you want to ask Mr. Ruter

18  anything, please feel free to do that.  Okay?

19         THE DEFENDANT:  Yes, ma'am.

20         THE COURT:  All right.  Please tell me your

21  educational background.

22         THE DEFENDANT:  I completed 11th grade.

23         THE COURT:  Okay.  Have you had G.E.D. classes or

24  taken the test?

25         THE DEFENDANT:  I had G.E.D. classes.  I just -- I

1  took a practice test.  I never got around to taking the actual

2  test.

3          THE COURT:  Okay.  I am just making notes here.

4      I assume you are able to read and write in English

5  without difficulty?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  Okay.  Good.

8      Have you ever been treated for any mental illness,

9  alcoholism, or any drug problem?

10          THE DEFENDANT:  No, ma'am.

11          THE COURT:  Do you currently take any medications

12  that can make you drowsy or might interfere with your

13  concentration?

14          THE DEFENDANT:  I take Suboxones.

15          THE COURT:  What's that for?

16          THE DEFENDANT:  Drug use.

17          THE COURT:  For drug use?

18          THE DEFENDANT:  To get over your drug use.

19          THE COURT:  Okay.  You are still taking it?

20          THE DEFENDANT:  Yes, ma'am.

21          THE COURT:  How are you feeling?

22          THE DEFENDANT:  I am okay.

23          THE COURT:  You are okay?

24      The reason I ask these particular questions is that it's

25  very important that you understand the proceedings, that you

1  are able to discuss things with Mr. Ruter and with me, and make

2  decisions on your own behalf with a clear head.

3        THE DEFENDANT:  Mm-hmm.

4        THE COURT:  So that's why I am asking you these

5  particular questions.

6        Do you feel you are okay?

7        THE DEFENDANT:  Yeah.  I am great.

8        THE COURT:  And when you have talked to Mr. Ruter,

9  there hasn't been any reason you couldn't understand each other

10  and communicate fully?

11        THE DEFENDANT:  I understood everything.

12        THE COURT:  Mr. Ruter, I am sure you would have told

13  me if you thought there were any reason we couldn't proceed?

14        MR. RUTER:  Yes, Your Honor, I would.  We actually

15  spent over an hour together just a little while ago having his

16  presentence interview, so he seems to be in totally fine shape

17  this morning.

18        THE COURT:  Okay.  And that's been the case --

19        MR. RUTER:  It has.

20        THE COURT:  -- every time you have met?

21        MR. RUTER:  Yes, Your Honor.

22        THE COURT:  So that means you have already met with

23  the probation officer?

24        MR. RUTER:  Yes, we have.

25        THE COURT:  Okay.  Very, very good.

1          Okay.   The charge in Count One is a conspiracy charge.

2    It alleges that from in or about April of 2019 through in or

3    about September of 2019, here in Maryland and elsewhere, you,

4    along with a group of other people whose names are in the

5    indictment, did knowingly and willfully combine, conspire,

6    confederate, and agree with each other and with other persons

7    known and unknown to the grand jury to distribute and possess

8    with the intent to distribute a number of different controlled

9    substances.

10          With regard to you, it specifically alleges that the

11   amounts involved in the conspiracy attributable to you as a

12   result of your own conduct and the conduct of other

13   coconspirators that was reasonably foreseeable to you were at

14   least 400 grams or more of a mixture and substance containing a

15   detectable amount of fentanyl, a Schedule II controlled

16   substance, at least 100 grams or more of a mixture and

17   substance containing a detectable amount of heroin, a Schedule

18   I controlled substance, and a mixture and substance containing

19   a detectable amount of cocaine, a Schedule II controlled

20   substance.

21          Do you understand the charge in Count One?

22          THE DEFENDANT:  Yes, ma'am.

23          THE COURT:  Okay.  If you are found guilty of that

24   offense, you face a maximum possible penalty of life in prison.

25   There is a mandatory minimum sentence of ten years that

1    applies.  A term of years would be followed by supervised

2    release, and it could, again, be up to the rest of your life,

3    but it must be at least five years.  There is a possible fine

4    of up to $1 million -- I'm sorry, $10 million, and a special

5    assessment of $100.

6           Supervised release is when someone who has served some

7    time in prison is released on conditions of good behavior.  If

8    he violates those conditions of release, he can be sentenced to

9    an additional term in prison on top of whatever was imposed to

10   begin with and without credit for the time that was already

11   spent on release.

12          Do you understand both the mandatory minimum and possible

13   maximum sentence for the offense alleged in Count One?

14               THE DEFENDANT:  Yes, ma'am.

15               THE COURT:  Okay.  We will get to the guidelines and

16   the terms of your plea agreement in a couple of minutes.

17   First, though, I am going to review with you the rights that

18   you give up by pleading guilty.

19          First, you have the absolute right to plead not guilty.

20   No one can make you come into court and enter a guilty plea.

21   If you plead not guilty, you are presumed to be innocent.  That

22   means that you cannot be found guilty unless there is a trial

23   at which your guilt is proven beyond a reasonable doubt.

24          You have the right to a trial before a jury of 12 people,

25   all of whom would have to agree unanimously that you were

1    guilty.  If even one of those jurors did not find guilt, there

2    could be no verdict of guilty entered at the conclusion of that

3    jury trial.

4         Alternatively, if both you and the government agreed,

5    there could be a trial before a judge without a jury.  But in

6    either case, you would be presumed to be innocent, and it would

7    be the government's burden to try to overcome that presumption

8    with proof beyond a reasonable doubt.

9         To try to do that, the government would have to call

10   people to testify as witnesses.  They would appear in open

11   court.  You would be present.  The witnesses would be placed

12   under oath, and they would be subject to cross-examination,

13   that is questioning by your lawyer.  You would, of course, have

14   the right to be represented by a lawyer throughout the trial,

15   and if you could not afford to hire counsel, the Court would

16   appoint an attorney to represent you.

17        At any trial, you would have the right to testify on your

18   own behalf if you wanted to, but you would have the equal right

19   to remain silent.  If you decided not to testify, neither the

20   jury nor the judge could hold it against you.  And if you

21   wished, the judge would tell the jury about your right not to

22   testify and that they can't hold it against you in any way

23   during their deliberations.

24        You would have the right to present a defense, to call

25   other people to testify as witnesses, and to produce documents

1  or other things as exhibits, and you would have the Court's

2  assistance through the subpoena power in requiring people to

3  come to court to testify for you.

4       If you were found guilty after that trial, you would have

5  the right to appeal to complain about any mistakes that might

6  have been made before or during that trial.

7       Do you understand all of those rights that you give up by

8  pleading guilty?

9            THE DEFENDANT:  Yes, ma'am.

10           THE COURT:  Do you understand that if I accept your

11  guilty plea, there won't be any trial of the charges against

12  you, and instead, we will set a date for sentencing?

13       Do you understand that?

14           THE DEFENDANT:  Yes, ma'am.

15           THE COURT:  Okay.  In addition, there have been many

16  pretrial motions filed complaining about how the government

17  came to have some of the evidence it might want to use at a

18  trial.  I have already resolved most if not all of them.  By

19  pleading guilty, you are giving up any right to complain about

20  any decisions I have already made in this case.

21       Do you understand that?

22           THE DEFENDANT:  Yes, ma'am.

23           THE COURT:  There is a written plea agreement.

24       Ms. Smith, do you have the original?

25           THE DEPUTY CLERK:  Yes, Your Honor.

1          THE COURT:  I am going to ask if you would take it

2    down to counsel table and show it to Mr. Spruill.  It looks

3    like you signed this, and I just want you to confirm for me

4    that those are indeed your signatures.

5          Are those your signatures?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  Okay.  I assume you only signed that

8    document after you had a full opportunity to read it yourself?

9          THE DEFENDANT:  Yes, ma'am.

10          THE COURT:  And to discuss it in full with Mr. Ruter.

11    Is that correct?

12          THE DEFENDANT:  Yes, ma'am.

13          THE COURT:  All right.  It's going to be placed in

14    the court file.

15          Mr. Spruill, this plea agreement was negotiated for you

16    by your attorney directly with the prosecutors.  I have not

17    been a party to those discussions, and as of right now, I am

18    not bound by the plea agreement.  But it's offered under a Rule

19    of Criminal Procedure that let's the parties reach an agreement

20    with regard to at least one aspect of the sentence.  Here, I

21    believe it's a term of imprisonment.  And then they present it

22    to the Court and ask the Court to agree as well.

23          The way it works is that we will have a presentence

24    report prepared by Probation.  We will then receive anything in

25    writing that the parties want me to see, and then we will have

1   a hearing, a sentencing hearing, at which, again, both sides

2   can tell me anything they think I ought to know, and you will

3   have an opportunity to address me directly.

4        Only after considering all of that material and all of

5   the proper factors that go into a sentencing decision will I

6   decide whether to agree or not.

7        If I agree, then you will be sentenced as proposed in the

8   plea agreement.  If, for any reason, I should disagree, I will

9   tell you, and then you will -- either side can declare this

10  plea agreement to be of no further force, that is, you could

11  call it void, and then you will be given an opportunity to

12  withdraw your guilty plea.

13       But if I accept your guilty plea today, the only

14  circumstance under which you can withdraw your guilty plea

15  later is if I say no, I decline to go along with this proposed

16  sentence.

17       Do you understand that?

18            THE DEFENDANT:  Yes, ma'am.

19            THE COURT:  Okay.

20            MR. RUTER:  Your Honor, could I interrupt the

21  Court --

22            THE COURT:  Sure.

23            MR. RUTER:  -- about that matter?  I appreciate it.

24       I just wanted to let the Court know that the whole idea

25  of the waiver of his right to appeal is a matter that we have

1  discussed many times.  Mr. Spruill has made it clear to me he's

2  wanted to plead guilty, but he wanted to plead guilty on a

3  condition that he could take an appeal.

4      I have explained to him that this is -- this is a

5  negotiated plea agreement and that we cannot force the

6  government to enter into a plea where they would agree to allow

7  him to take the Court's decisions, as an example, up on appeal

8  to see whether or not the Court had erred.

9      He even asked me, Judge Chasanow, whether or not you

10 could intervene in some way in order to permit him to take an

11 appeal and still plead guilty.  And I said, Unfortunately, the

12 answer is no, the Court will not and cannot assist him in

13 trying to enter into some plea or to change the plea in any

14 way.

15     And so I wanted the Court to be aware that that is

16 something that's been discussed many, many times, and I

17 appreciate the Court going over it carefully again today.

18     I thought I should add that for the record so that it

19 would be clear that he does understand, just as you said, that

20 if you accept the plea as written, during the sentencing

21 hearing, it will have nothing to do with whether or not he

22 might go enter into an appeal after that sentencing hearing

23 because he will not be able to based upon the fact that he

24 wanted to challenge the pretrial hearing.

25         THE COURT:  Thank you.  Yes.  There are rules that

1  allow, under some circumstances, the entry of what we call a

2  conditional guilty plea, but it must be with the consent not

3  only of the Court but also the government, that if they don't

4  agree to that kind of negotiation in a plea agreement, there is

5  no way to plead guilty and preserve your right to appeal any of

6  the pretrial motions.

7       Is that understood?

8            THE DEFENDANT:  Yes, ma'am.

9            MR. RUTER:  And I wanted the record to show, Your

10 Honor, that I, in fact, tried multiple times to engage the

11 government in that particular matter, and they, as is their

12 right, unconditionally said no.

13           THE COURT:  Right.  And it is -- I am not involved --

14 that's what I said to you:  I am not involved in those

15 negotiations.  I have to take it or leave it the way it's

16 presented to me.

17      But you have had an opportunity, obviously, to be

18 represented by Mr. Ruter who has listened to you, he's heard

19 your concerns, and has negotiated with the government, and are

20 you comfortable with the result that you have here in this

21 written plea agreement?

22           THE DEFENDANT:  Yes, ma'am.

23           THE COURT:  Okay.  As it's written, you will not be

24 allowed to appeal those pretrial decisions.  I know a lot of

25 people think I have already made mistakes, but you are giving

1    up your right to appeal if I accept your guilty plea, and you

2    have to be fully comfortable with that result.

3          Are you?

4                THE DEFENDANT:  Yes, ma'am.

5                THE COURT:  Okay.  I know it's a lot to take in and

6    to consider, so if there is any questions you have for me or

7    for Mr. Ruter, now is the time for you to ask them.

8                THE DEFENDANT:  No questions.

9                THE COURT:  No?  Okay.

10               MR. RUTER:  Thank you, Judge.

11               THE COURT:  As I was saying, though, we do need to

12   review the plea carefully because we do have to understand all

13   of its provisions.

14         First, it tells me you have agreed to plead guilty to

15   Count One, as you have already stated.  Now, it says here to

16   conspiracy to possess with intent to distribute 400 grams or

17   more of fentanyl, as well as one kilogram or more of heroin,

18   and it does not mention the cocaine.  Is that right?

19               MS. MATHIAS:  Yes, Your Honor.

20               THE COURT:  So even though the overall charge had all

21   three, the plea that -- the portion of the plea -- of the

22   count -- of the charge that you are pleading guilty to involves

23   400 grams of fentanyl and one kilogram or more of heroin.

24         Now, the charge was 100 grams or more.  Right?

25               MS. MATHIAS:  So I believe he will still be pleading

1  to the third superseding information -- or, excuse me,

2  indictment, and he might be admitting to more drugs than the

3  mandatory minimum, so he's not subject to the 841(a)(1)(A)

4  mandatory minimums.

5          THE COURT:  He is?

6          MS. MATHIAS:  Is not.  It would the B mandatory

7  minimum, so five to 40 years under this plea.

8          THE COURT:  I am not following here.

9          MS. MATHIAS:  You are right.  You are right.  I'm so

10  sorry.  It would be ten years to life.

11          THE COURT:  Right, which is what I read to him.  My

12  question is whether we really ought to amend the plea agreement

13  because it says he's going to plead to Count One, which charges

14  him with possession with intent to distribute 400 grams or more

15  of fentanyl, as well as one kilogram or more of heroin, and

16  that's not actually what --

17          MS. MATHIAS:  I see.  I see, Your Honor.

18          MR. RUTER:  And Your Honor, if I may, the heroin

19  question was one that was raised by Mr. Spruill to me on more

20  than one occasion.  He had requested that the -- the -- the

21  heroin be stricken all together, something which I thought, but

22  I can't verify, that I have spoken to Ms. Hoffman about.

23      I had advised Mr. Spruill, Your Honor, that in terms of

24  punishment, unfortunately, if he pled guilty to fentanyl alone,

25  he still is subject to the precise penalties as if he had pled

1    guilty to heroin alone or if he had pled guilty to both

2    fentanyl and heroin.

3         Now, I do not want to put the government in a difficult

4    position, but I will attempt to, and ask the government to --

5    and ask the government to consider striking the reference to

6    one kilogram or more of heroin.

7         I want the record to also be clear, Judge Chasanow, that

8    I have informed Mr. Spruill, because we have had discussions,

9    about the First Step Act and whether or not he may be able to

10   receive some kind of earned-time credits when he's in the --

11   when he's in the custody of Bureau of Prisons.  I have advised

12   him that it's not heroin that would prevent him theoretically

13   from earning earned-time credits, as the statute is now

14   structured, but fentanyl will.  Any fentanyl, my understanding,

15   that one pleads guilty to will prevent a person from receiving

16   additional earned-time credits under the First Step Act.

17        And so he is aware of that, and, therefore, in order to

18   rectify this issue, I would ask the government to consider

19   striking the reference to heroin knowing full well that 400

20   grams of fentanyl gives us the same -- absolutely the same

21   result.

22             THE COURT:  It's the same mandatory minimum and it's

23   the same guideline -- I mean, they are not -- the plea letter

24   does not use any of the heroin to calculate the guidelines.  Is

25   that right?

1          MR. RUTER:  That's correct.

2          MS. MATHIAS:  How about if we struck out one kilogram

3     and made it 100 grams or more of heroin, would that satisfy all

4     parties?

5          THE COURT:  That's a little better.  Right?  And

6     that's what the charge is.

7          Now, the question is not just on the -- that paragraph

8     but in the facts.

9          MS. MATHIAS:  I'd also like to draw the Court's

10    attention to the very bottom paragraph of the statement of

11    facts.  It should say 400 grams of fentanyl.  And then I would

12    also be willing to strike out at least one kilogram of heroin

13    and make it 100 grams.

14         THE COURT:  Definitely need to change the 400

15    kilograms of fentanyl.  That will be --

16         (Counsel conferring with client.)

17         MR. RUTER:  Your Honor, so the Court will know, the

18    -- my recollection was that Mr. Spruill had asked me to speak

19    with the government about removing heroin all together from the

20    -- the plea, and I just told him now I cannot remember whether

21    I raised that issue.  I raised a few other issues, and we are

22    going to get to those in a bit.  You will see there has been

23    some scratching out of things.  But nothing has changed on the

24    issue of the heroin.

25         And so I cannot represent to the Court that I for sure

1  spoke to Ms. Hoffman -- I have never spoken actually to counsel

2  here today.  I have been negotiating with Ms. Hoffman.

3       THE COURT:  What she said while you were possibly

4  speaking to Mr. Spruill --

5       MR. RUTER:  Yes.

6       THE COURT:  -- two things.  One, she would agree, on

7  behalf of the government, to reduce it to 100 grams or more of

8  heroin both in paragraph 1 as well as in the last paragraph of

9  the statement of facts; and number two, you do need to look at

10  that last statement of the facts because it misstates -- it

11  says 400 kilograms of fentanyl, and that's not what you meant.

12  They meant 400 grams.  So we are going to make that correction.

13       So she will reduce it back to what the charged language

14  was in the indictment in both the statement in paragraph 1 and

15  in the agreed amount in the statement of facts.  But the

16  government is not presently willing to eliminate any mention of

17  heroin.  So that's -- that's where she just announced --

18  because you can't always see each other over that way, so I am

19  kind of making sure that everybody knows what was said.

20       MR. RUTER:  Right.

21       THE COURT:  So do you want to chat with Mr. Spruill?

22       MR. RUTER:  If I could, Your Honor.  Yeah.

23  (Counsel conferring with client.)

24       MR. RUTER:  So, Your Honor, of course, you will

25  inquire yourself, but it's my understanding that Mr. Spruill

1   will reluctantly agree to 100 grams of heroin or more.  The

2   reason he's reluctant, Your Honor, is because he has advised me

3   that he admits to fentanyl but he denies his involvement with

4   heroin, and, therefore, he had asked me to have all references

5   to heroin stricken from the plea agreement.

6          And I cannot swear to the Court that I -- that I

7   addressed that issue with Ms. Hoffman.  I just can't -- I just

8   do not recall.  I know this:  It wasn't stricken by Mr. Spruill

9   and I.  We struck a couple of other things, which you will get

10  to hopefully today, but we did not, you will see -- you have

11  already seen here there is no striking of the one kilogram or

12  more of heroin.  And so whether I spoke to her about it or not,

13  I do not know.

14         But Mr. Spruill and I have been debating that here in the

15  courtroom, that he had wanted me to have that stricken, and it

16  has not been stricken.

17         THE COURT:  Understood.  Now, Ms. Mathias is here,

18  and she's every bit as capable as Ms. Hoffman was to negotiate

19  on behalf of the government.

20         MR. RUTER:  Yes.

21         THE COURT:  And I am not going to get in between all

22  of that.

23         But Mr. Spruill, you need to understand that the way the

24  plea is currently written, I am going to ask you at some point

25  whether you agree that you are guilty of the offense as stated,

1   and that would be to 400 -- that it being either you or

2   reasonably foreseeable to you that another coconspirator was

3   involved with 400 -- at least 400 grams of fentanyl and 100

4   grams of heroin.  And I am going to ask you that question, and

5   unless you say yes, you agree that you are guilty of that

6   offense, we are not going to be able to accept it.

7           Do you understand that?

8                   THE DEFENDANT:  Yes, ma'am.

9                   THE COURT:  Okay.  So why don't the attorneys take

10  another minute to talk and then talk to Mr. Spruill.

11          (Counsel conferring.)

12                  MR. RUTER:  Your Honor, thank you again.

13          Mr. Spruill advises me that he is not going to object any

14  further about the -- the change of one kilogram of heroin to

15  100 grams or more of heroin.

16                  THE COURT:  Okay.  But we will make the correction,

17  nevertheless, on the facts, and we will -- let's wait until we

18  have gone through this entire plea agreement before we start

19  making the changes and initialling them because we don't know

20  what else we will find.

21                  MR. RUTER:  Correct.

22                  THE COURT:  Okay.  All right.  So, Mr. Spruill, your

23  agreement is to plead guilty to the portion of Count One that

24  charges you with being involved in a conspiracy with regard to

25  both fentanyl and heroin, and that the amount either that you,

1   yourself, were involved with or was reasonably foreseeable to

2   you based on the conduct of your coconspirators involved at

3   least 400 grams or move of fentanyl and 100 grams or more of

4   heroin.

5        Is that correct?

6            THE DEFENDANT:  Yes, ma'am.

7            THE COURT:  Okay.  The plea letter tells me that at

8   the appropriate time, you will admit that you are, in fact,

9   guilty of that offense.

10       The plea letter then sets out the elements of the

11  offense.  These are the things the government would have to

12  prove beyond a reasonable doubt if the case were to go to

13  trial.  They'd have to prove that on or about the dates alleged

14  in the indictment, here in Maryland, there was an agreement

15  between two or more people to violate the drug laws of the

16  United States by distributing or possessing with the intent to

17  distribute heroin and fentanyl; that you joined that agreement

18  willfully, that is, with the intent to further its unlawful

19  purpose; and third, that the amounts involved in the conspiracy

20  attributable to you as a result of your own conduct and the

21  conduct of other conspirators reasonably foreseeable to you

22  were 400 grams or more of fentanyl, and, again, we will change

23  this to 100 grams or more of heroin.

24       Do you understand the burden would be on the government

25  to prove those elements?

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  Okay.  The plea agreement letter then

3     sets out the penalties, the mandatory minimum and possible

4     maximum sentence that I have already reviewed with you.

5          Next, the letter goes on to outline the rights that you

6     give up by pleading guilty.  I have already discussed with you

7     the trial rights that you give up.  The plea letter says you

8     also understand that a conviction in this case could cause you

9     to lose some valuable civil rights and could subject you to

10    deportation or other loss of immigration status.  Let me advise

11    you that if you are not a United States citizen, a conviction

12    in this case could affect your ability to remain in the United

13    States or to return at some later time.

14         Has anybody made any promise to you concerning any

15    immigration matter in order to induce you to plead guilty?

16         THE DEFENDANT:  No.

17         THE COURT:  Okay.  The letter then refers to the

18    advisory sentencing guidelines.  It tells me that you

19    understand that I must calculate the guidelines and then use

20    them as one of the factors in determining the sentence in your

21    case.

22         The letter then refers to a factual stipulation.  It's a

23    separate part of this document called Attachment A probably --

24    let me make sure -- yep, that begins at page 10.  I am going to

25    ask Ms. Mathias to read these facts out loud.  Please listen

1   carefully.  When she is finished, I will ask you if you agree

2   that these facts are true.

3        Ms. Mathias.

4        MS. MATHIAS:  Thank you.

5        In 2019, the Washington County Narcotics Task Force

6   conducted an investigation into a heroin and fentanyl

7   trafficking organization based in Hagerstown, Maryland that

8   included the defendant, Philander Spruill, a/k/a "Buddha."  The

9   investigation involved court-authorized wiretaps, search

10  warrants, the use of confidential sources, and other

11  investigative tools.  Pursuant to the wiretaps, investigators

12  intercepted calls and text messages over one of Spruill's cell

13  phones between June and August 2019.

14       Intercepted communications and other surveillance

15  revealed that Spruill was regularly driving to Owings Mills,

16  Maryland to obtain hundreds of grams of heroin/fentanyl from a

17  source of supply.  The investigation also revealed that Spruill

18  was working with an associate, Christopher Benton, to

19  distribute heroin and fentanyl to customers in Hagerstown that

20  included Eddie Ware, Tyler Ware, Michael Lyles, and Sirage

21  Delaney.

22       For instance, on June 21st, 2019, investigators

23  intercepted a text message exchange between Eddie Ware, using

24  TT3, and Spruill, using TT6, in which Ware asked whether

25  Spruill had the same food or different, referring to

1  heroin/fentanyl, and asked what total he owed Spruill.  Spruill

2  indicated that he had a different batch of heroin/fentanyl and

3  that Ware owed $1300.  Ware said his customers were sorta

4  complaining about the last batch but that it's gone; in other

5  words, he had sold the last batch of heroin/fentanyl supplied

6  to him by Spruill despite the fact that his drug customers were

7  complaining about the quality of the drugs.

8         On June 25th, 2019, investigators intercepted a call

9  between Tyler Ware, using TT3, and Spruill, using TT6, in which

10  they made plans to meet in the area of South Locust Street and

11  East Baltimore Street so that Ware could purchase $700 worth of

12  heroin/fentanyl.  Investigators set up surveillance in the area

13  and observed a blue Chrysler 300 registered to Spruill park in

14  the lot where Ware had directed him.

15         On June 26th, 2019, investigators intercepted calls and

16  text messages between Tyler Ware, using TT3, and Spruill, using

17  TT6, indicating they were going to meet in the same spot so

18  that Spruill could supply Ware with heroin /fentanyl.  Ware

19  told Spruill, If you want to put some of that other stuff on

20  it, you can, 'cause I got some people that will do that.

21  Investigators then observed the same Chrysler 300 park in the

22  same lot on Baltimore Street, where Tyler Ware entered the

23  front passenger seat of the vehicle and then emerged roughly

24  five minutes later.

25         On July 6th, 2019, investigators intercepted a call over

1 TT6 between Spruill and an unknown male.  Spruill told the

2 unknown male, I was tryin' get a read on something 'cause I was

3 giving my people some chunky shit.  I gave them some powder and

4 they didn't like it, but I had gave it to someone else, and

5 they was like it was the best shit ever.  The unknown male said

6 he would see Spruill in a couple minutes.

7      On July 7th, 2019, investigators intercepted a call over

8 TT6 between Spruill and a drug customer, in which the customer

9 told Spruill:  I need another basketball and a whole one, an

10 eight ball of crack cocaine and one gram of heroin/fentanyl.

11 Spruill said he would call his girl.  In a subsequent call,

12 Spruill told the customer:  Go to my house.  My girl will give

13 it to you.  Shortly thereafter, a covert surveillance camera

14 showed that the customer parked outside Spruill's residence and

15 walked to the door, where a female let him in.  Minutes later,

16 the customer left and drove away.

17      On July 9th, 2019, at 12:05 p.m., investigators

18 intercepted call TT6-2909 between Spruill and Michael Lyles, in

19 which Lyles asked to buy four or five of them; in other words,

20 four or five grams of heroin/fentanyl.  Spruill told Lyles he

21 was about to go grab something better from his supplier in

22 Baltimore.  Lyles asked:  Can you stop through on your way

23 back?  Spruill replied:  Bro, I'm not gonna stop with a whole

24 bunch of drugs on me to break off something.  Bro, I got to get

25 it where it goes and I'll double back, but I'm not gonna stop.

1   I don't ride with 10, 5 grams, bro, I ride with a buck, two,

2   three, referring to 100-, 200-, or 300-gram quantities of

3   heroin/fentanyl.  Later in the conversation, Spruill again

4   emphasized that he was not driving through Frederick with a

5   bunch of drugs.

6          On July 9th, 2019, investigators intercepted a series of

7   calls and texts over TT6 in which Spruill agreed to distribute

8   two -- believed to refer to two grams of heroin/fentanyl -- to

9   a drug customer on Lee Street.  A short time later, the covert

10  surveillance camera captured Spruill exiting his residence

11  carrying a gray WalMart grocery bag and getting into his 2012

12  Acura TL.  Investigators followed Spruill to Lee Street and

13  recorded him meeting with the customer in his car.  The

14  customer walked away from the Acura carrying a gray WalMart

15  bag, which he discarded in a trash can on the sidewalk.

16  Investigators recovered the gray Walmart bag and found that it

17  contained numerous baggies and packages containing fentanyl

18  residue.

19         On July 17th, 2019, law enforcement intercepted a series

20  of calls over TT6 between Spruill and Sirage Delaney, in which

21  Spruill agreed to supply Delaney with ten, i.e., ten grams of

22  heroin/fentanyl, in exchange for six, i.e., $600.  Spruill told

23  Delaney, I'm probably gonna have to tell Chris to go do it.  I

24  forgot I had to go pick my nephew up in PA.

25         On July 22nd, 2019, investigators intercepted a series of

1   calls and texts over TT6 in which Spruill agreed to deliver

2   three, i.e., of three grams of heroin/fentanyl, to Michael

3   Lyles.  A short time later, a covert surveillance camera

4   captured Spruill exit his residence and get into his 2012 Acura

5   TL.  Investigators set up surveillance outside Lyles' residence

6   in Frederick, where they observed Lyles meet with Spruill.

7   After the meeting, Spruill called Lyles and accused him of

8   paying only $180 instead of the agreed price of $200.  Spruill

9   then acknowledged he had miscounted the money.

10        On August 12th, 2019, the Washington County Narcotics

11   Task Force and the DEA executed a search warrant at Spruill's

12   residence at 746 Spruce Street in Hagerstown, Maryland.

13   Spruill was located in the residence along with his girlfriend

14   and three children under the age of four.

15        From the master bedroom of the residence, officers

16   recovered Spruill's wallet, which contained $409 in U.S.

17   currency, a loaded but inoperative North American Arms .22

18   caliber revolver, three iPhones, and a journal containing a

19   drug ledger or owe sheet that made reference to "Drama," Sirage

20   Delaney, among other drug customers.  Elsewhere in the

21   residence, they recovered two knotted plastic bags containing a

22   total of approximately 104 grams of fentanyl, a bottle of the

23   cutting agent mannitol, a blender, two drug presses, a digital

24   scale coated with suspected drug residue, and packaging

25   materials.

1      The warrant for Spruill's residence also authorized law

2  enforcement to search cell phones found within the residence.

3  Pursuant to the warrant, law enforcement searched Spruill's

4  iPhone and located numerous messages between Spruill and

5  Johnson.  For instance, on August 3rd, 2019, Spruill sent

6  Johnson a photograph of a Western Union receipt for a transfer

7  of cash from Spruill to Johnson.  Records from Western Union

8  show that Spruill sent Johnson $1,050 that day.

9      The defendant admits that the amount involved in the

10  conspiracy attributable to the defendant as a result of his own

11  conduct and the conduct of other coconspirators reasonably

12  foreseeable to him was at least 400 grams of fentanyl and at

13  least 100 grams of heroin.  The defendant also admits that the

14  $409 seized constitutes proceeds of drug trafficking.

15      THE COURT:  Mr. Spruill, did you hear those facts

16  when they were read out loud?

17      THE DEFENDANT:  Yes, ma'am.

18      THE COURT:  Do you agree that all of those facts are

19  true?

20      THE DEFENDANT:  Yes, ma'am.

21      THE COURT:  Do you agree that you are, in fact,

22  guilty of the offense in Count One, conspiracy to distribute

23  and possess with intent to distribute 400 grams or more of

24  fentanyl and 100 grams or more of heroin?

25      THE DEFENDANT:  Yes, ma'am.

1          MR. RUTER:  And Your Honor, would you allow me to

2    interrupt the Court yet again?

3          THE COURT:  Okay.

4          MR. RUTER:  Your Honor, looking at the last page of

5    the statement of facts, I wanted to bring to the Court's

6    attention that Mr. Spruill and I had had several debates about

7    the weapon which was found at Lee Street.  The weapon was

8    found, Your Honor -- and I think if I misspeak, the government

9    will correct me -- it was found in several pieces.  It was

10   found -- the barrel was found with the -- the actual frame.

11   The cylinder was apart from it.  The firing pin was removed.

12   There were I think two or three bullets that were loose.  And

13   then, finally, there appeared to be one -- one bullet in the

14   chamber.

15         So, again, this is for the record -- and Mr. Spruill may

16   have a comment; that's fine -- Mr. Spruill, Your Honor,

17   initially wanted me to challenge that that was not a firearm,

18   and it took me some time to demonstrate to him that under

19   federal law, like it or not, it, indeed, was a firearm, not

20   because it was operable, because it was not operable, but it

21   easily could be given the fact that all the component parts

22   were present, and there is ample case law to support the

23   definition of a firearm under federal law.  That's number one.

24         Secondly, Your Honor, he questioned strongly, then, the

25   issue that it was a loaded gun.  His thought was, Well, how

1   could it be loaded if it's in several different parts?  And so

2   you see the changes we had made, Your Honor, on your version

3   that Mr. Spruill and I have initialled.

4        And I just repeat -- and whether this will be shown at a

5   sentencing hearing, Your Honor, perhaps it will be -- but the

6   photograph does show, although the parts were clearly -- they

7   were staged.  They had to be.  They were all -- I think all

8   jumbled up in a handkerchief or something when they were found,

9   and they were spread out, and it does, in fact, show that there

10  appears to be one bullet in the chamber.

11       Whether or not this Court will find any significance in

12  whether there was or was not a bullet in the chamber of a

13  clearly inoperable, disassembled weapon remains to be seen.

14       And that's all I wanted the Court to hear as it relates

15  to that.

16            THE COURT:  Okay.  Right.  I was going to question

17  because I am -- I just looked at the original, and I see it

18  reads the way Ms. Mathias did it.  I must have received the

19  copy after the defense had made a change and before the

20  government had indicated it still wanted the word "loaded" in

21  there.

22            MR. RUTER:  Yes.

23            THE COURT:  Mr. Spruill, there are a lot of things in

24  cases such as this that are sometimes more complicated and not

25  as obvious as might otherwise seem, and one is the definition

1  of a firearm.  It's an item that is capable of expelling a

2  projectile by an explosive charge or something that is readily

3  convertible into that kind of mechanism.

4      I am sure you have had long discussions with Mr. Ruter

5  with regard to it, but is there any further question you have

6  with regard to this?

7          THE DEFENDANT:  I understand, you know, a firearm --

8  it fits the frame of a firearm.  I understand that.  I am

9  saying the language -- I am -- I am -- I am debating on the

10  language was the "loaded" part.

11          THE COURT:  Okay.

12          THE DEFENDANT:  That gun cannot -- obviously, they

13  didn't try to fire it because it can't be fired.  Why it can't

14  be fired?  Because all the pieces -- I am going to correct my

15  lawyer -- all the pieces wasn't there.  So, you know, I just

16  was trying to get the language switched because, you know, when

17  I go for I guess my sentencing or the PSI, I wasn't trying to

18  get a two-point enhancement for a firearm that I can't even

19  protect my proceeds with.  I wasn't trying to get a two-point

20  enhancement with that.  You know, that -- that stops me from

21  getting the RDAP drug program if I get a two-point enhancement

22  for a firearm.

23          THE COURT:  Well, they are not asking for that in the

24  plea letter.

25          THE DEFENDANT:  But that's why I wanted to change the

1    language because, you know, the PSI can do it themselves, so

2    that's why I was trying to change the language.

3            THE COURT:  As we will get to, this plea agreement

4    obligates the government to join in the agreement of the

5    sentence no matter what the guidelines turn out to be.  Is that

6    right?

7            THE DEFENDANT:  Say it again.

8            THE COURT:  Even if I find the guidelines to be

9    different than are stipulated in this plea letter -- and I am

10   not saying I will or that Probation is even going to recommend

11   it -- it won't change the agreed-upon sentence of 120 months.

12           THE DEFENDANT:  Yeah.  That's not -- that was never

13   the problem.  I just, you know, I was worried about the -- an

14   enhancement.  That won't allow me to get the RDAP drug program

15   wherever I am currently going to be housed at.

16           THE COURT:  Okay.  Well, we don't know what the

17   future is going to bring with regard to all sorts of credits

18   and calculations and all of that.  You are right to question

19   and to discuss it with Mr. Ruter, but the wording in this

20   letter is that it was a loaded but inoperable North American

21   Arms .22 caliber revolver.

22           THE DEFENDANT:  Yeah.  I just don't see how it was

23   loaded.  That's what I am saying.  But it's cool.

24           THE COURT:  Okay.  Well, what Mr. Ruter has said is

25   that there was a bullet in the chamber, which is where you load

1   a gun, but you think it --

2          THE DEFENDANT:  But the chamber wasn't -- the chamber

3   wasn't on the body -- it wasn't attached to the body of the gun

4   itself, though.

5          THE COURT:  Okay.  Well, you will have an opportunity

6   at any juncture that you think it is appropriate here in court

7   to show me photographs or descriptions or what have we, and we

8   will see if there is a factual issue for me to resolve.

9      But I think you are comfortable, then, after all of that

10  discussion, with the wording subject to your being able to

11  explain when appropriate.  Is that right?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Okay.

14         MR. RUTER:  Which we will do, Your Honor, at the

15  sentencing hearing.

16         THE COURT:  Okay.  All right.  We will see what --

17  where we go.

18     Now, back to the body of the plea agreement, that based

19  on the facts, the parties have stipulated to some of the

20  guidelines.  They agree that the base offense level is 30 based

21  solely on the 400 grams or more of fentanyl.

22     As of right now, the government will not oppose a

23  two-level downward adjustment for acceptance of responsibility.

24  Mr. Spruill, that's their agreement right now, but they will

25  pay attention to your conduct up until the time of sentencing.

1    If the government thinks you failed to admit all aspects of

2    that factual stipulation, if you deny your involvement in the

3    offense, if you give conflicting statements about your

4    involvement, if you are untruthful with me, the probation

5    office, or the U.S. Attorney, if you obstruct or attempt to

6    obstruct justice, engage in any new criminal conduct, if you

7    attempt to withdraw your guilty plea, or if you violate the

8    plea agreement in any way, the government might no longer agree

9    to the downward adjustment for acceptance of responsibility.

10        Indeed, if they think you are obstructing justice or

11   engaging in some new criminal conduct, they could ask me to

12   move higher on the advisory guidelines scale.

13        If the government should take that position, I will hear

14   fully from both sides before deciding whether you have done any

15   of those things, and if so, what to do about it under the

16   guidelines.

17        It's important for you to understand, though, that if the

18   government should take that position based upon something that

19   happens between today and the time of sentencing, you won't be

20   allowed to withdraw your guilty plea on that basis.

21        Do you understand?

22             THE DEFENDANT:  Yes, ma'am.

23             THE COURT:  Okay.  Now, if the government should take

24   that position and we have a hearing and the government should

25   persuade me that you did any of those things, then the

1   government is no longer bound by this plea agreement, that is,

2   they are no longer going to be required to agree to 120 months.

3          Do you understand that?

4              THE DEFENDANT:  Yes, ma'am.

5              THE COURT:  And you will no longer be asking me to

6   agree to that sentence.

7          Understood?

8              THE DEFENDANT:  Yes, ma'am.

9              THE COURT:  But you won't be allowed to withdraw your

10  guilty plea.

11         Also understood?

12             THE DEFENDANT:  Yes, ma'am.

13             THE COURT:  Okay.  But if everything goes as we

14  anticipate, the parties believe the offense level is 28.  There

15  is no agreement as to your criminal history information and,

16  thus, your criminal history category, and that can be an

17  important part of the guideline determination.

18         The parties also agree that except as is set forth in

19  this plea agreement, there are no other guideline issues for me

20  to decide; there are no other offense characteristics,

21  guideline factors, departures, or adjustments that are going to

22  be raised or are in dispute.

23         The parties agree that no matter what I find the

24  guidelines to be, the appropriate sentence in this case is 120

25  months, ten years, taking into consideration all of the

1    appropriate factors including your criminal history.

2        This does not affect my discretion in terms of supervised

3    release, in terms of the length of it, or any lawful conditions

4    on supervised release.

5        Do you understand that?

6            THE DEFENDANT:  Yes, ma'am.

7            THE COURT:  Again, I won't decide until the time of

8    sentencing after I have read the presentence report as well as

9    anything the parties present to me in writing or orally.  I

10   just won't make that decision today.

11       Clear?

12           THE DEFENDANT:  Yes, ma'am.

13           THE COURT:  Okay.  The government and the defendant

14   will recommend the ten-year sentence.  Both sides, of course,

15   have the right to tell me anything they think is relevant to

16   sentencing.  At the time of sentencing, the government is going

17   to dismiss the other charges.  That's a very important part of

18   this agreement.

19       Do you understand that?

20           THE DEFENDANT:  Yes, ma'am.

21           THE COURT:  All right.  In addition to the rights

22   that you give up by pleading guilty that I have already

23   reviewed with you, you are giving up your rights -- some of

24   your rights to appeal.

25       First, you will not be allowed to appeal the conviction,

1   that is the determination of guilt; and secondly, both you and

2   the government are giving up some of your rights to appeal the

3   sentence.

4       If you are sentenced to 120 months or less, you will not

5   be allowed to appeal the sentence.

6       Do you understand that?

7           THE DEFENDANT:  Yes, ma'am.

8           THE COURT:  On the other side, as long as you are

9   sentenced to 120 months or more, the government will not be

10  allowed to appeal the sentence.

11      Do you understand that?

12          THE DEFENDANT:  Yes, ma'am.

13          THE COURT:  Okay.  There is a forfeiture provision.

14  You have agreed to give up any right you might otherwise have

15  in the $409 in U.S. currency and the revolver, in whatever

16  shape or form it was, that was seized on August 12th, 2019.

17      Do you understand that?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  Okay.  I am now turning to the sealed

20  supplement, and if a transcript is ever prepared, this portion

21  will remain under seal.

22      (It is the policy of this court that every guilty plea

23  and sentencing proceeding include a bench conference concerning

24  whether the defendant is or is not cooperating.)

25          THE COURT:  Mr. Spruill, have we now talked about all

1  the provisions you think are part of the plea agreement you

2  have with the U.S. Attorney's Office?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  Other than what is written down in this

5  written plea letter, has anybody made any promise to you to

6  induce you to plead guilty?

7          THE DEFENDANT:  No, ma'am.

8          THE COURT:  Have you been threatened in any way?

9          THE DEFENDANT:  No, ma'am.

10          THE COURT:  How many times have you met with

11  Mr. Ruter to talk about this plea?

12          THE DEFENDANT:  A few times.

13          THE COURT:  A few times.

14      Has he always had the time that you thought was necessary

15  to talk with you?

16          THE DEFENDANT:  Yeah.  He made time.

17          THE COURT:  Okay.  Has he answered all of your

18  questions?

19          THE DEFENDANT:  Yeah.

20          THE COURT:  Are you satisfied with the help he has

21  provided you in this case?

22          THE DEFENDANT:  Yeah.

23          THE COURT:  Counsel, what have I forgotten to ask or

24  left unclear?

25          MS. MATHIAS:  Nothing from our perspective.  Thank

1  you, Your Honor.

2        MR. RUTER:  Nothing, Your Honor.  Thank you very

3  much.

4        THE COURT:  All right.  Mr. Spruill, we have spent

5  some time today talking about the charge and what the

6  government would have to prove if the case were to go to trial.

7  We talked about the sentencing structure, the mandatory

8  minimum, possible maximum, the guidelines, the terms of your

9  plea agreement.  But most importantly, we have talked about all

10  of the rights that you give up by pleading guilty.

11        Is it still your desire to plead guilty to this offense?

12        THE DEFENDANT:  Yes, ma'am.

13        THE COURT:  All right.  I am satisfied that you

14  understand what it means to plead guilty and that your plea is

15  being entered knowingly; you are pleading guilty pursuant to

16  the written plea agreement; there are no improper promises and

17  there have been no threats; and I believe your plea is being

18  entered voluntarily.  I am also satisfied, based on the

19  stipulated facts, that there is an adequate factual basis for

20  the plea.  Accordingly, I accept your plea of guilty.  You are,

21  as of now, adjudged guilty of the fentanyl and heroin portion

22  of Count One in the third superseding indictment.

23        It's my understanding that we have agreed to a sentencing

24  date of January 6th at 11:30?

25        MR. RUTER:  Your Honor, that is correct.

1       Mr. Spruill, Your Honor, is questioning whether or not

2  there would be any time prior to that date given the fact that

3  we do have a "c" plea here in place?

4       THE COURT:  Well, we still need to get the

5  presentence report.  I need to see all of that information.

6  And what we -- let me see.  That's not going to be ready until

7  November 28th, I think.  And then you need a couple of weeks

8  after you see the final -- see that report to give me memos.

9  But we can look.

10      Are you prepared to alter that sentencing date?  Do you

11  have a calendar?

12      MS. MATHIAS:  Absolutely, Your Honor.

13      THE COURT:  An expedited one -- let me see here.  The

14  dates that she's got in this draft are wrong here.

15      Ms. Smith, do you have a draft of an expedited

16  sentencing?

17      THE DEPUTY CLERK:  I'm sorry.  No, Your Honor.

18      THE COURT:  Let me see what those dates are because

19  something is wrong in this form I have here.

20      MR. RUTER:  Your Honor, Mr. Spruill is now kind of

21  encouraging me to not worry about the sentencing date.

22      THE DEFENDANT:  I am not about to stress out about

23  it.  Don't worry about it.

24      THE COURT:  It's okay?

25      THE DEFENDANT:  Yeah.

1          THE COURT:  I mean, I am looking at the calendar, and

2   because, frankly, the trial in this case and a couple of other

3   cases is -- I am looking at -- and the holidays and all of

4   that.  So you are all right with keeping it at January 6th?  If

5   you, you know, in thinking about it, if we go forward, talk to

6   Mr. Ruter, and we will get on the phone and see if we can move

7   it --

8          MR. RUTER:  Thank you, Your Honor.

9          THE COURT: -- if you decide you want to try to do

10  that.

11         THE DEFENDANT:  All right.

12         THE COURT:  But there is still something wrong in

13  this.

14      We are going to set sentencing, and I have signed that

15  order, for January 6th at 11:30 here in this courthouse, in

16  Greenbelt.

17      More importantly, Mr. Spruill, this order asks the

18  probation office to prepare that presentence report.  I

19  understand you have already had a discussion with the probation

20  officer so you could provide some background information.

21      When the draft of the report is ready, Mr. Ruter will

22  review it with you so you can let us know if there is anything

23  inaccurate or incomplete in that report.  Any disputes about

24  the contents of the report will be brought to my attention, and

25  I will decide at the time of sentencing what should or

1  shouldn't be in the report.

2      It is a very important document.  I rely on it quite a

3  lot in making my sentencing decisions.  It is also provided to

4  the Bureau of Prisons so they can decide where someone should

5  serve a sentence and what programs are most appropriate for

6  him.  So I do think it's in your interest that we make the

7  report as complete and accurate as we can, and I urge you to

8  cooperate in the process of preparing that report.

9      Once we have all the information that we need and the

10  proper amount of time available, we will have sentencing

11  currently set for January 6th at 11:30 here in this courthouse.

12      Do you have any questions?

13          THE DEFENDANT:  No.

14          THE COURT:  No?  Okay.  The clerk will also give you

15  the original of the plea agreement in order to change those

16  places and initial them.  By my count, I see one on page 1, one

17  on page 2, the same change, that is the reduction from a

18  kilogram to 100 grams of heroin.  In the statement of facts,

19  the change on page 12, the same change.

20      (Pause.)

21          THE COURT:  All right.  All done?

22          MR. RUTER:  Yes, ma'am.

23          THE COURT:  Okay.  Counsel, obviously, you can get

24  copies of the newly initialled plea letter.  It will be filed

25  and you will get it electronically.

1          MR. RUTER:  Yes, Your Honor.

2          THE COURT:  If that doesn't suffice, let us know and

3    we will get other copies to you.

4        Is there anything further to do in Mr. Spruill's case

5    today?

6          MS. MATHIAS:  No.  Thank you, Your Honor.

7          THE COURT:  Mr. Ruter, anything?

8          MR. RUTER:  No.  Thank you for your thoroughness,

9    Your Honor.

10          THE COURT:  Very good.  Thank you.  That completes

11   this proceeding.

12        (The proceedings were concluded at 12:21 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Renee A. Ewing, an Official Court Reporter

4    for the United States District Court for the District of

5    Maryland, do hereby certify that the foregoing is a true and

6    correct transcript of the stenographically reported proceedings

7    taken on the date and time previously stated in the above

8    matter; that the testimony of witnesses and statements of the

9    parties were correctly recorded in machine shorthand by me and

10   thereafter transcribed under my supervision with computer-aided

11   transcription to the best of my ability; and that I am neither

12   of counsel nor kin to any party in said action, nor interested

13   in the outcome thereof.

14

15                    Renee A  Ewing

16                    _____

17                    Renee A. Ewing, RPR, RMR, CRR
                       Official Court Reporter
18                     May 19, 2023

19

20

21

22

23

24

25