```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                         NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,          )
                                        )
 4            Plaintiff,                )
          vs.                           )
 5                                      ) CRIMINAL NO.:
     JARVIS COLEMAN-FULLER, et al.,     ) 1:20-cr-00038-DKC-7
 6                                      )
              Defendant.                )
 7   _____)

 8
                                       Baltimore, Maryland
 9                                     July 11, 2022
                                       9:30 a.m.
10
                        TRANSCRIPT OF PROCEEDINGS
11                          MOTIONS HEARING
                  BEFORE THE HONORABLE DEBORAH K. CHASANOW
12                           Courtroom 1A

13
     For the Plaintiff:
14
          Christina A. Hoffman, Esquire
15        Joan C. Mathias, Esquire
            Office of the United States Attorney
16          36 S. Charles Street, 4th Floor
            Baltimore, MD 21201
17

18   For Defendant Jeroam E. Nelson, Jr.:

19        Katherine T. Newberger, Esquire
            Office of the Federal Public Defender
20          100 S Charles St., Tower II, 9th floor
            Baltimore, MD 21201
21
     For Defendant Philander A. Spruill:
22
          Gerald C. Ruter, Esquire
23          Law Office of Gerald C. Ruter, PC
            9411 Philadelphia Road, Suite O
24          Baltimore, MD 21237

25          (Computer-aided transcription of stenotype notes)
```

_Patricia G. Mitchell, RMR, CRR  Federal Official Court Reporter_
_101 W. Lombard Street, Fourth Floor_
_Baltimore, MD 21201_

APPEARANCES (Continued)


For Defendant Eric T. Johnson:

        Joseph A. Balter, Esquire
        Law Office of Joseph A. Balter LLC
        1340 Smith Avenue, Suite 200
        Baltimore, MD 21209

For Defendant Jarvis A. Coleman-Fuller:

        Alan R.L. Bussard, Esquire
        Law Office of Alan R.L. Bussard
        304 Wynell Court
        Timonium, MD 21093

1               P R O C E E D I N G S

2       (9:38 a.m.)

3            THE COURT:  Good morning.  Please be seated.  Who's

4   going to do the honors calling the case?

5            MS. HOFFMAN:  Good morning, Your Honor.  This is

6   United States versus Jeroam Nelson, Criminal No. DKC-20-0038.

7   I'm Christina Hoffman on behalf of the United States.  With me

8   here at counsel table is AUSA Cassie Mathias.  We're here for

9   round two of the motions hearing in the case.

10           THE COURT:  Before I turn to the other side of the

11  courtroom, are you speaking directly into the microphone?

12           MS. HOFFMAN:  I thought I was.  Is that better?

13           THE COURT:  A little bit.  Okay, very good.

14           For the defendants, first for Mr. Nelson.

15           MS. NEWBERGER:  Thank you, Your Honor.  Katherine

16  Newberger from the Federal Public Defender's office.  I'm

17  representing Mr. Nelson today at this hearing.

18           THE COURT:  Mr. Balter.

19           MR. BALTER:  Good morning, Your Honor.  Joseph Balter

20  on behalf of Eric Johnson.

21           THE COURT:  Okay.

22           MR. RUTER:  Your Honor, good morning.  Gerald Ruter

23  on behalf of Mr. Spruill.  If I could just have the -- as the

24  Court's aware, Mr. Spruill had requested that his presence be

25  waived this morning.  I had sent correspondence to the Court,

1  and the Court had granted the request that he not be required

2  to be here this morning; hence, he is not here this morning.

3  Thank you, Judge.

4         THE COURT:  Very good.  Let me get everybody on the

5  record first.  Mr. Bussard.

6         MR. BUSSARD:  Good morning, Your Honor.  I will note

7  that I do not have a microphone.  I just noticed.

8         THE COURT:  We'll have to make sure I can hear you.

9  I just heard that so we're good.

10         MR. BUSSARD:  I represent Jarvis Coleman-Fuller who

11  is to my right at the trial table.

12         THE COURT:  Terrific, all right.  We're still

13  laboring under the COVID protocols so we all are wearing masks.

14  Please remain seated when you speak unless you come to the

15  podium.  Please wear your mask even when speaking unless you

16  are fully vaccinated and feel comfortable taking off the mask.

17  We will all try to speak more slowly than we might ordinarily

18  to make sure we can understand and hear each other.

19         We did receive a letter from Mr. Ruter last week

20  indicating that Mr. Spruill had himself requested to be excused

21  from appearing.  After confirming that the Government had no

22  problem with that, I permitted that to happen, contingent on

23  counsel obtaining a signed waiver in due course.  I understand

24  COVID makes it obviously much more difficult to do that.  In

25  looking at the authorities, it's not 100 percent clear whether

1   Rule 43 requires presence, doesn't require presence, allows

2   waiver of presence, but I'm relatively confident that this is

3   the type of hearing at which the defendant need not be present

4   if he voluntarily waives his right.

5           Do counsel wish to put anything else on the record?

6           MR. RUTER:  No.  Thank you, Your Honor.

7           MS. HOFFMAN:  No.  Thank you, Your Honor.

8           THE COURT:  Where to begin?  We have another full

9   banker's box of papers to discuss.  My understanding is there

10  will be no live witnesses with regard to this.  At least that's

11  what I'd assumed, but I have here some exhibits.  I don't even

12  know who they're from.  Is it the Government?

13          THE CLERK:  Your Honor, from Defendant --

14          THE COURT:  Mr. Coleman-Fuller, okay.  It's there on

15  top.  My eyes didn't quite get there.  And some PowerPoint

16  presentation.  I gather that's Mr. Nelson's?

17          MS. NEWBERGER:  That is, Your Honor, and there's one

18  report as Exhibit 2 which I will be referencing but not in

19  great detail.

20          THE COURT:  All right.  At least I recognized some

21  foreign matter sitting here on my bench other than my papers.

22  So we don't have any live witnesses; is that right?

23          MS. HOFFMAN:  No, Your Honor.

24          THE COURT:  Unlike the wiretaps, I have not received

25  any proposal as to how we proceed.  We can simply go in the

 1   order in which you're seated if you wish, but I don't think I

 2   want to hear all of the motions.  I think I want to go back and

 3   forth between whatever the motion is and the Government's

 4   response this morning.

 5           Ms. Newberger, are you ready?

 6           MS. NEWBERGER:  I am, Your Honor.  Thank you.  It

 7   will take me one moment.  Mr. Gurevich, I think I'm plugged in.

 8           We did test this a moment ago, and it was working

 9   fine.  Thank you, Your Honor.

10           Mr. Nelson has several motions that remain pending

11   even after Your Honor's ruling regarding the wiretaps.  In

12   particular, the filings numbered -- docket numbers 236 and 245

13   move to suppress evidence seized from 105 East Hillcrest Road,

14   45 Elgin Boulevard, and a 2018 Impala, as well as the download

15   of an iPhone that was seized from 105 East Hillcrest Road.

16   They also challenge GPS tracking.  These warrants all pertain

17   to -- were executed on September 9, 2019, the day that

18   Mr. Nelson was arrested.  Thus he has been in continuous

19   custody now for 34 months and appreciates the opportunity to be

20   heard on these motions.

21           To be clear, these motions are independent of

22   Mr. Nelson's motions challenging the wiretaps in this case.

23   Certainly we argue they were derivative of those wiretaps but

24   we have an independent basis for the motions that remain,

25   including also motion 237 which challenged the historical cell

1    site information and the warrant on TT-8 and TT-10 which the

2    Court is familiar with from the wiretap motions.

3              While these are independent from the wiretap motions,

4    what our position is is that much like the wiretap motions, the

5    applications involved in these particular motions evidence the

6    same rush to use the most invasive investigatory tactics

7    possible without taking intermediate steps.  For example, these

8    search warrants at issue cut corners by failing to establish

9    the requisite nexus to believe that evidence of the crime being

10   investigated would be found and using overly broad language

11   that failed to establish the items to be seized with

12   particularity and in some, particularly with the seizure of

13   cell phones, amount almost to a general warrant.

14             Can you hear me, Your Honor, with my mask on?

15             THE COURT:  I can.  It's obviously going to be easier

16   if you're comfortable taking it off.

17             MS. NEWBERGER:  That's fine, Your Honor.

18             Also, Your Honor, while obviously the wiretaps

19   provide a substantial amount of evidence in this case, these

20   motions do go to a substantial amount of evidence as well that

21   the Government would use should the case make it to trial.  To

22   aid the discussion of these motions, Ms. Francik had prepared

23   this PowerPoint presentation.  She wishes she could be here

24   today, but happily she gave birth to her daughter a week ago

25   and cannot be with us.

1          Your Honor, the road map for this presentation is

2    very similar to the presentation we gave regarding the

3    wiretaps.  I'm going to just outline the overview of what

4    evidence is at issue in terms of these motions, the applicable

5    law that provides the framework for the motions, and then I'll

6    discuss the problems with the warrant to search 105 East

7    Hillcrest Road; more particularly the seizure and wholesale

8    search of the iPhone found inside 105 East Hillcrest Road, the

9    warrant to search 45 Elgin Boulevard, the warrant to search the

10   2018 Chevy Impala, the GPS tracker on the Impala, and then the

11   warrants to obtain real-time cell site data for TT-8 and TT-10.

12         Your Honor, in terms of the evidence to be

13   suppressed, there is a substantial amount of evidence at issue

14   from these motions.  When the warrants were executed on

15   September 9, 2019 at 105 Hillcrest Road, which was Mr. Nelson's

16   mother's house, the law enforcement officers seized men's

17   clothing, Mr. Nelson's wallet and mail addressed to him, a

18   knotted bag containing suspected heroin/fentanyl mixture, a

19   brick-shaped package which contained a suspected heroin/

20   fentanyl mixture, more knotted plastic bags of suspected

21   fentanyl and heroin, digital scales, ammunition, kilogram

22   press, FoodSaver, four cell phones and the keys to the 2018

23   Chevy Impala.  There is a substantial amount at stake in terms

24   of these motions.

25         As to the cell phone, Your Honor, the iPhone, one of

1   the four cell phones that was seized from 105 East Hillcrest

2   Road, there was a wholesale forensic download of that phone

3   which, in terms of discovery, amounts to a more than 3,000-page

4   PDF document including call logs, text messages, message from

5   the WhatsApp application, and even time stamps as to every time

6   the phone screen turned on and off.  So that is a very invasive

7   search.

8               THE COURT:  Tell me those again.  You say the call

9   log?

10              MS. NEWBERGER:  Yes, Your Honor.  The forensic

11   download includes call logs, text messages, messages from the

12   WhatsApp application, time stamps as to every time the phone

13   screen turned on and off.  Your Honor, I believe there's even

14   more than that.  It's a more than 3,000-page PDF document.

15              THE COURT:  Which of those items would have been

16   available in other formats or already had been if there was a

17   wiretap?

18              MS. NEWBERGER:  Your Honor, it's interesting.

19   Certainly it would seem that the Government already had access

20   to the equivalent of call logs in terms of they should have

21   known the phone numbers calling in and the phone numbers going

22   out.  I don't believe wiretaps would have gotten to the text

23   messages -- I'm not entirely sure whether -- how the text

24   messages would be captured by the wiretap.

25              THE COURT:  We certainly saw some in the wiretaps.

1          MS. NEWBERGER:  There were.

2          THE COURT:  During the time that phone was actively

3    being monitored --

4          MS. NEWBERGER:  Yeah, there is reference to a couple

5    of text messages.  And I don't believe that they had access to

6    the apps that were on the phone and were being utilized and the

7    overall data on the phone's usage.  After the presentation, I

8    can look and see what other enumerated things.  I will say when

9    given to us in a PDF format, it's much more difficult for us to

10   maneuver than when it's given in the native format, which is

11   how the Government has it, which is as a Cellebrite download

12   which is a much easier way to ascertain exactly what data was

13   retrieved from the phone.

14         THE COURT:  You proffered that it was a wholesale

15   forensic --

16         MS. NEWBERGER:  As best we can tell, it is.  As best

17   we can tell, it is.  It's 3,000 pages.  When we have the PDF

18   and we don't have the Cellebrite and we don't have access to

19   the phone itself, I can't say to the Court with 100 percent

20   certainty that they downloaded every single thing on the phone.

21   But from the reports that we have and from the PDF, it does

22   seem like they did a full download of the phone.

23         THE COURT:  But it doesn't have, for instance, search

24   history on the internet or photographs?  I understand it's

25   still a lot, but there's a lot more on the phone.

1          MS. NEWBERGER:  Your Honor, if I can look at that,

2    and I will get back to the Court later in this hearing about

3    whether there are all the photographs and other data from the

4    phone.

5          Just to be clear, Your Honor, the search of that

6    phone was pursuant to the warrant for the house.  There was not

7    a separate warrant for the search of the phone.

8          THE COURT:  I understand that.  Which -- let me

9    just... that's your Exhibit B?

10         MS. NEWBERGER:  Exhibit B evidences that the DEA

11   participated in the execution of the search warrant and that

12   they -- in early October, one of the DEA agents who's on the

13   task force was looking through the forensic download of the

14   phone and identified something in the WhatsApp application of

15   particular interest.

16         I don't know if that answers the Court's question.

17         THE COURT:  The search warrant you're talking about

18   that authorized this download --

19         MS. NEWBERGER:  I apologize.

20         THE COURT:  -- is Exhibit B, the Hillcrest Road --

21         MS. NEWBERGER:  That is correct, Your Honor, I'm

22   sorry.  I thought I was going back to the exhibit list for

23   today.  That's correct.

24         THE COURT:  And what, if any, limiting principles do

25   you think applied to the search of the iPhone?

1           MS. NEWBERGER:  I don't think this set out any

2     limiting principles.

3           THE COURT:  Well, was it limited to a search for the

4     property that's identified:  Controlled substances,

5     paraphernalia, documents showing financial records,

6     documentation of drug transactions, members of the illegal drug

7     organization, weapons, ammunition?  It does list electronic

8     devices and money.  Wouldn't that limit what they could search

9     for any place under the warrant?

10          MS. NEWBERGER:  Your Honor, it does but -- so the way

11    that this warrant is worded is that it says you can search --

12    well, first of all, the warrant itself, which is -- so I think

13    what Your Honor was referring to was the affidavit in support

14    of the warrant.

15          THE COURT:  No, that's actually the warrant, first

16    page of Exhibit B is what I was reading from.  That says

17    there's probable cause to believe these items are being

18    concealed.  The phone itself can be of evidentiary value, but

19    then if this authorized the search of the phone itself, it

20    would be limited by the crimes that are being investigated and

21    the evidence that the warrant authorizes a search for.

22          MS. NEWBERGER:  Your Honor, that may be -- while

23    there is... I am not sure that we're looking at the same page.

24    Are you looking at what is Bates stamped at the bottom 1509?

25          THE COURT:  Yes.

1          MS. NEWBERGER:  Okay.

2          THE COURT:  It's the third from the last.  It says,

3   "I am satisfied" --

4          MS. NEWBERGER:  Right.  Attached here to -- Your

5   Honor, I don't think that -- I don't know, first of all, that

6   that actually is really limiting in terms of what the language

7   is.  The language is to seize and search all evidence,

8   including electronic devices such as cellular telephones.  It

9   maybe narrows but if you refer back to what it is that there's

10  probable cause for, but it doesn't say that in what they're

11  authorized to search, and I think when you look at the forensic

12  download of the phone, they are downloading the complete phone.

13  They are not searching only for those things in searching and

14  seizing only those things.

15          So I think in practicality what they're doing when

16  doing a forensic download of the phone is they are seizing and

17  searching everything in the phone.

18          THE COURT:  Well, there's a difference between

19  seizing and searching and searching and then seizing.  Some of

20  the cases analogize the cell phone to a huge filing cabinet,

21  and if you have a warrant that says you can search for a

22  particular type of evidence -- financial, for instance --

23  you're going to look at every piece of paper that's in the

24  filing cabinet.  You're authorized to do that because until you

25  see what's on the piece of paper, you don't know if it's

1    evidence or not.  Then once you've identified whether it's

2    evidence or not, you can seize it and keep it, but you do look

3    at everything.

4         So we go from search to seize, in this case the phone

5    because the phone itself could be evidence.  And then the

6    search of the phone which means you can look at everything at

7    least briefly or at least maybe look at everything briefly to

8    determine whether it is of evidentiary value.  So we've got to

9    take it each step.

10        MS. NEWBERGER:  Right, Your Honor.  I absolutely

11   agree with you in terms of what we're dealing with in this case

12   is a search, a seizure, and another search --

13        THE COURT:  And another seizure.

14        MS. NEWBERGER:  And another seizure.  But I think

15   problematically, in effect -- there are many differences to a

16   file cabinet.  And I think that there are opinions that sort

17   of, particularly when we were dealing with computers before

18   cell phones, they were trying to draw the analogy to a file

19   cabinet.  I think *Riley* suggests that you know what, actually,

20   this is even more invasive than a file cabinet because it

21   contains more information and more integrated information that

22   tells a lot more about a person's life than usually what a file

23   cabinet would.

24        But one of the differences, Your Honor, is you look

25   through the file cabinet, and you pick out the documents and

 1   put the rest away; that's not really what happened here.  They

 2   seized everything in the phone.  And so this is a very

 3   different circumstance than a file cabinet, although, candidly,

 4   I do have a recent fraud case where they seized every file

 5   cabinet and brought it to the customs house.  But it is, Your

 6   Honor, one of the very, very thorny, thorny, difficult issues

 7   that we are now dealing with in terms of smartphones.  We were

 8   dealing with it with computers, but smartphones take it to the

 9   next level because of all of the applications, because of the

10   fact that they are with us almost constantly, the fact that

11   probably all of the lawyers, at least, have one sitting in our

12   bag or in our pocket right now.

13          The result is that it is complicated but, Your Honor,

14   one of the reasons that I think that this is particularly

15   disturbing what happened here is that in the majority of my

16   cases that I have had in federal court, there is either the

17   upfront warrant that authorizes the search of the home and the

18   seizure of electronic devices, including cell phones, and then

19   authorizes a search of those devices, is far more

20   particularized and makes sure to establish the probable cause

21   to justify the search of the devices that are seized in a

22   degree that we don't see here.

23          And in other cases in which there is a cell phone

24   that is lawfully seized, we see federal agents getting a

25   subsequent warrant, a showing of probable cause to ultimately

1     search the device; what their probable cause is to engage in

2     the search, whether it's a wholesale search or it's a more

3     targeted search.  And to be clear, oftentimes they're searching

4     for search terms or other things.  There are ways they can do

5     this in a more tailored way.

6                    THE COURT:  Let's compartmentalize not just whether

7     it's a search or a seizure, but what you type -- probable

8     cause, in the warrant -- in the affidavit, rather, in support

9     of the warrant, it talks about cell phones, what use they

10    already had some evidence of.  And it says on USA 1525:  Based

11    upon the affiant's training and experience, narcotics

12    traffickers often utilize electronic equipment such as cellular

13    telephones to generate, transfer, account, record and/or store

14    the information described above in items A, C, D, E and G.

15    That is assets, financial information, books, records,

16    receipts, ledgers, transfer of funds, locations, and again the

17    laundry list of other items.

18                    So we have at least some attempt to describe what

19    could be contained in the phone, correct?

20                    MS. NEWBERGER:  Yes.

21                    THE COURT:  And based upon the expertise and the

22    facts of this investigation.  So what else would you be looking

23    for for probable cause at least for some of the contents of the

24    phone?

25                    MS. NEWBERGER:  So, Your Honor, and I think what

1    is -- what we would be seeking, and I think the *Griffith* case

2    is helpful here although that deals with the initial seizure

3    more than the subsequent search of the phone -- is this amounts

4    in our view to basically saying, "We have reason to believe

5    that Jeroam Nelson is a drug dealer, we have reason to believe

6    Jeroam Nelson has a cell phone.  Therefore, we should be able

7    to seize and search his cell phone."  And that we require more

8    than that.

9          Your Honor made a sort of interesting point which

10   was, well, they already had the wiretap on the phone; they were

11   getting the call information, it seems that they get the text

12   information.  And this goes back to sort of the broader, the

13   broader issue that we have raised in this case which it is, you

14   know, law enforcement basically is just saying, "Let's engage

15   in the most invasive investigatory tactics possible.  We want

16   to know absolutely everything about Jeroam Nelson."

17          I do believe when we look from -- take a more macro

18   perspective about the investigation about law enforcement, that

19   they could have seized the cell phone -- to be clear, we're

20   actually challenging the seizure of the cell phone also under

21   *Griffith* but even if they had lawfully seized the cell phone,

22   there's nothing --

23          THE COURT:  You think there wasn't probable cause in

24   this case to seize the cell phones allegedly used by the people

25   they had probable cause to believe were dealing?

1         MS. NEWBERGER:  Your Honor, that's not what the

2    warrant authorized.  The warrant authorized them to seize every

3    single cell phone no matter who it belonged to and that is, in

4    fact, what they did.  They knew they were not going to

5    Mr. Nelson's residence.  The affidavit indicated that they knew

6    that he -- that the transcribed conversations that are in that

7    particular application note that on the first call, Mr. Nelson

8    is waking up and he isn't at this address, he is elsewhere.

9    And another call he refers to his mama's house versus his

10   house.  They don't even establish in the search warrant

11   application that he is going to be home at the time that they

12   execute the warrant.

13        THE COURT:  So which cell phones were seized at

14   Hillcrest?

15        MS. NEWBERGER:  There were four at issue -- the

16   Government concedes that.  What the Government's response is,

17   "Well, we're not going to use three of them," because

18   presumably they have no connection to Mr. Nelson.  But they

19   were seized.

20        THE COURT:  Okay.  And you think that invalidates the

21   seizure of the one that is specifically referred to?

22        MS. NEWBERGER:  Yes, yes.  Your Honor, turning to the

23   law that applies here because I think that this is -- this is

24   where it gets a little bit murky.  The Fourth Amendment, the

25   particularity requirement is in the Fourth Amendment itself.

1    It says that "The right of the people to be secure in their

2    persons, houses, papers, and effects, against unreasonable

3    searches and seizures shall not be violated, and no warrants

4    shall issue but upon probable cause supported by oath or

5    affirmation and particularly describing the place to be

6    searched and the persons or things to be seized."

7            What we look at is we look at the four corners of the

8    warrant, and the question is not whether or not law enforcement

9    set forth probable cause to believe that Jeroam Nelson was a

10   drug dealer.  They have to establish a nexus to the place to be

11   searched and make sure that the things to be seized are

12   reasonably related to that probable cause.  Your Honor, that is

13   the overarching issue that we have here.

14           Probable cause mandates reasonably trustworthy facts

15   which, given the totality of the circumstances, are sufficient

16   to lead a prudent person to believe that the items sought by

17   the warrant constitute fruits in instrumentalities or evidence

18   of crime and will be present at the time and place.

19           It also requires that law enforcement doesn't just

20   provide bare conclusions but that they actually provide some

21   factual support for those conclusions so the magistrate judge

22   can make an independent determination as to probable cause.

23   Your Honor, I think there's a passage in *Griffith* that really

24   sort of explains what we think the issue is here.  And quoting

25   from *United States v. Griffith*, 867 F.3d 1265 at 1271, and

 1   that's a D.C. Circuit case from 2017:  To obtain a warrant to

 2   search for it and seize a suspect's possessions or property,

 3   the government must do more than show probable cause to arrest

 4   him.  An arrest warrant rests on probable cause to believe that

 5   the suspect committed an offense.  A search warrant, by

 6   contrast, is grounded in probable cause to believe that the

 7   legitimate object of a search is located in a particular place.

 8   Regardless of whether an individual is validly suspected of

 9   committing a crime, an application for a search warrant

10   concerning his property or possessions must demonstrate cause

11   to believe that evidence is likely to be found at the place to

12   be searched.  Moreover, there must, of course, be a nexus

13   between the item to be seized and the criminal behavior.

14          That nexus is met when the warrant application

15   establishes reasonable cause to believe that the specific

16   things to be searched for and seized are located on the

17   property that law enforcement is seeking authorization to

18   search.  So nexus is the probable cause to believe the place to

19   be searched will have the things there's probable cause to

20   believe are evidence of criminality.

21          And that's really the distinction here.  When we're

22   talking about breadth, breadth of the things to be seized must

23   be limited to what there's probable cause to believe is

24   evidence of a crime.  Overbreadth occurs when the authorized

25   search warrant is broader than the probable cause on which it

1    is based.  And as Judge Chuang explained in the *Lyles* case

2    which is a November 20, 2017 decision at 2017 Westlaw 5633093:

3    The Fourth Amendment requires that a warrant be no broader than

4    the probable cause on which it is based.  A warrant that uses

5    general terms to describe the object of the search raises the

6    possibility that there does not exist a showing of probable

7    cause to justify a search for them.

8              Then when we get to particularity, the particularity

9    required is focused as well on the officer executing the

10   warrant and ensures that the search will be carefully tailored

11   to its justifications rather than becoming a wide-ranging

12   exploratory search of the kind the framers intended to

13   prohibit.  And that is *United States v. Cobb* which the

14   Government cited, 970 F.3d 319, page 326, Fourth Circuit,

15   2020.

16             So, Your Honor, that is really what our focus is.

17   The Government has focused on, well, there was probable cause

18   to believe that Jeroam Nelson was engaged in drug trafficking.

19   What we're focusing on is the nexus breadth and particularity

20   requirements regarding the searches of these specific spaces

21   and the seizure of specific things.  So, Your Honor, I think

22   that's important.  Our motions are more nuanced than sort of

23   just a question of is there probable cause to believe that

24   Jeroam Nelson was engaged in illegal activity.

25             In terms of remedy, Your Honor, we're obviously

1  asking for suppression.  I do think suppression, what we often

2  forget is that the purpose of the exclusionary rule is to send

3  a message to law enforcement about what they can and cannot do,

4  and I do think when we're talking about cell phones, it really

5  is important, Your Honor, for the Court to give meaningful

6  guidance and to send clear messages to law enforcement as to

7  what is appropriate.

8          The Government relies on the severance doctrine under

9  citing *United States v. Cobb*.  I don't know that they actually

10 use the word severance, but they cite to *Cobb* and that

11 particular part of the opinion.  I'll get to a discussion of

12 why we don't think that that applies in this case, but the

13 severance -- *Cobb* explains that under the severance doctrine,

14 the constitutionality infirm portion of a warrant, usually for

15 lack of particularity or probable cause, is separated from the

16 remainder and evidence seized pursuant to that portion is

17 suppressed, and evidence seized under the valid portion may be

18 admitted.

19         You can't parse this warrant that way in terms of

20 what happened in *Cobb*.  So, Your Honor, we don't think that

21 severance is --

22         THE COURT:  Why can't we?

23         MS. NEWBERGER:  Your Honor, we can't because what was

24 at issue in *Cobb* was the Court found that they had set forth

25 probable cause to explain why they needed to seize a computer

1   from the residence and search that computer for evidence, the

2   animus or other evidence suggesting why a murder occurred.  At

3   the very end of the warrant, it basically had a catchall

4   provision that you can seize anything related to criminal

5   conduct or some type of very broad language.

6           The Fourth Circuit said, look, nothing was seized

7   pursuant to that very broad language; we agree it's overbroad,

8   but nothing was seized pursuant to that language.  What was

9   seized was pursuant to the particularized showing of probable

10  cause and that there was a particular computer that they sought

11  to search.  So this catchall provision "any and all evidence of

12  any other crimes," which is overbroad, is not the basis on

13  which the evidence was searched.

14          What we are talking about here is that language that

15  we discussed earlier, which is page 1,509 in Exhibit 1 to the

16  motion 245 which is challenging the search of the iPhone.  And

17  it has a blanket seize and search all evidence, paraphernalia,

18  documents, weapons, ammunition, controlled dangerous

19  substances, electronic devices such as cellular telephones and

20  the data stored in them.  So you can't -- the cell phone was

21  seized and searched specifically pursuant to the language that

22  we say is overbroad --

23          THE COURT:  Are you focusing just on the phone?  The

24  controlled substances that were seized, is that not proper if

25  they found it?

1          MS. NEWBERGER:  Your Honor --

2          THE COURT:  If the warrant, if the affidavit

3   established a nexus to believe that controlled substances would

4   be found in that residence.

5          MS. NEWBERGER:  Yes, Your Honor.  That would be fine

6   because it's contraband and it's clearly related.  The problem

7   is -- and *Griffith* talks about this -- all electronic devices,

8   including cell phones, is not inherently contraband.

9          THE COURT:  But you said that this warrant couldn't

10  be parsed in any way and I'm questioning that assertion.

11         MS. NEWBERGER:  I'm sorry, Your Honor.  Let me

12  fine-tune what I'm saying.  What I am saying is what we are

13  arguing in terms of the iPhone is that even if Your Honor

14  finds -- I think it's helpful to look at our motions in sort

15  of, a sort of chronological analysis.  The first step is we are

16  challenging whether or not the search warrant for 105 East

17  Hillcrest Road established probable cause to tie, to believe

18  that contraband would be found in 105 East Hillcrest Road.

19  That we don't think that the probable cause offered provided a

20  sufficient nexus to the property to have searched there.

21         So as a first argument, we're saying that all of the

22  evidence in the house, including the contraband and the iPhone,

23  has to be suppressed because they did not establish a nexus to

24  that residence.

25         But separate and apart from that argument -- and I

1   don't believe that the Government raised severance in that.

2   They're arguing that there was a nexus and so the search is --

3            THE COURT:  They have to, right.  You can't get

4   inside without a nexus.

5            MS. NEWBERGER:  Right.  So the second argument is

6   even if Your Honor thinks that there was a sufficient nexus to

7   getting the door of 105 East Hillcrest Road lawfully, we're

8   still challenging -- and that's why a separate motion -- we are

9   still challenging the seizure and search of the phones, the

10  search of the iPhone.  In that it raises two distinct

11  arguments.

12           The first argument is a *Griffith* argument which is

13  that the language is overbroad.  It authorizes the seizure of

14  any electronic device or cell phone in the house without even

15  establishing that Mr. Nelson would be at the house at the time,

16  that any of his cell phones would be kept at the house, and

17  that it was overbroad.  And under *Griffith*, you stop there,

18  that the seizure of the cell phone was unlawful.

19           So even if Your Honor denied motion 236 and said, I

20  think it's fine that they got into the house, what we're

21  arguing in motion 245 is that Your Honor should find that the

22  language that authorized the seizure of all the cell phones and

23  electronic devices in the house was overbroad and so that

24  evidence must be suppressed.

25           But we also have a third argument -- or it's the

1    second argument in 245.  And that is even if Your Honor says

2    it's okay that they seized all of the electronic devices,

3    including the iPhone, in the home, that they didn't have

4    sufficient particularity to do the wholesale download of the

5    cell phone, the iPhone -- which they did; and that they should

6    have obtained, once they lawfully seized the cell phone, they

7    should have -- maybe they could have done some cursory

8    determination, "Okay, of these four cell phones, this is the

9    one we think belongs to Mr. Nelson," but that they should have

10   stopped and they should have gotten a subsequent warrant to

11   authorize a search of that iPhone.

12           And so when I talk about -- when we talk about

13   severance, severance really doesn't pertain to this first

14   question of can they enter 105 East Hillcrest Road.  It really

15   goes to the question of whether or not the language pursuant to

16   which all the electronic devices and cell phones are seized was

17   overbroad or whether you can sever out the seizure, the

18   overbroad language, and save the seizure of the cell phone.

19   That's what severance goes to.

20           THE COURT:  There are many items other than the

21   phones listed in the inventory: cocaine, a lease agreement, a

22   kilogram of suspected heroin, a Western Union receipt, knotted

23   plastic bag containing suspected fentanyl, six digital scales,

24   knotted plastic bag containing again fentanyl, bag of black

25   rubber bands, Jeroam Nelson's wallet, miscellaneous paperwork,

1   box of ammunition, a drug press, two blenders, and a heat

2   sealer.  Those rise or fall simply by nexus, that first

3   argument?

4           MS. NEWBERGER:  Yes.

5           THE COURT:  And it's iPhones only that you're making

6   this other argument.

7           MS. NEWBERGER:  Yes.

8           THE COURT:  Even if the iPhones were improperly

9   seized and/or searched, it will not invalidate all those -- the

10   use of the other items.

11           MS. NEWBERGER:  That's right, Your Honor.

12           So, Your Honor, regarding that very first threshold

13   issue of whether or not they had a valid search warrant to

14   enter 105 East Hillcrest Road, again, this argument is focused

15   on nexus.

16           The affidavit includes conclusory statements about

17   the investigation and particular personalities rather than the

18   information from which a neutral magistrate can form his own

19   conclusions.  For example, it says:  Law enforcement identified

20   Mr. Nelson as the leader of a DTO, a multiounce supplier of

21   fentanyl in Washington County, and Mr. Coleman-Fuller as a

22   street-level dealer supplied by Mr. Nelson but didn't offer the

23   factual support for those conclusions, and the assertions are

24   not supported by the two instances of the interceptions and

25   surveillance that they detail in the affidavit.

1    So we do think that there's this problem that rather

2 than explain why they have come to the conclusion that

3 Mr. Nelson is a multiounce supplier of fentanyl in Washington

4 County, they just sort of assert he is, and here are two

5 conversations.  To be clear, the scope of the search is quite

6 substantial, as Your Honor read the text of the warrant itself;

7 it's authorizing a search and seizure of a lot in terms of what

8 it actually sets out.

9    What we believe, Your Honor, and we feel strongly is

10 that there was a lack of nexus.  The Fourth Amendment demands

11 probable cause to believe that evidence of Mr. Nelson's drug

12 activity would be found in his mother's house and not merely

13 that Mr. Nelson, who had visited his mother's house, was

14 engaged in drug activity.  From our perspective, what this

15 shows is they're saying Mr. Nelson is a drug dealer; there are

16 two instances in which in proximity to conversations with

17 Jarvis Coleman-Fuller, he stopped at his mother's house on one

18 occasion, and Mr. Coleman-Fuller came to his mother's house.

19    That's not enough.  Again, while that may have been

20 sufficient for an arrest warrant, it's not sufficient for a

21 search warrant of 105 East Hillcrest Road.  At most, the

22 affidavit suggests that Mr. Nelson stopped twice at his

23 mother's house before or during a suspected drug transaction

24 with Coleman-Fuller on August 29 and September 6, but it

25 doesn't establish probable cause to believe that on September 9

1    of 2019 when the warrant was executed at 4:54 a.m., that there

2    would be contraband or other evidence there.

3            It doesn't establish that he lives there or even that

4    he sleeps there.  Indeed, the August 29 call makes clear that

5    he was sleeping elsewhere.  The affidavit does not include any

6    observations suggesting he went to his mother's house with a

7    package or left the house with one on August 29.  It doesn't

8    include evidence that Mr. Nelson had traveled out of state and

9    brought something to his mother's house.

10           There are no observations as Mr. Coleman-Fuller came

11   and left 105 East Hillcrest Road to suggest he came without

12   something and left with something, a bag.  Indeed, the calls

13   even suggest that Mr. Coleman-Fuller did not assume that he was

14   even meeting Mr. Nelson at 105 East Hillcrest Road, that he was

15   expecting to meet Mr. Nelson elsewhere.

16           So what this warrant presumably is trying to do is

17   search this house because they're trying to assert, "We believe

18   that drug contraband is going to be stored there.  We believe

19   his electronic devices are going to be stored there," but they

20   haven't established the probable cause to believe that anything

21   is going to be found at his mother's house on September 9 of

22   2019.  And, Your Honor, this is the crux of the issue is this

23   issue of nexus and not the question of is there evidence to

24   believe that he sells drugs.

25           Your Honor, the warrant is also overbroad in the

1  sense that it's describing the places to be searched and the

2  items to be seized in a pretty indiscriminate way, and it

3  pretty much allows the search of anything or anyone in the

4  home, but it doesn't establish that anyone else connected to

5  the home is also connected to the illegal activity, although

6  they do seem to know that someone else lives there, at least in

7  terms of the statements that are transcribed.  They don't

8  establish that he stores anything there or would have evidence

9  of the drug dealing.  It doesn't notably -- we'll talk about

10 this a little bit more when we focus on the warrant for the

11 cell phone itself, but it doesn't even establish that he would

12 keep cell phones or computers or anything else there.

13         So, Your Honor, we think that the evidence that was

14 seized from 105 East Hillcrest Road should be suppressed

15 because that warrant lacks nexus, they have not established the

16 probable cause to believe that evidence of the illegal activity

17 are going to be found at that residence.  And so if Your Honor

18 agrees with that, then everything in that inventory, including

19 the cell phones, are seized -- excuse me, are suppressed.  Even

20 if Your Honor denied that motion and said, "I do believe that

21 they had sufficiently established nexus to search 105 East

22 Hillcrest Road," we then have the suppression motion which is

23 the motion to suppress cell phone and derivative evidence,

24 motion 245.  And that is a slightly different, more nuanced

25 argument than the more general critique of the 105 East

1    Hillcrest warrant.

2             The iPhone was seized on September 9 in searching

3    Hillcrest Road and, Your Honor, Exhibit 2 that I provided to

4    the Court is a DEA-6 report that shows that on or about

5    October 2, 2019, so less than a month after the seizure of the

6    phone, that a download of the phone was reviewed by TFO Mills.

7    I believe since he's filling out a DEA-6 that he is, that there

8    is DEA federal agency involvement.  So I just want to be clear

9    that this is, this is a situation in which time passes.  There

10   is no reason why they couldn't have stopped and gotten a

11   subsequent warrant.  That's not what they did.

12            Your Honor, in *United States v. Griffith* the D.C.

13   Circuit --

14            THE COURT:  I'm sorry, I'm not following.  The search

15   was on the 9th as well.  They seized the phone --

16            MS. NEWBERGER:  They seized the phone, yes.

17            THE COURT:  And what do you think Exhibit 2 shows?

18            MS. NEWBERGER:  Exhibit 2 shows two things.  One, it

19   just shows the DEA involvement in this investigation --

20            THE COURT:  It's a task force --

21            MS. NEWBERGER:  Yes, a task force.  The point being

22   that, frankly, in my opinion, Your Honor, they know better.

23   Second, Your Honor, what I think it also shows is TFO Mills is

24   looking through the download of the phone on October 2 of 2019

25   which is about three weeks later --

1          THE COURT:  You get that from Exhibit 2?

2          MS. NEWBERGER:  Yes.  If you look, Your Honor -- I

3    apologize, Your Honor.  I am referring to a different report,

4    not this one.  I apologize.  This one establishes that their

5    involvement, the DEA involvement and execution of the search

6    warrant for September 9.  There's another report that just

7    talks about the search of the forensic download of the phone.

8    But I don't think, Your Honor, there's really any question that

9    that happened.  At least the Government in their response did

10   not say no, it didn't happen the way that they think it

11   happened from discovery.  There's no really factual debate

12   about what happened with regards to this particular iPhone.

13          Your Honor, in *United States v. Griffith*, which is

14   the D.C. Circuit, that figures prominently in this particular

15   motion.  The D.C. Circuit considered a similar circumstance in

16   which law enforcement seized the defendant's cell phone

17   pursuant to a warrant that authorized seizures of all cell

18   phones in the premises.  The D.C. Circuit ruled that the

19   warrant was overbroad, authorized unwarranted intrusions by

20   failing to supply probable cause to seize every electronic

21   device, including every cell phone found in the residence

22   without any limiting principles.

23          THE COURT:  Do you have a case that would have

24   applied to the agents in Hagerstown as of September of 2019

25   that said the same thing?

1          MS. NEWBERGER:  Well, *Griffith* is 2017.  I know it's

2    a D.C. Circuit case.  Your Honor, I don't have a Fourth Circuit

3    case --

4          THE COURT:  Obviously you see what I'm getting at

5    which is potential good faith.

6          MS. NEWBERGER:  I understand that, Your Honor, except

7    for -- this is really why I focus on the DEA involvement.

8    Since *Riley*, what we have been seeing in the vast majority of

9    cases is even when a cell phone is lawfully seized, that the

10   law enforcement goes and gets a subsequent search warrant so

11   that goes to the second argument.  But even as to the first

12   argument, Your Honor, there's always been a nexus requirement.

13   There's always been a particularity requirement.  It's always

14   been the case that these warrants can't be overly broad.

15          To say that you can seize every cell phone, every

16   electronic device in a residence irregardless of who it belongs

17   to, whether or not you know that there are actually going to be

18   those devices in the home that belong to the person who is the

19   target of your search, Your Honor, while I see your point that

20   *Griffith*, we are relying on a D.C. Circuit case that lays this

21   out, this is not a big stretch from the clear principle --

22          THE COURT:  As I tell my law clerks, some here in the

23   Fourth Circuit, if you can't find something for what you

24   consider to be fundamental law, black letter law that everybody

25   should have known about, you can't find it here, I guess I have

1    to question your premise.  There's a disconnect.  You don't go

2    out of circuit for something that's fundamental.

3              MS. NEWBERGER:  Your Honor, so here's the problem.

4    The converse could be true as well which is everyone is doing

5    it correctly, so there aren't motions that are challenging this

6    that are getting up to the Fourth Circuit to be decided.

7              THE COURT:  Well, except you have to acknowledge

8    since *Riley* and focusing more on what cell phones actually are,

9    we are developing this.  Just like you say, it has to be

10   nuanced as to your argument on the merits; I think we have to

11   be nuanced on good faith as well.

12             MS. NEWBERGER:  Your Honor, I hear what Your Honor is

13   saying except for I think the problem is that when you have an

14   investigation that is done in the way that this investigation

15   has been done which is that you seize every -- you know, which

16   is the point that we were making with the wiretap motions in

17   which you basically see law enforcement using the most

18   aggressive tactics possible, not including in their warrants

19   everything that they know, sort of oddly picking and choosing

20   what they're going to disclose to the magistrate.  Not

21   everything is going to the same judge.  Not every affiant is

22   the same.  And you're seeing this sloppiness, you're seeing

23   this rush, you're seeing this reliance on the most aggressive

24   tactics possible.  And some of them are entirely duplicative in

25   terms of some of the pertinent information that they were

1    seizing but otherwise allows them to be incredibly invasive

2    into people's personal lives.

3              That this is a type of situation in which I do think

4    the exclusionary rule is important, and, frankly, this is the

5    kind of case in which the exclusionary rule has the benefit for

6    the Government that they have a substantial amount of evidence

7    which Your Honor has already said is not going to be

8    suppressed.  But I do think this is an opportunity to send a

9    clear message as to what the requirements are when you are

10   dealing with cell phones.

11             So I hear what Your Honor is saying about good faith,

12   but I also think this is a particular case when you look at how

13   this investigation was done, when you look at what is at stake,

14   that this is a situation which the exclusionary rule is an

15   appropriate remedy to set a clear bright line on the way that

16   they should be doing things.

17             You know, I attached Exhibit 2 because I did want to

18   make the point that the DEA was involved.  They had resources

19   available to them to determine what was the best way to do

20   this.  They didn't do it.  And, you know, that's what the

21   exclusionary rule is for is to send the message you don't cut

22   corners in this way, you don't cut corners when it pertains to

23   these fundamental principles regarding the Fourth Amendment.

24             Your Honor, going back to the *Griffith* case and just

25   what the analysis there, we do recognize that while in *Griffith*

1   the warrant failed on two fronts; first it failed to establish

2   that Mr. *Griffith* had a cell phone, and then second that the

3   cell phone would be on the premises at the time of the search.

4   Here we're really focusing on that second part.  We're not

5   arguing that the warrant fails to give probable cause to

6   believe that Mr. Nelson has a cell phone --

7              THE COURT:  Not in this case --

8              MS. NEWBERGER:  Yes, there is a wiretap.  But still,

9   Your Honor, it goes to this nexus issue which is is there

10  reason to believe that the cell phone is going to be there.

11  What *Griffith* recognizes -- and this goes back to *Riley*, Your

12  Honor -- is that considering the ubiquity of cell phones, the

13  assumption that most people have a cell phone is appropriate,

14  and we know that Mr. Nelson has a cell phone based on the

15  wiretap.  But still you have to show a nexus to believe that

16  the cell phone is going to be in the place to be searched and

17  that you're only allowing the seizure of that cell phone and

18  that is not what happened here.  Because they're authorizing

19  the seizure of every electronic device and cell phone in the

20  residence and, in fact, they seized every cell phone in the

21  residence.

22             And, Your Honor, this overlaps a little bit with the

23  nexus analysis from the prior motion because, again -- because

24  the affidavit just describes two instances at which Mr. Nelson

25  goes to the residence in connection with communications with

1    Mr. Coleman-Fuller; it establishes that he sleeps elsewhere,

2    that it is his mother's house.  So there really has not

3    established a reason to believe that his cell phone will even

4    be there to sort of authorize that search for that and seizure

5    of the cell phones that are in the home.

6            Your Honor, this is -- the reason why again we talked

7    about this before but why *Cobb* doesn't say this is that we're

8    challenging the very language by which the cell phone was

9    seized.  The Government doesn't argue that there was some other

10   provision under which the cell phone was seized.  So the

11   overbreadth language is that language that we have quoted from

12   the warrant authorizing the law enforcement to seize --

13           THE COURT:  Let me ask you this.  The Government

14   hasn't made this argument but if they hadn't included cell

15   phones in the warrant for Mr. Nelson's mother's house, if they

16   hadn't -- because you think they had no probable cause to

17   believe they'd find that evidentiary item there -- and they're

18   searching for contraband and that means you can look in lots of

19   different places, and they see a cell phone that they can -- it

20   says "Jeroam Nelson" on it, can they seize it?  It's plain

21   view -- the phone, not to search it but the phone itself;

22   couldn't they?

23           MS. NEWBERGER:  That is --

24           THE COURT:  -- doesn't get them into the contents of

25   it --

1            MS. NEWBERGER:  -- so in a factual situation in which

2     he, the cell phone says "this is Jeroam Nelson's cell phone"

3     and the factual situation in this case in which they have an

4     active wiretap on the cell phone -- on one of his cell phones,

5     Your Honor, maybe, maybe there's an argument that they could

6     argue that it is an instrument of criminal activity except for

7     the problem is that, you know, they would probably say, well, a

8     lot of drug dealers have multiple phones, so they don't

9     actually know that that particular phone is the cell phone they

10    have been listening to.

11            THE COURT:  What is the standard of probable cause?

12    Certainly not even 50 percent, is it?  Probable cause is reason

13    to look further, to believe, to seize it in order to find

14    out.

15            MS. NEWBERGER:  Right.  But, Your Honor, I think in

16    the situation that you're describing, the best practice --

17    we've seen this done.  When they encounter something that they

18    had not put in their warrant to seize and isn't necessarily

19    contraband is you call a time out; you've already restrained

20    the people, they can't do anything to it.  You have people

21    stand by, you call a judge, and you get a warrant authorizing

22    you to seize this particular cell phone.

23            THE COURT:  And it's the same probable cause

24    determination -- if there is probable cause to believe that it

25    is evidence of crime in plain view, you can seize it without a

1    warrant.

2              MS. NEWBERGER:  But actually, Your Honor, I think in

3    that situation at that point, there would actually be more

4    probable cause than they had at the time that they --

5              THE COURT:  I'm saying at the time they seize it.

6              MS. NEWBERGER:  Right, that's what I'm saying.  At

7    the time they seize it --

8              THE COURT:  If you can go get a warrant from a judge,

9    you can seize it under the plain view doctrine.  It might say

10   something about whether the exclusionary rule applies because

11   if you get a warrant, you get more leeway in case you're wrong,

12   but the probable cause determination at that precise moment is

13   probable cause to believe that it is evidence of crime.  You

14   plain-view seizure, you don't have to go get a warrant to seize

15   it.  You certainly do to search it but not to seize it.

16             MS. NEWBERGER:  If it is on its face evidence of a

17   crime.  But I think -- but to be clear, Your Honor, the

18   scenario that you're describing is not the scenario that we

19   have here.

20             THE COURT:  Here they took four phones belonging to

21   people other than Mr. Nelson.

22             MS. NEWBERGER:  That's correct, Your Honor.  So, you

23   know, it is different and certainly, Your Honor, in a situation

24   in which there isn't a wiretap, I think that -- I don't think

25   that in most cases you could jump to the conclusion that a cell

1    phone is contraband.  I mean, I think that's sort of -- this

2    goes to the very heart of the problem with cell phones.  That

3    cell phones are so ubiquitous, that they hold so much

4    information on them, that the Government could probably argue

5    that any time we believe that someone has committed a crime, we

6    have reason to believe that we'll find evidence of the criminal

7    activity on the phone.  But I don't believe that that's what

8    the probable cause standard is.  There has to be more than

9    that.  It cannot be that cell phones contain all the intimate

10   details in one's life so if you're engaged in crime, your cell

11   phone must therefore have some evidence that you're engaged in

12   criminal activity, and therefore we should be allowed to seize

13   and search it.

14          So I hear what Your Honor is saying and I think that

15   that is a very interesting hypothetical, but, you know, that's

16   not what they did here.  Your Honor goes back to the first

17   motion that the warrant itself for 105 East Hillcrest did not

18   give probable cause to even believe that that is the scenario

19   that they might be confronted when they entered the house.  And

20   that that is -- that is the problem.  It cannot be the case

21   that because you have probable cause to arrest someone, you

22   have probable cause that they have engaged in criminal

23   activity, that everything, every place that they are associated

24   with is then subject to search.

25          Your Honor, again, even if you found that the search

1   warrant was not overbroad, that they should -- they could

2   lawfully seize the cell phone pursuant to this language, that

3   *Griffith* is a D.C. Circuit case, it's not in the Fourth

4   Circuit -- and I understand you're talking more about good

5   faith than the substantive issue -- but Your Honor we do still

6   challenge the search of this cell phone pursuant to the warrant

7   for 105 East Hillcrest Road.

8           Again, the Hillcrest warrant contains no limiting

9   principles as to what they're seeking and I know Your Honor

10  cites to that information, the reference in the affidavit sort

11  of referencing back to the categories of information.  But that

12  doesn't -- Your Honor, I don't think that those are effective

13  limiting principles, and that is demonstrated by the way the

14  search was actually conducted of this phone --

15          THE COURT:  Was the search undertaken by the affiant

16  or somebody else?

17          MS. NEWBERGER:  Which search?

18          THE COURT:  Of 105 East Hillcrest Road.

19          MS. NEWBERGER:  I believe...

20          THE COURT:  Agent Mills was the affiant on that

21  one.

22          MS. NEWBERGER:  Yes, I believe he was, yes.

23          THE COURT:  Was the affidavit attached to the warrant

24  when it was issued?  Would those who were executing the warrant

25  have the affidavit?  You see what I'm getting at?  What's our

1   package here --

2          MS. NEWBERGER:  Right, what they're looking at --

3          THE COURT:  It certainly refers -- the actual warrant

4   itself refers, of course, to the affidavit.

5          MS. NEWBERGER:  It does.  Your Honor --

6          THE COURT:  It says:  Leave a copy of the warrant,

7   the affidavit and application with people there.  Return a copy

8   of the warrant, the affidavit and application to the court.

9          It sounds to me like the affidavit is attached.  It's

10  with the warrant, right?  They can't leave it if they don't

11  have it with them.

12         MS. NEWBERGER:  So, Your Honor, I guess I'm not

13  really quibbling with the position that the warrant itself can

14  be read in reference to the affidavit in support.  That's not

15  really what my argument is.  What my argument is is that these

16  so-called limiting principles are barely limiting principles

17  and that that is demonstrated by the way that they actually

18  conducted the search of the phone.

19         I think it's a slightly -- it's a different argument.

20  I'm not suggesting that you have to look at, you know, the

21  warrant itself in isolation from the affidavit.

22         What we're arguing more is that the affidavit does

23  not meaningfully set forth limiting principles that can guide

24  Task Force Officer Mills in the execution of that search

25  because, in effect, it didn't.

1          THE COURT:  Okay.

2          MS. NEWBERGER:  Does that address Your Honor's

3    question?

4          THE COURT:  Mm-hmm.

5          MS. NEWBERGER:  So, Your Honor, I do think when we're

6    talking about cell phones, we need to be very, very careful

7    about warrants that essentially are akin to general warrants

8    that allow a generalized rummaging through the contents of a

9    cell phone, that it contains all kinds of highly personal and

10   intimate information to them.

11         Your Honor, there's no question about how much

12   content is contained in a cell phone, so from the perspective

13   of good faith versus exclusionary rule, I do think that this is

14   a very, very important -- this is an important point and that

15   we have to be drawing lines here.

16         Again, the -- I don't want to say purely that, you

17   know, when the federal government is involved, law enforcement

18   can engage in, you know -- be less protective of the Fourth

19   Amendment.  But I do -- what is very striking to me in this

20   situation is that this is a task force case.  Presumably they

21   had access to someone from the U.S. Attorney's Office to get

22   guidance if they need it.  There's really no reason after

23   seizing the phone that they could not go and get a subsequent

24   warrant, they could not run it by someone and say, "How should

25   we do this?  What is the best way, what is the most protective

 1    way of doing this?" because I have seen it done.  I imagine

 2    Your Honor has seen it done as well.

 3              THE COURT:  What specific language would you expect

 4    to see in that subsequent warrant?

 5              MS. NEWBERGER:  I think it would be important to sort

 6    of set forth the probable cause for exactly why they believe

 7    that there's probable cause to search this cell phone.  So what

 8    are the connections of Mr. Nelson to the cell phone and why

 9    they have reason to believe that his cell phone will contain

10    information relevant to their investigation and then to

11    specifically state where are the areas of the phone under which

12    they would like to search because they believe -- they have

13    reason to believe that they would find evidence.  I've even

14    seen federal search warrants that go so far to explain the

15    methods by which they will conduct the search.  For example, we

16    are going to do a keyword search or we are going to look in

17    these particular areas for these particular phone numbers, et

18    cetera.

19              There are ways to have limiting principles that give

20    more guidance to the person executing the search warrant as to

21    how to lawfully conduct the search.  And that's what the case

22    law talks about, even setting aside from cell phones.  It talks

23    about the point of the particularity requirement is so that the

24    person executing the warrant has guidance as to how to execute

25    this warrant in a way --

1          THE COURT:  That's what I'm reaching for now.  What

2  specific language would you want to see in a warrant to search

3  an iPhone?

4          MS. NEWBERGER:  I would want to see language that

5  specified what were the places, the areas of the phone on which

6  they intended to search and how they were going to engage in

7  the search.  Were they going to sort of manually search the

8  phone, scroll through the contacts?  Are they going to --

9          THE COURT:  You think the warrants actually refer to

10  Cellebrite?  They do that?

11          MS. NEWBERGER:  Yes.

12          THE COURT:  But you don't like what they did with

13  Cellebrite here because you think it authorized, it actually

14  undertook too broad a search?

15          MS. NEWBERGER:  As best I can tell, they downloaded

16  the entire contents of the phone --

17          THE COURT:  Don't they always do that?

18          MS. NEWBERGER:  Your Honor --

19          THE COURT:  And then they don't actually use the

20  device, they copy it.

21          MS. NEWBERGER:  So no.  I have seen Cellebrite

22  downloads where they're clearly not downloading the entire

23  contents of the phone, where they're downloading the specific

24  places where they believe they are going to be finding evidence

25  of criminal conduct.

1          THE COURT:  Here they want the chats, they want the
2    push to talk, direct connect information, as well as
3    information as to associates, financial transactions, evidence
4    of meets -- some of it's in here.  It may not be focused but
5    some of it's in here.
6          MS. NEWBERGER:  Your Honor, I think what -- the way
7    that I read this is to essentially say we want to be able to
8    find evidence of criminal activity.
9          THE COURT:  I understand that's your argument here,
10   but I'm saying look at this and tell me what specifics they
11   could have done beyond that, assuming they had probable cause
12   to seize a particular iPhone and search it.  I mean, there's no
13   question they could do it all in one.  You don't have to go get
14   a separate warrant --
15         MS. NEWBERGER:  Right.
16         THE COURT:  -- if you already have a warrant.  You do
17   have to go get a separate warrant if you seize it
18   warrantlessly.  But here they could do it all in one if they
19   write it all down correctly and give enough for the judge to
20   find it appropriate.
21         MS. NEWBERGER:  Yes, and I don't disagree with that,
22   Your Honor, because I certainly have -- where we see this most
23   often, Your Honor, is in the context of cases involving child
24   pornography where we do all the time see warrants which are a
25   warrant to search a house that very clearly lay out probable

1    cause to search electronic devices in the house, computers,

2    cell phones.  And they talk about the specific means, what they

3    are looking for and the way they're going to engage in the

4    search, and it usually includes limiting principles.

5              THE COURT:  Okay.  All right, anything else on the

6    Hillcrest Road?

7              MS. NEWBERGER:  No.  Would you like me to -- what I

8    have on the remaining motions is much more brief.  Would you

9    like to hear from the Government first on Hillcrest --

10             THE COURT:  Why don't we do that.  Let you relax for

11   a bit.  Or at least sit down; I'm not going to say relax.

12             All right.  Ms. Hoffman?

13             MR. BALTER:  Your Honor, can I make --

14             THE COURT:  I can't hear you.  You can sit down and

15   stay closer to the microphone.

16             MR. BALTER:  Yes.  If I could just note, I would note

17   with respect to Mr. Johnson's motions that are still remaining,

18   he made a motion to suppress a cell phone that was seized from

19   his location as well.  Much --

20             THE COURT:  Right.  All I resolved on his was the dog

21   sniff.

22             MR. BALTER:  That's correct.

23             THE COURT:  The whole rest of it is still up.

24             MR. BALTER:  I only bring it up, Your Honor, from the

25   standpoint to the extent that the Court wants to listen to all

1   the presentations with regard to the cell phones, it may make

2   sense before the Government responds.  I know Mr. Spruill had a

3   similar argument -- I'm not speaking for him at this point --

4   but I just note that this cell phone issue has come up among

5   many of the defendants.

6            THE COURT:  I agree.  That's why I alerted the

7   Government that I was particularly interested in this aspect,

8   but let me hear from them.

9            MR. BALTER:  Very well.

10           THE COURT:  Everybody will get plenty of chance to

11   tell me if anybody has missed anything.  Ms. Hoffman.

12           MS. HOFFMAN:  Thank you, Your Honor.  There were a

13   number of threads to Ms. Newberger's argument, and I'll try to

14   address them in a structured way.

15           I think the logical place to start is with the

16   probable cause to search the residence.  I think Ms. Newberger

17   had tried to minimize the cell phone interceptions that were

18   discussed in the warrant, but I do think that they were very

19   significant and that there was more than ample probable cause

20   not just to believe that Mr. Nelson was involved in drug

21   trafficking but that he was specifically using 105 East

22   Hillcrest, his mother's house, to engage in drug trafficking

23   and that he was using cell phones to further his efforts and

24   that there was probable cause to believe that not just he but

25   also his cell phones would be located in the residence.

1           We've laid out in detail in our motions response, a

2    bullet point list of the probable cause in the warrant and I

3    won't go through everything, but I think it's very significant

4    that they detail these interceptions that happened.  First on

5    August 29, they intercept a series of calls in which Mr. Nelson

6    uses coded language essentially to talk about how he's going to

7    meet up with an unknown male to supply him with what

8    investigators believe is going to be 200 grams of drugs.  The

9    unknown male says he's trying to "double that, double that."

10   Nelson says, "Give me a minute."  He says he'll be out in like

11   20 minutes.

12           And then the GPS tracker on his car shows that he

13   traveled to 105 East Hillcrest Road which is his mother's

14   residence.  He parks there, he walks in the front door.  There

15   are more calls where the unknown male tells Nelson exactly

16   where he is on Reynolds Avenue by City Park.  Nelson says he's

17   about to come in that direction.  They joke a little bit.  The

18   unknown male asks whether Nelson knew the number, which

19   investigators believe he was referring to the quantity of drugs

20   he wants.  Nelson says, "I don't want to know," which they

21   interpret to mean he's saying let's not talk about it on the

22   phone, he's being cautious.  But then nevertheless the unknown

23   male says he wants "two, two," which investigators, based on

24   the context of the investigation, believe refers to 200 grams

25   of heroin.

1           Then again the covert surveillance camera shows him

2    leave the residence at 105 East Hillcrest, drive away.  There's

3    another call where Nelson says he's driving to meet the unknown

4    male at that location, Reynolds Avenue and Virginia Avenue, and

5    the GPS tracker shows that he goes there, stays for only one

6    minute and then he departs.  Right there you have -- that alone

7    would be probable cause to believe not just that Nelson is

8    involved in drug trafficking but that he's using his mother's

9    residence to store drugs because that's where he goes when he

10   has this conversation with the male.  He goes to his mother's

11   house, and then presumably that's where he gets the drugs and

12   then brings them to meet with this unknown male.

13           But then they go on and they detail this additional

14   transaction that happens on September 6.  First of all, they

15   know that he travels to New Jersey, Philadelphia area, so they

16   suspect that he's gone up there to get a new supply of drugs.

17   Then they intercept this series of communications between

18   Nelson and a co-defendant, Coleman-Fuller.  Nelson says he's

19   going to be in town in about 10 or 15 minutes.

20           Coleman-Fuller asks whether Nelson is going to come

21   to Coleman-Fuller's house, and Nelson says, "I don't know

22   exactly what's going on so you should come to me."  The

23   investigators explain how they believe what he's saying is --

24   when he says I don't know what exactly is going on, he's

25   saying, "I don't know exactly how much you want in the way of

 1    drugs, so why don't you come to me instead so that we can

 2    discuss it" because he has the drugs.  So he doesn't want to

 3    leave -- he doesn't want to bring more drugs than necessary

 4    basically.  He wants Coleman-Fuller to come to him so that he

 5    can figure out how much Coleman-Fuller wants and give him the

 6    drugs that way, and they don't have to talk about it over the

 7    phone.

 8            So Nelson says that he "would probably be at my

 9    house," he refers to it as "my house."  Then in a subsequent

10    call, Nelson tells Coleman-Fuller, "I'm at my mama's house."

11    Coleman-Fuller says, "All right, I'm on my way right now."

12    Then covert surveillance camera shows Nelson arriving at his

13    mother's house, 105 East Hillcrest, going inside.  Then it

14    shows Coleman-Fuller arriving, entering the front door, and

15    just about half an hour later, Coleman-Fuller leaves again.

16            So they explain how based on the calls that they've

17    intercepted and the context of the calls, they believe

18    Coleman-Fuller has gone to meet Nelson at his mother's house at

19    105 East Hillcrest Road to purchase drugs from him and that

20    they did this all inside the residence.

21            They also explain how the covert surveillance camera

22    outside 105 East Hillcrest and the GPS tracker on Nelson's

23    vehicle have shown that Nelson regularly frequented that

24    residence.  So it wasn't just these two occasions which they

25    laid out in extreme detail, but they also say there are a lot

 1    of other occasions that we know about where he's gone here

 2    based on this other evidence.

 3              Then the affiant also explains that he knows drug

 4    traffickers commonly keep drugs and drug proceeds in their

 5    residences and in residences of relatives and associates.  And

 6    he also explains that he knows drug traffickers commonly use

 7    multiple cell phones and applications to communicate with

 8    co-conspirators.

 9              So that is -- honestly, it's hard to imagine what

10    more they really could have done in this affidavit.  That is, I

11    think, more than ample probable --

12              THE COURT:  In this case, was there any evidence that

13    Mr. Nelson at any singular time was using more than one cell

14    phone for drug dealing --

15              MS. HOFFMAN:  Yes --

16              THE COURT:  We know he moved from one to another to

17    another, but what evidence is there that there were multiple

18    phones in use at the same time?

19              MS. HOFFMAN:  I understand.

20              THE COURT:  Focus for a minute on the fact that this

21    authorized seizure of any cell phone, not just the one

22    identified with Mr. Nelson.

23              MS. HOFFMAN:  Sure, I understand Your Honor's

24    question.  There clearly was evidence that he was cycling from

25    phone to phone.  We obviously talked a lot about that at the

1    last motions hearing because they, of course, applied to

2    intercept communications over different phones.  He would

3    switch from one to TT-5 to TT-8, to TT-10.  I think it was

4    certainly reasonable to presume that just because he switched

5    to a new cell phone didn't mean that he would necessarily

6    dispose of the old phone.  I think it's very common that drug

7    traffickers, even when they switch to a new phone to try to

8    avoid detection by law enforcement, they'll still keep the old

9    phone because the old phone might have a lot of contact

10   information for various suppliers and customers that they want

11   to hang on to.

12           So it's frequently the case and I think that TFO

13   Mills explains in the affidavit that based on his training and

14   experience, it's frequently the case that drug traffickers will

15   have multiple phones.  Even if they're not using all of them

16   simultaneously to engage in drug trafficking, they'll often

17   keep around the ones that they used in the past because they,

18   like I said, will contain valuable information in them.

19           So I think TFO Mills, he does explain that drug

20   traffickers commonly have and use multiple phones, and I think

21   that is sufficient to give the judge -- to enable the judge to

22   conclude that there's probable cause for them to seize multiple

23   phones in the residence.

24           So I want to talk about Ms. Newberger's argument

25   about particularity.  The operative language in the warrants

1    for the various residences, for the residences of Nelson,

2    Spruill, Johnson and Coleman-Fuller is all the same.  Obviously

3    there's different probable cause statements, different facts

4    supporting probable cause, but the operative language about

5    cell phones and what they're authorized to seize is the same in

6    all of the warrants.

7            So I'll just use as an example the warrant for Jeroam

8    Nelson's house at 105 East Hillcrest.  It's ECF 313-12; it's

9    Exhibit 12 to our motion's response.  Regardless which version

10   you use, it's the one that's Bates stamped at the bottom.  I'm

11   going to refer to the page that's Bates stamped at the bottom

12   USA 1509, the actual warrant.

13           As Your Honor pointed out, this page here, the third

14   paragraph from the bottom, the warrant states that:  The judge

15   is satisfied that there is probable cause to believe that

16   certain property is being concealed at the target residence,

17   including electronic devices.  There's a bunch of other things

18   too.  There's controlled dangerous substances, financial

19   records, weapons, ammunition, but also electronic devices, and

20   then at the end, it says "used in or incidental to the conduct

21   or operation of controlled dangerous substance violations and

22   the illegal possession of firearms on the persons in premises."

23           Then if you flip to the next page, the warrant

24   authorizes the officers to -- in letter D -- seize and search

25   all evidence... electronic devices such as cellular telephones

1    and the data stored in them... used in or incidental to the

2    conduct or operation of controlled dangerous substances

3    violations.  So, again, there's that same limiting language,

4    and that's extremely important.  That is the limiting principle

5    that the case law makes clear is required, and that's exactly

6    what these warrants provide.

7              They limit the evidence that can be seized and

8    searched based on the crime that is under investigation.  Here

9    it is controlled dangerous substance violations.  So the

10   language used in or incidental to the conduct or operation of

11   controlled dangerous substance violations applies to all of the

12   evidence that the agents are authorized to seize.  Perhaps it's

13   not worded as articulately as you might like, but I think it is

14   clear based on context that that limiting language is meant to

15   apply to all of the evidence that comes before.  And if the

16   Court had any doubt about that, I think all you need to do is

17   look to the Supreme Court's decision in *Andresen v. Maryland*

18   which is the filing cabinet case that Ms. Newberger -- I don't

19   know if she mentioned it by name, but she alluded to it.

20             *Andresen v. Maryland* counsels that we have to read

21   this language in context.  If you look at -- the opinion is 427

22   U.S. 463.  If you look at pages 80 to 81 of that opinion,

23   there's a very similar argument that's made by the defense in

24   that case where there was actually even broader language in the

25   warrant.  But there was this clause at the end of a long string

1    of evidence that tied it to violations of a particular crime.

2    And the Supreme Court said you have to read the language all in

3    context, and clearly that limiting language that comes at the

4    end of the long clause is meant to cabin and limit everything

5    that came before.  That's what matters, that as long as you're

6    limiting the evidence that's being seized and searched by the

7    crime that's under investigation, that's all you need and

8    that's sufficient.

9           So there is a limiting principle in all of these

10   warrants for all of the residences and the cell phones, and

11   that is all that's required under the case law.

12          I also want to address -- there's some more case law

13   that I'm going to talk about that kind of goes to both of these

14   points: the limiting principle that we have in the warrant and

15   also whether ex ante search protocols are required.

16          One of the threads of Ms. Newberger's argument, I

17   think, is that Your Honor asked what's the additional language

18   that you would want to see in a follow-up warrant if there were

19   a follow-up warrant?  Ms. Newberger said, well, I would want to

20   see basically -- she didn't use this term -- but she was

21   saying:  I'd want to see a search protocol.  I'd want to see

22   language in there explaining what locations in the phone

23   they're going to look at and what specific files or

24   applications they're going to look through and see.

25          The Fourth Circuit and numerous other circuit courts

1    have held that ex ante search protocols in search warrants are

2    neither required nor are they practical for electronic device

3    warrants.  So the Fourth Circuit, the most important case is

4    the Fourth Circuit one in *United States v. Williams* which is

5    592 F.3d 511; I think Your Honor alluded to it earlier in some

6    of your comments.  But in that case the Fourth Circuit

7    explicitly held that a similar electronic device warrant,

8    "Impliedly authorized officers to open each file" -- I'm sorry,

9    it was for a computer in that case.  "Impliedly authorized

10   officers to open each file on the computer and view its

11   contents at least cursorily to determine whether the file fell

12   within the scope of the warrant's authorization."

13           The Fourth Circuit explains that to be effective,

14   such a search could not be limited to reviewing only the file's

15   designation or labeling because the designation or labeling of

16   files on a computer can easily be manipulated to hide their

17   substance.  Surely the owner of a computer who is engaged in

18   criminal conduct on that computer will not label his files to

19   indicate their criminality.

20           There are cases that are on all fours with *Williams*

21   from just about every other circuit as well.  What all of these

22   cases hold is that you can't possibly know ex ante what the

23   folder structure is going to be on someone's computer.

24   Similarly for a cell phone, you can't possibly know ex ante

25   what code words the defendant is going to use to refer to the

1    drugs that are being trafficked.  You can't possibly know what

2    targeted searches you're going to need to do until you actually

3    look at what's on the phone.  It would be entirely impractical

4    to require officers ex ante in a warrant to explain what search

5    protocol they're going to use.  Instead they can -- and, in

6    fact, they really have to -- first engage in this two-step

7    process where first they download the entire contents of the

8    phone, usually via Cellebrite or a similar program.

9            Usually that entire download of the phone is turned

10   over to defense counsel.  There are obvious reasons for that.

11   Under *Brady* and *Giglio*, we wouldn't want to not turn that over

12   just in case perhaps there is some exculpatory evidence in

13   there.  Perhaps there's something that's covered by Rule 16.

14           So in the first instance, that full download is

15   turned over to defense counsel.  Then at the second step of the

16   process, officers are permitted to look through and at least

17   cursorily open every single thing in the phone to determine

18   whether it is evidence of the crime under investigation that

19   they're authorized to look for by the warrant.

20           It's also, I think, notable that Rule 41 of the

21   Federal Rules of Criminal Procedure explicitly approves of this

22   two-step process for searching electronic devices; first

23   seizing all the information on the device and then searching.

24   The advisory committee notes explain that the two-step process

25   is "inherent in searches for electronically stored

1    information."  That's the 2009 amendment.  And the notes

2    "acknowledge the need for a two-step process.  Officers may

3    seize or copy the entire storage medium and review it later to

4    determine what electronically stored information falls within

5    the scope of the warrant."

6                In promulgating that rule, the Supreme Court

7    recognized that that two-step procedure would be used routinely

8    for searches of electronic devices such as cell phones.  That

9    is what's done routinely in every case that I've ever had.  The

10   cell phone is initially downloaded in its entirety.  That

11   entire report is turned over to defense counsel for -- to meet

12   discovery obligations, and then law enforcement will cull from

13   that.  They'll cursorily open each file to determine whether

14   it's relevant to the evidence of the crimes under

15   investigation, and they'll cull a more select group of text

16   messages and photos and whatnot that constitutes evidence of

17   the crime, and they'll also turn that over.  That's what was

18   done in this case as well.

19               There was also a report that contained a selection of

20   clearly drug-related text messages between Nelson and his

21   Mexican source of supply using the WhatsApp platform, and that

22   was also turned over to defense counsel.

23               So what was done in this case is the same procedure

24   that's used in virtually every case.  It is sanctioned by

25   Rule 41 itself and by all of the case law, *Williams,* and like I

1    said, cases from many others circuits as well, and it was

2    entirely proper.

3            If the defense argument were taken to its logical

4    conclusion, I think executing a search warrant on a cell phone

5    would be kind of like playing Pin the Tail on the Donkey.

6    Police officers would have to, you know, blindly try to

7    speculate about what code words a drug trafficker is going to

8    use to refer to drug trafficking activity in the phone or how

9    they're going to label particular files, and that's just not

10   feasible and that's what the case law recognizes.

11           There's another case that I wanted to quote from just

12   because it's right on point and it's very helpful.  This is the

13   Seventh Circuit's decision in *Bishop*.  And...

14           THE COURT:  910 F.3d 335.

15           MS. HOFFMAN:  Thank you, Your Honor.  That's what I

16   was looking for, yes.  So the defendant was suspected of

17   shooting a woman during a drug deal gone wrong in that case.

18   Police obtained a warrant authorizing them to search the

19   defendant's cell phone for "any evidence of suspect identity,

20   motives, scheme, plan, relating to the crime of criminal

21   recklessness with a deadly weapon or the offense of dealing

22   illegal drugs."  The defendant moved to quash the warrant,

23   contending that its language was too general because it

24   "authorized police to rummage through every application and

25   file on the phone and left to the officer's judgment the

1   decision which file has met the description."

2          The Seventh Circuit disagreed.  I apologize but I am

3   going to read a lengthy paragraph here just because it's right

4   on point and it's very helpful.  The Seventh Circuit said,

5   "Bishop is right about the facts.  This warrant does permit

6   police to look at every file on his phone and decide which file

7   satisfied the description.  But he is wrong to think that this

8   makes a warrant too general.  Criminals don't advertise where

9   they keep evidence.  A warrant authorizing a search of a house

10  for drugs permits police to search everywhere in the house

11  because everywhere is where contraband may be hidden.

12          "And a warrant authorizing a search for documents

13  that will prove a crime may authorize a search of every

14  document the suspect has because any of them might supply

15  evidence.  To see this, it isn't necessary to look beyond

16  *Andresen v. Maryland* in which the court considered a warrant

17  that permitted a search of every document in a lawyer's files.

18          "Just so with this warrant.  It permits the search of

19  every document on the cell phone which, like a computer, serves

20  the same function as the filing cabinets in *Andresen*'s office.

21  As with filing cabinets, the incriminating evidence may be in

22  any file or folder.  That's why courts routinely conclude that

23  warrants with wording similar to the one at issue here are

24  valid.  It is enough these decisions hold if the warrant cabins

25  the things being looked for by stating what crime is under

1   investigation."

2          That's exactly what the warrants in this case did.

3   Again, you know, perhaps it's possible that the affiants could

4   have worded things a little bit more eloquently than they did,

5   but it's very clear when you read the warrant as a whole, the

6   two pages at 1509 and 1510 and the attached affidavit, that

7   everything that they are authorized to seize and search is

8   limited by the phrase "used in or incidental to the conduct or

9   operation of controlled dangerous substance violations."  That

10  is the crime that's under investigation.  They clearly had

11  probable cause to believe that Nelson was engaging in

12  controlled substance violations, that he was using cell phones

13  to do so.  So the warrants are properly cabined to the crime

14  under investigation.

15         There certainly was no -- I want to address the

16  argument also that there was a follow-up warrant required.  I

17  think Your Honor basically said that's not the case, but I just

18  want to respond to Ms. Newberger's argument.  I think she said

19  in every case I've ever had I've always seen -- at least when

20  it's a federal case, I've always seen the agents go back and

21  get a follow-up warrant.  I think that's certainly not true in

22  my experience.  It just depends on the facts of the case.

23         Certainly when you have a lengthy wiretap

24  investigation like the one at issue here, it made perfect sense

25  for the agents to seek approval, seek authorization to search

1   cell phones that were found in the residences belonging to the

2   targets of the investigation based on the very well-supported

3   statement of facts laying out all the different cell phone

4   communications that members of the conspiracy were involved in,

5   really it's a drug trafficking.

6          I think -- I also wanted to address Ms. Newberger's

7   argument that these warrants were problematic because they

8   authorize the seizure of any and all electronic devices, not

9   necessarily limited to ones that were used by Mr. Nelson.  I

10  think, first of all, it's very clear based on the statement of

11  probable cause for both warrants at 45 Elgin and at 105 East

12  Hillcrest that Mr. Nelson was engaged in drug trafficking

13  activity at those residences.  He was using those residences

14  routinely to store drugs and to distribute drugs to other

15  people.  It was certainly reasonable for the affiants to

16  presume that Mr. Nelson may be located in those residences and

17  that his cell phones would be located in those residences, and,

18  of course, it's very difficult to know without actually looking

19  inside a phone who it belongs to.

20         A cell phone doesn't usually have a label.  Your

21  Honor gave the example of a cell phone that says "Nelson's

22  phone."  Of course, that's not typically the case.  I have

23  never heard of someone labeling their cell phone.  It's very

24  difficult to know before you actually open up the cell phone

25  and look inside who it belongs to.

1            In this case, they executed both search warrants the

2    same morning at 45 Elgin Avenue which was Mr. Nelson's, I

3    guess, ex-girlfriend's house.  He wasn't located there, and

4    they actually didn't seize any phones from the residence which

5    I think is testament to their good faith.  He wasn't located

6    there; it was reasonable to assume that any cell phones that

7    she had belonged to her, and they didn't take any cell phones

8    from that residence.  But the same morning they execute the

9    search warrant at Nelson's mother's house at 105 East Hillcrest

10   and Nelson is there, and they executed it very early in the

11   morning.  So he had clearly slept there the night before, as he

12   sometimes did, and they find him in the living room, and near

13   him they find two iPhones.  Then they find two other cell

14   phones in the master bedroom of the residence.

15           It was reasonable for them to believe at that moment

16   that all four of those cell phones might have been used by Mr.

17   Nelson.  They seize all four of them.  They ultimately only get

18   into -- of the two iPhones seized from the living room where

19   Mr. Nelson was they only get into one of them.  That's the one

20   that the Government intends to use as evidence at trial that

21   contains the WhatsApp messages with the source of supply in

22   Mexico.

23           The two that were found in the master bedroom of the

24   house, I'm actually not sure whether they -- they may have

25   attempted to -- started searching and quickly realized that

1    they belonged to the mother and then stopped searching, or they

2    may have just not been able to get into the phones at all.  I'm

3    not sure which one it was.  But in any event, they didn't do a

4    download of those phones, and the Government doesn't intend to

5    use anything from those phones.  The only cell phone evidence

6    the Government intends to use in this case vis-a-vis Mr. Nelson

7    is the evidence that was found in that iPhone that was located

8    right where he was in the living room.  I think --

9                 THE COURT:  Was that TT-10?

10               MS. HOFFMAN:  I don't believe it was TT-10.  I'm

11   pretty sure it wasn't.  But I would have to look back to be

12   sure.  If defense counsel believes I'm wrong, please correct

13   me.  Which, I guess, goes to Your Honor -- I think one of Your

14   Honor's first questions to Ms. Newberger was:  What was on the

15   phone that they didn't already have?  I think there was --

16   certainly the WhatsApp messages, in particular, that we intend

17   to use at trial, as far as I'm aware wiretaps -- at least the

18   wiretap in this case did not intercept WhatsApp messages.  So

19   those WhatsApp messages they didn't already have.  That was new

20   evidence, but it was evidence that they were certainly lawfully

21   authorized to seize.  It was clearly drug related.  So that is

22   over and above what they already had from the wiretap.

23               Oh, the severance principle.  The severance principle

24   also clearly applies here.  Even if the Court were to find that

25   the officers shouldn't have seized the two cell phones from the

1    master bedroom, like I said, there were no downloads of the

2    cell phones; we're not intending to use anything from the cell

3    phones.  If you look at the *Cobb* case I think it is clearly on

4    point.  I know Ms. Newberger attempted to distinguish it, but

5    what it says is that even if a warrant is overbroad in

6    authorizing agents to seize and search particular things, it

7    doesn't necessarily render the entire warrant invalid.  Here's

8    the quoted language:  "The constitutionally infirm portion of a

9    warrant, usually for lack of particularity or probable cause,

10   is separated from the remainder, and evidence seized pursuant

11   to the former portion is suppressed.  Evidence seized under the

12   valid portion may be admitted."

13          So in this case, I think it's abundantly clear that

14   the officers did have probable cause to seize and search cell

15   phones belonging to Nelson.  That much should be very clear

16   from the statement of probable cause in the warrant.  They had

17   numerous, had lengthy wiretap investigations.  They had

18   numerous concrete examples of Nelson using cell phones to

19   arrange drug transactions with various people.  They clearly

20   had probable cause to seize cell phones belonging to him, and

21   that evidence is seized pursuant to a valid portion of the

22   warrant.  That should not be suppressed.

23          If the Court were to find that the cell phones that

24   were found in the master bedroom, that there wasn't sufficient

25   indicia that those might have been used by Nelson, the only

1    evidence to suppress would be that evidence, those cell phones

2    that were found in the master bedroom, nothing else.  So I

3    think *Cobb* clearly applies here as well.

4          There was a lot of ground that Ms. Newberger covered,

5    and it's possible that I have neglected to respond to certain

6    points that Your Honor was interested in, so please let me know

7    if there are additional questions or things that I've missed.

8          THE COURT:  There are cases out of circuit --

9    primarily in the District of Columbia, whether it's the D.C.

10   Circuit or the D.C. Court of Appeals -- that at least appear on

11   their face to require more.  Do you want to comment on those?

12   We discussed the one from the D.C. Circuit, but there are

13   others from, as I say, the state court equivalent, the D.C.

14   Court of Appeals, that require more precision, focus.

15         MS. HOFFMAN:  I confess I don't think I am aware of

16   the D.C. Court of Appeals case that Your Honor might be

17   referring to.  I don't think I read that one.  I'm happy to

18   submit additional briefing if the Court would like.  Of course,

19   I did read the *Griffith* case closely.  That's the D.C. Circuit

20   case that the defense relied on.  I think it really couldn't be

21   more dissimilar from this one on the facts.  There is some

22   language in there that if you take it out of context, you could

23   try to say that it precludes what happened here, but when you

24   actually look at the facts of the case, it's just so dissimilar

25   that it really doesn't apply and cover the situation.

1              *Griffith* was suspected of being involved in a

2     homicide over a year before the warrant was executed, and he'd

3     been locked up during most of that one-year period.  The police

4     had absolutely no evidence that he had ever owned a cell phone,

5     ever talked on a cell phone, ever used somebody else's cell

6     phone, nothing.  Nothing linking him to a cell phone

7     whatsoever.  And yet they used the possibility that he might

8     have a cell phone and that it might be in this particular

9     residence in order to get a search warrant for that residence.

10    That was really what the probable cause for the warrant was

11    based on.  They said, "Well, we think he did this homicide, we

12    think he might have a cell phone, and we think the cell phone

13    might be in the residence, so we have probable cause to search

14    the residence."

15             The D.C. Circuit said, well, of course that's not

16    allowed.  That would basically give police authority to search

17    any residence at any time if you can just speculate that

18    somebody might have a cell phone in the home and then use that

19    to get PC for a warrant for the home, police could do that to

20    anyone.  That's not permitted, that's overbroad.

21             Here, of course, it couldn't be farther from that

22    actual scenario.  In this case we have, again, a lengthy

23    wiretap investigation.  We have example after example after

24    example of these defendants using cell phones to further their

25    drug trafficking activities.

1              Anticipating an argument that I think Mr. Balter

2    might make with respect to Eric Johnson, of course, he's the

3    one defendant who wasn't actually intercepted on the wiretap,

4    and yet the warrant for his house did use the same language

5    that I discussed earlier and did authorize the agents to seize

6    cell phones.  But if you read the statement of facts closely,

7    first of all, it details the lengthy wiretap investigation.  It

8    gives all these examples of co-defendant Spruill's use of cell

9    phones.  It explains exactly why they believe Spruill is being

10   supplied by Eric Johnson, and it explains why they believe that

11   Spruill is using one phone to communicate with customers, which

12   is the TT-6 phone that they're intercepting, and a different

13   phone to communicate with his supplier.

14              They explain how they're intercepting these calls

15   where he's talking to customers saying, "I'm going to go meet

16   up with my supplier in Owings Mills, I'll be back soon."

17   Extremely explicit conversations where he actually says the

18   word "drugs," he's "going to pick up the drugs."  Then he

19   drives all the way from Hagerstown to Owings Mills.  Clearly

20   they explain, based on the context, they know that he's having

21   contemporaneous cell phone communications with Eric Johnson,

22   his supplier, because how else would he communicate?  He's in

23   Hagerstown, Johnson is in Owings Mills.  How else would they be

24   communicating other than via cell phone?

25              They explain that based on the investigation as a

1    whole, they believe he's using a different cell phone, an

2    unknown cell phone number to communicate with Eric Johnson, and

3    they don't know what that number is and they're not

4    intercepting it.  But nonetheless they have probable cause to

5    believe that that cell phone will be found at Eric Johnson's

6    residence, and, in fact, they did find that cell phone, and it

7    did contain a lot of drug-related communications with Spruill.

8            I'm sure there may be other defendant-specific

9    arguments that Mr. Balter or Mr. Ruter, Mr. Coleman-Fuller

10   might want to raise.  But I think I've covered most of the

11   general points.

12           THE COURT:  Okay, thanks.  In case anyone is

13   interested, there's a line of cases from the District of

14   Columbia Court of Appeals.  The most defendant-friendly one is

15   *Burns*, B-u-r-n-s, *v. United States*, 235 A.3d 758, an August

16   2020 decision.  But it's followed by a couple of others that

17   the D.C. Court of Appeals has distinguished that.  Again, I'm

18   sure you would find all of the facts to be distinguishable, but

19   it does have some very sweeping language as to what's required

20   in the District of Columbia for phones, cell phones.

21           MS. HOFFMAN:  Your Honor, just one point that I

22   forgot to raise, but Your Honor raised is, of course, good

23   faith.  I do think that I haven't read the *Burns* case or the

24   follow-on cases, but it sounds from Your Honor's description

25   that it's an outlier, and of course it's not the same

1    jurisdiction.  And so I don't think that the officers in this

2    case, in Hagerstown, can be held to that standard.  I do think

3    that they -- even if Your Honor found that the search warrants

4    were overbroad in some way in this case, they certainly had

5    good faith based on the *Andresen* case, the *Williams* case, some

6    of the other cases that we've discussed.

7              My co-counsel just pointed out also it sounds like

8    the *Burns* case was a 2020 case which was after the search

9    warrants here were executed, so they, of course, couldn't have

10   known about that.

11             THE COURT:  Right, I guess -- I'm struggling.  I'm

12   troubled.  Cell phones were so central to the investigation, to

13   the evidence in this case, to bury that in effect in these

14   warrant affidavits and in the warrant, it just -- it's causing

15   a lot of trouble.  I can tell you that.  Certainly all of the

16   issues that we're dealing with, I'm struggling obviously

17   visibly with that one.  And it's -- you know, I guess I'm just

18   mystified as to why they didn't realize that there was just

19   more of a focus on it.  They wanted the phones they'd been

20   intercepting.  They wanted to see what else was on -- there's

21   no question that's what they wanted as part of this.

22             They were certainly also looking for the contraband

23   and other evidence, hard evidence, so to speak.  But why not

24   pull it out and do it at least more clearly?

25             MS. HOFFMAN:  I think two things, Your Honor.  One,

1    Ms. Newberger made the argument that well, this was a DEA task

2    force, I'm sure there was an AUSA involved.  That's actually

3    not -- it was a DEA task force, but this case did not come to

4    our office until well after these search warrants were

5    executed.  It was primarily a state-level investigation, state

6    officers primarily who were running things.  I'm sure that they

7    used templates from warrants that they frequently use in the

8    state.  There were no AUSAs involved, so they did not have

9    guidance from our office about how to more articulately explain

10   exactly what they're looking for in terms of cell phones.

11            I would also disagree with Your Honor's

12   characterization -- I agree certainly they could have been more

13   articulate.  There are typos in these warrants and there are

14   awkward turns of phrase to be sure, but I would disagree with

15   the characterization of it as being buried in the warrant.  I

16   don't think that's quite fair.  They do a very good job of

17   laying out why they believe these defendants are using cell

18   phones to engage in drug trafficking activity, and they do very

19   explicitly explain that they are asking for authorization to

20   seize and search all electronic devices such as cellular

21   telephones and the data stored in them.

22            Then it's qualified by this phrase, "used in or

23   incidental to the conduct or operation of controlled dangerous

24   substance violations."  That is what the case law says is

25   required and that's what they did.

1              It is absolutely not required to include a search

2    protocol, and in fact, you know, *Williams* and all these cases

3    from multiple circuits say you shouldn't do that, that that is

4    going to unnecessarily constrain you.  You can't possibly know

5    what files you're looking for until you get into the device.

6    So they weren't required to do that.  And I think they did

7    comply with the limiting principle that's been set forth in the

8    governing case law, in *Andresen* and *Williams*.  So I wouldn't

9    characterize it as buried in the warrant.  I do think it's

10   pretty straightforward, and I think they did all that was

11   required.

12             THE COURT:  Okay.  Ms. Newberger, anything else on

13   Hillcrest?

14             MS. NEWBERGER:  Your Honor, just very, very briefly,

15   and then I want to allow the other attorneys to argue the cell

16   phone claim.  The one thing that struck me, Your Honor, is that

17   in the argument, the Government says they can't possibly know

18   what they might find on the cell phone.  But as Your Honor

19   pointed out, this is a case in which they had multiple wiretaps

20   going, they were tracking the cell site data by phone, they had

21   GPS trackers.  And so I think to Your Honor's point which is

22   they had so much here, they clearly wanted to get on the

23   phones, why are they not being more specific?  Why are they

24   really not setting out probable cause in a way that is more

25   specific to their reasons for believing that there's evidence

1   on the cell phone and why they want to get on the cell phones?

2          This idea that the Government is arguing that they

3   shouldn't have to do it because they couldn't possibly have

4   known what they wanted to look for on the phones, I think that

5   doesn't pass muster.

6          THE COURT:  They did say in the warrant application

7   that they used texts to talk which is the WhatsApp, isn't it?

8   That they couldn't intercept or hadn't intercepted so they did

9   specify that in the application.

10         MS. HOFFMAN:  I'm sorry, I don't want to interrupt,

11  but one point I forgot to make as well, there's the lengthy

12  section -- it starts on USA 1524 and goes through 1527 where

13  the affiant talks about his training, knowledge and experience.

14  As Your Honor noted, the affiant explains that "based on his

15  training, knowledge and experience, narcotics traffickers often

16  use electronic equipment such as cell phones to generate,

17  transfer, count, record and restore the information described

18  above in items A, C, D, E or G."

19         And one thing I wanted to point out is that E,

20  section E says it's common for narcotics traffickers to secrete

21  contraband, proceeds of narcotic sales, and records of

22  narcotics transactions in secure locations within the

23  residences.  That, I think, is the most relevant phrase really

24  that includes -- they're saying narcotics -- basically what

25  he's saying is that narcotics traffickers often use cell phones

1    to store records of narcotics transactions which is -- that's

2    the text messages, the WhatsApp messages.  They're records of

3    narcotics transactions.

4             So could it be worded more eloquently?  Of course,

5    but I think it fairly covered, encompasses exactly what they

6    were likely to find in the phones and what they were looking

7    for and what they did find.

8             MS. NEWBERGER:  Your Honor, I just maintain and I

9    think this goes to Your Honor's point and this also goes to the

10   good faith, this idea that they couldn't possibly; they could

11   have in this case.  And similarly it's a DEA task force.  I'm

12   not suggesting that there was an AUSA who told them that they

13   didn't have to go get another warrant, but certainly there was

14   nothing preventing them from asking the question.

15            THE COURT:  Practically speaking, I'm not sure how --

16   I know you each still have nexus, probable cause, et cetera, to

17   deal with with a lot of different warrants, but as Mr. Balter

18   pointed out, each of you may have additional arguments.  But

19   please focus on anything that Ms. Newberger did not raise with

20   regard to the affidavit and warrant as it permitted seizure of

21   any cell phone in a location, whether it's a car or residence,

22   so that I can make sure I have all of that in my brain at the

23   same time.

24            Mr. Balter, anything further?

25            MR. BALTER:  Yes, Your Honor, just briefly.

1          THE COURT:  Okay.

2          MR. BALTER:  Your Honor, the first thing I'd like to

3     do is distinguish Mr. Johnson's case from the case that the

4     Government just heard about, factually distinguish what's in

5     the affidavit from that of Mr. Nelson and Mr. Spruill.

6          THE COURT:  Let me get it in front of me.

7          MR. BALTER:  The affidavit for this case is attached

8     to Government's ECF and it was Exhibit 6.

9          THE COURT:  Mill Run Circle, Apartment 201?

10          MR. BALTER:  Correct.  As the Court is aware, I

11     already touched on many issues related to the probable cause

12     within the context of my argument regarding the dog sniff, so I

13     don't want to repeat all that.  But I think what's most

14     significant to the Court's consideration as to the cell phone

15     is the fact that within the context of this affidavit, there is

16     absolutely no reference to the fact that Mr. Johnson ever had a

17     cell phone, held a cell phone, talked on his cell phone.  No

18     statement with regard to even surmising that he was using a

19     cell phone.

20          The only issues that came out -- and the Government

21     made reference to this -- are the Government's inferences with

22     respect to, well, if as alleged in the affidavit, Mr. Johnson

23     was in the process of having meetings with Mr. Spruill, those

24     meetings would have had to have been arranged in some way in

25     connection with the use of a cell phone.  But that's not what

1    the affidavit says.

2            The affidavit simply recites the fact that Spruill

3    was on -- was being intercepted on the wire, that Spruill was

4    in contact with other individuals in connection with making

5    statements which suggested that he was traveling to the Owings

6    Mills area for the purpose of obtaining CDS.  As the Court is

7    aware from the affidavit, Spruill is monitored through either a

8    tracking on the phone or tracking on the vehicle to that area

9    of the Owings Mills location that is ultimately searched, but

10   there is nothing regarding any type of communication with

11   Mr. Johnson that related to a phone.

12           So what we have here in this affidavit, Your Honor,

13   is a total lack of at least direct allegation in connection

14   with the use of a phone, and the only thing that the Government

15   really can rely upon here are these generic statements with

16   respect to what drug dealers in general do in the conduct of

17   the commission of drug trafficking.  Your Honor, I'm not

18   suggesting that the warrant cannot contain that type of

19   information for the purpose of explaining other information

20   which they have in the warrant.  But, in essence, what we have

21   here is allegations in the most general sense that Mr. Johnson

22   is engaged in drug trafficking without any particularization as

23   to the way in which he might be using a cell phone in

24   conducting that trafficking.  That puts this case in a totally

25   different procedural place than an affidavit in which there's

1    statements about the fact that the individual who is the target

2    of the warrant has been intercepted on a wire, that the person

3    who is the target of the warrant is in some way communicating

4    through a particular number or in some other way using a cell

5    device or for that matter any other type of electronic device,

6    computer, laptop, Apple iPad, whatever it might be.  There is

7    just nothing that makes that out.

8              So for that purpose, I think this case is totally

9    distinguishable from those other cases.  So to that extent I

10   think that this case is probably closer to the *Griffith* case

11   than the other cases that the Court has in front of it.

12   Because in *Griffith* there was probable cause with regard to the

13   individual, but, in essence, the cell phone part of it was just

14   bootstrapped on.  They had no particular information with

15   regard to in that case the defendant owning a cell phone, using

16   a cell phone.  They surmised further because of the fact that

17   apparently he had been locked up or there had been the passage

18   of time.  But in its most important way, it was totally similar

19   to the extent that there was no particularized knowledge that

20   he, in fact, had a cell phone.

21             So for that reason, Your Honor, I would suggest that

22   there couldn't be any probable cause, and it makes this issue

23   that the Court has pointed out as to the necessity for a

24   separate warrant for the phone even more dramatic in this

25   particular case.

1              As the Court has properly done, there is a total

2      distinction between whether or not the seizure of the phone as

3      a device and the seizure of the phone for the purpose of

4      searching the phone as basically a container, that might

5      contain that evidence of the drug trafficking which is being

6      investigated at that point.

7              So in this case, again, assuming just for purposes of

8      argument at this point that seeing the phone there was

9      justified -- I'm not conceding that it was, I'm not conceding

10     that it was.  But then in terms of that second step of any kind

11     of particularized information being in the affidavit as to, you

12     know, why it is that in any one of these phones they might find

13     that kind of information, it's even more attenuated, and the

14     Fourth Amendment requires at that point there be a separate

15     warrant for the Government to establish the fact that there

16     was -- to establish what that probable cause would be.

17             Now I note in the papers -- I'm not sure they're in

18     front of the Court, but the information disclosed to the

19     defense in discovery, it indicated that there were three phones

20     that had been seized out of the apartment and a Baltimore

21     County report from just a couple days after the search.  I

22     believe the search was on August 9.  On August 12, there was --

23     there's a note as -- they noted the seizure of the phones in

24     the report, and in parentheses at that point they say "phones

25     turned over to the DEA."  So right from the beginning,

1    obviously the federal government is well aware of the fact

2    these phones are there.

3           There's just a note in the papers that I have that

4    there was a download at that point, but then the Cellebrite

5    report that we received indicated, I believe, that the

6    Cellebrite download was made in December of '20.  Again, in

7    terms of whether or not they could have obtained a search

8    warrant, it looks like we have a lapse between the seizure of

9    the phone as a device and the forensic evaluation of

10   approximately 16 months which certainly would seem to have

11   allowed the Government ample time to be able to obtain a

12   warrant for this seizure.

13          So, Your Honor, I would adopt the arguments that were

14   made by Ms. Newberger with regard to matters related to the

15   severance.  I would, of course, again adopt her general

16   arguments with regard to the Fourth Amendment principles that

17   would apply here.  But, again, I think that in this case, it's

18   much different when, in fact, there is no reference made to the

19   phone at all.

20          I would also just like to address a matter related to

21   the question if we do get up to *Leon*.  The Court made reference

22   to, well, what is anybody going to know about this?  Of course,

23   the *Leon* issue would only go, I suppose, as far as the issue of

24   what the agents or the seizing officers were aware of at that

25   time.  Again, I think that either way, we prevail with respect

1   to they didn't have the authority because of the fact that the

2   warrant didn't supply probable cause with regard to those

3   phones.

4           And with respect to that, to the extent that the

5   authorities might have been on notice, I would refer to *United*

6   *States v. Lyles,* L-y-l-e-s, 910 F.3d 787.  A different type of

7   case but there in *Lyles*, there was a -- there was suspicion

8   about a defendant's involvement in more serious crimes.  But

9   not having apparently sufficient information in *Lyles,* they

10  went and did a trash pull.  They found scant evidence of

11  marijuana dealing, and so they used that marijuana dealing for

12  purpose of obtaining a search warrant.

13          That search warrant -- from that search warrant, they

14  sought a warrant in which there was basically the general type

15  of -- authorized basically the general type of, if you will,

16  rummaging that was authorized in this case.  In other words, a

17  warrant that surmised every conceivable type of evidence of

18  criminal wrongdoing that one could conjure up being authorized

19  in what the Court was suggesting was in a very disproportionate

20  way to what was being investigated as a result of what was

21  alleged in the warrant in the sense of a very minor amount of

22  CDS being acquired.

23          I bring this up within the context, though, as to

24  there is Fourth Circuit law suggesting kind of this general

25  type of warrant under certain circumstances, if there is not

1   evidence of more specific particularized evidence of criminal

2   wrongdoing, may -- may be overly broad.  I believe that's where

3   we are with this case.  The warrant is overly broad to the

4   extent that it is authorizing, it is authorizing the seizure of

5   all of this information related to the phones.  Again, the

6   phone information is particularized only to the extent that it

7   is talking about generally what drug dealers to.  It's not

8   particularized with regard to anything that Mr. Johnson

9   actually did with a device in his hand.  So in that sense, it's

10  disproportionate, and all this does is just open the floodgates

11  to basically a generalized warrant.

12          I will note also, Your Honor, with respect to the

13  D.C. case that the Court commented on before *Burns* -- and I

14  commend my client, Mr. Johnson, for finding this case on his

15  own -- and the language in that case is significant here.  In

16  that case the Court said:  To be compliant with the Fourth

17  Amendment, the warrant must specify the particular items of

18  evidence to be searched and seized from the phone and to be

19  strictly limited to the time and information or other data for

20  which probable cause has been properly established in the facts

21  and circumstances set forth under the oath in the warrant

22  supporting affidavit.

23          We have just nothing that approaches any of that in

24  this case.  So for all those reasons, Your Honor, I think both

25  in terms of the initial seizure of the phones, as well as the

1   subsequent download apparently 16 months later in the

2   Cellebrite forensic, that it should all be suppressed.

3          Your Honor, again, I've talked about the information

4   generally about the search warrant previously.  I adopt the

5   previous arguments I made with regard to the search warrant.

6   The Court has ruled with respect to the dog sniff and found the

7   dog sniff not to have been in violation of the Fourth

8   Amendment.  I supplement my previous arguments to the extent

9   that even if that dog sniff information is to be considered, I

10  still submit that there was a lack of probable cause, but I

11  will submit on further argument with respect to that.  Unless

12  the Court has other questions.

13         THE COURT:  Okay, I'm just making notes.  Thanks.

14         MS. NEWBERGER:  Your Honor, if I may, one thing that

15  Mr. Balter made the very good argument regarding good faith; he

16  gave a citation for *United States v. Lyles*.  The one thing I

17  don't think he mentioned is it's a 2018 case, so it was before

18  the search warrant was executed.

19         MR. BALTER:  That's correct.  Thank you.

20         THE COURT:  What jurisdiction, that's D.C?

21         MS. NEWBERGER:  No, it's Fourth Circuit.

22         THE COURT:  That is Fourth Circuit.

23         MS. NEWBERGER:  The Fourth Circuit, 2018, a Judge

24  Wilkinson opinion.

25         THE COURT:  Okay.  Mr. Ruter, do you want to be heard

1   on the cell phone aspect of these search warrants?

2          MR. RUTER:  Just very briefly, Your Honor.  Thank you

3   very much.  I adopt the arguments of prior counsel.  I'm not

4   surprised as to the thoroughness of Ms. Newberger which is to

5   be expected every time I see her in court, so I adopt all of

6   those arguments as well as Mr. Balter's.

7          Your Honor, I do admit -- I'm talking now about my

8   filing ECF 265 -- that perhaps, totally unlike Mr. Johnson and

9   her client, Mr. Nelson, there were, shall we say, numerous

10  telephone calls which I think started around July 7, ended on

11  July 30.  The warrant was executed on August 13.  In those

12  phone calls, Mr. Spruill is alleged to have been talking to

13  Mr. Redmen, Mr. Kegarise, Mr. Ware and others.  So I do not

14  have perhaps the strength of an argument as does Mr. Balter as

15  it relates to probable cause or Mr. Nelson, but nonetheless

16  that is contained in my paper but I will make no further

17  argument on it.

18         Our complaint, Your Honor, is strictly that which has

19  already been spoken of by both counsel which is the way in

20  which the warrant is written and the way in which it was

21  executed.  That is, without there being a second warrant

22  actually authorizing the search of the cell phones here in

23  question results in a general warrant.  On its face it is a

24  general warrant because anything, any paper, any drawer, any

25  electronic device could be seized per the affidavit and the

1    judge's order when there's probable cause, if any, as it

2    relates to Mr. Spruill, that one phone, (301) 331-3307, is the

3    only phone that he was ever known to have used.

4           I know that counsel for the Government suggested that

5    the affiant could infer that none of the phone calls referenced

6    the source of Mr. Spruill's drug sales which evidently were

7    alleged to have been happening between he and Mr. Kegarise and

8    he and Mr. Redmen and others.  But that's not mentioned in any

9    way in the four corners of the warrant.  Quite frankly, what

10   thoughts the affiant may have had in his mind is not relevant

11   to that particular issue.  What's contained inside the warrant

12   is.

13          Therefore, although I appreciate the Government's

14   attempt to say that per that argument, it's not contained

15   within the warrant and, therefore, the Court should ignore the

16   fact that there's no -- there could be an inference drawn that

17   because there's no calls referencing where the drugs are coming

18   from that, therefore, all phones found in his home may be

19   seized.

20          With that, Your Honor, I do submit.

21          THE COURT:  Okay.  Mr. Bussard.

22          MR. BUSSARD:  I will use the podium only because I

23   don't have a microphone back there at the moment.  I don't

24   believe I filed any phone searches per se.  To the extent that

25   I can, I will adopt the argument of counsel.  The closest I

1    have to a phone issue would be on ECF 231 which is location,

2    electronic location data.  That's something else.

3             THE COURT:  Right, we haven't talked about what's

4    required to do that yet.

5             MR. BUSSARD:  That's fine.

6             THE COURT:  Ms. Hoffman, any additional arguments?

7    You anticipated Mr. Balter's to some extent.

8             MS. HOFFMAN:  Yes, I did anticipate it.  I just

9    wanted to direct Your Honor to the specific language in the

10   warrant.  Again, this is ECF 313-6, the warrant for 10090 Mill

11   Run Circle.  At the bottom of page 8 and onto page 9, the

12   affiant explains:  As stated above, investigators have been

13   intercepting communications on one of Spruill's telephones,

14   TT-6, since June 28 of 2019.  Based on those interceptions,

15   investigators have established that Spruill uses TT-6 when he

16   is selling CDS to his customers.  However, investigators -- it

17   should say have also established that Spruill has another

18   telephone on which he contacts his suppliers.  Investigators

19   have yet to identify the phone number that Spruill uses to

20   contact his suppliers.

21             Then they in a very detailed way described these

22   multiple communications that Spruill is having where he is very

23   explicitly talking about going to pick up drugs from his

24   supplier which they, of course, follow him there and they see

25   him leaving the defendant's apartment building.  They record

1    him leaving the defendant's apartment building.

2          Then there's this additional incident on July 30, I

3    believe, where the defendant and his girlfriend, Latrice

4    Campbell, go to Spruill's residence in a vehicle.  They don't

5    positively identify them at that point, but they look up the

6    car's registration and learn that it's registered to Latrice

7    Campbell and that Eric Johnson has been pulled over in that

8    vehicle multiple times, and they believe that he's the same

9    person who they saw.

10          So I think that the clear inference from the fact

11   that they know Spruill is -- he's constantly using his cell

12   phone to arrange drug transactions with customers.  He's

13   telling his drug customers that he's making plans to go and

14   meet his supplier, who they know is Eric Johnson, at Johnson's

15   residence, and they're missing the conversations that he's

16   having with the actual supplier.  The clear inference is that

17   he has another phone that he's using to contact his supplier,

18   Eric Johnson.

19          So I think they certainly had probable cause to

20   believe that Eric Johnson was using a phone to communicate with

21   Spruill about the plan, transactions, both when Spruill would

22   go to Johnson's residence or when Johnson would go to Spruill's

23   residence.  There's no possible other way that they could

24   arrange those meetings, particularly given that they live a

25   significant distance apart from one another in different towns.

1   And clearly it's Spruill's modus operandi to use cell phones.

2   That's what he uses to communicate with other members of the

3   conspiracy.

4            So I think that was certainly a reasonable inference

5   and I don't think that more was required.  Certainly there was

6   more in the warrants for the other residences, but I don't

7   think it was required.

8            Then I just wanted to point out as a factual matter,

9   there were three cell phones seized from Eric Johnson's

10  residence.  The warrant, again, it did authorize agents to

11  seize any and all cell phones found in the residence, but they

12  had probable cause to believe that there were just two people

13  living in the residence, Eric Johnson and Latrice Campbell, and

14  that was true.  When they executed the warrant, it was just the

15  two of them in the residence.  And the affidavit does lay out

16  that Latrice Campbell -- not only was the apartment, the lease

17  was in her name, but she also went with him on that July 30

18  trip to Spruill's residence which the investigators explained

19  they believed was an instance in which Johnson supplied Spruill

20  with drugs.  And she's also the owner of the car that

21  Spruill -- I'm sorry, that Johnson is using to presumably

22  transfer, distribute drugs to Spruill.

23           So I think it was completely reasonable for them to

24  assume that there may be evidence of drug trafficking found on

25  her phones as well and that the phones in that residence that

1    was only occupied by the two of them were fair game.

2              And the same is true -- actually there's even a

3    stronger argument for Spruill.  They did seize multiple cell

4    phones from Spruill's residence, but the only people who lived

5    in that residence were Spruill, his girlfriend Tyesha Weedon,

6    and several children under the age of four who, of course,

7    would not have cell phones at that age.  The statement of

8    probable cause laid out in great detail how Spruill would use

9    Tyesha Weedon to distribute drugs to his customers.  They gave

10   examples of interceptions where -- I believe it was Bret Redmen

11   who he was talking to.  He said, "Okay, my girl is going to

12   have to give it to you," and they had the covert surveillance

13   camera shows the customer go to the door, and someone who looks

14   like Weedon opens the door and gives him something.

15             They clearly have reason to believe that she's

16   involved in the conspiracy as well and that phones in her

17   possession would have contained evidence of drug trafficking as

18   well.  So, again, I think there's probable cause to seize and

19   search all of the phones found in that residence.

20             Mr. Balter raised something about a Cellebrite

21   download happening in December of 2020.  I could be mistaken; I

22   believe that was the date the Cellebrite download was turned

23   over.  I don't think that's the date that the Cellebrite

24   download happened.  I believe that the warrants were executed

25   in a timely manner.  It's sometimes the case that the

1   extraction takes some time to get into -- they have software

2   that they use to break into the phones or whatever.  As far as

3   I'm aware, as long as the execution begins within the 14 days

4   or whatever it is, then it's timely executed.  I'm not sure if

5   that's exactly the point that Mr. Balter was making.

6              THE COURT:  He was suggesting there was plenty of

7   time to seek another warrant, get advice and oversight, all of

8   that.  At least that's part of what -- I did not hear -- he can

9   correct me if I am wrong -- that there was some error of

10  magnitude by not doing the Cellebrite extraction until December

11  of 2020 if that's when it was done.

12             MR. BALTER:  That's what I was arguing, Your Honor.

13  I'm looking at the face page of the report, and it's got the

14  creation time of 12/1/2020.  Again, the reason why the initial

15  report, the Baltimore County report -- I take that back.  I'm

16  not sure whether -- there were reports that were generated

17  within just days of the search by both the county and DEA

18  because apparently there was close coordination going on at the

19  time.

20             It appeared that there had been what was

21  characterized as a download, and, quite frankly, I don't know

22  what that was.  So to the extent that it appeared something had

23  happened within days, that may well have happened.  What the

24  relationship is between the download and the Cellebrite

25  forensic report, I frankly don't know either.  I'm just

1    surmising from the discovery that I have gotten.  So something

2    did happen.  There were three phones that were seized.  Two of

3    the phones, they were not able to get a download at least at

4    the time when the report was made.  It's P2, the second phone

5    which is the subject that we're really talking about now

6    because that is the one in which they were able to get a

7    download, and the Government made reference to the fact that

8    there was -- made reference to the fact that they had been able

9    to go further with it at that point.

10              Again, I just don't know anything more specific.

11   And, of course, the other issue is generally the questions with

12   delay relate back to the issuance of the warrant.  So, in other

13   words, if there was a valid warrant, there should be a search

14   of a phone within a particular period of time.  If there wasn't

15   a valid warrant, then it might kick in at the time that there

16   would have been, but either way, the defense has the argument

17   that for whatever reason, there was delay going on, be it with

18   the warrant or with the forensic search.  I would --

19              THE COURT:  Are you making a separate argument that

20   they didn't search within the time authorized or not?

21              MR. BALTER:  I don't know enough at this point to

22   make -- I, frankly, have not been given enough information to

23   know at this point to what extent there was a search.  In other

24   words, it was characterized to me as a download, at least

25   that's what the report said.

1           THE COURT:  They could have looked at it before they

2     downloaded it.  They could have searched it, and the download

3     is just for evidentiary purposes?

4           MR. BALTER:  Again, I don't know what the answer to

5     that is.

6           THE COURT:  If there's a warrant to seize drugs and

7     they seize what they think is heroin, fentanyl, cocaine, but

8     they don't send it to a lab right away or the lab doesn't get

9     to it right away, is there a problem?

10          MR. BALTER:  No, but there is with a phone.  The

11    problems with the phone --

12          THE COURT:  Why, if the phone itself is evidence?

13          MR. BALTER:  What the case law says -- I'm sorry I

14    didn't bring the case with me -- but, in fact, there's Fourth

15    Circuit law which it's suggested that a defendant continues to

16    have, in essence, a property interest in the contents of that

17    phone and that there is an impairment of that property interest

18    if there is an undue delay in actually what generally goes to

19    is in obtaining the warrant.  In other words, that interference

20    with a property interest between, say, a warrantless seizure --

21          THE COURT:  Yes, but this wasn't warrantless --

22          MR. BALTER:  It was warrantless if this was outside

23    the warrant, I suppose, is what the argument would be --

24          THE COURT:  If this were a plain-view seizure, that's

25    a different issue.  I get that.

1          MR. BALTER:  Correct.  Again, if this was -- it's

2     pursuant to the warrant but our underlying argument is it was

3     only executed because there was no really broad warrant, and

4     that would arguably make it a nullity.  It's within that

5     context I make the argument.

6          Just two other factual matters with regard to what

7     the Government just said about the affidavit.  They referred to

8     an incident that happened, I believe it was on July 30, in

9     which there was surveillance of a person at the back of

10    Spruill's residence who went inside the residence and then came

11    back out, and there was a female in who apparently accompanied

12    that person.  The Government alleged that that person was

13    Latrice Campbell and that's not what the affidavit says.

14         What the affidavit says is they got a plate number,

15    they were able to trace the plate number.  Through tracing the

16    plate number, they were able to obtain the name of Latrice

17    Campbell, and from there they ultimately were able to get the

18    information from the Run Mill -- or the apartment complex that

19    tied them to that apartment 201.  But there was nothing that

20    suggested that she was, in fact, the female who was there at

21    the time, other than the fact the only allegation was that the

22    car related back to her because it was supposedly registered in

23    her name.

24         The other matter that, again, I think is somewhat

25    nuanced is the issue with regard to the fact that the agents

1    said that they -- I don't know, let me just get the warrant for

2    a moment.  The agents made reference to their belief that

3    Spruill has another telephone on which he contacts his

4    suppliers.  There's no explanation for -- it doesn't say the

5    investigators infer or believe.  It says the investigators have

6    established.  With no explanation for what their basis for

7    belief is in stating that they have established that he has

8    another telephone.

9              In other words, they could have surmised he must have

10   another telephone because there's information we believe we

11   would know about but for the fact it's not coming up on the

12   wire; therefore, we believe he must have another phone.  Or

13   there could have been some other independent information

14   suggesting, oh, Spruill's got another phone, but they just

15   don't know what it is.  They would suggest in the way that this

16   is worded, "have established," which is distinguishable from we

17   draw the inference that they knew something else, but whatever

18   it is, it's not there.

19             So to the extent that this is an inference, he had

20   another phone, and they're doubling that inference with the

21   fact that, well, if there is another device he's using, that

22   would have been the one that he would be using to communicate

23   with a source.  We're dealing with so many inferences at this

24   point that I think it seriously undermines whatever probable

25   cause that the Government might have.  Thank you.

1          THE COURT:  Nothing further, Mr. Ruter, in rebuttal?

2          MR. RUTER:  No, thank you, Judge.

3          THE COURT:  I wouldn't think so, but Mr. Bussard?

4          MR. BUSSARD:  No, thank you.

5          THE COURT:  Let's take our lunch break.  I want to

6    hear after lunch the specific nexus, probable cause issues with

7    regard to the warrants for the residences, the cars, the

8    location information, and see how far we can get this

9    afternoon.  Because then we only have a motion to sever and I

10   think we have a couple in terms of evidence.  Maybe we can get

11   it all in, maybe we won't have to come back tomorrow.

12          Can we come back at 1:15, not quite an hour?  Is that

13   all right, doable?  Okay, see you at 1:15.

14          THE CLERK:  All rise.  Court stands in recess.

15      (Recess taken at 12:24 p.m. until 1:18 p.m.)

16          THE COURT:  Please be seated, everyone.  Good

17   afternoon.  I guess we're ready to resume.  Ms. Newberger, do

18   you want to move on to Elgin?

19          MS. NEWBERGER:  I'd be happy to, Your Honor.  Thank

20   you.

21          MS. HOFFMAN:  Your Honor, if I could just clarify one

22   thing for the record very briefly.  I think I was wrong when I

23   said that the iPhone that was recovered and searched from

24   Nelson's phone was not TT-10.  It looks like it was TT-10.  But

25   regardless, the WhatsApp messages would not have been

1    encompassed by the wiretap.

2              THE COURT:  It was mainly curiosity.  I'm not sure it

3    would matter, but thank you for clarifying it.

4              MS. NEWBERGER:  Thank you, Your Honor.  The arguments

5    regarding 45 Elgin Boulevard are, again, focused on nexus, but

6    we don't have that added issue of the cell phone that we had

7    with 105 East Hillcrest.

8              THE COURT:  You mean you would concede that there was

9    a nexus with Elgin because it was more a residence, or it's

10   just not relevant because none were seized?

11             MS. NEWBERGER:  Because none were seized.

12             THE COURT:  Okay.

13             MS. NEWBERGER:  Your Honor, we do maintain that we

14   don't believe that there was a sufficient nexus to search 45

15   Elgin Boulevard.  Again, the focus of our argument isn't that

16   the Government didn't have or failed to establish probable

17   cause to believe that Jeroam Nelson may have been engaged in

18   drug trafficking, but, again, the focus is on whether or not

19   the government -- the law enforcement established in the

20   application probable cause to believe the evidence of that

21   wrongdoing would be found at 45 Elgin Boulevard.

22             Much like the 105 East Hillcrest warrant, the 45

23   Elgin warrant relies on a lot of conclusory allegations

24   regarding Mr. Nelson and his conduct.  It also has pretty on

25   specific descriptions of what Mr. Nelson's connection to 45

1   Elgin Boulevard is, and the interceptions and surveillance that

2   they mention occur really on one circumstance.  There are

3   references and crass language to it being a former girlfriend's

4   house in the transcribed conversation, and there is some

5   surveillance of him at the address on a date at which there are

6   calls and text messages with Mr. Coleman-Fuller.  I think this

7   is actually the warrant you were referring to where it's

8   clearly delineated that some of what they've intercepted are

9   text messages and not just calls.

10          Your Honor, with that, pretty much that single time

11   of surveillance at that address and all else they indicate is

12   that they determine who resides or who's registered to that

13   address -- it's redacted in the exhibit -- and that the toll

14   records for Mr. Nelson's current cell phone shows that he's in

15   contact with the person who is the listed resident of 45 Elgin

16   Boulevard.  That is basically what they set forth in terms of

17   the nexus to search 45 Elgin Boulevard.  And yet similar to --

18   as Ms. Hoffman, I think, conceded -- is that sort of the

19   language about what the warrant authorizes in terms of the

20   scope of the search is the same in all of these various

21   warrants, and it includes sort of that broad in scope

22   authorization to search for the listed items and really be able

23   to search wholesale within the home.

24          Your Honor, again, as we have talked about at great

25   lengths previously regarding 105 East Hillcrest, the Fourth

1    Amendment demands probable cause to believe that evidence of

2    Mr. Nelson's suspected drug activity be found at 45 Elgin

3    Boulevard, not merely that Mr. Nelson, who law enforcement's

4    probable cause is believed was engaged in drug activity, has

5    gone to his girlfriend's house on one occasion to meet with

6    someone who they have probable cause to believe is also engaged

7    in drug trafficking.  For a single meeting to satisfy that

8    nexus requirement, it would need to establish more.  Something

9    to suggest that that is where Mr. Nelson stored drugs or

10   otherwise kept contraband related to his drug activity, but

11   that is not what the affidavit establishes.

12             There's really very little information about

13   Mr. Coleman-Fuller other than the transcribed communications in

14   September, and then, Your Honor, there's only the single

15   instance of surveillance where they believe they saw what might

16   have been a drug transaction at that residence.  But I say

17   they're assuming because they don't explain observations that

18   suggest one of them went into the house with something, someone

19   else came out with something.  In fact, the transcriptions

20   really do suggest the intent was just to meet outside the

21   house, that it wasn't even clear that they were going to be

22   meeting within the house.

23             So for those reasons, Your Honor, this statement of

24   probable cause in the application fails to set forth the nexus

25   as to why they believe that evidence of Mr. Nelson's wrongdoing

1    is going to be found at 45 Elgin Boulevard.

2          Your Honor, similar as this overbreadth argument

3    regarding the scope, that for something that really authorized

4    the wholesale search of the home and items to be seized, they

5    really don't establish probable cause to believe that the home

6    is sufficiently connected to Mr. Nelson's illegal activities

7    such that they are going to find evidence.  For example, unlike

8    what Ms. Hoffman stated about refuting some of the arguments

9    regarding the overbreadth by allowing seizure of some of the

10   girlfriends' phones from Mr. Nelson's co-defendants, there

11   really doesn't appear to have been any allegation whatsoever in

12   this application that the resident at the primary residence of

13   the house was at all engaged in any way with Mr. Nelson's

14   illegal activity and nothing to suggest that he keeps things

15   there, including cell phones, which, again, it authorizes sort

16   of the search and seizure of all electronic devices, including

17   cell phones.  That isn't really a basis -- no cell phones or

18   electronic evidence to suppress from the search of 45 Elgin

19   Boulevard, but it does go to this overbreadth issue.

20         So for those reasons, Your Honor, we believe that the

21   application for the search warrant for 45 Elgin Boulevard

22   fails.

23         Your Honor, would you like me to let the Government

24   proceed, or should I move on --

25         THE COURT:  No, let's move on to do all of yours.

1            MS. NEWBERGER:  Thank you, Your Honor.  Regarding the

2     warrant to search the Chevy Impala, that was obtained after the

3     search warrants were executed at Hillcrest and Elgin Road and

4     it -- I believe -- and because it relies on the presence of the

5     Impala outside Hillcrest at the time that the search warrant is

6     executed.  The affidavit primarily talks about his rental car

7     history and him carrying undescribed items from the car's trunk

8     to 105 East Hillcrest Road on one occasion.  Given that it's

9     his mother's house, that isn't a particular cause for concern.

10           Your Honor, what I will just note which is

11    interesting is in this particular warrant, it includes, "Nelson

12    was observed at this location on almost a daily basis at 105

13    East Hillcrest Road."  That is interestingly not in the

14    application for 105 Hillcrest Road which, I think, just goes to

15    this issue in *Lyles*; they talk about uncontroverted facts that

16    are inadvertently left out.  There are all kinds of things that

17    are just not included in these warrants which I think goes to

18    the issue of good faith.

19           THE COURT:  Well, they were discussing that in *Lyles*

20    in the context of what could supply evidence of good faith.

21           MS. NEWBERGER:  Yes, right.  And I actually think

22    here it works, but what they were saying is it has to be not

23    just uncontroverted but inadvertently omitted and there's

24    nothing here to suggest it's inadvertently omitted.  The

25    Government hasn't attempted to call these individuals to say,

1    "Actually, when I was swearing out the application, I added

2    these details for the judge."  There is such a difference in

3    what they include in each of these different warrants.  It is

4    mystifying, but it does not seem to be inadvertent because it

5    doesn't appear that it's just in everything else and then

6    missing from one.  It's interesting what they choose to include

7    and not include in these various documents.

8            Your Honor, based on what is included in this

9    particular and relatively brief application regarding the

10   Impala, there really is not reason to believe that they're

11   going to find evidence there.  They just haven't established

12   nexus in the same way.

13           Your Honor, what I will just note is it does clearly

14   appear that this warrant is derivative of the 105 Hillcrest

15   Road warrant, so if Your Honor ultimately determined that they

16   didn't demonstrate sufficient nexus and granted Mr. Nelson's

17   suppression motion pertaining to the overall search of 105 East

18   Hillcrest Road, then we would argue that this particular

19   warrant and the search of the Impala is derivative of that.

20           As to the GPS tracker on the 2018 Impala, this

21   precedes the previous warrants, so this is a little bit out of

22   order in terms of the order in which these things were

23   obtained.  That was applied for on August 28, 2019, so a little

24   more than a week before the search warrants for -- that we have

25   already discussed.  This warrant also raises sort of these

1   unsupported conclusions that Mr. Nelson is a drug trafficker

2   and doesn't really give the basis but then moves on to talk

3   about how there is a wiretap on a phone associated with

4   Mr. Nelson and then that he has a rental car history.  He rents

5   cars for fairly short periods of time and then indicates that

6   they know that he rented a Chevy Impala on August 26.

7           Then it says that they had reliable information that

8   Mr. Nelson was traveling to Pittsburgh, Pennsylvania, and

9   describes that it's believed that that vehicle was seen.  It's

10   not clear, I don't know, I think it's not that this particular

11   task force -- maybe law enforcement in Pittsburgh, that's not

12   entirely clear, that they recognized the vehicle.  It has two

13   male occupants and two female occupants, and it's followed to a

14   hotel where they suspect that something happened.

15           But it also indicates that they were not able to

16   positively identify Mr. Nelson at that time.  And they indicate

17   that Mr. Nelson works at Maryland Paper and that the Impala has

18   been parked there.  That is the sum total of the probable cause

19   that they get for this GPS tracking.  It really doesn't provide

20   probable cause to believe that tracking this Impala will enable

21   them to gather more incriminating evidence against Mr. Nelson.

22   They associate it with what they suspect to be a drug deal in

23   Pittsburgh except they concede that they're not even sure that

24   Mr. Nelson was there, nor are they sure that it was, in fact, a

25   drug deal.

1          For those reasons, Your Honor, we move to suppress

2    the tracking information from the Chevy Impala.

3          Your Honor, the only remaining -- there are two

4    remaining motions, one challenging the historical -- the

5    real-time cell site data and severance.  The Government had --

6    on severance for a moment, the Government had indicated that

7    they thought that it was premature to deal with severance at

8    this point because we need to see how things shake out.  We had

9    filed a letter indicating that we were in agreement that it

10   might ultimately become a moot point depending on how --

11   various choices that defendants make.  So I was not really

12   prepared to argue about severance today, so severance is not

13   part of this PowerPoint presentation.  I think that the

14   Government doesn't have a problem with setting aside the

15   severance issue --

16          THE COURT:  Waiting a little while longer, just a

17   little while.

18          MS. NEWBERGER:  Just a little while longer.  Things

19   may shake out a little bit after the conclusion of these

20   hearings.

21          Your Honor, regarding the cell site data, in 2018,

22   the year before law enforcement obtained this warrant -- and

23   they did, in fact, obtain a warrant -- but in *Carpenter*, the

24   Supreme Court made clear that cell site location information

25   provides an intimate window into a person's personal life,

1   revealing not only his particular movements but through them

2   his familial, political, professional, religious, and

3   sexual associations, and so the information that can be

4   gathered through cell site information is much like a cell

5   phone of incredible -- of an incredibly personal nature.  So,

6   again, when we're analyzing the issue of probable cause, I do

7   think it's important to look at it through that veil of this is

8   highly, highly personal information which the Government is

9   seeking, so we do need to hold their warrants to a rigorous

10  standard in determining whether or not there was, in fact,

11  probable cause.

12          The first warrant which is for TT-8, largely it lays

13  out communications with an individual named Marvis Jackson

14  which the statement of probable cause interprets as having to

15  do with someone potentially going to re-up a supply in the New

16  York area.  Really all that communications on their face sort

17  of discuss is Mr. Jackson wanting to get up to New York and his

18  various plans for how he's going to make that trip and

19  ultimately concluding that he's going to take the train.  It is

20  fairly vague and it doesn't say a whole lot about Mr. Nelson in

21  this interaction, even taking on face value that it's about

22  Mr. Jackson's attempts to find the best way to get to New York

23  to re-up, it really -- Mr. Nelson doesn't really -- the

24  conversations or the comments attributable to him just don't

25  really bespeak to what his interest is other than sort of

1    talking through these logistical issues.

2            The remaining calls are, again, one with an unknown

3    male in which he's sort of indicating that -- again, it's

4    fairly ambiguous as to what the nature of that communication

5    is.  And then there's another communication with Mr. Jackson,

6    and he asks if, presumably -- taking on face value that law

7    enforcement says that when you refer to "Do you have some

8    girl?" that it's controlled substances, and Mr. Nelson's

9    response is, "I wish."

10           So based on those communications, law enforcement

11   obtained on August 12 of 2019 authorization to get real-time

12   cell site data on Mr. Nelson's phone.  Your Honor, I would say

13   that they have not established probable cause to seize that

14   data because they have not sufficiently established that

15   tracking Mr. Nelson is going to demonstrate or provide more

16   evidence of his wrongdoing.  In fact, this warrant is

17   particularly weak, Your Honor, in even clearly stating that

18   Mr. Nelson is involved clearly in illegal activity at the

19   time.

20           The second warrant, which is the one that is

21   authorized on August 20 of 2019 for TT-10, starts out again

22   with that ambiguous -- it talks about the investigation more

23   broadly and Thamar Smith, that they've identified Mr. Nelson

24   again; these are conclusory statements.  When it comes to the

25   actual wires, communications that they talk about again, quote,

 1    this fairly ambiguous communication between Mr. Nelson and

 2    Mr. Jackson about Mr. Jackson's attempts to get up to New York

 3    and the other conversations that are in the previous motion.

 4    Then it adds some communications on August -- it then explains

 5    why they believe that Mr. Nelson was no longer using TT-8 and

 6    that from looking at the people who he had been in

 7    communication with when he was using TT-8 and looking for

 8    common numbers, they think that he is now using TT-10.

 9              Then it cites to a conversation with

10    Mr. Coleman-Fuller on August 18 of 2019 about where Mr. Nelson

11    is and again meeting up with Mr. Nelson, and this -- again,

12    it's pretty explicit, "I'm at my mom's."  Interestingly, again,

13    this one isn't included in the Hillcrest warrant; they rely on

14    a different call.

15              Your Honor, again, we would make the argument that

16    this is not sufficient probable cause to justify the incredibly

17    invasive tactic of getting real-time cell site data for

18    Mr. Nelson's cell phone, TT-10.  For that reason, we have moved

19    to suppress the historical cell -- not historical -- the

20    real-time cell site data from that phone.

21              THE COURT:  All right.

22              MS. HOFFMAN:  Thank you, Your Honor.  I think if it's

23    not too confusing, I might actually take the warrants in the

24    order that they were obtained.

25              THE COURT:  Sure.

1          MS. HOFFMAN:  I will start with the August 12, 2019

2    tracking warrant for Nelson's TT-8 cell phone.  I think

3    they're -- Ms. Newberger has sort of nitpicked the agent's

4    interpretation of the wiretap calls at issue, but that's really

5    not the standard.  I think she's applying too high a standard

6    here.  Also I just note in response to the *Carpenter* argument.

7    *Carpenter* said what it said, but there's no -- it's not a

8    higher standard of proof for search warrants for real-time cell

9    phone location data than there is for a search warrant for a

10   home, for instance.  It's still the same probable cause

11   standards.  I don't think that there's a greater showing that's

12   necessary.

13          In any event, the affiant began the warrant with --

14   it is a high-level summary, but it is a truthful summary of

15   what the wiretap investigation has revealed so far.  They

16   explain that based on wire intercepts over both TT-5 and TT-8,

17   as well as physical surveillance and electronic surveillance,

18   they've identified Nelson as a supplier of narcotics to a

19   number of individuals; that they've established that he obtains

20   narcotics from an unknown male in Mexico; and that two of his

21   associates in the organization are Coleman-Fuller and Marvis

22   Jackson.  And that, you know, it's high level but it's true.

23   It's certainly borne out by all the many specific calls that

24   we've looked at in the context of the wiretap affidavits.

25          But then they go on and they provide a few examples

1    of specific calls that lead them to believe that Nelson is

2    using TT-8 in furtherance of drug trafficking.  The first is

3    this August 10 call and Ms. Newberger characterized it as

4    vague, but I think when you take it in context, it's quite

5    clearly suspicious and indicative of drug trafficking.

6    Nelson's not just talking about taking a recreational trip to

7    New York City with Marvis Jackson.  They're talking about

8    taking a trip and coming back on the same night which is highly

9    unusual, going from Maryland to New York and coming back the

10   same night.

11           They're also talking about the possibility that this

12   other person Ty is going to drive one or both of them for $250.

13   Based on the investigator's training and experience, they know

14   that is a common tactic used by drug traffickers to use a

15   courier essentially, pay somebody else to drive so that if

16   they're pulled over, they're not necessarily the one who has to

17   take the fall for the drugs.  So that's certainly suspicious in

18   and of itself.

19           Then they intercept these additional calls.  On

20   August 10, they intercept another call in which Nelson tells

21   someone he was supposed to get mail from him yesterday, which

22   may be innocuous standing on its own, but then he said, "I had

23   to use some of it but I still got -- where you at?"  They

24   explained that it wouldn't make sense if you were taking about

25   mail to say I had to use some of it, and based on the context

1    they believe "mail" is a code word for drugs which I think is

2    perfectly reasonable.  We've seen in many of these calls that

3    are used as examples in these affidavits that Mr. Nelson was

4    careful to use coded language.  He was cautious about talking

5    about drugs on the phone.

6          Then the most explicit call is this August 11 call

7    where Marvis Jackson asked Mr. Nelson whether he "got some

8    girl" which, of course, would be nonsensical if you were

9    talking about an actual girl.  The agents know that's a

10   commonly used street term for cocaine.  So that's fairly

11   explicit.

12         Then they talk, of course, about Nelson's criminal

13   record and the agent's extensive training and experience and

14   the fact that he knows that drug traffickers commonly carry

15   cell phones on them and that the locations of the cell phones

16   reveal information about sources of supply and stash houses and

17   identities of co-conspirators.

18         So I think there's ample probable cause for that

19   warrant and certainly good faith.  The next warrant is the

20   August 20, 2019, tracking warrant for Nelson's cell phone,

21   TT-10.  Again, they begin -- I'm sorry, scratch that.

22         This warrant provides even more probable cause than

23   the one for TT-8.  They begin with the discussion of the search

24   warrant that was executed on Eric Johnson's residence on

25   August 12 and the fact that they recovered 240 grams of a

1    heroin/fentanyl mixture, a handgun, drug paraphernalia, and a

2    large amount of cash.  They explain that a search of Johnson's

3    telephone revealed that he and Nelson were in communication

4    with one another, arranging meetings, and Johnson was wiring

5    money to Nelson through a third party.  That's obviously very

6    strong PC right there.

7            It's also -- they referenced the search of Johnson's

8    telephone on August 20 which also -- I think this goes to the

9    timeliness issue that was raised earlier.  Mr. Balter suggested

10   there may -- the search of Johnson's phone may not have been

11   timely, but clearly they had already searched the phone by

12   August 20 when they obtained this warrant which would have been

13   eight days after the search warrant was issued for Johnson's

14   residence and his phone, so I think that does establish that it

15   was timely.

16           But in any event, turning to the PC issue, they then

17   explain how almost immediately after the warrant is executed on

18   Eric Johnson's house, and they find all these text messages

19   between Johnson and Nelson, Nelson then switches phones from

20   TT-8 to TT-10.  And right before he switches phones, he tells

21   Marvis Jackson, one of his co-conspirators, "BS going on," or

22   bullshit going on, which is clearly, based on their

23   interpretation, a reference to something fishy is going on, and

24   therefore he's going to switch phones.

25           So they explain how, based on this, they believe

1   Nelson had been supplying Johnson with heroin and fentanyl, and

2   it was Johnson's arrest that caused Nelson to switch phone

3   numbers.  Then they go further and provide another example of a

4   call in which Nelson and Coleman-Fuller make plans to meet at

5   Nelson's mother's house so that Coleman-Fuller could pay Nelson

6   money that he owed.  Again, very explicit evidence of drug

7   trafficking activity using that phone, and they actually

8   surveil a meeting between the two of them at that location as

9   well.

10          So I think there is certainly, again, probable cause

11  for this tracking warrant, and at the very least there is good

12  faith.

13          The next one is the August 28, 2019, tracking warrant

14  for Nelson's 2018 Chevy Impala.  I certainly acknowledge that

15  this warrant is a little bit more high level than the other

16  warrants in terms of the factual -- the statement of probable

17  cause, but I think it's very clear why.  The affidavit explains

18  that there's this ongoing active investigation going on in

19  Pittsburgh into this known fentanyl dealer.  It's reasonable

20  that they don't want to include the name of the fentanyl dealer

21  or very detailed information that could lead Mr. Nelson to

22  figure out who they're talking about.  But there is absolutely

23  no claim by the defense that any of the information in this

24  affidavit is false or misleading in any way.  It is all

25  completely truthful and borne out by other evidence turned over

1    in discovery --

2              THE COURT:  Let me stop you for a second.

3              MS. HOFFMAN:  Sure.

4              THE COURT:  This warrant wasn't going to be revealed

5    to anybody at the time of its issue, was it?

6              MS. HOFFMAN:  Well...

7              THE COURT:  Unlike one where you search a house, they

8    know you're searching their house and you leave a copy.

9              MS. HOFFMAN:  Certainly not right away but recall the

10   residential search warrants for Mr. Nelson, they were executed

11   on September 9 which is just 11, 12 days later.  And I presume

12   at that time they did -- they arrested Mr. Nelson and did, in

13   state discovery, turn over these warrants.

14             THE COURT:  Well, there are ways to protect ongoing

15   investigations if that's what's happening.  You don't hold back

16   from an issuing judge necessarily on that basis.

17             MS. HOFFMAN:  There certainly is the possibility of

18   redaction, although in order to -- I've dealt with this issue

19   in federal cases.  Obviously, the defendant has to have the

20   ability to challenge the warrant in a motions hearing, so you

21   can't really effectively redact anything that's necessary to

22   probable cause because that prevents the defendant --

23             THE COURT:  You make choices at that point.

24             MS. HOFFMAN:  Right.  I think it's reasonable for

25   them here to decide to be cautious in how they're describing

1   this and make it less than obvious who it is who he's meeting

2   with --

3           THE COURT:  I don't disagree that's possible but

4   not -- it can't be at the risk of not showing enough facts to

5   the issuing judge.

6           MS. HOFFMAN:  Of course not, of course not.  I

7   completely agree; they still have to show probable cause.  They

8   have to give enough detail for the judge to be able to make a

9   determination that there's PC and the judge is not just a

10  rubber stamp.  I think they did that here.  I do think the

11  information -- while more high level than some of the other

12  warrants we've seen, it is specific enough.  They explained --

13  again, they have this summary paragraph in the beginning where

14  they explain that based on all the wire calls and texts they've

15  intercepted, they have learned that Nelson's trafficking heroin

16  and fentanyl in Washington County as well as Pennsylvania.

17  They've learned he's in contact with sources of supply in

18  Mexico, Delaware and New York.  They've identified all these

19  individuals who Nelson is supplying with drugs in the

20  Washington County area.

21          They explained how he cycles through various rental

22  vehicles and uses rental vehicles to transport drugs and drug

23  proceeds.  They explained that they contacted Enterprise and

24  learned that he would typically return cars after having them

25  for just a short period.  They explained how, based on our

1   training and experience, they know that's a typical method used

2   by drug traffickers to avoid detection by law enforcement.

3   They explained that the target vehicle is just such a rental

4   vehicle that was rented by the defendant on August 26, 2019,

5   and then they explained they received reliable information that

6   Nelson is going to be traveling to Pittsburgh to supply drugs

7   to a known fentanyl distributor in Pittsburgh who's the target

8   of an active investigation there.  They explained that they

9   know he's made two other recent trips from Hagerstown to

10  Pittsburgh to meet with the same person.

11          I think you can read between the lines and realize

12  that they're getting this information from the investigators in

13  Pittsburgh and that they're being cautious about how much they

14  reveal here because it's an active investigation, and they

15  don't want to ruin things for the Pittsburgh investigators.

16          Then most importantly is this specific observation of

17  this transaction on August 26.  They locate the target vehicle

18  in the Monroeville Mall just outside Pittsburgh.  They have a

19  GPS tracker on his cell phone.  It shows that he's pinging in

20  the same area so the inference is that he's the one operating

21  the vehicle because his phone is also in that area.  They

22  follow the vehicle to a local hotel that's known for drug and

23  prostitution activities.  Most importantly, it says that the

24  occupants of the target vehicle met with the known fentanyl

25  distributor.

1          So they say that they observed the occupants of the

2     target vehicle, presumably Nelson because his phone is pinging

3     there, meet with that known fentanyl distributor.  They don't

4     give the fentanyl distributor's name it's true, and they don't

5     give a high level of detail and say we saw a black bag

6     exchanged or whatnot, but I don't think that's required.  I

7     think they give enough detail.  They give the date, the place

8     where it happened.  They explain why they believe that it was

9     Nelson who was involved because it's his vehicle, he's been

10    observed operating it, and his phone is pinging there.  And

11    they explain that he stayed at the hotel for just a very short

12    period of time before leaving which is also suspicious.

13         So I think that that is a sufficient level of detail.

14    They also confirm that the target vehicle was parked in the

15    parking lot of the place where Nelson worked on August 28 while

16    his cell phone was pinging there too.  So that's additional

17    corroboration that it was almost certainly Nelson who was

18    driving the target vehicle on August 26 when they observed this

19    transaction.

20         I would also note, I think, it is somewhat ironic

21    that Mr. Nelson protests there was not probable cause for this

22    warrant because at the last motions hearing that we had,

23    defense counsel spent quite a bit of time arguing that law

24    enforcement should have gotten a tracking warrant on Nelson's

25    2018 Chevy Impala sooner and that their failure to do so was

1    evidence of a lack of exhaustion.  They can't have it both

2    ways.  As I said, I fully acknowledge this is not written --

3    this warrant is not written with the same level of specificity

4    as some of the other warrants, but I think it still clearly

5    meets the bar and certainly there was good faith.

6            I did also just note in a footnote that in reality,

7    they had actual footage of the meeting, so it's not as

8    though -- there's no suggestion that the information in here is

9    not truthful.  It was 100 percent truthful.  Mr. Nelson did

10   meet with this Wesley Ellis-Barnes character and they had the

11   whole thing on security camera footage, but they just withheld

12   the specifics of it in an attempt to preserve that ongoing

13   investigation in Pittsburgh.

14           So then we get to the search warrant at 45 Elgin

15   Boulevard.  I think that the defense has conceded that the

16   language about the cell phones in this warrant isn't really

17   relevant because no cell phones were seized.  It sounds like

18   their primary argument is just that there was not sufficient

19   nexus between Nelson's drug trafficking activity and the home.

20   I think that there is more than sufficient probable cause.  You

21   know, not only do they explain that he frequents this residence

22   based on covert surveillance camera that they have installed

23   outside and that it's normal for drug traffickers to store

24   drugs in their residences, but they give, more importantly, a

25   very specific, concrete example of Nelson using the residence

1    for drug trafficking.

2            Specifically on September 1 and September 2, they

3    intercept a series of text messages and calls between Nelson on

4    TT-10 and Coleman-Fuller on TT-9, and they make plans to meet

5    up for an exchange of money and drugs.  First call Nelson asks

6    Coleman-Fuller for $5,000, and then the following day,

7    Coleman-Fuller asks where to meet Nelson.  He tells them "his

8    old bitch house" which is a reference to his ex-girlfriend's

9    house.  And Coleman-Fuller asks him, "You got them 200 things?"

10   Which is actually fairly explicit, at least for these two who

11   often talk in coded language, and he asks for confirmation that

12   it's a one-stop shop.  So he's looking to get everything, all

13   the drugs that he wants in one place, and Nelson says yes.

14           So the affiant explains that he interprets this

15   conversation to mean Coleman-Fuller is going to be purchasing

16   200 grams of drugs from Nelson.  He wanted to make sure Nelson

17   had everything in one place.  Then they actually surveil --

18   using the covert surveillance camera, they surveil the deal.

19   First, they see a black female arrive in a white Honda, and

20   then they see Nelson arrive at the residence.  They both go

21   inside the residence.  Then minutes later the black female

22   exits, she gets a black bag from the Honda.  She brings the

23   black bag back into the residence.  Then Coleman-Fuller

24   arrives, he goes into the residence.  Then four minutes later,

25   Coleman-Fuller gets out, gets in his truck and leaves.  So

1    obviously highly suspicious circumstances.  We don't know for

2    sure whether the black bag that was brought in contained drugs,

3    but it's certainly a reasonable inference that this woman was

4    bringing something in from the car that contained drugs, and

5    then Nelson was distributing some of those drugs to

6    Coleman-Fuller.

7            Then to top it all off, they then observe

8    Coleman-Fuller, shortly after that, dealing drugs to a white

9    female in a car with West Virginia license plates near his

10   residence at 30 East Franklin Street.  So obviously makes it

11   even more logical to infer that Coleman-Fuller has just

12   obtained a supply of drugs from Nelson within 45 Elgin Road.

13   So I think it's just wrong to say that there's no nexus to the

14   home.  There's clearly a very explicit nexus, and all of this

15   occurred just days before the search warrant was obtained and

16   executed.

17           Then, of course, they also explain the house is owned

18   by Geneses Walsh and that they have toll records showing

19   Nelson's in contact with her at that address which is

20   additional evidence that he's connected to that home.

21           Ms. Newberger suggested that perhaps there was an

22   intentional omission of the fact that Nelson was frequenting

23   105 East Hillcrest Road on an almost daily basis.  I guess I

24   fail to see how that's at all relevant.  It's certainly not

25   inconsistent with him also frequenting the residence at 45

1    Elgin Boulevard.

2            THE COURT:  I think she meant it with regard to the

3    Hillcrest warrant that didn't show that kind of regular visit

4    there.

5            MS. HOFFMAN:  Perhaps I misunderstood but I think

6    Ms. Newberger pointed -- in the warrant for the 2018 Chevy

7    Impala, there's language about how Nelson was observed at 105

8    East Hillcrest on an almost daily basis.

9            THE COURT:  Correct.

10           MS. HOFFMAN:  I think she's saying that language

11   wasn't in the warrant for 45 Elgin.

12           THE COURT:  It wasn't in the warrant for Hillcrest

13   either.

14           MS. HOFFMAN:  Ah.  It certainly would not be -- if

15   anything, it would add more probable cause --

16           THE COURT:  That was her point is that they had more

17   than they put in.

18           MS. HOFFMAN:  Then I entirely missed the point, I

19   apologize.

20           THE COURT:  At least that's the way I took it.

21   She'll tell me if I got it wrong.

22           MS. HOFFMAN:  I thought the point was that they were

23   leaving out from the 45 Elgin warrant the fact that he was at

24   105 East Hillcrest all the time and that that would have

25   somehow defeated probable cause for 45 Elgin Boulevard.  My

1    point is simply that it's certainly not inconsistent -- it's

2    certainly possible and was the case that he was frequenting

3    both residences on a regular basis.  And they had the covert

4    surveillance footage and everything else to show that, and they

5    certainly had probable cause to search both residences, both of

6    which he was using as stash locations.

7         I think that's it, but I'm happy to answer any

8    questions.

9         THE COURT:  The search of the Impala.

10        MS. HOFFMAN:  I'm sorry, yes.  The search of the

11   Impala, I think, can be disposed of pretty quickly --

12        THE COURT:  Actually you didn't do Hillcrest

13   either.

14        MS. HOFFMAN:  I thought we did --

15        THE COURT:  You mean you did it --

16        MS. HOFFMAN:  I think I did East Hillcrest this

17   morning.

18        THE COURT:  Okay.

19        MS. HOFFMAN:  Unless the Court wants to hear more

20   about that, I will spare everybody --

21        THE COURT:  Okay.

22        MS. HOFFMAN:  -- a second rehash.  The warrant for

23   the 2018 Chevy Impala I think is very straightforward.

24   Obviously they included a whole lot of background information,

25   but then there's also the fact that they executed the warrant

1    at 105 East Hillcrest and found over a kilogram of fentanyl and

2    heroin and keys to the car, and they had seen him operating

3    that car in connection with drug trafficking activity in the

4    past.  I think that's fairly straightforward.

5              THE COURT:  Ms. Newberger, any rebuttal on the

6    remaining motions?

7              MS. NEWBERGER:  No.  Only Your Honor interpreted my

8    point correctly.

9              THE COURT:  Glad to know I was listening correctly

10   there.  All right.

11             Mr. Balter, what's left for this?  You did argue a

12   little bit more the last time.

13             MR. BALTER:  Your Honor, I believe I've covered all

14   the points that arise out of the motion to suppress the

15   residential search, so in terms of -- and this morning's motion

16   arose out of not only the basic motion, but there was a

17   supplemental motion to suppress evidence which had to do

18   specifically with the phones and that was ECF 341 --

19             THE COURT:  That's 341.

20             MR. BALTER:  Correct.  So what is left at this point,

21   from our standpoint in terms of the substantive motions, is the

22   motion for severance.

23             THE COURT:  Okay, which you agree we can wait until

24   we know who's going to trial?

25             MR. BALTER:  I think that that makes sense.  Also,

1    quite frankly, with regard to what the Court's rulings are with

2    respect to the motions today to the extent that, again, I think

3    Mr. Johnson is probably the most marginal person with respect

4    to the center of gravity of the events that are alleged in the

5    conspiracy, and much of what is alleged ties him in comes out

6    of that information.  So other than that, it would simply be I

7    had a motion to join, motion to file additional motions.

8              THE COURT:  Okay, thanks.  Ms. Hoffman, I don't think

9    there's anything supplemental at the moment.

10             MS. HOFFMAN:  No, I think we covered it this morning.

11   Thank you.

12             THE COURT:  Okay.  Mr. Ruter.

13             MR. RUTER:  Your Honor, can I go through in the order

14   in which I filed my motions to make certain that I don't miss

15   anything?  There's not that many.

16             THE COURT:  Right.  Let me get them in front of me.

17   I have too many stacks.

18             MR. RUTER:  Sure.  The first three, Your Honor,

19   happen to be ECF 103, 104 and 105, all of which will be taken

20   care of very speedily, but I want to make sure I don't miss

21   them so the Court can rule upon them.

22             THE COURT:  Okay, I have them.

23             MR. BALTER:  ECF 103.

24             MR. RUTER:  ECF 103 is motion to adopt; I think

25   nothing needs to be discussed about that at all.  ECF 104 is a

1   motion to sever.  I agree with other counsel that perhaps the

2   Court can wait until we see what happens prior to trial.

3           105 is the motion to suppress evidence from an order

4   authorizing location monitoring on Mr. Spruill's telephone that

5   was signed on July 2 of 2019.  That can be found -- I actually

6   introduced that as an exhibit on March 15, 2022.  It also can

7   be found at ECF 313, Exhibit 1.

8           The probable cause in that case, Your Honor, consists

9   of, I think, 17 phone calls and a lot of surveillance.  These

10  phone calls and surveillance occur between June 21 and June 26,

11  just about a week prior to the actual order being signed.  I

12  believe that all the calls are purported to be between

13  Mr. Spruill and Edward Ware, a co-conspirator in this case.

14  Your Honor, of course, has already reviewed the content of

15  those calls and the surveillance.  I would also note that it

16  appears that the surveillance did demonstrate that after calls

17  were made, Mr. Spruill was seen in the presence of Mr. Ware

18  right after having used his telephone, and therefore in terms

19  of probable cause, I will submit on what Her Honor has already

20  read.

21          ECF 106 is a motion to suppress the Edward Ware

22  wiretap because Mr. Spruill was overheard, and, therefore, he

23  is defined as an aggrieved party.  The Court denied that

24  motion, and therefore nothing needs to be said further about

25  that.

1          ECF 109 was a motion to suppress TT-6 which is

2    Mr. Spruill's phone number.  That again is (301) 331-3307.  Her

3    Honor denied that motion as well.

4          ECF 196 is the motion to suppress the search of 746

5    Spruce Street, Apartment A, purported to be associated with

6    Mr. Spruill.  It can be found at ECF 313, Exhibit 4.  We

7    discussed that briefly this morning.  I don't think anything

8    really further needs to be said.  I have adopted the arguments

9    of Ms. Newberger in terms of overbreadth, in terms of how the

10   warrant is actually written and how the search was actually

11   conducted.  I believe in both those instances the Court should

12   then find this was a general warrant in its scope as well as

13   its execution, and it's facially deficient, and therefore

14   should be suppressed.

15         I do admit in terms of the probable cause, Your

16   Honor, there were, I believe, some 40 telephone calls that

17   existed between Mr. Spruill, Mr. Ware, Mr. Redmen, Mr. Kegarise

18   and Mr. Lyles, all between July 7 and July 30, and therefore I

19   will make no further comments about the efficacy of the

20   probable cause itself.

21         ECF 197 is a motion to suppress the July 9, 2019

22   placement of a GPS device on a 2012 Acura.  It can be found at

23   ECF 313, Exhibit 3.  There is probable cause there, Your Honor,

24   outlined concerning once again telephone calls that are

25   overheard on Mr. Spruill's phone, as well as surveillance which

1  showed meetings between individuals with whom he was having

2  conversations over his phone which some would argue might be

3  consistent with the content of the phones themselves, and

4  therefore I will submit on that motion.

5          ECF 198 can be found at ECF 313, Exhibit 2.  It's a

6  motion to suppress the search on July 9, 2019 of the placement

7  of a GPS on the 2013 Chrysler 300.  Actually, Your Honor, what

8  had happened was according to the affidavit, at least, the car

9  associated with Mr. Spruill being the Chrysler had gone bad,

10  and he wasn't using it any longer, and he was looking for

11  another car which happened to be the Acura.  When that Chrysler

12  went bad, I don't think much was collected as far as the GPS

13  location monitoring was concerned, and the Government then

14  switched to the Acura which he evidently purchased subsequent

15  to the Chrysler going bad.  In terms of that particular

16  warrant, Your Honor, there were several calls purportedly

17  between Mr. Ware and what was identified as an unidentified

18  male number 2.

19          You may recall, Judge Chasanow, that during the last

20  hearing, you thought contrary, but I thought that the fact that

21  Mr. Spruill was known at that time, he should not have been

22  identified as an unidentified male.  You found that,

23  nonetheless, the wiretap which was a part of that argument

24  still stood.  I'll submit on ECF 198.

25          ECF 199, Your Honor, is a motion to suppress the

1  search on August 13, 2019 of the 2012 Acura pursuant to a

2  search warrant.  Government counsel has indicated they intend

3  on introducing no evidence from that search, and therefore that

4  motion would be moot.

5          ECF 216 is a motion to suppress the search of a

6  Chrysler 300; that warrant also issued on August 13, 2019.  The

7  Government has indicated it does not intend on introducing any

8  evidence from that search, and therefore it should be deemed

9  moot.

10          ECF 217 was a motion to extend motions deadline.  I

11 hope that motion is moot, Your Honor, but I hope that the Court

12 may leave that open in the event that something else comes

13 up.

14          THE COURT:  Okay.

15          MR. RUTER:  ECF 265, Your Honor, was a motion to

16 suppress a search of cell phones on August 6, 2019 is when the

17 warrant was signed.  It was executed on August 13, 2019.  That

18 also can be found at ECF 313, Exhibit 4.

19          We've had discussions about that, Your Honor, and I

20 think it suffers from the same difficulties that the search

21 warrant of 746 Spruce Street, Apartment A, suffers and that is

22 its overbreadth.  It has the same language in terms of anything

23 can be searched, anything you can find no matter where it's

24 located, open it, seize it and search it.  We believe that

25 makes that a general warrant in its breadth as written and also

1    as it's executed.  We'd ask the Court again to suppress that.

2           With that, Your Honor, I believe I'd submit unless

3    the Court has any questions.

4           THE COURT:  Okay, thank you.  Ms. Hoffman.

5           MS. HOFFMAN:  Your Honor, I think I'm inclined to

6    also submit on the papers unless the Court has any additional

7    questions.

8           THE COURT:  Okay.  Mr. Bussard.

9           MR. BUSSARD:  Good afternoon, Your Honor.  I will try

10   to go through like Mr. Ruter did in the order of filing, if

11   that will help the Court in any respect.

12          According to my list here, ECF 223 was a motion to

13   adopt, and I would ask the Court to consider anything that

14   would be appropriate and not inconsistent with argument of any

15   other counsel.  I will adopt Ms. Newberger, Mr. Balter and

16   Mr. Ruter's arguments as they have been presented today also.

17          THE COURT:  Mm-hmm.

18          MR. BUSSARD:  ECF 224 is a motion for leave to amend,

19   and at this stage I don't have anything further to add to that.

20   If we get additional discovery, I will ask the Court to make a

21   ruling on that.

22          ECF 225 is motion for disclosure of Rule 404(b) and

23   609 evidence.  At least up to this point in time, I believe

24   that the Government has fulfilled all their responsibilities as

25   are current, and we will await production of *Giglio* and *Jencks*

1   material later on.

2            THE COURT:  So you agree that there's nothing for me

3   to do on ECF 225 at this point?

4            MR. BUSSARD:  I don't believe there is at this point.

5   I'm kind of arguing as to what I don't know.

6            THE COURT:  Understood.

7            MR. BUSSARD:  ECF 226 is the severance for relief for

8   prejudicial joinder, and at this point I will join co-counsel

9   in reserving to see what transpires over the next couple of

10  weeks.

11           The next motion will be ECF 228, motion to reveal

12  identity of informants.  Your Honor, I just want to be heard

13  very briefly on this.

14           The Court heard when we were here back in March about

15  a controlled purchase that took place on about August 7, if I'm

16  not mistaken, of 2019 between a person identified as CS-3 and

17  allegedly Mr. Coleman-Fuller.  The Court has ruled that

18  evidence as it pertained to establishment of probable cause for

19  TT-9 was sufficient.  I just want to make one particular

20  argument regarding this if I may.

21           It appears from the papers as to CS-3 that this

22  person was familiar with Mr. Coleman-Fuller, may have had

23  purchases from him in the past, or had an ongoing buyer seller

24  relationship with him.  He/she, I'm not sure whether it's

25  he/she, possessed a phone number that was able to contact

1    Mr. Coleman-Fuller to arrange the controlled purchase.  In

2    fact, he/she did arrange that controlled purchase on that

3    date.

4            The probable cause -- and I'm relying partially on

5    the affidavit that was used by law enforcement, which is USA

6    1314, in the affidavit to obtain TT-9.  Again, I'm not going to

7    rehash the probable cause because the Court has already ruled

8    on it, but it starts off by briefly saying that there was a

9    reference to Thamar Smith -- and I apologize if I'm not

10   pronouncing that correctly -- Mr. Smith's relationship to the

11   Ware brothers, the Ware brothers' relationship allegedly to

12   Mr. Nelson, and the obtaining of wire intercepts on Mr. Nelson.

13   Then finally we come to early August of 2019 where CS-3 is

14   present and assists law enforcement in arranging a controlled

15   purchase.

16           Our argument is that CS-3 is an integral part of the

17   unlawful activity alleged to be conducted by Mr. Coleman-Fuller

18   and the others in this case.  What we don't have is the basis

19   of he or she's knowledge of Mr. Coleman-Fuller and the others

20   in this case.  We don't know the length of that knowledge.

21   Could be one week, could be one month, could be years going by,

22   and we don't know the extent of CS-3's drug usage.

23           The argument is simply there are two extremes -- this

24   is all coming from the case law that originates from *Riviera v.*

25   *United States* which is the lead case, 353 U.S. 53.  I believe

1    it's a 1957 case so it's been around quite a while, but it is

2    still cited often.  The spectrum of relationships has to do --

3    this is Fourth Circuit law, comes from *U.S. v. Price*, 783 F.2d

4    1132 which is Fourth Circuit, 1986, and *U.S. v. McLawhorn*, 484

5    F.2d 1, Fourth Circuit case, 1973.

6            There seems to be -- the range is if there's

7    information from a mere tipster, that may be used in some

8    respect.  That has been found to be mostly insufficient.  The

9    opposite end of that spectrum is that the person is an integral

10   part of the ongoing illegal activity and that requires

11   disclosure.

12           Our argument briefly is that CS-3, even as a buyer in

13   a buyer-seller relationship with one of the members of this

14   ongoing conspiracy, was such a necessary part because without a

15   buyer, you obviously don't have a drug conspiracy and that

16   disclosure is necessary and should be compelled for that

17   reason.  I'm taking a lot of that argument from *U.S. v.*

18   *Brinkman,* B-r-i-n-k-m-a-n, which is 739 F.2d 977, a Fourth

19   Circuit case in 1984.

20           We are asking the Court to consider compelling the

21   Government to disclose the identity and some other information

22   about CS-3 so that as counsel for Mr. Coleman-Fuller, I can do

23   my job to the extent of investigating to finding out about

24   criminal history, any other background information that may be

25   necessary.  CS-3 is not a mere tipster; that would be the one

1    end of the extreme.  He or she is an integral part of --

2              THE COURT:  If the jury doesn't hear about CS-3, does

3    it hear about that purported controlled purchase?

4              MR. BUSSARD:  That may be a problem for our argument,

5    yes.

6              THE COURT:  Okay.  Because that's what I gather the

7    Government is responding; that that isn't charged specifically,

8    won't be the subject of what they propose to put on.

9              MR. BUSSARD:  Right.  It was used for the

10   establishment of probable cause.

11             THE COURT:  There's no question about that.

12             MR. BUSSARD:  And we will submit on that.

13             Next motion on my list chronologically was ECF 229

14   which is the motion to suppress the search of the residence

15   which is 30 East Franklin Street in Hagerstown.  If the Court

16   will allow me to find my place here, get all my papers.

17             September 6, 2019, Judge Boyer of the Circuit Court

18   for Washington County issued a search warrant for 30 East

19   Franklin Street, Apartment 3, in Hagerstown, alleged to be the

20   residence of Mr. Coleman-Fuller.

21             The affidavit was attached to the motion that I am

22   speaking about which is ECF 229, and it was the only

23   attachment, and it is identified as USA 1569.  I would move to

24   make that part of the record.

25             THE COURT:  I have it.

1          MR. BUSSARD:  Thank you, Your Honor.  The probable

2    cause briefly in the affidavit in support of the request for a

3    search warrant is that -- and we've heard this over and over

4    again -- Mr. Nelson has been identified as a drug trafficker in

5    Hagerstown as a result of an investigation that took place

6    really since July of 2019, and I think even the facts reveal

7    that that investigation may have been started earlier than that

8    in some respect.  He was identified through a series of

9    Title III wire intercepts of another DTO, which is drug

10   trafficking organization.  That language is actually taken from

11   the affidavit, and I can give you the page if the Court would

12   like to hear it.  But I presume that that other drug

13   trafficking organization is the Ware brothers that was under

14   investigation at the time.

15          The next statement in the affidavit is that

16   Mr. Coleman-Fuller was identified as a street-level dealer.  On

17   August 14, the Court is fully aware at this time that a Title

18   III wire intercept was authorized by Judge Dwyer in the Circuit

19   Court for Washington County, and that phone is identified as

20   TT-9, and the Court has already ruled on that request.

21          There is an allegation now in the affidavit for the

22   search of 30 East Franklin Street that Mr. Coleman-Fuller is

23   transacting business and going to and from his residence.

24   There are no reports of any sales actually taking place at the

25   residence.  Court's indulgence for a brief moment.

1              What the Title III intercepts reveal is around

2    September 4 of 2019, there is a series of phone calls from

3    unidentified persons to Mr. Coleman's phone, TT-9, that law

4    enforcement interprets as drug related, and it requests to

5    purchase amounts of drugs.  Mr. Coleman-Fuller is seen either

6    driving to 30 East Franklin Street or away from 30 East

7    Franklin Street, but there is no observation of him ever going

8    to meet with anybody after that.  And the argument is simply

9    that there's no corroboration that these were, in fact, drug

10   related or that he was picking up drugs at 30 East Franklin

11   Street to go have these meetings.  They are all compacted

12   within a very short period of time on September 4, 2019.  They

13   go between approximately 9:02 a.m. in the morning to 9:12, an

14   eight-minute period of time.

15             In one of the calls, Mr. Coleman-Fuller apparently is

16   not at his residence, and another one as he is seen coming out

17   of his residence and driving away.  The other information is

18   that CS-3, the Court may recall, CS-3 told law enforcement that

19   she did not or he did not know where Mr. Coleman-Fuller

20   resided.

21             In the affidavit which is identified as USA 1569,

22   there is no corroboration.  There is a GPS which we will get to

23   in a few minutes, but there's a location reference that

24   Mr. Coleman-Fuller's phone is approximately near the residence.

25   I don't know exactly, there's an awful lot of vagaries in that.

1    But that's the wording that is in the affidavit.

2              Other than that, there is a reference to a dispute

3    that took place -- and the Court may recall this.  The day

4    before the wire intercept was authorized on August 14, on

5    August 13, there was a call of dispute, and law enforcement

6    spoke to persons -- in fact, they spoke to Mr. Coleman-Fuller

7    at that address also.  Nothing transpired out of it.  But --

8    and other than establishing residence itself, it doesn't really

9    add to the equation.  There is a statement and outline of

10   Mr. Coleman-Fuller's criminal history.  Again, it may be

11   accurate but it doesn't add to the equation.  And, finally,

12   there's a utility check on September 5, a day before the

13   warrant is actually issued for the search of 30 East Franklin

14   Street that confirms that that is, in fact, his residence.

15             The Court may recall when we were here in March,

16   there was a discussion about the fact that law enforcement

17   should have checked earlier about the utilities, and I stand

18   corrected from what I said after that.  Anyway, this is the

19   allegations.

20             The constitutional requirement for nexus is that it

21   must be -- there must be a sufficient nexus between the

22   criminal conduct, the items to be searched, and the place to be

23   searched.  That comes from *U.S. v. Anderson*, 851 F.2d 727,

24   Fourth Circuit case, 1988.  These cases are old but they still

25   are cited routinely.  They haven't gotten old.  The spectrum --

1    I talked about spectrum before -- there's a range of cases that

2    the courts seem to identify when analyzing a nexus argument.

3    One extreme seems to be illustrated by a case of *United States*

4    *v. Grossman,* which is 400 F.3d 212 which is a Fourth Circuit

5    case, 2005.

6              In that case the defendant had three residences, and

7    he was seen actively staying at all those and transacting

8    business out of all three of those locations.  The Court had

9    very little difficulty finding a nexus between all three of

10   those locations.

11             The other end of the spectrum is an older case called

12   *United States v. Lalor*, L-a-l-o-r, which is 996 F.2d 1578, a

13   Fourth Circuit case in 1993 if I'm reading my writing

14   correctly.  In that case, the Court found there was an

15   insufficient nexus but upheld the warrant on a good faith

16   argument.  But the factors are important for the Court to

17   consider and I just want to briefly talk about those.

18             Some of the factors that were mentioned -- in *Lalor*,

19   Lalor lived maybe one place but he was conducting business in

20   another place.  A tipster or informant had some information and

21   provided to law enforcement.  In fact, there was two

22   confidential informants.  They provided Lalor's street name;

23   they said he was Jamaican; the location where he was conducting

24   business and it was not from his residence; and his mode of

25   operation.  He had pagers.  That tells you how old this case

1    is.  But he was using pagers, and they specifically said where

2    the transactions were taking place.  In fact, that was mostly

3    corroborated, but there was no corroboration of anything taking

4    place at his residence.  It was all somewhere else.

5              For that reason, the Court found there was an

6    insufficient nexus between the drug activity, which was at some

7    other location, and what was taking place at Mr. Lalor's

8    residence which apparently was just a place for him to live.

9              As I said, the CS-3, the controlled purchase

10   participant didn't know where the residence was, and it didn't

11   take place -- although it might have been in the vicinity of 30

12   East Franklin Street, it was not at 30 East Franklin Street.

13   Law enforcement never identified a line of people who were

14   coming over, and we've heard some argument today that people

15   coming over to other participants' houses to have meetings.

16   There was never any meetings or lines of people lining up at

17   East Franklin Street to purchase drugs or even meet with

18   Mr. Coleman-Fuller.

19             The analysis goes on under *Illinois v. Gates*, the

20   totality of the circumstances.  The totality of the

21   circumstances are essentially that the CI, the confidential

22   informant, confirmed that possibly Mr. -- the Court has already

23   confirmed this -- Mr. Coleman-Fuller was engaged in some kind

24   of drug trafficking but could not link that in any way to 30

25   East Franklin Street.  The purchases allegedly of other people

1    calling his phone did not go any further of corroborating any

2    activity within 30 East Franklin Street.  All those were

3    off-site places.

4             Again, I will say that if they took place, they were

5    probably near 30 East Franklin, but, again, it is off site and

6    just like in *Lalor*, the activity and the link between the

7    off-site location and the residence itself could not be made.

8    There was no geographical relationship between the sales and

9    the residence.  If we had corroboration from the surveillance

10   of these other buys, we probably wouldn't be standing here or I

11   wouldn't be standing here arguing today.  If they had taken

12   place in the residence, I wouldn't be making this argument

13   today.

14             THE COURT:  Is there any indication that law

15   enforcement had any other place that they thought

16   Mr. Coleman-Fuller could be storing things or keeping evidence

17   of crime?  Other than the cars and we'll get to that -- or the

18   car.

19             MR. BUSSARD:  Other than going to and from

20   Mr. Nelson's residence, I don't know.  I don't have any reports

21   that indicate that there was -- what was commonly known as a

22   stash house.  I don't know.

23             THE COURT:  In the absence of a stash house, this

24   isn't either/or like in *Lalor* where there are two possible

25   locations.  Here it's here or it's somewhere in the cloud,

1    right --

2            MR. BUSSARD:  It's in between those two, somewhere

3    between those extremes.  Our argument is it's closer to *Lalor*

4    than it is to *Grossman*.

5            THE COURT:  Understood.

6            MR. BUSSARD:  Also there was no previous arrest of

7    the defendant at the residence either which is one of the

8    factors that sometimes the cases do mention.

9            THE COURT:  Okay.

10           MR. BUSSARD:  What I wanted to show the Court, and I

11   will do it in relationship to the argument of the vehicles, if

12   I can.  May I be able to get a glass of water real quick?

13           THE COURT:  Of course.

14           MR. BUSSARD:  Next in sequential order is ECF 230

15   which is the motion to suppress the search of two motor

16   vehicles.  There are several attachments to those motions and,

17   again, I would ask they be made part of the record.

18           THE COURT:  They are in.

19           MR. BUSSARD:  Thank you, Your Honor.  The first thing

20   I want to be clear about is there was a search -- I already

21   said that the warrant to search 30 East Franklin Street was

22   issued September 6 of 2019.  The warrant was served on Monday,

23   September 9, three days later, of 2019.  At that time law

24   enforcement did, in fact, find Mr. Coleman-Fuller in the

25   residence at that time.  30 East Franklin is described as a row

1   house, and the issue for the cars is going to be what the back

2   side or the rear of this building looks like.  These two

3   photographs which I will -- on the exhibit list would be

4   Exhibit 3, first of all.

5             You can see, if I'm correct, that this is 28 East

6   Franklin Street.  Then the other residence is 30 East Franklin

7   Street.  I apologize there's not a very good picture, but

8   there's a back area and over to the side is a wall.  You will

9   see in a few moments a wall.  This is all part of the property

10  for these two residences which are joined in the middle, and as

11  the affidavit seemed to describe, it has a common exit to the

12  back side.  That is Exhibit 3.

13            Exhibit 4 is from the side.  This is the same

14  stairway coming down from -- you'll see the wall which is this

15  whole white area off to the side, and there's some cars parked

16  there.  These vehicles are not the ones.  This was taken some

17  other time.  I just wanted to give the Court -- these are the

18  only pictures I have -- that were included in discovery as to

19  the area.

20            But the argument -- prefacing the argument is that

21  this is not street parking.  It is part of the lease for the

22  premises of 30 East Franklin Street.  So there is a search of

23  30 East Franklin Street on September 9.  Among the items that

24  are alleged to have been found, and it's pertinent to the

25  argument I'll be making in a few minutes, are that the keys to

1    the 2011, I think it is, Crown Vic and the 2019 Nissan Altima

2    were found in the premises.  That's significant for a number of

3    reasons, but I show you what is marked as Defense Exhibit 1.

4    This is the return from the search of 30 East Franklin Street.

5    The Court will see that it's dated September 9, the same day as

6    the search.  In this list, no keys were seized.  There's a lot

7    of other things seized --

8            THE COURT:  I'm sorry, I didn't hear that.

9            MR. BUSSARD:  The keys.  The keys to the two

10   vehicles -- they were legally parked in the back -- were not

11   seized.  They are not on this list of the search warrant

12   returned.  There's a lot of other things, some incriminating

13   and some not so much, on the list.  But the keys are not listed

14   as being seized.

15           So there's a couple other things that are in common.

16   After the keys were found, the vehicles were towed to the

17   impound lot at the Washington County law enforcement impound

18   lot.  I raise this -- I'm not a mechanic, but I don't know how

19   a car can be towed unless you get inside of the car.  Law

20   enforcement had the keys to the car.

21           THE COURT:  I'm sorry, you don't think you can tow a

22   car without getting inside?

23           MR. BUSSARD:  You can have the crane and have it

24   lifted up and put on a flatbed.  You can also, if the wheels

25   are not locked -- and we don't know that -- or if they're a

1    different kind of drive, they could be dragged up on, pulled up

2    on a flatbed.  We don't know how it was.  There was no canine

3    scan on either vehicle in the back.

4           The argument I'm making, Your Honor, is that law

5    enforcement -- I want to correct something.  The Nissan Altima

6    that we're talking about in this motion is not the Nissan

7    Altima that was the one alleged to have been operated by

8    Mr. Coleman-Fuller on August 7 with the controlled purchase.

9    They are described the same but they are different vehicles and

10   different colors.  Other than seeing Mr. Coleman-Fuller in

11   these vehicles, there's not much else that links him to that.

12          There is some wire intercepts that are indicated that

13   Mr. Coleman-Fuller made statements that "I just purchased a

14   Crown Vic," for example.  I think there is an observation that

15   he is standing next to a Crown Vic at some point, and I think

16   law enforcement confirmed by driving through the back alleyway

17   behind 30 East Franklin Street and seeing the car parked there

18   and the Nissan also.

19          The argument we're making is that if law enforcement

20   had gotten a canine to walk around the cars at that time, then

21   I wouldn't be standing here either.  That's been found to be

22   sufficient probable cause.  But merely finding the keys to a

23   vehicle in a residence -- I concede that there was unlawful

24   objects found, for want of a better word.  There was controlled

25   substances and the paraphernalia that goes along with that

1    inside the residence.  But the mere finding of that with the

2    keys does not translate into any more than reasonable suspicion

3    possibly to maybe detain the cars for a little while until

4    probable cause could be established.

5           What there wasn't is no canine scan.  There was no --

6    all the usual exceptions to the search warrant do not apply,

7    the warrant was searched.  So there was no consent.  There was

8    nothing in plain view of the cars other than the cars

9    themselves.  There was no exigent circumstances because

10   Mr. Coleman-Fuller was already under arrest and was detained at

11   30 East Franklin Street, maybe even taken away by that time.

12   The vehicles were legally parked and there was no search

13   incident to arrest.

14          Using the analysis of *Arizona v. Gant,* 556 U.S. 332,

15   which is a 2009 case, once the defendant is secured and is not

16   in close proximity to the vehicle, the search incident argument

17   fails.  I guess the argument comes down to is it reasonable to

18   believe that evidence relevant to the crime of the arrest might

19   be found in the vehicle.  For this, the police did nothing more

20   than tow it.

21          If you're towing a car based on only reasonable

22   suspicion and all the other possible reasons for warrantless

23   searches and what have you have dissipated, our argument is

24   that it exceeded the scope of the reasonable suspicion.

25   Without using, without talking about *Terry* in a lot of detail,

1    that's kind of where we're at --

2            THE COURT:  You've lost me a little bit.  You're

3    talking about the Nissan now, not the Crown Vic.

4            MR. BUSSARD:  They were both towed.

5            THE COURT:  Right, but for the Crown Vic, they're

6    saying investigators know that Coleman-Fuller was using the

7    target vehicle to transport, distribute and store CDS in

8    Washington County.  That's in it.  You can quarrel with --

9            MR. BUSSARD:  -- a bare-bones statement.  I don't

10   know when that happened --

11           THE COURT:  With regard to the other one, they said

12   they did -- he was operating the 2019 Nissan Altima.  You told

13   me it's not the one they saw him in.

14           MR. BUSSARD:  It's not the one they saw him in from

15   the controlled purchase.  That was a Nissan Altima also.  That

16   was a black vehicle.

17           THE COURT:  But they say they saw him in this one.

18           MR. BUSSARD:  They saw him in this one but not

19   conducting business.  They just see him coming and going from

20   the residence.  So he gets a call.  Whether he meets with

21   somebody or not is important because if he doesn't, if he just

22   leaves his residence and goes somewhere but there's never the

23   physical meeting to conduct a transaction, then nothing ever

24   happened.

25           In the case of the controlled purchase, there

1   actually was an observation of an alleged transaction, plus the

2   monitoring and what have you.  In this case, however, it's much

3   weaker than that.

4           The case about the residence, there's a statement

5   about the Crown Vic where he is -- we'll find it for the Court.

6   It says on another occasion -- this is page 4, USA 1631.  "On

7   another occasion, investigators intercepted communications that

8   Mr. Coleman-Fuller had traveled to an area of Bethel Gardens

9   and was selling CDS.  Agent Logsdon went to the location,

10  observed the target vehicle on the street with

11  Mr. Coleman-Fuller standing next to it."

12          There's a disconnect though.  He doesn't ever say

13  that he saw business being conducted.  If he was in a covert

14  location, the opportunity was there for Mr. Coleman-Fuller to

15  be conducting business but he didn't.  I know I'm kind of

16  splitting hairs a little bit, but a reading of that paragraph

17  does not indicate that he, in fact, was ever observed by law

18  enforcement doing hand to hands out at that location.

19          In the same way for the paragraph right before it,

20  they intercepted communication that he was meeting people at

21  North Locust Street and East Franklin Street for that purpose.

22  While doing so, he was telling people that he was in a Crown

23  Vic.  Again, saying it and observing it are not the same thing.

24  The controlled purchase was much more concrete in what it was

25  proving and confirming than these bare-boned statements; they

1   hear statements they interpret on the Title III wiretap, and

2   then they go to that location and they don't see actual drug

3   transaction.  He's just there hanging out and then one time he

4   has the Crown Vic, standing next to it.

5          So without the observations of actual open-air drug

6   transactions, these aren't being -- not trying to hide it, not

7   going back in the alleyways.  They're not going to houses out

8   of view.  This apparently is locations, very public locations,

9   and whatever law enforcement is interpreting one way is not

10  being confirmed by their diligent effort.  So they go out and

11  they get there quickly.  Yes, he is there but nothing's

12  happening.  So our argument is it does not add anything to the

13  reasonable suspicion argument.

14         The fact that the vehicle was towed based on

15  reasonable suspicion is something that has been discouraged --

16  and I'm taking this from the dog sniff cases that have come

17  out, *Rodriguez* and *Caballes* and what have you -- that when an

18  officer has reasonable suspicion, they cannot extend the

19  reasonable suspicion any longer than they have to in order to

20  procure the probable cause.

21         The solution obviously, repeating it again, is they

22  could have brought the dog into the parking area where the

23  vehicles were legally parked, and then I would not have filed

24  motions based on that because that has been found to be

25  sufficient to establish probable cause.

1          What happened next, after the cars were towed, law

2    enforcement gets a warrant for the Nissan which is the 2019

3    Nissan Altima.  That's the rental vehicle.  Just like the one

4    Mr. Coleman-Fuller was alleged to have been using during the

5    controlled purchase, it was a rental vehicle but it was not the

6    same vehicle.

7          In that case, law enforcement gets a warrant and the

8    probable cause statement essentially starts off by talking

9    about the Title III wire intercept authorized on August 14,

10   that Mr. Coleman-Fuller is alleged to have been transacting

11   business from his residence.  Again, with no real observations

12   of what was going on there.  And then they talk about the area

13   itself.

14         If I may, I have -- just so the Court is aware,

15   because the Court asked and I brought it up.  This is a picture

16   of the Nissan Altima -- I had tags on, excuse me.  This is the

17   picture of the Crown Vic.  There are two pictures, as a matter

18   of fact.  This is the rear picture, the type of vehicle that's

19   sometimes often used by law enforcement.  And this is -- that

20   was No. 2A, this is 2B.  2C is the Nissan Altima.  2D is

21   another view, the Nissan Altima.

22         My purpose for showing these, besides showing what

23   kind of cars they are, is the Court will notice that these cars

24   were not isolated.  They were put in an impound lot with other

25   vehicles, numerous other vehicles.  If you're going to do a

1    canine scan, it's important to isolate the vehicle away from

2    other vehicles so that the canine is not contaminated in any

3    respect.

4           Apparently that was not taken place here.  The

5    vehicles were merely towed, placed in a location with numerous

6    other vehicles until the canine scan could be accomplished.  As

7    I said, the canine scan was not even done on the Nissan.

8           THE COURT:  Not even done -- isn't your argument that

9    they had to have probable cause to seize these vehicles?

10           MR. BUSSARD:  Yes.

11           THE COURT:  At the residence.

12           MR. BUSSARD:  At the residence.  They --

13           THE COURT:  So the canine sniff, if it happened,

14    could amplify it but it can't supply probable cause.

15           MR. BUSSARD:  Correct.  They did not have probable

16    cause, our argument, at the time they seized it.  They had

17    reasonable suspicion, and reasonable suspicion alone does not

18    lead to towing and detaining and delaying until a later time.

19           I will move on to another.  We're almost finished,

20    Your Honor.

21           THE COURT:  231.

22           MR. BUSSARD:  231, I will submit on this electronic

23    information gathering.  The argument, it was a bare-bones

24    motion that was filed, just to preserve the issue.  Probable

25    cause, again, is used to establish -- let me give the timing.

1    Let me back up for a moment.  The timing of this authorization

2    was that it may very well have been offered to Judge Boyer,

3    presented to Judge Boyer at the same time as the TT-3

4    authorization.  It is dated August 14, 2019.  The same date,

5    same judge as the TT-3, authorization on TT-9.

6            This is a request for real-time geographic location

7    generated by TT-9 and the number is (518) 844-5148.  The

8    probable cause taken from the attachment -- and I ask that be

9    made part of the record too -- is USA 8125.  At page, I think

10   it's page 29, law enforcement established probable cause for

11   the Title III wiretap.  They then give a brief statement of

12   Mr. Coleman-Fuller's criminal history.  There is a couple

13   paragraphs, a boilerplate generalization about drug

14   trafficking.  Then there's a reference to the controlled

15   purchase in early 2019 that we now know took place August 7,

16   2019, the transaction involving CS-3, and the statement

17   regarding Mr. Coleman-Fuller using rental vehicles.  Law

18   enforcement was obviously trying to learn his residence because

19   CS-3, whoever that is, did not know where Mr. Coleman-Fuller

20   lived at that time.

21           Otherwise, we will submit on the papers.  As to that,

22   that alone does not establish probable cause for the real-time

23   geographic location.  Unless the Court has some other

24   questions.

25           There was some other motions filed, but I believe the

1   only other one -- and that's already been dealt with, ECF 390

2   which is a motion to suppress a statement, and that was found

3   to be -- the Government agreed not to use that statement and I

4   believe when we were here in March, the Court entered that it

5   was moot.

6           In between that and the motion for the Title III

7   suppression motions was -- let me just go through them.  There

8   was ECF 233 which was a motion to seal.  The reason that was

9   done is because at least, according to my review of the

10  documents, the affidavit for the Title III wire intercept had

11  not been unsealed yet.  In an abundance of caution, I think I

12  filed it for that reason.

13          ECF 276 was an amended motion to suppress.  It was

14  just adjusting some of the statements that were made in the

15  original motion to suppress, the Title III wiretap which was

16  ECF 232.

17          I filed ECF 284 which is a supplemental motion to

18  adopt Nelson's motions which were ECF 206 and ECF 280, and I

19  would ask the Court to -- I think the Court already ruled when

20  we were here in March permitting the defense to adopt those

21  motions.

22          ECF 299 was the corrected motion to suppress the

23  Title III wire intercept, and that was the one I believe we

24  proceeded on.

25          There is then a brief ECF 315 which was

1    Mr. Coleman-Fuller's reply to a response.  That speaks for

2    itself.

3            Then again at ECF 336, there was a motion to adopt

4    Nelson's sur-reply which was ECF 335.

5            I believe that is the full extent of the motions that

6    I filed on behalf of Mr. Coleman-Fuller.

7            THE COURT:  Okay.  Don't know if you filed any

8    motions to seal but that's the other category nobody has really

9    talked about, but they're pending.

10           MR. BUSSARD:  As I said, I wasn't sure whether that

11   motion -- I see "sealed" on a document and I take it very

12   seriously.  I'm not sure what the status of that was at that

13   moment, and I didn't want to file it as an attachment and --

14           THE COURT:  Yes, 233, that's motion to seal, right.

15           MR. BUSSARD:  Thank you, Your Honor.

16           THE COURT:  All right.  Ms. Mathias.

17           MS. MATHIAS:  Thank you.  If it's okay, I'll follow

18   similar order as Mr. Bussard.  We'll start with ECF 228, his

19   motion to reveal the identity of the confidential informants

20   and witnesses, specifically here CS-3.  Mr. Coleman-Fuller,

21   through counsel, has made it abundantly clear he would like to

22   know the identity of CS-3.  It's not appropriate here.  We

23   aren't conceding that we won't put on evidence of the

24   controlled buy, but we don't anticipate it, and if we do, we'll

25   provide the appropriate *Jencks* and *Giglio*.  We would call the

1   CS as a witness and we would provide the appropriate *Jencks* and

2   *Giglio* then.

3            THE COURT:  Okay.

4            MS. MATHIAS:  I'll start off explaining that his

5   motion should be denied because Coleman-Fuller is not charged

6   with that controlled purchase, nor would his information be

7   helpful to Mr. Coleman-Fuller's defense.  As Mr. Bussard talked

8   about in *United States v. Rovario*, the Supreme Court said that

9   we can withhold the disclosure of the identity of confidential

10  informants in order to further the public interest and

11  effective law enforcement.  But there's an exception if the

12  identity or the conscience of his or her communications would

13  be relevant and helpful to the defense of the accused or it's

14  essential to a fair determination of cause.  However, to

15  justify a disclosure, a defendant must come forward with

16  something more than mere speculation as to the usefulness of

17  such disclosure.

18            I respectfully submit Mr. Bussard has not done so.

19  Indeed, it would only be required after the Court has

20  determined that the informant's testimony would be highly

21  relevant.  Some of the mere speculation that he provided was,

22  for example, what if this was a drug addict or what if this

23  person was a user of drugs.  That's possible, but it's mere

24  speculation at this point.

25            On the other hand, disclosure is not required when

1   the informant is neither a participant in the offenses nor

2   helped set up the commission but is a mere tipster who only

3   supplies a lead to law enforcement officers.  So when an

4   informant merely provides information that furnishes probable

5   cause for a search warrant --

6              THE REPORTER:  Counsel, I'm sorry.  Slow down a

7   little bit.

8              MS. MATHIAS:  Slow down, sorry.

9              -- disclosure is not required.  And that's exactly

10  what the case was here.  The controlled purchase furnished

11  probable cause for a search warrant, disclosure is not

12  required.  We used a nontestifying confidential source to

13  conduct a controlled purchase of a small amount of drugs to

14  Mr. Coleman-Fuller.  Although that transaction was used to

15  establish probable cause for the wiretap, it wasn't charged as

16  part of the case.  CS-3 is not a member of the Nelson DTO and,

17  to our knowledge, he doesn't have any information that would be

18  useful to Mr. Coleman-Fuller's defense.

19             So with respect to such nontestifying informants who

20  were not involved in the charged drug conspiracy, the *Rovario*

21  case law does not require and, in fact, counsel is against

22  disclosure of their identities.  Furthermore, his motion should

23  be denied.

24             I'd next like to switch order a little bit.  I'll

25  start with the tracking warrant for his cell phones since

1    that's what happened first chronologically; that's ECF 231.

2            First, let's think about it as a whole.  If you were

3    to believe -- Mr. Bussard has set forth about what should be

4    sufficient probable cause for the house and for the vehicles;

5    we would need to have surveillance camera of a line of addicts

6    outside a house or deals happening outside of cars in plain

7    view of law enforcement.  It would be nearly impossible.  But

8    in this case we have the next best thing.  We have

9    Mr. Coleman-Fuller on these wiretaps dealing drugs, setting up

10   the drugs, we have informants, we have these purchases.  I'll

11   go through them in more detail.

12           But I think Mr. Bussard has really misplaced the

13   standard that we're looking at here.  We're looking at probable

14   cause.  Is there a fair probability that the contraband or

15   evidence of a crime will be found in a particular place?  Not

16   do you have evidence there was a line of people buying heroin

17   and screaming with billboards or any other extremes like that.

18           So now I'll go first to the tracking warrant.  He's

19   moved to suppress the real-time location data for the tracking

20   warrant for TT-9.  This was issued by Judge Boyer on August 14,

21   2019.  The motion was largely boilerplate.  The motion -- the

22   warrant and affidavit supporting it had ample probable cause to

23   show that the location information regarding TT-9 would provide

24   evidence of drug trafficking.  Again, probable cause means a

25   probability which is less than preponderance of evidence.  As

1    Your Honor pointed out earlier, it's less than 50 percent.

2           The facts that support probable cause for this

3    tracking warrant include the controlled purchase that we've

4    talked about at length throughout these hearings.  Again,

5    during the second week of August 2019, the task force used a

6    confidential informant to make a controlled purchase of drugs

7    in the area of North Locust Street and East Franklin Street.

8    CS-3 engaged in a text conversation with Mr. Coleman-Fuller on

9    TT-9.  He called TT-9 later and told the CS to hurry up.  He

10   used the phone, they brought him there.

11          The protocol was followed.  Before the purchase, CS-3

12   was searched for contraband, provided with task force funds to

13   make the purchase and equipped with electronic monitoring

14   device.  Investigators set up surveillance there, and they

15   observed CS-3 meet with a black male who arrived in a black

16   Nissan Altima.

17          And this was the Nissan Altima -- I think this was

18   the point Mr. Bussard was trying to make was that this was the

19   Nissan Altima with Maryland plates, and he later rented a

20   different black Nissan Altima with D.C. plates.  Yes, they were

21   two different cars, but that was part of his modus operandi was

22   renting these cars and cycling through them quickly to avoid

23   law enforcement detection.  Again, I commend the

24   sophistication -- not commend but there's a lot of

25   sophisticated attempts to avoid law enforcement detection.

1              So again, after the controlled purchase, the tests

2      indicated it was a mixture of heroin and fentanyl, the

3      preliminary lab tests, and the CS-3 identified

4      Mr. Coleman-Fuller as the person who had sold the drugs.

5              The affidavit also went through Mr. Coleman-Fuller's

6      criminal history which includes fourth degree burglary, theft,

7      false statement to a police officer, first degree assault, and

8      a distribution charge of cocaine.

9              Furthermore, based on his extensive training and

10     experience which was described in the affidavit, the Task Force

11     Officer Bryce Parrish knows that narcotics traffickers commonly

12     use cell phones to further their drug distribution activities

13     and to thwart law enforcement detection, and the location

14     information for their cell phones can help investigators

15     identify sources of supply, co-conspirators and stash

16     locations.

17             So, again, contrary to the boilerplate claims in

18     Mr. Bussard's motion, the evidence established far more than

19     fair probability that Mr. Coleman-Fuller was involved in drug

20     trafficking, and the location information for TT-9 would

21     provide evidence of the crimes under investigation.  Thus, we

22     requested the Court should deny the motion to suppress.

23             I'll next go to the search warrant for

24     Mr. Coleman-Fuller's house.  It was the September 6, 2019

25     search warrant for his residence at 30 East Franklin Street,

1   Apartment 3, ECF 229.  Again, he's moved to suppress the gun

2   and drug evidence recovered during the execution of a search

3   warrant at his residence.  The search warrant that was

4   authorized by Judge Boyer had ample probable cause to believe

5   Mr. Fuller was involved in drug trafficking and that evidence

6   of drug trafficking would be found at his residence.  Again,

7   Mr. Bussard suggests that there should -- probable cause might

8   require or an example of it would be a line of drug customers

9   outside Mr. Coleman-Fuller's house, but, again, that's not the

10  standard here.

11          Like we talked about earlier, the affidavit starts

12  talking about how based on a wiretap investigation, which Your

13  Honor has now upheld, they'd identified Nelson as a multiounce

14  supplier of fentanyl in Washington County, and they identified

15  Coleman-Fuller as a street-level dealer who Nelson was

16  supplying.  On August 14, 2019, investigators obtained wiretap

17  authorization for TT-9, and based on wiretap intercepts,

18  physical and electric surveillance and other evidence,

19  investigators determined that Coleman-Fuller was distributing

20  heroin, fentanyl, cocaine and crack cocaine to the residence at

21  30 East Franklin Street in Apartment 3.

22          The August 4, 2019 were the specific -- was the

23  specific date we went into details as we talked about -- as

24  Mr. Bussard brought up, there were two calls or two different

25  females, one of which at 9:02 in the morning, we intercepted a

1  communication between Mr. Coleman-Fuller and an unknown female

2  which she asked to purchase three of "food" which the agents

3  interpreted to be jargon for three grams of heroin and/or

4  fentanyl.  Mr. Coleman-Fuller agreed and said that he was on

5  his way to his residence.  So, again, he agrees that he's going

6  to supply someone drugs, drives to his residence.

7          The agents then set up physical surveillance in the

8  rear of his house and after that call, they observed

9  Mr. Coleman-Fuller arriving in the 2019 Nissan Altima with the

10 D.C. plates.  We see Mr. Coleman-Fuller park in the rear of the

11 chart residence, get out of his car, walk in the common entry

12 and out of the door.

13         A couple minutes later -- four minutes later, law

14 enforcement intercepts a communication with him and a second

15 unknown female who ordered four of "girl," believed to be

16 jargon for four grams of cocaine.  Mr. Coleman-Fuller agreed to

17 complete the deal, and at the time the tracker and cell phone

18 showed he was in the area of his residence.  At approximately

19 9:12 a.m., investigators intercepted another communication

20 between him and the second female in which she asked where he

21 was.  He said on the phone that we intercepted that he was at

22 his house and he was about to walk out the door.

23         Agent Logsdon then observed Coleman-Fuller exit the

24 rear door, enter the 2019 Nissan Altima, and leave the area.

25 The obvious inference here is that he was storing the drugs in

1    his house.  The standard is not that we need to see this line

2    of people or that he needs to be selling them out of his

3    house.

4            Furthermore, as Mr. Bussard brought up on August 13,

5    2019, the police department made contact with him at the target

6    residence based on a domestic violence incident.  Mr. Bussard

7    later said that Mr. Coleman-Fuller had never been arrested at

8    his residence.  Again, that's an extreme requirement and one

9    that's just not required by the case law or statutes.

10           Again -- also law enforcement conducted a utilities

11   check.  I believe that Mr. Bussard -- Court's indulgence.

12   Again, there was a utilities check for the target residence,

13   and the residence was in Mr. Coleman-Fuller's name.  That

14   further shows that he's connected to the house, it's his house.

15   And, again, using physical and electronic surveillance,

16   investigators observed him traveling to and from the target

17   residence multiple times of day.

18           The affidavit also went through his criminal history.

19   Then, again, based on TFO Logsdon's extensive training and

20   experience described in the affidavit, he knows that drug

21   traffickers commonly keep drugs and drug proceeds in secure

22   locations within their residences.  So there's clearly ample

23   probable cause.

24           We'll look next to the nexus evidence.  There's much

25   more than a fair probability that he's involved in drug

1   trafficking and that evidence of the drug trafficking will be

2   found in the residence.  He challenges the nexus, but he

3   wrongly asserts that there's nothing in the affidavit to

4   indicate any kind of criminal activity relating to the charge

5   in this case that had taken place on or near the residence.  To

6   the contrary, the affidavit provided a detailed explanation as

7   to why investigators believed that he was distributing drugs

8   out of 30 East Franklin Street, Apartment 3, and that includes

9   multiple wiretap communications in which he agreed to

10  distribute quantities of heroin and cocaine directly to

11  customers after traveling from his residence.

12          That brings me to my next point is how did he get

13  there, how did he travel to distribute the drugs and that

14  brings us to ECF 30, the two vehicles.  Those are the Nissan

15  Altima and the Crown Vic, of course.  I'll start with the

16  Nissan Altima.  This search warrant was authorized by Judge

17  Wilson and there was ample probable cause to believe that he

18  was involved in drug trafficking and evidence of drug

19  trafficking would be found in his vehicles.  So for the 2019

20  Altima, the affidavit starts with all the incidents that we

21  just talked about, about the two unknown females on

22  September 4, 2019 where he's using that same Nissan Altima.

23          The next series of events are the warrant is executed

24  on September 9, 2019.  Law enforcement recovers fentanyl and

25  heroin drug paraphernalia, currency and digital scales.  At the

1    time that the search warrant was executed, Mr. Coleman-Fuller

2    was at the residence and, again, as we talked about, there was

3    a key to the Altima, it was in the rear of his residence and

4    towed to Washington County's Sheriff's impound lot --

5             THE COURT:  Ms. Mathias, you would agree they needed

6    probable cause in order to do that?

7             MS. MATHIAS:  To tow, yes, and I submit there's

8    probable cause with or without the canine search.  But, yes,

9    they had probable cause there that Coleman-Fuller had been

10   using the Nissan Altima to transport, distribute and store

11   drugs.

12            The Altima was registered to Enterprise Rent-A-Car

13   and had been rented and operated by Mr. Coleman-Fuller and had

14   not been returned.

15            Moving next to the Crown Vic, the warrant included

16   many facts that support probable cause, that there would be a

17   fair probability of the contraband or evidence of a crime would

18   be found in this particular place.  On August 14, 2019,

19   investigators obtained a wiretap authorization for

20   Coleman-Fuller's cell phone.  Based on these interceptions and

21   other surveillance and evidence, the affidavit concludes that

22   Coleman-Fuller resided at the residence.  And it next goes on

23   to say that the investigators learned that Coleman-Fuller had

24   recently purchased a 2011 Ford Crown Vic with Maryland plates,

25   is registered in his name.  It was a different address but,

1    again, registered in his name.

2           Again, the affidavit talks about the wiretap

3    communications, indicating that he's meeting people on North

4    Locust Street and East Franklin in order to sell them drugs,

5    and there's literally interceptions over the wiretap where he

6    tells his customers he's in the Crown Vic while he's selling

7    what he's discussing, the drug deals.

8           On another occasion, the affidavit talks about how we

9    intercepted communications over TT-9 that he traveled to Bethel

10   Gardens to sell drugs.  TFO Logsdon went out there and he saw

11   Coleman-Fuller's Crown Vic on the street with Coleman-Fuller

12   standing next to it.

13          Again, as we just discussed, the affidavit explains

14   that a search warrant is executed at his apartment.  At the

15   time the search warrant was executed, they found him in the

16   residence along with the key to the Crown Victoria, was found

17   parked outside as Mr. Bussard showed us.  Then the very next

18   day, Deputy First Class Jasen Litten and his K-9 partner did

19   conduct a scan of the Crown Vic, and there was a positive alert

20   for the presence of narcotics.  I don't think there's any

21   requirement that a car be completely isolated from any other

22   vehicles in order to do a canine scan.

23          If you think about the airport, there might be

24   canines there, there's tons of people there.  Dogs are trained,

25   and up until now, I hadn't heard any argument from Mr. Bussard

1    on the validity of the canine scan.

2              Again, this evidence establishes far more than a fair

3    probability that he's involved in drug trafficking and that

4    evidence of his drug trafficking would be found in his cars.

5              Mr. Coleman-Fuller's main complaint is that the

6    search warrant did not authorize law enforcement to search

7    either of the vehicles, and then he made some speculations in

8    his motion that law enforcement must search it first.  Today

9    he's said there's no way it could have been towed without using

10   the keys and opening the door.  That's speculation.  His

11   allegation is baseless.  And, again, as described in the

12   affidavits and the DEA-6 has turned over, they are simply towed

13   to the impound lot, investigators got search warrants to search

14   them, and there was overwhelming probable cause.

15             Lastly as we've discussed throughout, the officers

16   relied on all of these warrants in good faith.

17             This is the same point of clarification about the

18   Nissan Altimas.  This Nissan Altima, the target vehicle, was

19   the same Nissan Altima he was driving on September 4 with two

20   unknown girls -- the two unknown females.  It was a different

21   Nissan Altima than the one he'd been observed in doing the

22   controlled purchase a few weeks earlier.

23             Unless the Court has any questions or I've missed

24   anything, the Government rests.

25             THE COURT:  Mr. Bussard, any rebuttal?

1          MR. BUSSARD:  Your Honor, just a correction, if I

2    may.  Mr. Coleman-Fuller pointed out that the Nissan Altima was

3    towed the same day as the search of the residence, which was

4    September 9, back to the impound lot.  The Crown Vic was not

5    towed until the next day.  It was left there at the scene and

6    was -- a warrant was obtained on September 10 the next day.

7    Then the search took place around 2:56 in the afternoon of

8    September 10.  That's when the dog scan, canine scan around the

9    Crown Vic the next day.

10          THE COURT:  So you may have a chain of custody issue;

11   is that what you're suggesting?  That anything found --

12   something between the 9th and the 10th could have altered what

13   was in the car even though law enforcement had the key?

14          MR. BUSSARD:  I'm correcting a misstatement.

15          THE COURT:  Okay.  But you're not taking any --

16          MR. BUSSARD:  They did have control of the vehicle

17   and the defendant did not, obviously.

18          THE COURT:  He was not available to have control.

19          MR. BUSSARD:  No, he was in Washington County

20   Detention Center I would presume.

21       (Pause.)

22          THE COURT:  Which one do you say was not towed until

23   the 10th?

24          MR. BUSSARD:  The Crown Vic.

25          THE COURT:  And you base that on the report you've

1  attached to 230?

2         MR. BUSSARD:  I don't think the Government is going

3  to dispute that the warrant was the next day.

4         THE COURT:  The warrant was the next day, but the

5  towing was -- both applications for both searches of the

6  vehicles indicate they were located on the 9th at the time of

7  the search of the house and towed.

8         MR. BUSSARD:  Yes, it does.

9         THE COURT:  I don't see anything that says they

10 didn't tow them both on the 9th.

11        MR. BUSSARD:  I have information only at this

12 point.

13        THE COURT:  Do I --

14        MR. BUSSARD:  That it was not towed until the next

15 day.

16        THE COURT:  The search warrant was the next day.

17        MR. BUSSARD:  I can't even tell from the report that

18 was --

19        THE COURT:  That it was what?

20        MR. BUSSARD:  The report that I attached, the DEA-6,

21 it just says the vehicle was towed.  Every document I have

22 seen, it just says it was towed.

23        THE COURT:  The application and affidavit for the

24 search warrants puts it right at the time of the search of the

25 residence.  It doesn't say on the same date but it follows

1   immediately.  So I don't have any -- I'm telling you now.  I

2   hear what you've argued, but I don't know that I've seen in

3   writing anything that says they did not tow both of the cars on

4   the 9th.

5           MR. BUSSARD:  Out of an abundance of caution, Your

6   Honor, if I can get an affidavit --

7           THE COURT:  But then my question is "So what?" and

8   you need to articulate that for me.

9           MR. BUSSARD:  I was just trying to correct facts.

10          THE COURT:  All right.  I don't see anybody angling

11  to tell me anything else at the moment.  I'm not going to

12  rule, although I have a fairly good idea on most of them as to

13  what, but there are far too many details for me to try to do

14  them all orally, so I will write it down and hope to cover

15  everything as comprehensively as I can.

16          Regardless of the rulings I make on these motions, I

17  gather we're going to trial.  What evidence the Government has

18  had yet to be finalized because I haven't ruled.  We're set

19  for, I believe, a three-week period beginning October 31.  So

20  we need to keep that date in mind as we plan.

21          I checked the court's master calendar and there are

22  nine trials -- jury trials due to start that day, and if we're

23  under COVID protocol, that may mean that we won't be starting

24  on the 31st.  The reason for that is we have to stagger the

25  jury selection process in order to do it as safely as we can

1    during COVID, and that may mean that we will not be able to

2    begin on the 31st.

3             For some it's sliding to the next day.  For others

4    it's sliding to the prior week.  We'll certainly talk to

5    counsel when I know more about that possibility.  I'm hoping

6    that we get some priority given the numbers of people involved

7    and the need to get started.  We have reserved this courtroom

8    for the trial.  That's all I can tell you about the start date.

9    It's what we're looking at at this point.

10            What remains to be done is voir dire and, again, if

11   we're under COVID protocol, that requires more advanced

12   preparation than might otherwise be the case because we give

13   the jurors voir dire in written form as it's read to them and

14   ask them to indicate a yes-or-no answer on an answer sheet

15   rather than having them all here in the courtroom during oral

16   voir dire.  So there's a slightly different process which means

17   that we have to have resolved the voir dire questions further

18   in advance than might otherwise be true.

19            If we're done with COVID and we're back to our normal

20   process, then all of this will not be necessary, and it will be

21   easier in terms of the schedule.  I still have to have the

22   questions properly framed.

23            So at some point, I need to ask counsel to address

24   their attention to that.  My normal practice, it seems to work

25   usually, is to have the Government provide a draft, proposal to

1    defense counsel, have defense counsel react to it, discuss it

2    with Government counsel, see if you can reach agreement, and if

3    you can, doesn't mean I'll use the wording or exactly the

4    questions but you submit it to me.  If you can't agree, then I

5    get what is agreed to along with submissions as to what each

6    side thinks is missing or is wrong in the other side's

7    proposal, and then I'll referee those disputes and put together

8    a list.

9              Jury instructions also need to be proposed.  Those,

10   of course, aren't delivered until the end of the trial, but

11   it's very helpful for counsel and me to have a good idea what

12   those instructions are going to be.  So, again, I'll ask the

13   Government to draft their proposal and provide it to defense

14   counsel who should react and see what you can agree to, what

15   you don't agree to, and then submit a package to me.

16             I'll ask to have that done probably sometime

17   beginning of September, so we're getting close, but we're not

18   quite there yet.

19             We obviously do need to resolve any severance

20   requests at some point.  Right now I'm planning all four

21   because if it's going to be different, we're going to have to

22   figure out which subset goes then and which subset doesn't, so

23   I do need to resolve that.  At what point -- after I do these

24   motions, is that when we're ready to talk about severance?

25   From the Government's perspective -- you're ready now, I

1    know.

2              MS. HOFFMAN:  I think that's reasonable.  We're ready

3    when everyone else is ready.

4              THE COURT:  Let me get these in writing but if once I

5    do that, anybody thinks they have a serious severance motion,

6    you need to pipe up promptly.  Generally, as counsel know,

7    defendants indicted together and alleged to be part of the same

8    overall conspiracy go to trial together.  I am not aware right

9    now of *Bruton* issues.  The Government usually takes the

10   position that if I find a *Bruton* issue, they'll either sanitize

11   the statement or do without rather than sever.  So I'm not

12   thinking this is a huge concern, but we obviously need to talk

13   about it.

14             I don't know what else counsel will need to talk with

15   me about before we go to trial.  I just want to plan for what

16   other things might be coming.  Ms. Newberger, anything you want

17   to tell me is coming down the pike?

18             MS. NEWBERGER:  No, Your Honor.  What might be

19   helpful -- and I apologize if we've set this already, I can't

20   remember, if there are any motions in limine to be filed.

21             THE COURT:  I haven't because I didn't know we were

22   necessarily going to have them.

23             MS. NEWBERGER:  I'm not necessarily sure either.

24   Just in case.

25             THE COURT:  Okay.  I will put a deadline.  It's going

1    to have to be around the time we're talking voir dire and jury

2    instructions at the latest.  Anything that you already know

3    about, tell us.  Let's get it aired early.  Sometimes the

4    motions can be resolved and help you prepare.  Sometimes

5    they're intended more to educate my ears so I know what's

6    coming at trial; that is, I can't resolve them until I hear

7    more evidence at trial, so we'll see.  All right.  I will add

8    that to my list of things.

9              Mr. Balter?

10             MR. BALTER:  Nothing further, Your Honor.

11             THE COURT:  Mr. Ruter?

12             MR. RUTER:  No, thank you.

13             THE COURT:  Mr. Bussard?

14             MR. BUSSARD:  Ms. Newberger already took my

15   question.

16             THE COURT:  That's what happens when you're sitting

17   in the order you're sitting in.  Some other time you'll be up

18   front.  Anything from the Government?

19             MS. HOFFMAN:  I would just note that we do have

20   several cooperating witnesses.  I don't see any problem with

21   turning over the *Jencks* two weeks ahead of time, but -- I can't

22   really anticipate off the top of my head any motions in limine

23   that that would prompt, but there's always the possibility.

24             THE COURT:  Counsel can only object to things they

25   know about.

1          MS. HOFFMAN:  Right.

2          THE COURT:  That's sort of a rolling process.

3          MS. HOFFMAN:  Okay.  We will aim to get it out the

4   door at least two weeks --

5          THE COURT:  At least two weeks before.  All right.

6   This was not the two-day marathon that I feared might be

7   coming.  You've given me lots to chew on.  I tried to read up

8   on some more of the cases again on the break.  My Westlaw was

9   bulky so I didn't get as far.  I have all day tomorrow set

10  aside so we'll see how far I can get in doing this.

11         Mr. Gurevich, anything further from the clerk?

12         THE CLERK:  No, Your Honor.

13         THE COURT:  All right.  Thank you.  We'll stand

14  adjourned.

15         THE CLERK:  All rise.  This Court stands adjourned.

16     (Proceedings concluded at 3:36 p.m.)

17              CERTIFICATE OF OFFICIAL REPORTER

18         I, Patricia G. Mitchell, Registered Merit Reporter,
    Certified Realtime Reporter, in and for the United States
19  District Court for the District of Maryland, do hereby certify,
    pursuant to 28 U.S.C. § 753, that the foregoing is a true and
20  correct transcript of the stenographically-reported proceedings
    held in the above-entitled matter and the transcript page
21  format is in conformance with the regulations of the Judicial
    Conference of the United States.
22         Dated this 20th day of May 2023.

23                    Patricia G. Mitchell

24         _____
                 Patricia G. Mitchell, RMR, CRR
25                 Federal Official Reporter

**< Dates >.**
**August**  106:4, 129:13 .
**August 10**  108:3 .
**August 10,**  108:20 .
**August 11**  109:6 .
**August 12**  105:11, 109:25 .
**August 12,**  79:22 .
**August 12, 2019**  107:1 .
**August 13,**  134:5 .
**August 13, 2019**  126:1 .
**August 13, 2019,**  158:4 .
**August 13, 2019.**  126:6, 126:17 .
**August 13.**  84:11 .
**August 14,**  132:17, 134:4, 146:9 .
**August 14, 2019,**  156:16, 160:18 .
**August 14, 2019.**  148:4, 153:20 .
**August 18**  106:10 .
**August 20**  105:21, 110:8, 110:12 .
**August 20, 2019,**  109:20 .
**August 2019,**  154:5 .
**August 2020 decision.**  70:15 .
**August 26**  115:18 .
**August 26, 2019,**  114:4 .
**August 26.**  102:6, 114:17 .
**August 28**  115:15 .
**August 28, 2019,**  101:23, 111:13 .
**August 29**  28:24, 29:4 .
**August 29.**  29:7 .
**August 4, 2019**  156:22 .
**August 6, 2019**  126:16 .
**August 7**  141:8 .
**August 7,**  128:15 .

**August 7, 2019,**  148:15 .
**August 9.**  79:22 .
**December**  80:6, 89:21, 90:10 .
**July**  132:6 .
**July 11, 2022**  1:17 .
**July 2**  123:5 .
**July 30**  88:17 .
**July 30,**  87:2, 93:8, 124:18 .
**July 30.**  84:11 .
**July 7**  124:18 .
**July 7,**  84:10 .
**July 9, 2019**  124:21, 125:6 .
**June 21**  123:10 .
**June 26,**  123:10 .
**June 28**  86:14 .
**March**  128:14, 149:20 .
**March 15, 2022.**  123:6 .
**March,**  134:15, 149:4 .
**May**  138:12 .
**May 2023.**  170:27 .
**November 20, 2017 decision**  21:2 .
**October 2**  31:24 .
**October 2, 2019,**  31:5 .
**October 31.**  165:19 .
**October, one**  11:12 .
**September**  32:24 .
**September 1**  117:2 .
**September 10**  163:6 .
**September 10.**  163:8 .
**September 2,**  117:2 .
**September 4**  133:2, 162:19 .
**September 4, 2019**  159:22 .
**September 4, 2019.**  133:12 .
**September 5,**  134:12 .
**September 6**  138:22 .
**September 6,**  28:24 .
**September 6, 2019**  155:24 .
**September 6, 2019,**  131:17 .
**September 6. First**

50:14 .
**September 9**  28:25, 29:21, 31:2, 112:11 .
**September 9,**  140:5, 163:4 .
**September 9, 2019**  8:15 .
**September 9, 2019,**  6:17 .
**September 9, 2019.**  159:24 .
**September 9, three day**  138:23 .
**September 9.**  32:6, 139:23 .
**September,**  98:14, 167:17 .
**$250**  108:12 .
**$5**  117:6 .
.
.

**< 0 >.**
**0-cr-00038-dkc-7**  1:10 .
**000**  10:17, 117:6 .
**000-page**  9:3, 9:14 .
**02**  133:13, 156:25 .
.
.

**< 1 >.**
**1**  23:15, 95:12, 95:13, 95:15, 123:7, 130:5, 140:3 .
**10**  50:19 .
**100**  1:39, 4:25, 10:19, 116:9 .
**10090**  86:10 .
**103**  122:19, 122:23, 122:24 .
**104**  122:19, 122:25 .
**106**  123:21 .
**109**  124:1 .
**10th**  163:12, 163:23 .
**11**  112:11 .
**1132**  130:4 .
**12**  54:9, 95:15, 112:11, 133:13, 157:19 .
**12/1/2020**  90:14 .
**1265**  19:25 .
**1271**  19:25 .
**1314**  129:6 .

**1340**  2:8 .
**14**  90:3 .
**15**  50:19, 95:12, 95:13 .
**1509**  12:24, 54:12, 62:6 .
**1510**  62:6 .
**1524**  74:12 .
**1525**  16:10 .
**1527**  74:12 .
**1569**  131:23, 133:21 .
**1578**  135:12 .
**16**  58:13, 80:10, 83:1 .
**1631**  144:6 .
**17**  123:9 .
**18**  95:15 .
**1957**  130:1 .
**196**  124:4 .
**197**  124:21 .
**1973**  130:5 .
**198**  125:5, 125:24 .
**1984**  130:19 .
**1986**  130:4 .
**1988**  134:24 .
**199**  125:25 .
**1993**  135:13 .
**1:**  1:10 .
**1A**  1:23 .
.
.

**< 2 >.**
**2**  5:18, 31:3, 31:17, 31:18, 32:1, 35:17, 125:5, 125:18, 163:7 .
**20**  49:11, 80:6 .
**200**  2:8, 49:8, 49:24, 117:9, 117:16 .
**2005**  135:5 .
**2009**  59:1, 142:15 .
**201**  76:9, 93:19 .
**2011**  140:1, 160:24 .
**2012**  124:22, 126:1 .
**2013**  125:7 .
**2017**  20:1, 21:2, 33:1 .
**2018**  6:14, 8:10, 8:22, 83:17, 83:23, 101:20, 103:21, 111:14, 115:25, 119:6, 120:23 .
**2019**  29:1, 29:22, 31:24, 32:24, 86:14, 105:11, 105:21, 106:10, 123:5,

128:16, 129:13, 132:6, 133:2, 138:22, 138:23, 140:1, 143:12, 146:2, 148:15, 157:9, 157:24, 159:19 .
**2020** 21:15, 71:8, 89:21, 90:11 .
**206** 149:18 .
**20th** 170:27 .
**21093** 2:16 .
**212** 135:4 .
**21201** 1:32, 1:40 .
**21209** 2:9 .
**21237** 1:47 .
**216** 126:5 .
**217** 126:10 .
**223** 127:12 .
**224** 127:18 .
**225** 127:22, 128:3 .
**226** 128:7 .
**228** 128:11, 150:18 .
**229** 131:13, 131:22, 156:1 .
**230** 138:14, 164:1 .
**231** 86:1, 147:21, 147:22, 153:1 .
**232** 149:16 .
**233** 149:8, 150:14 .
**235** 70:15 .
**236** 6:12, 25:19 .
**237** 6:25 .
**24** 95:15 .
**240** 109:25 .
**245** 6:12, 23:16, 25:21, 26:1, 30:24 .
**265** 84:8, 126:15 .
**276** 149:13 .
**28** 139:5, 170:22 .
**280** 149:18 .
**284** 149:17 .
**29** 148:10 .
**299** 149:22 .
**2A** 146:20 .
**2B** 146:20 .
**2C** 146:20 .
**2D** 146:20 .
**.**

**< 3 >.**
**3** 9:3, 9:14, 10:17, 124:23,

131:19, 139:4, 139:12, 156:1, 156:21, 159:8, 170:16 .
**30** 1:18, 118:10, 131:15, 131:18, 132:22, 133:6, 133:10, 134:13, 136:11, 136:12, 136:24, 137:2, 137:5, 138:21, 138:25, 139:6, 139:22, 139:23, 140:4, 141:17, 142:11, 155:25, 156:21, 159:8, 159:14 .
**300** 125:7, 126:6 .
**301** 85:2, 124:2 .
**304** 2:15 .
**313** 123:7, 124:6, 124:23, 125:5, 126:18 .
**313-12** 54:8 .
**313-6** 86:10 .
**315** 149:25 .
**319** 21:14 .
**31st** 165:24, 166:2 .
**326** 21:14 .
**331-3307** 85:2, 124:2 .
**332** 142:14 .
**335** 60:14, 150:4 .
**336** 150:3 .
**34** 6:19 .
**341** 121:18, 121:19 .
**353** 129:25 .
**36** 1:31, 170:16 .
**38** 3:2 .
**390** 149:1 .
**.**
**.**

**< 4 >.**
**4** 29:1, 124:6, 126:18, 139:13, 144:6 .
**40** 124:16 .
**400** 135:4 .
**404(b** 127:22 .
**41** 58:20, 59:25 .
**427** 55:21 .
**43** 5:1 .
**45** 6:14, 8:9, 63:11, 64:2, 96:5, 96:14, 96:21, 96:22, 96:25, 97:15, 97:17, 98:2, 99:1, 99:18, 99:21, 116:14, 118:12, 118:25, 119:11, 119:23,

119:25 .
**463** 55:22 .
**484** 130:4 .
**4th** 1:31 .
**.**

**< 5 >.**
**50** 38:12, 154:1 .
**509** 23:15 .
**511** 57:5 .
**518** 148:7 .
**53** 129:25 .
**54** 29:1 .
**556** 142:14 .
**56** 163:7 .
**5633093** 21:2 .
**592** 57:5 .
**.**
**.**

**< 6 >.**
**6** 76:8 .
**609** 127:23 .
**.**

**< 7 >.**
**727** 134:23 .
**739** 130:18 .
**746** 124:4, 126:21 .
**753** 170:22 .
**758** 70:15 .
**783** 130:3 .
**787** 81:6 .
**.**

**< 8 >.**
**8** 86:11 .
**80** 55:22 .
**81** 55:22 .
**8125** 148:9 .
**844-5148** 148:7 .
**851** 134:23 .
**867** 19:25 .
**.**

**< 9 >.**
**9** 1:18, 3:2, 86:11, 133:13, 156:25, 157:19 .
**910** 60:14, 81:6 .
**9411** 1:46 .
**970** 21:14 .

**977** 130:18 .
**996** 135:12 .
**9th** 1:39, 31:15, 163:12, 164:6, 164:10, 165:4 .
**.**
**.**

**< A >.**
**A.** 1:28, 1:42, 2:6, 2:7, 2:11 .
**A.3d** 70:15 .
**a.m.** 1:18, 3:2, 29:1, 133:13, 157:19 .
**ability** 112:20 .
**able** 17:6, 46:7, 65:2, 80:11, 91:3, 91:6, 91:8, 93:15, 93:16, 93:17, 97:22, 102:15, 113:8, 128:25, 138:12, 166:1 .
**above** 16:14, 65:22, 74:18, 86:12 .
**above-entitled** 170:24 .
**absence** 137:23 .
**absolutely** 14:10, 17:16, 68:4, 73:1, 76:16, 111:22 .
**abundance** 149:11, 165:5 .
**abundantly** 66:13, 150:21 .
**access** 9:19, 10:5, 10:18, 43:21 .
**accompanied** 93:11 .
**accomplished** 147:6 .
**According** 125:8, 127:12, 149:9 .
**account** 16:13 .
**accurate** 134:11 .
**accused** 151:13 .
**acknowledge** 34:7, 59:2, 111:14, 116:2 .
**acquired** 81:22 .
**active** 38:4, 111:18, 114:8, 114:14 .
**actively** 10:2, 135:7 .
**activities** 68:25, 99:6, 114:23, 155:12 .
**activity** 21:24, 28:12, 28:14, 30:5, 30:16, 38:6,

40:7, 40:12, 40:23, 46:8,
60:8, 63:13, 72:18, 98:2,
98:4, 98:10, 99:14,
105:18, 111:7, 116:19,
121:3, 129:17, 130:10,
136:6, 137:2, 137:6,
159:4 .

**actual** 42:3, 54:12, 68:22,
87:16, 105:25, 109:9,
116:7, 123:11, 145:2,
145:5 .

**Acura** 124:22, 125:11,
125:14, 126:1 .

**add** 119:15, 127:19, 134:9,
134:11, 145:12,
169:7 .

**added** 96:6, 101:1 .

**addict** 151:22 .

**addicts** 153:5 .

**additional** 50:13, 56:17,
67:7, 67:18, 75:18, 86:6,
87:2, 108:19, 115:16,
118:20, 122:7, 127:6,
127:20 .

**address** 18:8, 43:2, 48:14,
56:12, 62:15, 63:6,
80:20, 97:5, 97:11,
97:13, 118:19, 134:7,
160:25, 166:23 .

**addressed** 8:17 .

**adds** 106:4 .

**adjourned** 170:14,
170:15 .

**adjusting** 149:14 .

**admit** 84:7, 124:15 .

**admitted** 22:18 .

**admitted.** 66:12 .

**adopt** 80:13, 80:15, 83:4,
84:3, 84:5, 85:25,
122:24, 127:13, 127:15,
149:18, 149:20,
150:3 .

**adopted** 124:8 .

**advance** 166:18 .

**advanced** 166:11 .

**advertise** 61:8 .

**advice** 90:7 .

**advisory** 58:24 .

**affiant** 16:11, 34:21, 41:15,
41:20, 52:3, 74:13,

74:14, 85:5, 85:10,
86:12, 107:13,
117:14 .

**affiants** 62:3, 63:15 .

**affidavits** 71:14, 107:24,
109:3, 162:12 .

**affirmation** 19:5 .

**afternoon** 95:9, 95:17,
127:9, 163:7 .

**age** 89:6, 89:7 .

**agency** 31:8 .

**Agent** 41:20, 107:3,
109:13, 144:9,
157:23 .

**agents** 11:12, 15:24, 32:24,
55:12, 62:20, 62:25,
66:6, 69:5, 80:24, 88:10,
93:25, 94:2, 109:9,
157:2, 157:7 .

**aggressive** 34:18,
34:23 .

**aggrieved** 123:23 .

**ago** 6:8, 7:24 .

**agree** 14:11, 23:7, 48:6,
72:12, 113:7, 121:23,
123:1, 128:2, 160:5,
167:4, 167:14,
167:15 .

**agreed** 149:3, 157:4,
157:16, 159:9,
167:5 .

**agreement** 26:21, 103:9,
167:2 .

**agrees** 30:18, 157:5 .

**Ah** 119:14 .

**ahead** 169:21 .

**aid** 7:22 .

**aim** 170:3 .

**aired** 169:3 .

**airport** 161:23 .

**akin** 43:7 .

**al** 1:10 .

**Alan** 2:13, 2:14 .

**alert** 161:19 .

**alerted** 48:6 .

**allegation** 77:13, 93:21,
99:11, 132:21,
162:11 .

**allegations** 77:21, 96:23,
134:19 .

**alleged** 76:22, 81:21,
84:12, 85:7, 93:12,
122:4, 122:5, 129:17,
131:19, 139:24, 141:7,
144:1, 146:4, 146:10,
168:7 .

**allegedly** 17:24, 128:17,
129:11, 136:25 .

**alleyway** 141:16 .

**alleyways** 145:7 .

**allow** 43:8, 73:15,
131:16 .

**allowed** 40:12, 68:16,
80:11 .

**allowing** 36:17, 99:9 .

**allows** 5:1, 30:3, 35:1 .

**alluded** 55:19, 57:5 .

**almost** 7:13, 15:10, 100:12,
110:17, 115:17, 118:23,
119:8, 147:19 .

**alone** 50:6, 147:17,
148:22 .

**already** 9:16, 9:19, 16:10,
17:10, 35:7, 38:19,
46:16, 65:15, 65:19,
65:22, 76:11, 84:19,
101:25, 110:11, 123:14,
123:19, 129:7, 132:20,
136:22, 138:20, 142:10,
149:1, 149:19, 168:19,
169:2, 169:14 .

**altered** 163:12 .

**Although** 15:3, 17:2, 30:5,
85:13, 112:18, 136:11,
152:14, 165:12 .

**Altima** 140:1, 141:5, 141:7,
143:12, 143:15, 146:3,
146:16, 146:20, 146:21,
154:16, 154:17, 154:19,
154:20, 157:9, 157:24,
159:15, 159:16, 159:20,
159:22, 160:3, 160:10,
160:12, 162:18, 162:19,
162:21, 163:2 .

**Altimas** 162:18 .

**ambiguous** 105:4, 105:22,
106:1 .

**amend** 127:18 .

**amended** 149:13 .

**Amendment** 18:24, 18:25,

21:3, 28:10, 35:23,
43:19, 59:1, 79:14,
80:16, 82:17, 83:8,
98:1 .

**AMERICA** 1:5 .

**ammunition** 8:21, 12:7,
23:18, 27:1, 54:19 .

**Among** 48:4, 139:23 .

**amount** 7:13, 7:19, 7:20,
8:13, 8:23, 35:6, 81:21,
110:2, 152:13 .

**amounts** 9:3, 17:3,
133:5 .

**ample** 48:19, 52:11, 80:11,
109:18, 153:22, 156:4,
158:22, 159:17 .

**amplify** 147:14 .

**analogize** 13:20 .

**analogy** 14:18 .

**analysis** 24:15, 35:25,
36:23, 136:19,
142:14 .

**analyzing** 104:6,
135:2 .

**and/or** 16:13, 27:9,
157:3 .

**Anderson** 134:23 .

**Andresen** 55:17, 55:20,
61:16, 61:20, 71:5,
73:8 .

**angling** 165:10 .

**animus** 23:2 .

**answer** 92:4, 120:7,
166:14 .

**answers** 11:16 .

**ante** 56:15, 57:1, 57:22,
57:24, 58:4 .

**anticipate** 86:8, 150:24,
169:22 .

**anticipated** 86:7 .

**Anticipating** 69:1 .

**anybody** 48:11, 80:22,
112:5, 133:8, 165:10,
168:5 .

**Anyway** 134:18 .

**apart** 24:25, 87:25 .

**Apartment** 76:9, 79:20,
86:25, 87:1, 88:16,
93:18, 93:19, 124:5,
126:21, 131:19, 156:1,

156:21, 159:8,
161:14 .
**apologize** 11:19, 32:3,
32:4, 61:2, 119:19,
129:9, 139:7,
168:19 .
**Apparently** 78:17, 81:9,
83:1, 90:18, 93:11,
133:15, 136:8, 145:8,
147:4 .
**Appeals** 67:10, 67:14,
67:16, 70:14, 70:17 .
**appear** 67:10, 99:11, 101:5,
101:14 .
**APPEARANCES** 2:1 .
**appeared** 90:20,
90:22 .
**appearing** 4:21 .
**appears** 123:16,
128:21 .
**Apple** 78:6 .
**applicable** 8:4 .
**application** 9:5, 9:12,
11:14, 18:7, 18:11, 20:9,
20:14, 42:7, 42:8, 60:24,
74:6, 74:9, 96:20, 98:24,
99:12, 99:21, 100:14,
101:1, 101:9,
164:23 .
**applications** 7:5, 15:9,
52:7, 56:24, 164:5 .
**applied** 11:25, 32:24, 53:1,
101:23 .
**applies** 18:23, 22:12,
39:10, 55:11, 65:24,
67:3 .
**apply** 55:15, 67:25, 80:17,
142:6 .
**applying** 107:5 .
**appreciate** 85:13 .
**appreciates** 6:19 .
**approaches** 82:23 .
**appropriate** 22:7, 35:15,
36:13, 46:20, 127:14,
150:22, 150:25,
151:1 .
**approval** 62:25 .
**approves** 58:21 .
**approximately** 80:10,
133:13, 133:24,

157:18 .
**apps** 10:6 .
**area** 50:15, 77:6, 77:8,
104:16, 113:20, 114:20,
114:21, 139:8, 139:15,
139:19, 144:8, 145:22,
146:12, 154:7, 157:18,
157:24 .
**areas** 44:11, 44:17,
45:5 .
**arguably** 93:4 .
**argue** 6:23, 37:9, 38:6,
40:4, 73:15, 101:18,
103:12, 121:11,
125:2 .
**argued** 165:2 .
**arguing** 24:13, 25:2, 25:21,
36:5, 42:22, 74:2, 90:12,
115:23, 128:5,
137:11 .
**arguments** 25:11, 70:9,
75:18, 80:13, 80:16,
83:5, 83:8, 84:3, 84:6,
86:6, 96:4, 99:8, 124:8,
127:16 .
**arise** 121:14 .
**Arizona** 142:14 .
**arose** 121:16 .
**around** 53:17, 84:10,
130:1, 133:1, 141:20,
163:7, 163:8, 169:1 .
**arrange** 66:19, 87:12,
87:24, 129:1, 129:2 .
**arranged** 76:24 .
**arranging** 110:4,
129:14 .
**arrest** 20:3, 20:4, 28:20,
40:21, 111:2, 138:6,
142:10, 142:13,
142:18 .
**arrested** 6:18, 112:12,
158:7 .
**arrive** 117:19, 117:20 .
**arrived** 154:15 .
**arrives** 117:24 .
**arriving** 51:12, 51:14,
157:9 .
**articulate** 72:13,
165:8 .
**articulately** 55:13,

72:9 .
**ascertain** 10:12 .
**aside** 44:22, 103:14,
170:10 .
**asks** 49:18, 50:20, 105:6,
117:5, 117:7, 117:9,
117:11 .
**aspect** 48:7, 84:1 .
**assault** 155:7 .
**assert** 28:4, 29:17 .
**assertion** 24:10 .
**assertions** 27:23 .
**asserts** 159:3 .
**assets** 16:15 .
**assists** 129:14 .
**associate** 102:22 .
**associated** 40:23, 102:3,
124:5, 125:9 .
**associates** 46:3, 52:5,
107:21 .
**associations** 104:3 .
**assume** 29:13, 64:6,
88:24 .
**assumed** 5:11 .
**assuming** 46:11, 79:7,
98:17 .
**assumption** 36:13 .
**Attached** 13:4, 35:17,
41:23, 42:9, 62:6, 76:7,
131:21, 164:1,
164:20 .
**attachment** 131:23, 148:8,
150:13 .
**attachments** 138:16 .
**attempt** 16:18, 85:14,
116:12 .
**attempted** 64:25, 66:4,
100:25 .
**attempts** 104:22, 106:2,
154:25 .
**attention** 166:24 .
**attenuated** 79:13 .
**Attorney** 1:30, 43:21 .
**attorneys** 73:15 .
**attributable** 104:24 .
**AUSA** 3:8, 72:2, 75:12 .
**Ausas** 72:8 .
**authorities** 4:25, 81:5 .
**authority** 68:16, 81:1 .
**authorization** 20:17,

62:25, 72:19, 97:22,
105:11, 148:1, 148:4,
148:5, 156:17,
160:19 .
**authorization.** 57:12 .
**authorize** 26:11, 37:4,
61:13, 63:8, 69:5, 88:10,
162:6 .
**authorized** 11:18, 12:19,
13:11, 13:24, 18:2,
20:24, 25:22, 32:17,
32:19, 45:13, 52:21,
54:5, 55:12, 57:8, 57:9,
58:19, 60:24, 62:7,
65:21, 81:15, 81:16,
81:18, 91:20, 99:3,
105:21, 132:18, 134:4,
146:9, 156:4,
159:16 .
**authorizes** 12:21, 15:17,
15:19, 25:13, 54:24,
97:19, 99:15 .
**authorizing** 28:7, 36:18,
37:12, 38:21, 60:18,
61:9, 61:12, 66:6, 82:4,
84:22, 123:4 .
**available** 9:16, 35:19,
163:18 .
**Avenue** 2:8, 49:16, 50:4,
64:2 .
**avoid** 53:8, 114:2, 154:22,
154:25 .
**await** 127:25 .
**aware** 3:24, 65:17, 67:15,
76:10, 77:7, 80:1, 80:24,
90:3, 132:17, 146:14,
168:8 .
**away** 15:1, 50:2, 92:8,
92:9, 112:9, 133:6,
133:17, 142:11,
147:1 .
**awful** 133:25 .
**awkward** 72:14 .
.
.
**< B >.**
**B-r-i-n-k-m-a-n**
130:18 .
**B-u-r-n-s** 70:15 .
**background** 120:24,

130:24 .
**bad** 125:9, 125:12,
125:15 .
**bag** 8:18, 15:12, 26:23,
26:24, 29:12, 115:5,
117:22, 117:23,
118:2 .
**bags** 8:20 .
**Baltimore** 1:16, 1:32, 1:40,
1:47, 2:9, 79:20,
90:15 .
**bands** 26:25 .
**banker** 5:9 .
**bar** 116:5 .
**bare** 19:20 .
**bare-boned** 144:25 .
**bare-bones** 143:9,
147:23 .
**barely** 42:16 .
**base** 163:25 .
**baseless** 162:11 .
**basic** 121:16 .
**basically** 17:4, 17:14, 23:3,
34:17, 51:4, 56:20,
62:17, 68:16, 74:24,
79:4, 81:14, 81:15,
82:11, 97:16 .
**basis** 6:24, 23:12, 94:6,
99:17, 100:12, 102:2,
112:16, 118:23, 119:8,
120:3, 129:18 .
**Bates** 12:24, 54:10,
54:11 .
**become** 103:10 .
**becoming** 21:11 .
**bedroom** 64:14, 64:23,
66:1, 66:24, 67:2 .
**began** 107:13 .
**begin** 5:8, 109:21, 109:23,
166:2 .
**beginning** 79:25, 113:13,
165:19, 167:17 .
**begins** 90:3 .
**behalf** 3:7, 3:20, 3:23,
150:6 .
**behavior** 20:13 .
**behind** 141:17 .
**belief** 94:2, 94:7 .
**believed** 88:19, 98:4,
102:9, 157:15,

159:7 .
**believes** 65:12 .
**believing** 73:25 .
**belong** 33:18 .
**belonged** 18:3, 64:7,
65:1 .
**belonging** 39:20, 63:1,
66:15, 66:20 .
**belongs** 26:9, 33:16,
63:19, 63:25 .
**bench** 5:21 .
**benefit** 35:5 .
**besides** 146:22 .
**bespeak** 104:25 .
**best** 10:16, 35:19, 38:16,
43:25, 45:15, 104:22,
153:8 .
**Bethel** 144:8, 161:9 .
**better** 3:12, 31:22,
141:24 .
**beyond** 46:11, 61:15 .
**big** 33:21 .
**billboards** 153:17 .
**birth** 7:24 .
**Bishop** 60:13, 61:5 .
**bit** 3:13, 18:24, 30:10,
36:22, 47:11, 49:17,
62:4, 101:21, 103:19,
111:15, 115:23, 121:12,
143:2, 144:16, 152:7,
152:24 .
**bitch** 117:8 .
**black** 26:24, 33:24, 115:5,
117:19, 117:21, 117:22,
117:23, 118:2, 143:16,
154:15, 154:20 .
**blanket** 23:17 .
**blenders** 27:1 .
**blindly** 60:6 .
**boilerplate** 148:13, 153:21,
155:17 .
**books** 16:15 .
**bootstrapped** 78:14 .
**borne** 107:23, 111:25 .
**bottom** 12:24, 54:10,
54:11, 54:14, 86:11 .
**Boulevard** 6:14, 8:9, 96:5,
96:15, 96:21, 97:1,
97:16, 97:17, 98:3, 99:1,
99:19, 99:21, 116:15,

119:1, 119:25 .
**box** 5:9, 27:1 .
**Boyer** 131:17, 148:2,
148:3, 153:20,
156:4 .
**Brady** 58:11 .
**brain** 75:22 .
**breadth** 20:22, 21:19,
126:25 .
**break** 90:2, 95:5,
170:8 .
**Bret** 89:10 .
**brick-shaped** 8:19 .
**brief** 47:8, 101:9, 132:25,
148:11, 149:25 .
**briefing** 67:18 .
**briefly** 14:7, 73:14, 75:25,
84:2, 95:22, 124:7,
128:13, 129:8, 130:12,
132:2, 135:17 .
**bright** 35:15 .
**bring** 47:24, 51:3, 81:23,
92:14 .
**bringing** 118:4 .
**brings** 50:12, 117:22,
159:12, 159:14 .
**Brinkman** 130:18 .
**broad** 7:10, 23:5, 23:7,
33:14, 45:14, 82:2, 82:3,
93:3, 97:21 .
**broader** 17:12, 17:13,
20:25, 21:3, 55:24 .
**broadly** 105:23 .
**brothers** 129:11,
132:13 .
**brought** 15:5, 29:9, 118:2,
145:22, 146:15, 154:10,
156:24, 158:4 .
**Bruton** 168:9, 168:10 .
**Bryce** 155:11 .
**BS** 110:21 .
**building** 86:25, 87:1,
139:2 .
**bulky** 170:9 .
**bullet** 49:2 .
**bullshit** 110:22 .
**bunch** 54:17 .
**burglary** 155:6 .
**buried** 72:15, 73:9 .
**Burns** 70:15, 70:23, 71:8,

82:13 .
**bury** 71:13 .
**business** 132:23, 135:8,
135:19, 135:24, 143:19,
144:13, 144:15,
146:11 .
**buy** 150:24 .
**buyer** 128:23, 130:12,
130:15 .
**buyer-seller** 130:13 .
**buying** 153:16 .
**buys** 137:10 .
.
.
**< C >** .
**C.** 1:29, 1:44, 1:45, 20:1,
31:12, 32:14, 32:15,
32:18, 33:2, 33:20, 41:3,
67:9, 67:10, 67:12,
67:13, 67:16, 67:19,
68:15, 70:17, 82:13,
154:20, 157:10,
170:22 .
**Caballes** 145:17 .
**cabin** 56:4 .
**cabined** 62:13 .
**cabinet** 13:20, 13:24,
14:16, 14:19, 14:20,
14:23, 14:25, 15:3, 15:5,
55:18 .
**cabinets** 61:20, 61:21 .
**cabins** 61:24 .
**calendar** 165:21 .
**call** 9:4, 9:8, 9:11, 9:20,
17:11, 18:7, 18:9, 29:4,
38:19, 38:21, 50:3,
51:10, 100:25, 106:14,
108:3, 108:20, 109:6,
111:4, 117:5, 134:5,
143:20, 150:25,
157:8 .
**called** 135:11, 154:9 .
**calling** 3:4, 9:21,
137:1 .
**camera** 50:1, 51:12, 51:21,
89:13, 116:11, 116:22,
117:18, 153:5 .
**Campbell** 87:4, 87:7,
88:13, 88:16, 93:13,
93:17 .

candidly 15:3 .
canine 141:2, 141:20,
    142:5, 147:1, 147:2,
    147:6, 147:7, 147:13,
    160:8, 161:22, 162:1,
    163:8 .
canines 161:24 .
captured 9:24 .
car 49:12, 75:21, 87:6,
    88:20, 93:22, 100:6,
    100:7, 102:4, 118:4,
    118:9, 121:2, 121:3,
    125:8, 125:11, 137:18,
    140:19, 140:20, 140:22,
    141:17, 142:21, 157:11,
    161:21, 163:13 .
care 122:20 .
careful 43:6, 109:4 .
carefully 21:10 .
Carpenter 103:23, 107:6,
    107:7 .
carry 109:14 .
carrying 100:7 .
cars 95:7, 102:5, 113:24,
    137:17, 139:1, 139:15,
    141:20, 142:3, 142:8,
    146:1, 146:23, 153:6,
    154:21, 154:22, 162:4,
    165:3 .
cases 13:20, 15:16, 15:23,
    33:9, 39:25, 46:23,
    57:20, 57:22, 60:1, 67:8,
    70:13, 70:24, 71:6, 73:2,
    78:9, 78:11, 112:19,
    134:24, 135:1, 138:8,
    145:16, 170:8 .
cash 110:2 .
Cassie 3:8 .
catchall 23:3, 23:11 .
categories 41:11 .
category 150:8 .
caused 111:2 .
causing 71:14 .
caution 149:11, 165:5 .
cautious 49:22, 109:4,
    112:25, 114:13 .
CDS 77:6, 81:22, 86:16,
    143:7, 144:9 .
Cellebrite 10:11, 10:18,
    45:10, 45:13, 45:21,

58:8, 80:4, 80:6, 83:2,
    89:20, 89:22, 89:23,
    90:10, 90:24 .
cellular 13:8, 16:12, 23:19,
    54:25, 72:20 .
Center 122:4, 163:20 .
central 71:12 .
certain 54:16, 67:5, 81:25,
    122:14 .
certainty 10:20 .
CERTIFICATE 170:17 .
Certified 170:20 .
certify 170:21 .
cetera 44:18, 75:16 .
chain 163:10 .
challenge 6:16, 41:6,
    112:20 .
challenged 6:25 .
challenges 159:2 .
challenging 6:22, 17:20,
    23:16, 24:16, 25:8, 25:9,
    34:5, 37:8, 103:4 .
chance 48:10 .
character 116:10 .
characterization 72:12,
    72:15 .
characterize 73:9 .
characterized 90:21,
    91:24, 108:3 .
charge 155:8, 159:4 .
charged 131:7, 151:5,
    152:15, 152:20 .
Charles 1:31, 1:39 .
chart 157:11 .
Chasanow 1:22,
    125:19 .
chats 46:1 .
check 134:12, 158:11,
    158:12 .
checked 134:17,
    165:21 .
Chevy 8:10, 8:23, 100:2,
    102:6, 103:2, 111:14,
    115:25, 119:6,
    120:23 .
chew 170:7 .
child 46:23 .
children 89:6 .
choices 103:11,
    112:23 .

choose 101:6 .
choosing 34:19 .
Christina 1:28, 3:7 .
chronological 24:15 .
chronologically 131:13,
    153:1 .
Chrysler 125:7, 125:9,
    125:11, 125:15,
    126:6 .
Chuang 21:1 .
CI 136:21 .
Circle 76:9, 86:11 .
circuits 60:1, 73:3 .
circumstance 15:3, 32:15,
    97:2 .
circumstances 19:15,
    81:25, 82:21, 118:1,
    136:20, 136:21,
    142:9 .
citation 83:16 .
cite 22:10 .
cited 21:14, 130:2,
    134:25 .
cites 41:10, 106:9 .
citing 22:9 .
City 49:16, 108:7 .
claim 73:16, 111:23 .
claims 155:17 .
clarification 162:17 .
clarify 95:21 .
clarifying 96:3 .
Class 161:18 .
clause 55:25, 56:4 .
clear 4:25, 6:21, 11:5, 16:3,
    17:19, 22:6, 28:5, 29:4,
    31:8, 33:21, 35:9, 35:15,
    39:17, 55:5, 55:14, 62:5,
    63:10, 66:13, 66:15,
    87:10, 87:16, 98:21,
    102:10, 102:12, 103:24,
    111:17, 138:20,
    150:21 .
Clearly 24:6, 45:22, 46:25,
    52:24, 56:3, 59:20,
    62:10, 64:11, 65:21,
    65:24, 66:3, 66:19, 67:3,
    69:19, 71:24, 73:22,
    88:1, 89:15, 97:8,
    101:13, 105:17, 105:18,
    108:5, 110:11, 110:22,

116:4, 118:14,
    158:22 .
CLERK 5:13, 95:14,
    170:11, 170:12,
    170:15 .
clerks 33:22 .
client 82:14, 84:9 .
close 90:18, 142:16,
    167:17 .
closely 67:19, 69:6 .
closer 47:15, 78:10,
    138:3 .
closest 85:25 .
clothing 8:17 .
cloud 137:25 .
co-conspirator
    123:13 .
co-conspirators 52:8,
    109:17, 110:21,
    155:15 .
co-counsel 71:7,
    128:8 .
co-defendant 50:18,
    69:8 .
co-defendants 99:10 .
Cobb 21:13, 22:9, 22:10,
    22:13, 22:20, 22:24,
    37:7, 66:3, 67:3 .
cocaine 26:21, 92:7,
    109:10, 155:8, 156:20,
    157:16, 159:10 .
code 57:25, 60:7,
    109:1 .
coded 49:6, 109:4,
    117:11 .
Coleman 133:3 .
collected 125:12 .
colors 141:10 .
Columbia 67:9, 70:14,
    70:20 .
comes 55:15, 56:3, 105:24,
    122:5, 126:12, 130:3,
    134:23, 142:17 .
comfortable 4:16,
    7:16 .
coming 85:17, 94:11,
    108:8, 108:9, 129:24,
    133:16, 136:14, 136:15,
    139:14, 143:19, 168:16,
    168:17, 169:6,

**170**:7 .
**commend** 82:14, 154:23, 154:24 .
**comment** 67:11 .
**commented** 82:13 .
**comments** 57:6, 104:24, 124:19 .
**commission** 77:17, 152:2 .
**committed** 20:5, 40:5 .
**committee** 58:24 .
**committing** 20:9 .
**common** 53:6, 74:20, 106:8, 108:14, 139:11, 140:15, 157:11 .
**commonly** 52:4, 52:6, 53:20, 109:10, 109:14, 137:21, 155:11, 158:21 .
**communicate** 52:7, 69:11, 69:13, 69:22, 70:2, 87:20, 88:2, 94:22 .
**communicating** 69:24, 78:3 .
**communication** 77:10, 105:4, 105:5, 106:1, 106:7, 110:3, 144:20, 157:1, 157:14, 157:19 .
**communications** 36:25, 50:17, 53:2, 63:4, 69:21, 70:7, 86:13, 86:22, 98:13, 104:13, 104:16, 105:10, 105:25, 106:4, 144:7, 151:12, 159:9, 161:3, 161:9 .
**compacted** 133:11 .
**compartmentalize** 16:6 .
**compelled** 130:16 .
**compelling** 130:20 .
**complaint** 84:18, 162:5 .
**complete** 13:12, 157:17 .
**completely** 88:23, 111:25, 113:7, 161:21 .
**complex** 93:18 .
**compliant** 82:16 .
**complicated** 15:13 .

**comply** 73:7 .
**comprehensively** 165:15 .
**computer** 22:25, 23:1, 23:10, 57:9, 57:10, 57:16, 57:17, 57:18, 57:23, 61:19, 78:6 .
**Computer-aided** 1:49 .
**computers** 14:17, 15:8, 30:12, 47:1 .
**concealed** 12:18, 54:16 .
**concede** 96:8, 102:23, 141:23 .
**conceded** 97:18, 116:15 .
**concedes** 18:16 .
**conceding** 79:9, 150:23 .
**conceivable** 81:17 .
**concern** 100:9, 168:12 .
**concerned** 125:13 .
**concerning** 20:10, 124:24 .
**conclude** 53:22, 61:22 .
**concluded** 170:16 .
**concludes** 160:21 .
**concluding** 104:19 .
**conclusion** 28:2, 39:25, 60:4, 103:19 .
**conclusions** 19:20, 19:21, 27:19, 27:23, 102:1 .
**conclusory** 27:16, 96:23, 105:24 .
**concrete** 66:18, 116:25, 144:24 .
**conduct** 23:5, 44:15, 44:21, 45:25, 54:20, 55:2, 55:10, 57:18, 62:8, 72:23, 77:16, 96:24, 134:22, 143:23, 152:13, 161:19 .
**conducted** 41:14, 42:18, 124:11, 129:17, 144:13, 158:10 .
**conducting** 77:24, 135:19, 135:23, 143:19, 144:15 .
**Conference** 170:26 .

**confess** 67:15 .
**confident** 5:2 .
**confidential** 135:22, 136:21, 150:19, 151:9, 152:12, 154:6 .
**confirm** 115:14 .
**confirmation** 117:11 .
**confirmed** 136:22, 136:23, 141:16, 145:10 .
**confirming** 4:21, 144:25 .
**confirms** 134:14 .
**conformance** 170:25 .
**confronted** 40:19 .
**confusing** 106:23 .
**conjure** 81:18 .
**connect** 46:2 .
**connected** 30:4, 30:5, 99:6, 118:20, 158:14 .
**connection** 18:18, 36:25, 76:25, 77:4, 77:13, 96:25, 121:3 .
**connections** 44:8 .
**conscience** 151:12 .
**consent** 142:7 .
**consider** 33:24, 127:13, 130:20, 135:17 .
**consideration** 76:14 .
**considered** 32:15, 61:16, 83:9 .
**considering** 36:12 .
**consistent** 125:3 .
**consists** 123:8 .
**conspiracy** 63:4, 88:3, 89:16, 122:5, 130:14, 130:15, 152:20, 168:8 .
**constantly** 15:10, 87:11 .
**constitute** 19:17 .
**constitutes** 59:16 .
**constitutional** 134:20 .
**constitutionality** 22:14 .
**constitutionally** 66:8 .
**constrain** 73:4 .
**contact** 53:9, 77:4, 86:20, 87:17, 97:15, 113:17, 118:19, 128:25,

**158**:5 .
**contacted** 113:23 .
**contacts** 45:8, 86:18, 94:3 .
**contain** 40:9, 44:9, 53:18, 70:7, 77:18, 79:5 .
**contained** 8:19, 16:19, 43:12, 59:19, 84:16, 85:11, 85:14, 89:17, 118:2, 118:4 .
**container** 79:4 .
**containing** 8:18, 26:23, 26:24 .
**contains** 14:21, 41:8, 43:9, 64:21 .
**contaminated** 147:2 .
**contemporaneous** 69:21 .
**contending** 60:23 .
**content** 43:12, 123:14, 125:3 .
**contents** 16:23, 37:24, 43:8, 45:16, 45:23, 57:11, 58:7, 92:16 .
**context** 46:23, 49:24, 51:17, 55:14, 55:21, 56:3, 67:22, 69:20, 76:12, 76:15, 81:23, 93:5, 100:20, 107:24, 108:4, 108:25 .
**contingent** 4:22 .
**Continued** 2:1 .
**continues** 92:15 .
**continuous** 6:18 .
**contraband** 24:6, 24:8, 24:18, 24:22, 29:2, 29:18, 37:18, 38:19, 40:1, 61:11, 71:22, 74:21, 98:10, 153:14, 154:12, 160:17 .
**contrary** 125:20, 155:17, 159:6 .
**contrast** 20:6 .
**control** 163:16, 163:18 .
**conversation** 50:10, 97:4, 106:9, 117:15, 154:8 .
**conversations** 18:6, 28:5, 28:16, 69:17, 87:15,

104:24, 106:3,
125:2 .
**converse** 34:4 .
**cooperating** 169:20 .
**coordination** 90:18 .
**copy** 42:6, 42:7, 45:20,
59:3, 112:8 .
**corners** 7:8, 19:7, 35:22,
85:9 .
**Correct** 11:21, 11:23,
16:19, 39:22, 47:22,
65:12, 76:10, 83:19,
90:9, 93:1, 119:9,
121:20, 139:5, 141:5,
147:15, 165:9,
170:23 .
**corrected** 134:18,
149:22 .
**correcting** 163:14 .
**correction** 163:1 .
**correctly** 34:5, 46:19,
121:8, 121:9, 129:10,
135:14 .
**correspondence** 3:25 .
**corroborated** 136:3 .
**corroborating** 137:1 .
**corroboration** 115:17,
133:9, 133:22, 136:3,
137:9 .
**Counsel** 3:8, 4:23, 5:5,
58:10, 58:15, 59:11,
59:22, 65:12, 84:3,
84:19, 85:4, 85:25,
115:23, 123:1, 126:2,
127:15, 130:22, 150:21,
152:6, 152:21, 166:5,
166:23, 167:1, 167:2,
167:11, 167:14, 168:6,
168:14, 169:24 .
**counsels** 55:20 .
**count** 74:17 .
**County** 27:21, 28:4, 79:21,
90:15, 90:17, 113:16,
113:20, 131:18, 132:19,
140:17, 143:8, 156:14,
160:4, 163:19 .
**couple** 10:4, 70:16, 79:21,
95:10, 128:9, 140:15,
148:12, 157:13 .
**courier** 108:15 .

**course** 4:23, 20:12, 42:4,
53:1, 63:18, 63:22,
67:18, 68:15, 68:21,
69:2, 70:22, 70:25, 71:9,
75:4, 80:15, 80:22,
86:24, 89:6, 91:11,
109:8, 109:12, 113:6,
118:17, 123:14, 138:13,
159:15, 167:10 .
**Courtroom** 1:23, 3:11,
166:7, 166:15 .
**courts** 56:25, 61:22,
135:2 .
**cover** 67:25, 165:14 .
**covered** 58:13, 67:4,
70:10, 75:5, 121:13,
122:10 .
**covert** 50:1, 51:12, 51:21,
89:12, 116:22, 117:18,
120:3, 144:13 .
**COVID** 4:13, 4:24, 165:23,
166:1, 166:11,
166:19 .
**crack** 156:20 .
**crane** 140:23 .
**crass** 97:3 .
**creation** 90:14 .
**crime** 7:9, 19:18, 20:9,
20:24, 38:25, 39:13,
39:17, 40:5, 40:10, 55:8,
56:1, 56:7, 58:18, 59:17,
60:20, 61:13, 61:25,
62:10, 62:13, 137:17,
142:18, 153:15,
160:17 .
**crimes** 12:20, 23:12, 59:14,
81:8, 155:21 .
**Criminal** 1:9, 3:6, 20:13,
23:4, 38:6, 40:6, 40:12,
40:22, 45:25, 46:8,
57:18, 58:21, 60:20,
81:18, 82:1, 109:12,
130:24, 134:10, 134:22,
148:12, 155:6, 158:18,
159:4 .
**criminality** 20:20,
57:19 .
**Criminals** 61:8 .
**critique** 30:25 .
**Crown** 140:1, 141:14,

141:15, 143:3, 143:5,
144:5, 144:22, 145:4,
146:17, 159:15, 160:15,
160:24, 161:6, 161:11,
161:16, 161:19, 163:4,
163:9, 163:24 .
**CRR** 170:32 .
**crux** 29:22 .
**CS** 151:1, 154:9 .
**CS-3** 128:16, 128:21,
129:13, 129:16, 129:22,
130:12, 130:22, 130:25,
131:2, 133:18, 136:9,
148:16, 148:19, 150:20,
150:22, 152:16, 154:8,
154:11, 15, 155:3 .
**cull** 59:12, 59:15 .
**curiosity** 96:2 .
**currency** 159:25 .
**current** 97:14, 127:25 .
**cursorily** 57:11, 58:17,
59:13 .
**cursory** 26:7 .
**custody** 6:19, 163:10 .
**customer** 89:13 .
**customers** 53:10, 69:11,
69:15, 86:16, 87:12,
87:13, 89:9, 156:8,
159:11, 161:6 .
**customs** 15:5 .
**cut** 7:8, 35:21, 35:22 .
**cycles** 113:21 .
**cycling** 52:24, 154:22 .
.
.

**< D >**
**D.C** 83:20 .
**daily** 100:12, 118:23,
119:8 .
**dangerous** 23:18, 54:18,
54:21, 55:2, 55:9, 55:11,
62:9, 72:23 .
**data** 8:11, 10:7, 10:12,
11:3, 23:20, 55:1, 72:21,
73:20, 82:19, 86:2,
103:5, 103:21, 105:12,
105:14, 106:17, 106:20,
107:9, 153:19 .
**date** 89:22, 89:23, 97:5,
115:7, 129:3, 148:4,

156:23, 164:25, 165:20,
166:8 .
**Dated** 140:5, 148:4,
170:27 .
**daughter** 7:24 .
**day** 6:17, 117:6, 134:3,
134:12, 140:5, 158:17,
161:18, 163:3, 163:5,
163:6, 163:9, 164:3,
164:4, 164:15, 164:16,
165:22, 166:3, 170:9,
170:27 .
**days** 79:21, 90:3, 90:17,
90:23, 110:13, 112:11,
118:15 .
**DEA** 11:10, 11:12, 31:8,
31:19, 32:5, 33:7, 35:18,
72:1, 72:3, 75:11,
90:17 .
**DEA-6** 31:4, 31:7, 162:12,
164:20 .
**DEA.** 79:25 .
**deadline** 126:10,
168:25 .
**deadly** 60:21 .
**deal** 60:17, 75:17, 102:22,
102:25, 103:7, 117:18,
157:17 .
**dealer** 17:5, 19:10, 27:22,
28:15, 111:19, 111:20,
132:16, 156:15 .
**dealers** 38:8, 77:16,
82:7 .
**dealing** 14:11, 14:17, 15:7,
15:8, 17:25, 30:9, 35:10,
52:14, 60:21, 71:16,
81:11, 94:23, 118:8,
153:9 .
**deals** 17:2, 153:6,
161:7 .
**dealt** 112:18, 149:1 .
**debate** 32:11 .
**DEBORAH** 1:22 .
**decide** 61:6, 112:25 .
**decided** 34:6 .
**decision** 55:17, 60:13,
61:1 .
**decisions** 61:24 .
**deemed** 126:8 .
**defeated** 119:25 .

**Defendant** 1:12, 1:35, 1:42, 2:4, 2:11, 5:3, 5:13, 32:16, 57:25, 60:16, 60:19, 60:22, 69:3, 78:15, 81:8, 86:25, 87:1, 87:3, 92:15, 112:19, 112:22, 114:4, 135:6, 138:7, 142:15, 151:15, 163:17 .

**defendant-friendly** 70:14 .

**defendant-specific** 70:8 .

**defendants** 3:14, 48:5, 68:24, 72:17, 103:11, 168:7 .

**Defender** 1:38, 3:16 .

**Defense** 55:23, 58:10, 58:15, 59:11, 59:22, 60:3, 65:12, 67:20, 79:19, 91:16, 111:23, 115:23, 116:15, 140:3, 149:20, 151:7, 151:13, 152:18, 167:1, 167:13 .

**deficient** 124:13 .

**defined** 123:23 .

**degree** 15:22, 155:6, 155:7 .

**Delaware** 113:18 .

**delay** 91:12, 91:17, 92:18 .

**delaying** 147:18 .

**delineated** 97:8 .

**delivered** 167:10 .

**demands** 28:10, 98:1 .

**demonstrate** 20:10, 101:16, 105:15, 123:16 .

**demonstrated** 41:13, 42:17 .

**denied** 25:19, 30:20, 123:23, 124:3, 151:5, 152:23 .

**deny** 155:22 .

**department** 158:5 .

**departs** 50:6 .

**depending** 103:10 .

**depends** 62:22 .

**Deputy** 161:18 .

**derivative** 6:23, 30:23, 101:14, 101:19 .

**describe** 16:18, 21:5, 139:11 .

**described** 16:14, 74:17, 86:21, 138:25, 141:9, 155:10, 158:20, 162:11 .

**describes** 36:24, 102:9 .

**describing** 19:5, 30:1, 38:16, 39:18, 112:25 .

**description** 61:7, 70:24 .

**description.** 61:1 .

**descriptions** 96:25 .

**designation** 57:15 .

**detail** 5:19, 27:25, 49:1, 49:4, 50:13, 51:25, 89:8, 113:8, 115:5, 115:7, 115:13, 142:25, 153:11 .

**detailed** 86:21, 111:21, 159:6 .

**details** 40:10, 69:7, 101:2, 156:23, 165:13 .

**detain** 142:3 .

**detained** 142:10 .

**detaining** 147:18 .

**detection** 53:8, 114:2, 154:23, 154:25, 155:13 .

**Detention** 163:20 .

**determination** 19:22, 26:8, 38:24, 39:12, 113:9, 151:14 .

**determine** 14:8, 35:19, 57:11, 58:17, 59:4, 59:13, 97:12 .

**determined** 101:15, 151:20, 156:19 .

**determining** 104:10 .

**developing** 34:9 .

**device** 16:1, 25:14, 32:21, 33:16, 36:19, 45:20, 57:2, 57:7, 58:23, 73:5, 78:5, 79:3, 80:9, 82:9, 84:25, 94:21, 124:22, 154:14 .

**devices** 12:8, 13:8, 15:18, 15:19, 15:21, 23:19, 24:7, 25:23, 26:2, 26:16, 29:19, 33:18, 47:1, 54:17, 54:19, 54:25, 58:22, 59:8, 63:8, 72:20, 99:16 .

**difference** 13:18, 101:2 .

**differences** 14:15, 14:24 .

**different** 15:3, 30:24, 32:3, 37:19, 39:23, 42:19, 53:2, 54:3, 63:3, 69:12, 70:1, 75:17, 77:25, 80:18, 81:6, 87:25, 92:25, 101:3, 106:14, 141:1, 141:9, 141:10, 154:20, 154:21, 156:24, 160:25, 162:20, 166:16, 167:21 .

**difficult** 4:24, 10:9, 15:6, 63:18, 63:24 .

**difficulties** 126:20 .

**difficulty** 135:9 .

**digital** 8:21, 26:23, 159:25 .

**diligent** 145:10 .

**dire** 166:10, 166:13, 166:16, 166:17, 169:1 .

**direct** 46:2, 77:13, 86:9 .

**direction** 49:17 .

**directly** 3:11, 159:10 .

**disagree** 46:21, 72:11, 72:14, 113:3 .

**disagreed** 61:2 .

**disclose** 34:20, 130:21 .

**disclosed** 79:18 .

**disclosure** 127:22, 130:11, 130:16, 151:9, 151:15, 151:17, 151:25, 152:9, 152:11, 152:22 .

**disconnect** 34:1, 144:12 .

**discouraged** 145:15 .

**discovery** 9:3, 32:11, 59:12, 79:19, 91:1,

112:1, 112:13, 127:20, 139:18 .

**discuss** 5:9, 8:6, 51:2, 104:17, 167:1 .

**discussed** 23:15, 48:18, 67:12, 69:5, 71:6, 101:25, 122:25, 124:7, 161:13, 162:15 .

**discussing** 100:19, 161:7 .

**discussion** 7:22, 22:11, 109:23, 134:16 .

**discussions** 126:19 .

**dispose** 53:6 .

**disposed** 120:11 .

**disproportionate** 81:19, 82:10 .

**dispute** 134:2, 134:5, 164:3 .

**disputes** 167:7 .

**dissimilar** 67:21, 67:24 .

**dissipated** 142:23 .

**distance** 87:25 .

**distinct** 25:10 .

**distinction** 20:21, 79:2 .

**distinguish** 66:4, 76:3, 76:4 .

**distinguishable** 70:18, 78:9, 94:16 .

**distinguished** 70:17 .

**distribute** 63:14, 88:22, 89:9, 143:7, 159:10, 159:13, 160:10 .

**distributing** 118:5, 156:19, 159:7 .

**distribution** 155:8, 155:12 .

**distributor** 114:7, 114:25, 115:3, 115:4 .

**District** 1:1, 1:2, 67:9, 70:13, 70:20, 170:21 .

**disturbing** 15:15 .

**DIVISION** 1:3 .

**DKC-20-0038** 3:6 .

**doable** 95:13 .

**docket** 6:12 .

**doctrine** 22:8, 22:13,

39:9 .
**document** 9:4, 9:14, 61:14, 61:17, 61:19, 150:11, 164:21 .
**documentation** 12:6 .
**documents** 12:5, 14:25, 23:18, 61:12, 101:7, 149:10 .
**dog** 47:20, 76:12, 83:6, 83:7, 83:9, 145:16, 145:22, 163:8 .
**Dogs** 161:24 .
**doing** 13:15, 13:16, 34:4, 35:16, 44:1, 90:10, 144:18, 144:22, 162:21, 170:10 .
**domestic** 158:6 .
**done** 26:7, 34:14, 34:15, 35:13, 38:17, 44:1, 44:2, 46:11, 52:10, 59:9, 59:18, 59:23, 79:1, 90:11, 147:7, 147:8, 149:9, 151:18, 166:10, 166:19, 167:16 .
**Donkey** 60:5 .
**door** 25:7, 49:14, 51:14, 89:13, 89:14, 157:12, 157:22, 157:24, 162:10, 170:4 .
**double** 49:9 .
**doubling** 94:20 .
**doubt** 55:16 .
**down** 46:19, 47:11, 47:14, 139:14, 142:17, 152:6, 152:8, 165:14, 168:17 .
**download** 6:14, 9:2, 9:11, 10:11, 10:22, 11:13, 11:18, 13:12, 13:16, 26:4, 31:6, 31:24, 32:7, 58:7, 58:9, 58:14, 65:4, 80:4, 80:6, 83:1, 89:21, 89:22, 89:24, 90:21, 90:24, 91:3, 91:7, 91:24, 92:2 .
**downloaded** 10:20, 45:15, 59:10, 92:2 .
**downloading** 13:12, 45:22, 45:23 .
**downloads** 45:22,

66:1 .
**draft** 166:25, 167:13 .
**dragged** 141:1 .
**dramatic** 78:24 .
**draw** 14:18, 94:17 .
**drawer** 84:24 .
**drawing** 43:15 .
**drawn** 85:16 .
**drive** 50:2, 108:12, 108:15, 141:1 .
**drives** 69:19, 157:6 .
**driving** 50:3, 115:18, 133:6, 133:17, 141:16, 162:19 .
**drug-related** 59:20, 70:7 .
**drugs.** 60:22, 69:18 .
**DTO** 27:20, 132:9, 152:16 .
**due** 4:23, 165:22 .
**duplicative** 34:24 .
**During** 10:2, 28:23, 60:17, 68:3, 125:19, 146:4, 154:5, 156:2, 166:1, 166:15 .
**Dwyer** 132:18 .
.
.
**< E >.**
**E.** 1:35 .
**earlier** 23:15, 57:5, 69:5, 110:9, 132:7, 134:17, 154:1, 156:11, 162:22 .
**early** 11:12, 64:10, 129:13, 148:15, 169:3 .
**ears** 169:5 .
**easier** 7:15, 10:12, 166:21 .
**easily** 57:16 .
**educate** 169:5 .
**Edward** 123:13, 123:21 .
**effect** 14:15, 42:25, 71:13 .
**effective** 41:12, 57:13, 151:11 .
**effectively** 112:21 .
**effects** 19:2 .
**efficacy** 124:19 .

**effort** 145:10 .
**efforts** 48:23 .
**eight** 110:13 .
**eight-minute** 133:14 .
**either** 15:16, 77:7, 80:25, 90:25, 91:16, 119:13, 120:13, 133:5, 138:7, 141:3, 141:21, 162:7, 168:10, 168:23 .
**either/or** 137:24 .
**electric** 156:18 .
**electronically** 58:25, 59:4 .
**Elgin** 6:14, 8:9, 63:11, 64:2, 95:18, 96:5, 96:9, 96:15, 96:21, 96:23, 97:1, 97:15, 97:17, 98:2, 99:1, 99:18, 99:21, 100:3, 116:14, 118:12, 119:1, 119:11, 119:23, 119:25 .
**Ellis-barnes** 116:10 .
**eloquently** 62:4, 75:4 .
**elsewhere** 18:8, 29:5, 29:15, 37:1 .
**enable** 53:21, 102:20 .
**encompassed** 96:1 .
**encompasses** 75:5 .
**encounter** 38:17 .
**end** 23:3, 54:20, 55:25, 56:4, 130:9, 131:1, 135:11, 167:10 .
**ended** 84:10 .
**engage** 16:1, 17:14, 43:18, 45:6, 47:3, 48:22, 53:16, 58:6, 72:18 .
**engaged** 21:18, 21:24, 28:14, 40:10, 40:11, 40:22, 57:17, 63:12, 77:22, 96:17, 98:4, 98:6, 99:13, 136:23, 154:8 .
**engaging** 62:11 .
**enough** 28:19, 46:19, 61:24, 91:21, 91:22, 113:4, 113:8, 113:12, 115:7 .
**ensures** 21:10 .
**enter** 26:14, 27:14, 157:24 .

**entered** 40:19, 149:4 .
**entering** 51:14 .
**Enterprise** 113:23, 160:12 .
**entire** 45:16, 45:22, 58:7, 58:9, 59:3, 59:11, 66:7 .
**entirely** 9:23, 34:24, 58:3, 60:2, 102:12, 119:18 .
**entirety** 59:10 .
**entry** 157:11 .
**enumerated** 10:8 .
**equation** 134:9, 134:11 .
**equipment** 16:12, 74:16 .
**equipped** 154:13 .
**equivalent** 9:20, 67:13 .
**Eric** 2:4, 3:20, 69:2, 69:10, 69:21, 70:2, 70:5, 87:7, 87:14, 87:18, 87:20, 88:9, 88:13, 109:24, 110:18 .
**error** 90:9 .
**Esquire** 1:28, 1:29, 1:37, 1:44, 2:6, 2:13 .
**essence** 77:20, 78:13, 92:16 .
**essential** 151:14 .
**essentially** 43:7, 46:7, 49:6, 108:15, 136:21, 146:8 .
**establish** 7:8, 7:11, 15:20, 18:10, 19:10, 24:23, 28:25, 29:3, 30:4, 30:8, 30:11, 36:1, 79:15, 79:16, 96:16, 98:8, 99:5, 110:14, 145:25, 147:25, 148:22, 152:15 .
**established** 24:3, 24:17, 29:20, 30:15, 30:21, 37:3, 82:20, 86:15, 86:17, 94:6, 94:7, 94:16, 96:19, 101:11, 105:13, 105:14, 107:19, 142:4, 148:10, 155:18 .
**establishes** 20:15, 32:4, 37:1, 98:11, 162:2 .
**establishing** 25:15,

134:8 .
**establishment** 128:18,
131:10 .
**et** 1:10, 44:17, 75:16 .
**evaluation** 80:9 .
**event** 65:3, 107:13, 110:16,
126:12 .
**events** 122:4, 159:23 .
**Everybody** 4:4, 33:24,
48:10, 120:20 .
**everyone** 34:4, 95:16,
168:3 .
**everything** 13:17, 14:3,
14:6, 14:7, 15:2, 17:16,
30:18, 34:19, 34:21,
40:23, 49:3, 56:4, 62:7,
101:5, 117:12, 117:17,
120:4, 165:15 .
**everywhere** 61:10,
61:11 .
**evidences** 11:10 .
**evidentiary** 12:18, 14:8,
37:17, 92:3 .
**evidently** 85:6, 125:14 .
**ex** 56:15, 57:1, 57:22,
57:24, 58:4 .
**ex-girlfriend** 64:3,
117:8 .
**exactly** 10:12, 44:6, 49:15,
50:22, 50:24, 50:25,
55:5, 62:2, 69:9, 72:10,
75:5, 90:5, 133:25,
152:9, 167:3 .
**example** 7:7, 27:19, 44:15,
54:7, 63:21, 68:23,
68:24, 99:7, 111:3,
116:25, 141:14, 151:22,
156:8 .
**examples** 66:18, 69:8,
89:10, 107:25,
109:3 .
**exceeded** 142:24 .
**except** 33:6, 34:7, 34:13,
38:6, 102:23 .
**exception** 151:11 .
**exceptions** 142:6 .
**exchange** 117:5 .
**exchanged** 115:6 .
**exclusionary** 22:2, 35:4,
35:5, 35:14, 35:21,

39:10, 43:13 .
**exculpatory** 58:12 .
**excuse** 30:19, 146:16 .
**excused** 4:20 .
**execute** 18:12, 44:24,
64:8 .
**executed** 6:17, 8:14, 29:1,
64:1, 64:10, 68:2, 71:9,
72:5, 83:18, 84:11,
84:21, 88:14, 89:24,
90:4, 93:3, 100:3, 100:6,
109:24, 110:17, 112:10,
118:16, 120:25, 126:17,
127:1, 159:23, 160:1,
161:14, 161:15 .
**executing** 21:9, 41:24,
44:20, 44:24, 60:4 .
**execution** 11:11, 32:5,
42:24, 90:3, 124:13,
156:2 .
**exhaustion** 116:1 .
**Exhibit** 5:18, 11:9, 11:10,
11:20, 11:22, 12:16,
23:15, 31:3, 31:17,
31:18, 32:1, 35:17, 54:9,
76:8, 97:13, 123:6,
123:7, 124:6, 124:23,
125:5, 126:18, 139:3,
139:4, 139:12, 139:13,
140:3 .
**exhibits** 5:11 .
**exigent** 142:9 .
**exist** 21:6 .
**existed** 124:17 .
**exit** 139:11, 157:23 .
**exits** 117:22 .
**expect** 44:3 .
**expected** 84:5 .
**expecting** 29:15 .
**experience** 16:11, 53:14,
62:22, 74:13, 74:15,
108:13, 109:13, 114:1,
155:10, 158:20 .
**expertise** 16:21 .
**explain** 22:25, 28:2, 44:14,
50:23, 51:16, 51:21,
53:19, 58:4, 58:24,
69:14, 69:20, 69:25,
72:9, 72:19, 98:17,
107:16, 110:2, 110:17,

110:25, 113:14, 115:8,
115:11, 116:21,
118:17 .
**explained** 21:1, 88:18,
108:24, 113:12, 113:21,
113:23, 113:25, 114:3,
114:5, 114:8 .
**explaining** 56:22, 77:19,
151:4 .
**explains** 19:24, 22:13,
52:3, 52:6, 53:13, 57:13,
69:9, 69:10, 74:14,
86:12, 106:4, 111:17,
117:14, 161:13 .
**explanation** 94:4, 94:6,
159:6 .
**explicit** 69:17, 106:12,
109:6, 109:11, 111:6,
117:10, 118:14 .
**explicitly** 57:7, 58:21,
72:19, 86:23 .
**exploratory** 21:12 .
**extend** 126:10, 145:18 .
**extensive** 109:13, 155:9,
158:19 .
**extent** 47:25, 78:9, 78:19,
81:4, 82:4, 82:6, 83:8,
85:24, 86:7, 90:22,
91:23, 94:19, 122:2,
129:22, 130:23,
150:5 .
**extraction** 90:1, 90:10 .
**extreme** 51:25, 131:1,
135:3, 158:8 .
**Extremely** 55:4, 69:17 .
**extremes** 129:23, 138:3,
153:17 .
**eyes** 5:15 .
.

**< F >.**
**F.2d** 130:3, 130:5, 130:18,
134:23, 135:12 .
**F.3d** 19:25, 21:14, 57:5,
60:14, 81:6, 135:4 .
**face** 39:16, 67:11, 84:23,
90:13, 104:16, 104:21,
105:6 .
**facially** 124:13 .
**factors** 135:16, 135:18,

138:8 .
**facts** 16:22, 19:14, 54:3,
61:5, 62:22, 63:3, 67:21,
67:24, 69:6, 70:18,
82:20, 100:15, 113:4,
132:6, 154:2, 160:16,
165:9 .
**factual** 19:21, 27:23, 32:11,
38:1, 38:3, 88:8, 93:6,
111:16 .
**factually** 76:4 .
**fail** 118:24 .
**failed** 7:11, 36:1,
96:16 .
**failing** 7:8, 32:20 .
**fails** 36:5, 98:24, 99:22,
142:17 .
**failure** 115:25 .
**fair** 72:16, 89:1, 151:14,
153:14, 155:19, 158:25,
160:17, 162:2 .
**fairly** 75:5, 102:5, 104:20,
105:4, 106:1, 109:10,
117:10, 121:4,
165:12 .
**faith** 33:5, 34:11, 35:11,
41:5, 43:13, 64:5, 70:23,
71:5, 75:10, 83:15,
100:18, 100:20, 109:19,
111:12, 116:5, 135:15,
162:16 .
**fall** 27:2, 108:17 .
**falls** 59:4 .
**false** 111:24, 155:7 .
**familial** 104:2 .
**familiar** 7:2, 128:22 .
**far** 15:19, 44:14, 65:17,
80:23, 90:2, 95:8,
107:15, 125:12, 155:18,
162:2, 165:13, 170:9,
170:10 .
**farther** 68:21 .
**feared** 170:6 .
**feasible** 60:10 .
**Federal** 1:38, 3:16, 15:16,
15:24, 31:8, 43:17,
44:14, 58:21, 62:20,
80:1, 112:19,
170:33 .
**feel** 4:16, 28:9 .

fell 57:11 .
female 93:11, 93:20, 102:13, 117:19, 117:21, 118:9, 157:1, 157:15, 157:20 .
females 156:25, 159:21, 162:20 .
fentanyl 8:20, 8:21, 26:23, 26:24, 27:21, 28:3, 92:7, 111:1, 111:19, 111:20, 113:16, 114:7, 114:24, 115:3, 115:4, 121:1, 155:2, 156:14, 156:20, 157:4, 159:24 .
few 107:25, 133:23, 139:9, 139:25, 162:22 .
figure 51:5, 111:22, 167:22 .
figures 32:14 .
file 14:16, 14:18, 14:20, 14:22, 14:25, 15:3, 15:4, 57:8, 57:10, 57:11, 57:14, 59:13, 60:25, 61:1, 61:6, 61:22, 122:7, 150:13 .
filed 85:24, 103:9, 122:14, 145:23, 147:24, 148:25, 149:12, 149:17, 150:6, 150:7, 168:20 .
files 56:23, 57:16, 57:18, 60:9, 61:17, 73:5 .
filing 13:20, 13:24, 55:18, 61:20, 61:21, 84:8, 127:10 .
filings 6:12 .
filling 31:7 .
finalized 165:18 .
finally 129:13, 134:11 .
financial 12:5, 13:22, 16:15, 46:3, 54:18 .
find 25:21, 33:23, 33:25, 37:17, 38:13, 40:6, 44:13, 46:8, 46:20, 64:12, 64:13, 65:24, 66:23, 70:6, 70:18, 73:18, 75:6, 75:7, 79:12, 99:7, 101:11, 104:22, 110:18, 124:12, 126:23, 131:16, 138:24, 144:5, 168:10 .

finding 45:24, 82:14, 130:23, 135:9, 141:22, 142:1 .
finds 24:14 .
fine 6:9, 7:17, 24:5, 25:20, 86:5 .
fine-tune 24:12 .
finished 147:19 .
firearms 54:22 .
fishy 110:23 .
flatbed 140:24, 141:2 .
flip 54:23 .
floodgates 82:10 .
Floor 1:31, 1:39 .
Focus 21:16, 30:10, 33:7, 52:20, 67:14, 71:19, 75:19, 96:15, 96:18 .
focused 21:9, 21:17, 27:14, 46:4, 96:5 .
focusing 21:19, 23:23, 34:8, 36:4 .
folder 57:23, 61:22 .
follow 86:24, 114:22, 150:17 .
follow-on 70:24 .
follow-up 56:18, 56:19, 62:16, 62:21 .
followed 70:16, 102:13, 154:11 .
following 31:14, 117:6 .
follows 164:25 .
food 157:2 .
Foodsaver 8:22 .
footage 116:7, 116:11, 120:4 .
footnote 116:6 .
Force 11:13, 31:20, 31:21, 42:24, 43:20, 72:2, 72:3, 75:11, 102:11, 154:5, 154:12, 155:10 .
Ford 160:24 .
foregoing 170:22 .
foreign 5:21 .
forensic 9:2, 9:10, 10:15, 11:13, 13:11, 13:16, 32:7, 80:9, 83:2, 90:25, 91:18 .
forget 22:2 .
forgot 70:22, 74:11 .
form 27:18, 166:13 .

format 10:9, 10:10, 170:25 .
formats 9:16 .
former 66:11, 97:3 .
forth 6:3, 19:9, 22:24, 42:23, 44:6, 73:7, 82:21, 97:16, 98:24, 153:3 .
forward 151:15 .
four 8:22, 9:1, 18:15, 19:7, 26:8, 39:20, 64:16, 64:17, 85:9, 89:6, 117:24, 157:13, 157:15, 157:16, 167:20 .
fours 57:20 .
framed 166:22 .
framers 21:12 .
framework 8:5 .
Francik 7:22 .
Franklin 118:10, 131:15, 131:19, 132:22, 133:6, 133:7, 133:10, 134:13, 136:12, 136:17, 136:25, 137:2, 137:5, 138:21, 138:25, 139:6, 139:22, 139:23, 140:4, 141:17, 142:11, 144:21, 154:7, 155:25, 156:21, 159:8, 161:4 .
frankly 31:22, 35:4, 85:9, 90:21, 90:25, 91:22, 122:1 .
fraud 15:4 .
frequented 51:23 .
frequenting 118:22, 118:25, 120:2 .
frequently 53:12, 53:14, 72:7 .
frequents 116:21 .
front 49:14, 51:14, 76:6, 78:11, 79:18, 122:16, 169:18 .
fronts 36:1 .
fruits 19:17 .
fulfilled 127:24 .
full 5:8, 10:22, 58:14, 150:5 .
Fuller 156:5 .
fully 4:16, 116:2, 132:17 .
function 61:20 .

fundamental 33:24, 34:2, 35:23 .
funds 16:16, 154:12 .
furnished 152:10 .
furnishes 152:4 .
furtherance 108:2 .

.

< G > .

G. 16:14, 74:18, 170:19, 170:32 .
game 89:1 .
Gant 142:14 .
Gardens 144:8, 161:10 .
Gates 136:19 .
gather 5:16, 102:21, 131:6, 165:17 .
gathered 104:4 .
gathering 147:23 .
gave 7:24, 8:2, 63:21, 83:16, 89:9 .
general 7:13, 21:5, 30:25, 43:7, 60:23, 61:8, 70:11, 77:16, 77:21, 80:15, 81:14, 81:15, 81:24, 84:23, 84:24, 124:12, 126:25 .
generalization 148:13 .
generalized 43:8, 82:11 .
Generally 82:7, 83:4, 91:11, 92:18, 168:6 .
generate 16:13, 74:16 .
generated 90:16, 148:7 .
generic 77:15 .
Geneses 118:18 .
geographic 148:6, 148:23 .
geographical 137:8 .
Gerald 1:44, 1:45, 3:22 .
gets 18:24, 33:10, 50:11, 117:22, 117:25, 143:20, 146:2, 146:7 .
getting 15:24, 17:11, 25:7, 33:4, 34:6, 41:25, 106:17, 114:12, 140:22, 167:17 .

**Giglio** 58:11, 127:25, 150:25, 151:2 .

**girl** 89:11, 105:8, 109:8, 109:9, 157:15 .

**girlfriend** 87:3, 89:5, 97:3, 98:5 .

**girlfriends** 99:10 .

**girls** 162:20 .

**Give** 22:5, 36:5, 40:18, 44:19, 46:19, 49:10, 51:5, 53:21, 68:16, 89:12, 102:2, 113:8, 115:4, 115:5, 115:7, 116:24, 132:11, 139:17, 147:25, 148:11, 166:12 .

**Given** 10:9, 10:10, 19:15, 87:24, 91:22, 100:8, 166:6, 170:7 .

**gives** 69:8, 89:14 .

**Glad** 121:9 .

**glass** 138:12 .

**gotten** 9:22, 26:10, 31:10, 91:1, 115:24, 134:25, 141:20 .

**governing** 73:8 .

**GPS** 6:16, 8:10, 49:12, 50:5, 51:22, 73:21, 101:20, 102:19, 114:19, 124:22, 125:7, 125:12, 133:22 .

**grams** 49:8, 49:24, 109:25, 117:16, 157:3, 157:16 .

**granted** 4:1, 101:16 .

**gravity** 122:4 .

**great** 5:19, 89:8, 97:24 .

**greater** 107:11 .

**Griffith** 17:1, 17:21, 19:23, 19:25, 24:7, 25:12, 25:17, 31:12, 32:13, 33:1, 33:20, 35:24, 35:25, 36:2, 36:11, 41:3, 67:19, 68:1, 78:10, 78:12 .

**Grossman** 135:4, 138:4 .

**ground** 67:4 .

**grounded** 20:6 .

**group** 59:15 .

**guess** 33:25, 42:12, 64:3, 65:13, 71:11, 71:17, 95:17, 118:23, 142:17 .

**guidance** 22:6, 43:22, 44:20, 44:24, 72:9 .

**guide** 42:23 .

**gun** 156:1 .

**Gurevich** 6:7, 170:11 .

.

.

**< H >** .

**Hagerstown** 32:24, 69:19, 69:23, 71:2, 114:9, 131:15, 131:19, 132:5 .

**hairs** 144:16 .

**half** 51:15 .

**hand** 82:9, 144:18, 151:25 .

**handgun** 110:1 .

**hands** 144:18 .

**hang** 53:11 .

**hanging** 145:3 .

**happen** 4:22, 32:10, 91:2, 122:19 .

**happened** 15:1, 15:15, 22:20, 32:9, 32:11, 32:12, 36:18, 49:4, 67:23, 89:24, 90:23, 93:8, 102:14, 115:8, 125:8, 125:11, 143:10, 143:24, 146:1, 147:13, 153:1 .

**happening** 85:7, 89:21, 112:15, 145:12, 153:6 .

**happens** 50:14, 123:2, 169:16 .

**happily** 7:24 .

**happy** 67:17, 95:19, 120:7 .

**hard** 52:9, 71:23 .

**he'll** 49:10 .

**He/she** 128:24, 128:25, 129:2 .

**head** 169:22 .

**hear** 4:8, 4:18, 6:2, 7:14, 34:12, 35:11, 40:14, 47:9, 47:14, 48:8, 90:8,

95:6, 120:19, 131:2, 131:3, 132:12, 140:8, 145:1, 165:2, 169:6 .

**heard** 4:9, 6:20, 63:23, 76:4, 83:25, 128:12, 128:14, 132:3, 136:14, 161:25 .

**HEARING** 1:21, 3:9, 3:17, 5:3, 11:2, 53:1, 112:20, 115:22, 125:20 .

**hearings** 103:20, 154:4 .

**heart** 40:2 .

**heat** 27:1 .

**held** 57:1, 57:7, 71:2, 76:17, 170:24 .

**help** 127:11, 155:14, 169:4 .

**helped** 152:2 .

**helpful** 17:2, 24:14, 60:12, 61:4, 151:7, 151:13, 167:11, 168:19 .

**hence** 4:2 .

**hereby** 170:21 .

**heroin** 8:21, 26:22, 49:25, 92:7, 111:1, 113:15, 121:2, 153:16, 155:2, 156:20, 157:3, 159:10, 159:25 .

**heroin/** 8:19 .

**heroin/fentanyl** 8:18, 110:1 .

**hidden** 61:11 .

**hide** 57:16, 145:6 .

**high** 107:5, 107:22, 111:15, 113:11, 115:5 .

**high-level** 107:14 .

**higher** 107:8 .

**highly** 43:9, 104:8, 108:8, 118:1, 151:20 .

**historical** 6:25, 103:4, 106:19 .

**history** 10:24, 100:7, 102:4, 130:24, 134:10, 148:12, 155:6, 158:18 .

**hold** 40:3, 57:22, 61:24, 104:9, 112:15 .

**home** 15:17, 18:11, 26:3, 30:4, 30:5, 33:18, 37:5,

68:18, 68:19, 85:18, 97:23, 99:4, 99:5, 107:10, 116:19, 118:14, 118:20 .

**homicide** 68:2, 68:11 .

**Honda** 117:19, 117:22 .

**honestly** 52:9 .

**HONORABLE** 1:22 .

**honors** 3:4 .

**hope** 126:11, 165:14 .

**hoping** 166:5 .

**hotel** 102:14, 114:22, 115:11 .

**hour** 51:15, 95:12 .

**house.** 51:9, 51:10 .

**houses** 19:2, 109:16, 136:15, 145:7 .

**huge** 13:20, 168:12 .

**hurry** 154:9 .

**hypothetical** 40:15 .

.

**< I >** .

**idea** 74:2, 75:10, 165:12, 167:11 .

**identified** 11:14, 12:4, 14:1, 27:19, 52:22, 105:23, 107:18, 113:18, 125:17, 125:22, 128:16, 131:23, 132:4, 132:8, 132:16, 132:19, 133:21, 136:13, 155:3, 156:13, 156:14 .

**identify** 86:19, 87:5, 102:16, 135:2, 155:15 .

**identities** 109:17, 152:22 .

**identity** 60:19, 128:12, 130:21, 150:19, 150:22, 151:9, 151:12 .

**ignore** 85:15 .

**II** 1:39 .

**III** 132:9, 132:18, 133:1, 145:1, 146:9, 148:11, 149:6, 149:10, 149:15, 149:23 .

**illegal** 12:6, 21:24, 30:5, 30:16, 54:22, 60:22, 99:6, 99:14, 105:18,

130:10 .
**Illinois** 136:19 .
**illustrated** 135:3 .
**imagine** 44:1, 52:9 .
**immediately** 110:17,
  165:1 .
**impairment** 92:17 .
**Impala** 6:14, 8:10, 8:23,
  100:2, 100:5, 101:10,
  101:19, 101:20, 102:6,
  102:17, 102:20, 103:2,
  111:14, 115:25, 119:7,
  120:9, 120:11,
  120:23 .
**Impliedly** 57:8, 57:9 .
**important** 21:22, 22:5,
  35:4, 43:14, 44:5, 55:4,
  57:3, 78:18, 104:7,
  135:16, 143:21,
  147:1 .
**importantly** 114:16,
  114:23, 116:24 .
**impossible** 153:7 .
**impound** 140:17, 146:24,
  160:4, 162:13,
  163:4 .
**impractical** 58:3 .
**improperly** 27:8 .
**in.** 6:7, 169:17 .
**inadvertent** 101:4 .
**inadvertently** 100:16,
  100:23, 100:24 .
**incident** 87:2, 93:8,
  142:13, 142:16,
  158:6 .
**incidental** 54:20, 55:1,
  55:10, 62:8, 72:23 .
**incidents** 159:20 .
**inclined** 127:5 .
**include** 29:5, 29:8, 73:1,
  101:3, 101:6, 101:7,
  111:20, 154:3 .
**included** 37:14, 100:17,
  101:8, 106:13, 120:24,
  139:18, 160:15 .
**includes** 9:11, 27:16, 47:4,
  74:24, 97:21, 100:11,
  155:6, 159:8 .
**including** 6:25, 9:4, 13:8,
  15:18, 24:8, 24:22, 26:3,

30:18, 32:21, 34:18,
  54:17, 99:15, 99:16 .
**inconsistent** 118:25,
  120:1, 127:14 .
**incredible** 104:5 .
**incredibly** 35:1, 104:5,
  106:16 .
**incriminating** 61:21,
  102:21, 140:12 .
**independent** 6:21, 6:24,
  7:3, 19:22, 94:13 .
**indicate** 57:19, 97:11,
  102:16, 137:21, 144:17,
  159:4, 164:6,
  166:14 .
**indicated** 18:5, 79:19,
  80:5, 103:6, 126:2,
  126:7, 141:12,
  155:2 .
**indicates** 102:5,
  102:15 .
**indicating** 4:20, 103:9,
  105:3, 161:3 .
**indication** 137:14 .
**indicative** 108:5 .
**indicia** 66:25 .
**indicted** 168:7 .
**indiscriminate** 30:2 .
**individual** 20:8, 78:1,
  78:13, 104:13 .
**individuals** 77:4, 100:25,
  107:19, 113:19,
  125:1 .
**indulgence** 132:25,
  158:11 .
**infer** 85:5, 94:5,
  118:11 .
**inference** 85:16, 87:10,
  87:16, 88:4, 94:17,
  94:19, 94:20, 114:20,
  118:3, 157:25 .
**inferences** 76:21,
  94:23 .
**infirm** 22:14, 66:8 .
**informant** 135:20, 136:22,
  151:20, 152:1, 152:4,
  154:6 .
**informants** 128:12, 135:22,
  150:19, 151:10, 152:19,
  153:10 .

**information.** 59:1 .
**inherent** 58:25 .
**inherently** 24:8 .
**initial** 17:2, 82:25,
  90:14 .
**initially** 59:10 .
**innocuous** 108:22 .
**inside** 8:8, 25:4, 51:13,
  51:20, 63:19, 63:25,
  85:11, 93:10, 117:21,
  140:19, 140:22,
  142:1 .
**installed** 116:22 .
**instance** 10:23, 13:22,
  58:14, 88:19, 98:15,
  107:10 .
**instances** 27:24, 28:16,
  36:24, 124:11 .
**Instead** 51:1, 58:5 .
**instructions** 167:9,
  167:12, 169:2 .
**instrument** 38:6 .
**instrumentalities**
  19:17 .
**insufficient** 130:8, 135:15,
  136:6 .
**integral** 129:16, 130:9,
  131:1 .
**integrated** 14:21 .
**intend** 65:4, 65:16, 126:2,
  126:7 .
**intended** 21:12, 45:6,
  169:5 .
**intending** 66:2 .
**intends** 64:20, 65:6 .
**intent** 98:20 .
**intentional** 118:22 .
**interaction** 104:21 .
**intercept** 49:5, 50:17, 53:2,
  65:18, 74:8, 108:19,
  108:20, 117:3, 132:18,
  134:4, 146:9, 149:10,
  149:23 .
**intercepted** 51:17, 69:3,
  74:8, 77:3, 78:2, 97:8,
  113:15, 144:7, 144:20,
  156:25, 157:19, 157:21,
  161:9 .
**intercepting** 69:12, 69:14,
  70:4, 71:20, 86:13 .

**interceptions** 27:24,
  48:17, 49:4, 86:14,
  89:10, 97:1, 160:20,
  161:5 .
**intercepts** 107:16, 129:12,
  132:9, 133:1, 141:12,
  156:17, 157:14 .
**interest** 11:15, 92:16,
  92:17, 92:20, 104:25,
  151:10 .
**interested** 48:7, 67:6,
  70:13 .
**interesting** 9:18, 17:9,
  40:15, 100:11,
  101:6 .
**Interestingly** 100:13,
  106:12 .
**interference** 92:19 .
**intermediate** 7:7 .
**internet** 10:24 .
**interpret** 49:21, 145:1 .
**interpretation** 107:4,
  110:23 .
**interpreted** 121:7,
  157:3 .
**interpreting** 145:9 .
**interprets** 104:14, 117:14,
  133:4 .
**interrupt** 74:10 .
**intimate** 40:9, 43:10,
  103:25 .
**introduced** 123:6 .
**introducing** 126:3,
  126:7 .
**intrusions** 32:19 .
**invalid** 66:7 .
**invalidate** 27:9 .
**invalidates** 18:20 .
**invasive** 7:6, 9:6, 14:20,
  17:15, 35:1, 106:17 .
**inventory** 26:21,
  30:18 .
**investigated** 7:10, 12:20,
  79:6, 81:20 .
**investigating** 130:23 .
**investigation.** 62:1 .
**investigations** 66:17,
  112:15 .
**investigator** 108:13 .
**Investigators** 49:8, 49:19,

49:23, 50:23, 86:12,
86:15, 86:16, 86:18,
88:18, 94:5, 114:12,
114:15, 143:6, 144:7,
154:14, 155:14, 156:16,
156:19, 157:19, 158:16,
159:7, 160:19, 160:23,
162:13 .
**investigatory** 7:6,
17:15 .
**involved** 7:5, 35:18, 43:17,
48:20, 50:8, 63:4, 68:1,
72:2, 72:8, 89:16,
105:18, 115:9, 152:20,
155:19, 156:5, 158:25,
159:18, 162:3,
166:6 .
**involvement** 31:8, 31:19,
32:5, 33:7, 81:8 .
**involving** 46:23,
148:16 .
**ipad** 78:6 .
**iphone** 6:15, 8:8, 8:25,
11:25, 23:16, 24:13,
24:22, 25:10, 26:3, 26:5,
26:11, 31:2, 32:12, 45:3,
46:12, 65:7, 95:23 .
**iphones** 27:5, 27:8, 64:13,
64:18 .
**ironic** 115:20 .
**irregardless** 33:16 .
**isolate** 147:1 .
**isolated** 146:24,
161:21 .
**isolation** 42:21 .
**issuance** 91:12 .
**issued** 41:24, 110:13,
126:6, 131:18, 134:13,
138:22, 153:20 .
**issues** 15:6, 71:16, 76:11,
76:20, 95:6, 105:1,
168:9 .
**issuing** 112:16, 113:5 .
**it.** 144:11 .
**item** 20:13, 37:17 .
**items** 7:11, 9:15, 12:17,
16:14, 16:17, 19:16,
26:20, 27:10, 30:2,
74:18, 82:17, 97:22,
99:4, 100:7, 134:22,

139:23 .
**itself** 10:19, 12:12, 12:18,
12:19, 14:5, 18:25, 28:6,
30:11, 37:21, 40:17,
42:4, 42:13, 42:21,
59:25, 92:12, 108:18,
124:20, 134:8, 137:7,
146:13, 150:2 .

.
.
**< J >.**
**Jackson** 104:13, 104:17,
104:22, 105:5, 106:2,
107:22, 108:7, 109:7,
110:21 .
**Jamaican** 135:23 .
**jargon** 157:3, 157:16 .
**Jarvis** 1:10, 2:11, 4:10,
28:17 .
**Jasen** 161:18 .
**Jencks** 127:25, 150:25,
151:1, 169:21 .
**Jeroam** 1:35, 3:6, 17:5,
17:6, 17:16, 19:9, 21:18,
21:24, 26:25, 37:20,
38:2, 54:7, 96:17 .
**Jersey** 50:15 .
**Joan** 1:29 .
**job** 72:16, 130:23 .
**join** 122:7, 128:8 .
**joinder** 128:8 .
**joined** 139:10 .
**joke** 49:17 .
**Joseph** 2:6, 2:7, 3:19 .
**Jr** 1:35 .
**Judge** 4:3, 19:21, 21:1,
34:21, 38:21, 39:8,
46:19, 53:21, 54:14,
83:23, 85:1, 95:2,
112:16, 113:5, 113:8,
113:9, 125:19, 131:17,
132:18, 148:2, 148:3,
148:5, 153:20, 156:4,
159:16 .
**judge.** 101:2 .
**judgment** 60:25 .
**Judicial** 170:25 .
**jump** 39:25 .
**jurisdiction** 71:1,
83:20 .

**jurors** 166:13 .
**Jury** 131:2, 165:22, 165:25,
167:9, 169:1 .
**justifications** 21:11 .
**justified** 79:9 .
**justify** 15:21, 21:7, 106:16,
151:15 .

.
.
**< K >.**
**K-9** 161:18 .
**K.** 1:22 .
**Katherine** 1:37, 3:15 .
**keep** 14:2, 30:12, 52:4,
53:8, 53:17, 61:9,
158:21, 165:20 .
**keeping** 137:16 .
**keeps** 99:14 .
**Kegarise** 84:13, 85:7,
124:17 .
**kept** 25:16, 98:10 .
**key** 160:3, 161:16,
163:13 .
**keys** 8:22, 121:2, 139:25,
140:6, 140:9, 140:13,
140:16, 140:20, 141:22,
142:2, 162:10 .
**keyword** 44:16 .
**kick** 91:15 .
**kilogram** 8:21, 26:22,
121:1 .
**kind** 21:12, 35:5, 56:13,
60:5, 79:10, 79:13,
81:24, 119:3, 128:5,
136:23, 141:1, 143:1,
144:15, 146:23,
159:4 .
**kinds** 43:9, 100:16 .
**knotted** 8:18, 8:20, 26:22,
26:24 .
**knowledge** 74:13, 74:15,
78:19, 129:19, 129:20,
152:17 .
**known** 9:21, 33:25, 71:10,
74:4, 85:3, 111:19,
114:7, 114:22, 114:24,
115:3, 125:21,
137:21 .
**knows** 52:3, 52:6, 109:14,
155:11, 158:20 .

.
.
**< L >.**
**L-a-l-o-r** 135:12 .
**L-y-l-e-s** 81:6 .
**L.** 2:13, 2:14 .
**lab** 92:8, 155:3 .
**label** 57:18, 60:9,
63:20 .
**labeling** 57:15, 63:23 .
**laboring** 4:13 .
**lack** 22:15, 28:10, 66:9,
77:13, 83:10, 116:1 .
**lacks** 30:15 .
**laid** 49:1, 51:25, 89:8 .
**Lalor** 135:12, 135:18,
135:19, 135:22, 136:7,
137:6, 137:24,
138:3 .
**lapse** 80:8 .
**laptop** 78:6 .
**large** 110:2 .
**largely** 104:12, 153:21 .
**last** 4:19, 13:2, 53:1,
115:22, 121:12,
125:19 .
**Lastly** 162:15 .
**later** 11:2, 31:25, 51:15,
59:3, 83:1, 112:11,
117:21, 117:24, 128:1,
138:23, 147:18, 154:9,
154:19, 157:13,
158:7 .
**latest** 169:2 .
**Latrice** 87:3, 87:6, 88:13,
88:16, 93:13, 93:16 .
**laundry** 16:17 .
**lawfully** 15:24, 17:21, 25:7,
26:6, 33:9, 41:2, 44:21,
65:20 .
**lawyer** 61:17 .
**lawyers** 15:11 .
**lay** 46:25, 88:15 .
**laying** 63:3, 72:17 .
**lays** 33:20, 104:12 .
**lead** 19:16, 108:1, 111:21,
129:25, 147:18,
152:3 .
**leader** 27:20 .
**learn** 87:6, 148:18 .

**learned** 113:15, 113:17, 113:24, 160:23 .

**lease** 26:21, 88:16, 139:21 .

**least** 5:10, 5:20, 14:7, 15:11, 16:18, 16:23, 30:6, 32:9, 47:11, 57:11, 58:16, 62:19, 65:17, 67:10, 71:24, 77:13, 90:8, 91:3, 91:24, 111:11, 117:10, 119:20, 125:8, 127:23, 149:9, 170:4, 170:5 .

**Leave** 42:6, 42:10, 50:2, 51:3, 112:8, 126:12, 127:18, 157:24 .

**leaves** 51:15, 117:25, 143:22 .

**leaving** 86:25, 87:1, 115:12, 119:23 .

**ledgers** 16:16 .

**leeway** 39:11 .

**left** 29:7, 29:11, 29:12, 60:25, 100:16, 121:11, 121:20, 163:5 .

**legally** 140:10, 142:12, 145:23 .

**legitimate** 20:7 .

**length** 129:20, 154:4 .

**lengths** 97:25 .

**lengthy** 61:3, 62:23, 66:17, 68:22, 69:7, 74:11 .

**Leon** 80:21, 80:23 .

**less** 31:5, 43:18, 113:1, 153:25, 154:1 .

**letter** 4:19, 33:24, 54:24, 103:9 .

**level** 15:9, 107:22, 111:15, 113:11, 115:5, 115:13, 116:3 .

**license** 118:9 .

**life** 14:22, 40:10, 103:25 .

**lifted** 140:24 .

**likely** 20:11, 75:6 .

**limine** 168:20, 169:22 .

**limit** 12:8, 55:7, 56:4 .

**limited** 12:3, 12:20, 20:23, 57:14, 62:8, 63:9, 82:19 .

**limiting** 11:24, 12:2, 13:6, 32:22, 41:8, 41:13, 42:16, 42:23, 44:19, 47:4, 55:3, 55:4, 55:14, 56:3, 56:6, 56:9, 56:14, 73:7 .

**line** 35:15, 70:13, 136:13, 153:5, 153:16, 156:8, 158:1 .

**lines** 43:15, 114:11, 136:16 .

**lining** 136:16 .

**link** 136:24, 137:6 .

**linking** 68:6 .

**links** 141:11 .

**list** 11:22, 12:7, 16:17, 49:2, 127:12, 131:13, 139:3, 140:6, 140:11, 140:13, 167:8, 169:8 .

**listed** 26:21, 97:15, 97:22, 140:13 .

**listen** 47:25 .

**listening** 38:10, 121:9 .

**literally** 161:5 .

**Litten** 161:18 .

**little** 3:13, 18:24, 30:10, 36:22, 49:17, 62:4, 98:12, 101:21, 101:23, 103:16, 103:17, 103:18, 103:19, 111:15, 121:12, 135:9, 142:3, 143:2, 144:16, 152:7, 152:24 .

**live** 5:10, 5:22, 87:24, 136:8 .

**lived** 89:4, 135:19, 148:20 .

**lives** 29:3, 30:6, 35:2 .

**living** 64:12, 64:18, 65:8, 88:13 .

**LLC** 2:7 .

**local** 114:22 .

**locate** 114:17 .

**located** 20:7, 20:16, 48:25, 63:16, 63:17, 64:3, 64:5, 65:7, 126:24, 164:6 .

**location** 47:19, 50:4, 75:21, 77:9, 86:1, 86:2, 95:8, 100:12, 103:24,

107:9, 111:8, 123:4, 125:13, 133:23, 135:23, 136:7, 137:7, 144:9, 144:14, 144:18, 145:2, 147:5, 148:6, 148:23, 153:19, 153:23, 155:13, 155:20 .

**locations** 16:16, 56:22, 74:22, 109:15, 120:6, 135:8, 135:10, 137:25, 145:8, 155:16, 158:22 .

**locked** 68:3, 78:17, 140:25 .

**Locust** 144:21, 154:7, 161:4 .

**log** 9:9 .

**logical** 48:15, 60:3, 118:11 .

**logistical** 105:1 .

**logs** 9:4, 9:11, 9:20 .

**Logsdon** 144:9, 157:23, 158:19, 161:10 .

**long** 55:25, 56:4, 56:5, 90:3 .

**longer** 103:16, 103:18, 106:5, 125:10, 145:19 .

**looked** 61:25, 92:1, 107:24 .

**looking** 4:25, 11:13, 12:23, 12:24, 16:22, 31:24, 42:2, 47:3, 60:16, 63:18, 71:22, 72:10, 73:5, 75:6, 90:13, 106:6, 106:7, 117:12, 125:10, 153:13, 166:9 .

**looks** 80:8, 89:13, 95:24, 139:2 .

**lost** 143:2 .

**lot** 10:25, 14:22, 28:7, 38:8, 51:25, 52:25, 53:9, 67:4, 70:7, 71:15, 75:17, 96:23, 104:20, 115:15, 120:24, 123:9, 130:17, 133:25, 140:6, 140:12, 140:17, 140:18, 142:25, 146:24, 154:24, 160:4, 162:13, 163:4 .

**lots** 37:18, 170:7 .

**lunch** 95:5, 95:6 .

**Lyles** 21:1, 81:6, 81:7, 81:9, 83:16, 100:15, 100:19, 124:18 .

.

.

**< M >**

**macro** 17:17 .

**magistrate** 19:21, 27:18, 34:20 .

**magnitude** 90:10 .

**mail** 8:17, 108:21, 108:25, 109:1 .

**main** 162:5 .

**mainly** 96:2 .

**maintain** 75:8, 96:13 .

**majority** 15:15, 33:8 .

**male** 49:7, 49:9, 49:15, 49:18, 49:23, 50:4, 50:10, 50:12, 102:13, 105:3, 107:20, 125:18, 125:22, 154:15 .

**Mall** 114:18 .

**mama** 18:9, 51:10 .

**mandates** 19:14 .

**maneuver** 10:10 .

**manipulated** 57:16 .

**manner** 89:25 .

**manually** 45:7 .

**map** 8:1 .

**marathon** 170:6 .

**marginal** 122:3 .

**marijuana** 81:11 .

**marked** 140:3 .

**Marvis** 104:13, 107:21, 108:7, 109:7, 110:21 .

**Maryland** 1:2, 1:16, 55:17, 55:20, 61:16, 102:17, 108:9, 154:19, 160:24, 170:21 .

**mask** 4:15, 4:16, 7:14 .

**masks** 4:13 .

**master** 64:14, 64:23, 66:1, 66:24, 67:2, 165:21 .

**material** 128:1 .

**MATHIAS** 1:29, 3:8, 150:16, 150:17, 151:4, 152:8, 160:5, 160:7 .

**matter** 5:21, 18:3, 78:5,

80:20, 88:8, 93:24, 96:3,
126:23, 146:17,
170:24 .
**matters** 56:5, 80:14,
93:6 .
**Mclawhorn** 130:4 .
**MD** 1:32, 1:40, 1:47, 2:9,
2:16 .
**me.** 50:22 .
**mean** 40:1, 46:12, 49:21,
53:5, 96:8, 117:15,
120:15, 165:23, 166:1,
167:3 .
**meaningful** 22:5 .
**meaningfully** 42:23 .
**means** 14:6, 37:18, 47:2,
153:24, 166:16 .
**meant** 55:14, 56:4,
119:2 .
**mechanic** 140:18 .
**medium** 59:3 .
**meet** 29:15, 49:7, 50:3,
50:12, 51:18, 59:11,
69:15, 87:14, 98:5,
98:20, 111:4, 114:10,
115:3, 116:10, 117:4,
117:7, 133:8, 136:17,
154:15 .
**meeting** 29:14, 98:7,
98:22, 106:11, 111:8,
113:1, 116:7, 143:23,
144:20, 161:3 .
**meetings** 76:23, 76:24,
87:24, 110:4, 125:1,
133:11, 136:15,
136:16 .
**meets** 46:4, 116:5,
143:20 .
**member** 152:16 .
**members** 12:6, 63:4, 88:2,
130:13 .
**men** 8:16 .
**mention** 97:2, 138:8 .
**mentioned** 55:19, 83:17,
85:8, 135:18 .
**mere** 130:7, 130:25, 142:1,
151:16, 151:21, 151:23,
152:2 .
**merely** 28:12, 98:3, 141:22,
147:5, 152:4 .

**Merit** 170:19 .
**merits** 34:10 .
**message** 9:4, 22:3, 35:9,
35:21 .
**messages** 9:4, 9:11, 9:23,
9:24, 10:5, 22:6, 59:16,
59:20, 64:21, 65:16,
65:18, 65:19, 75:2,
95:25, 97:6, 97:9,
110:18, 117:3 .
**met** 20:14, 61:1,
114:24 .
**method** 114:1 .
**methods** 44:15 .
**Mexican** 59:21 .
**Mexico** 64:22, 107:20,
113:18 .
**microphone** 3:11, 4:7,
47:15, 85:23 .
**middle** 139:10 .
**Mill** 76:9, 86:10, 93:18 .
**Mills** 31:6, 31:23, 41:20,
42:24, 53:13, 53:19,
69:16, 69:19, 69:23,
77:6, 77:9 .
**mind** 85:10, 165:20 .
**minimize** 48:17 .
**minor** 81:21 .
**minute** 50:6, 52:20 .
**minute.** 49:10 .
**minutes** 49:11, 50:19,
117:21, 117:24, 133:23,
139:25, 157:13 .
**miscellaneous** 26:25 .
**misleading** 111:24 .
**misplaced** 153:12 .
**missed** 48:11, 67:7,
119:18, 162:23 .
**missing** 87:15, 101:6,
167:6 .
**misstatement** 163:14 .
**mistaken** 89:21,
128:16 .
**misunderstood** 119:5 .
**Mitchell** 170:19,
170:32 .
**mixture** 8:18, 8:20, 110:1,
155:2 .
**Mm-hmm** 43:4,
127:17 .

**mode** 135:24 .
**modus** 88:1, 154:21 .
**mom's.** 106:12 .
**moment** 6:7, 6:8, 39:12,
64:15, 85:23, 94:2,
103:6, 122:9, 132:25,
148:1, 150:13,
165:11 .
**moments** 139:9 .
**Monday** 138:22 .
**money** 12:8, 110:5, 111:6,
117:5 .
**monitored** 10:3, 77:7 .
**monitoring** 123:4, 125:13,
144:2, 154:13 .
**Monroeville** 114:18 .
**month** 31:5, 129:21 .
**months** 6:19, 80:10,
83:1 .
**moot** 103:10, 126:4, 126:9,
126:11, 149:5 .
**morning** 3:3, 3:5, 3:19,
3:22, 3:25, 4:2, 4:6, 6:4,
64:2, 64:8, 64:11,
120:17, 121:15, 122:10,
124:7, 133:13,
156:25 .
**mostly** 130:8, 136:2 .
**mother** 8:16, 28:12, 28:13,
28:17, 28:18, 28:23,
29:6, 29:9, 29:21, 37:2,
37:15, 48:22, 49:13,
50:8, 50:10, 51:13,
51:18, 64:9, 65:1, 100:9,
111:5 .
**motives** 60:20 .
**motor** 138:15 .
**move** 6:13, 95:18, 99:24,
99:25, 103:1, 131:23,
147:19 .
**moved** 52:16, 60:22,
106:18, 153:19,
156:1 .
**movements** 104:1 .
**moves** 102:2 .
**Moving** 160:15 .
**multiounce** 27:20, 28:3,
156:13 .
**multiple** 38:8, 52:7, 52:17,
53:15, 53:20, 53:22,

73:3, 73:19, 86:22, 87:8,
89:3, 158:17, 159:9 .
**murder** 23:2 .
**murky** 18:24 .
**muster** 74:5 .
**mystified** 71:18 .
**mystifying** 101:4 .
.

**< N >.**
**name** 55:19, 88:17, 93:16,
93:23, 111:20, 115:4,
135:22, 158:13, 160:25,
161:1 .
**named** 104:13 .
**narcotic** 74:21 .
**narcotics** 16:11, 74:15,
74:20, 74:22, 74:24,
74:25, 75:1, 75:3,
107:18, 107:20, 155:11,
161:20 .
**narrows** 13:9 .
**native** 10:10 .
**nature** 104:5, 105:4 .
**near** 64:12, 118:9, 133:24,
137:5, 159:5 .
**nearly** 153:7 .
**necessarily** 38:18, 53:5,
63:9, 66:7, 108:16,
112:16, 168:22,
168:23 .
**necessary** 51:3, 61:15,
107:12, 112:21, 130:14,
130:16, 130:25,
166:20 .
**necessity** 78:23 .
**need** 5:3, 43:6, 43:22,
55:16, 56:7, 58:2, 59:2,
98:8, 103:8, 104:9,
153:5, 158:1, 165:8,
165:20, 166:7, 166:23,
167:9, 167:19, 167:23,
168:6, 168:12,
168:14 .
**needed** 22:25, 160:5 .
**needs** 122:25, 123:24,
124:8, 158:2 .
**neglected** 67:5 .
**neither** 57:2, 152:1 .
**Nelson.** 17:16 .

**neutral** 27:18 .
**nevertheless** 49:22 .
**New** 50:15, 50:16, 53:5,
    53:7, 65:19, 104:15,
    104:17, 104:22, 106:2,
    108:7, 108:9,
    113:18 .
**night** 64:11, 108:8,
    108:10 .
**nine** 165:22 .
**Nissan** 140:1, 141:5,
    141:6, 141:18, 143:3,
    143:12, 143:15, 146:2,
    146:3, 146:16, 146:20,
    146:21, 147:7, 154:16,
    154:17, 154:19, 154:20,
    157:9, 157:24, 159:14,
    159:16, 159:22, 160:10,
    162:18, 162:19, 162:21,
    163:2 .
**nitpicked** 107:3 .
**No.** 1:9, 3:6, 5:6, 5:7,
    45:21, 47:7, 121:7,
    146:20 .
**nobody** 150:8 .
**none** 85:5, 96:10,
    96:11 .
**nonetheless** 70:4, 84:15,
    125:23 .
**nonsensical** 109:8 .
**nontestifying** 152:12,
    152:19 .
**nor** 57:2, 102:24, 151:6,
    152:1 .
**normal** 116:23, 166:19,
    166:24 .
**North** 144:21, 154:7,
    161:3 .
**NORTHERN** 1:3 .
**notable** 58:20 .
**notably** 30:9 .
**note** 4:6, 18:7, 47:16, 48:4,
    79:17, 79:23, 80:3,
    82:12, 100:10, 101:13,
    107:6, 115:20, 116:6,
    123:15, 169:19 .
**noted** 74:14, 79:23 .
**notes** 1:49, 58:24, 59:1,
    83:13 .
**Nothing** 17:22, 23:6, 23:8,

67:2, 68:6, 75:14, 77:10,
    78:7, 82:23, 93:19, 95:1,
    99:14, 100:24, 122:25,
    123:24, 128:2, 134:7,
    142:8, 142:19, 143:23,
    145:11, 159:3,
    169:10 .
**notice** 81:5, 146:23 .
**noticed** 4:7 .
**now.** 51:11 .
**nuanced** 21:22, 30:24,
    34:10, 34:11, 93:25 .
**nullity** 93:4 .
**number** 48:13, 49:18, 70:2,
    70:3, 78:4, 86:19, 93:14,
    93:15, 93:16, 107:19,
    124:2, 125:18, 128:25,
    140:2, 148:7 .
**numbered** 6:12 .
**numbers** 6:12, 9:21, 44:17,
    106:8, 111:3, 166:6 .
**numerous** 56:25, 66:17,
    66:18, 84:9, 146:25,
    147:5 .

.

**< O >.**
**oath** 19:4, 82:21 .
**object** 20:7, 21:5,
    169:24 .
**objects** 141:24 .
**obligations** 59:12 .
**observation** 114:16, 133:7,
    141:14, 144:1 .
**observations** 29:6, 29:10,
    98:17, 145:5,
    146:11 .
**observe** 118:7 .
**observed** 100:12, 115:1,
    115:10, 115:18, 119:7,
    144:10, 144:17, 154:15,
    157:8, 157:23, 158:16,
    162:21 .
**observing** 144:23 .
**obtain** 8:11, 20:1, 80:11,
    93:16, 103:23,
    129:6 .
**obtained** 26:6, 60:18, 80:7,
    100:2, 101:23, 103:22,
    105:11, 106:24, 110:12,

118:12, 118:15, 156:16,
    160:19, 163:6 .
**obtaining** 4:23, 77:6,
    81:12, 92:19,
    129:12 .
**obtains** 107:19 .
**obvious** 58:10, 113:1,
    157:25 .
**Obviously** 4:24, 7:15, 7:18,
    21:25, 33:4, 52:25, 54:2,
    71:16, 80:1, 110:5,
    112:19, 118:1, 118:10,
    120:24, 130:15, 145:21,
    148:18, 163:17, 167:19,
    168:12 .
**occasion** 28:18, 98:5,
    100:8, 144:6, 144:7,
    161:8 .
**occasions** 51:24, 52:1 .
**occupants** 102:13, 114:24,
    115:1 .
**occupied** 89:1 .
**occur** 97:2, 123:10 .
**occurred** 23:2, 118:15 .
**occurs** 20:24 .
**oddly** 34:19 .
**off-site** 137:3, 137:7 .
**offense** 20:5, 60:21 .
**offenses** 152:1 .
**offer** 27:22 .
**offered** 24:19, 148:2 .
**Office** 1:30, 1:38, 1:45, 2:7,
    2:14, 3:16, 43:21, 61:20,
    72:4, 72:9 .
**Officer** 21:9, 42:24, 60:25,
    145:18, 155:7,
    155:11 .
**Officers** 8:16, 54:24, 57:8,
    57:10, 58:4, 58:16, 59:2,
    60:6, 65:25, 66:14, 71:1,
    72:6, 80:24, 152:3,
    162:15 .
**Official** 170:17,
    170:33 .
**often** 16:12, 22:1, 46:23,
    53:16, 74:15, 74:25,
    117:11, 130:2,
    146:19 .
**oftentimes** 16:3 .
**old** 53:6, 53:8, 53:9, 117:8,

134:24, 134:25,
    135:25 .
**older** 135:11 .
**omission** 118:22 .
**omitted** 100:23,
    100:24 .
**once** 14:1, 26:6, 124:24,
    142:15, 168:4 .
**one-stop** 117:12 .
**one-year** 68:3 .
**ones** 53:17, 63:9,
    139:16 .
**ongoing** 111:18, 112:14,
    116:12, 128:23, 130:10,
    130:14 .
**open** 57:8, 57:10, 58:17,
    59:13, 63:24, 82:10,
    126:12, 126:24 .
**open-air** 145:5 .
**opening** 162:10 .
**opens** 89:14 .
**operandi** 88:1, 154:21 .
**operated** 141:7,
    160:13 .
**operating** 114:20, 115:10,
    121:2, 143:12 .
**operation** 54:21, 55:2,
    55:10, 62:9, 72:23,
    135:25 .
**operative** 53:25, 54:4 .
**opinion** 22:11, 31:22,
    55:21, 55:22, 83:24 .
**opinions** 14:16 .
**opportunity** 6:19, 35:8,
    144:14 .
**opposite** 130:9 .
**oral** 166:15 .
**orally** 165:14 .
**order** 6:1, 38:13, 68:9,
    85:1, 101:22, 106:24,
    112:18, 122:13, 123:3,
    123:11, 127:10, 138:14,
    145:19, 150:18, 151:10,
    152:24, 160:6, 161:4,
    161:22, 165:25,
    169:17 .
**ordered** 157:15 .
**ordinarily** 4:17 .
**organization** 12:7, 107:21,
    132:10, 132:13 .

**original** 149:15 .
**originates** 129:24 .
**others** 60:1, 67:13, 70:16, 84:13, 85:8, 129:18, 129:19, 166:3 .
**Otherwise** 35:1, 98:10, 148:21, 166:12, 166:18 .
**outlier** 70:25 .
**outline** 8:3, 134:9 .
**outlined** 124:24 .
**outside** 51:22, 92:22, 98:20, 100:5, 114:18, 116:23, 153:6, 156:9, 161:17 .
**overall** 10:7, 101:17, 168:8 .
**overarching** 19:13 .
**Overbreadth** 20:24, 37:11, 99:2, 99:9, 99:19, 124:9, 126:22 .
**overbroad** 23:7, 23:12, 23:22, 25:13, 25:17, 25:23, 26:17, 26:18, 29:25, 32:19, 41:1, 66:5, 68:20, 71:4 .
**overheard** 123:22, 124:25 .
**overlaps** 36:22 .
**overly** 7:10, 33:14, 82:2, 82:3 .
**oversight** 90:7 .
**overview** 8:3 .
**overwhelming** 162:14 .
**owed** 111:6 .
**Owings** 69:16, 69:19, 69:23, 77:5, 77:9 .
**own** 27:18, 82:15, 108:22 .
**owned** 68:4, 118:17 .
**owner** 57:17, 88:20 .
**owning** 78:15 .
.

**< P >** .

**p.m.** 95:15, 170:16 .
**P2** 91:4 .
**package** 8:19, 29:7, 42:1, 167:15 .
**page** 12:16, 12:23, 21:14,

23:15, 54:11, 54:13, 54:23, 86:11, 90:13, 132:11, 144:6, 148:9, 148:10, 170:24 .
**pagers** 135:25, 136:1 .
**pages** 10:17, 55:22, 62:6 .
**Paper** 13:23, 13:25, 84:16, 84:24, 102:17 .
**papers** 5:9, 5:21, 19:2, 79:17, 80:3, 127:6, 128:21, 131:16, 148:21 .
**paperwork** 26:25 .
**paragraph** 54:14, 61:3, 113:13, 144:16, 144:19 .
**paragraphs** 148:13 .
**paraphernalia** 12:5, 23:17, 110:1, 141:25, 159:25 .
**parentheses** 79:24 .
**Park** 49:16, 157:10 .
**parked** 102:18, 115:14, 139:15, 140:10, 141:17, 142:12, 145:23, 161:17 .
**parking** 115:15, 139:21, 145:22 .
**parks** 49:14 .
**Parrish** 155:11 .
**parse** 22:19 .
**parsed** 24:10 .
**part** 22:11, 36:4, 71:21, 78:13, 90:8, 103:13, 125:23, 129:16, 130:10, 130:14, 131:1, 131:24, 138:17, 139:9, 139:21, 148:9, 152:16, 154:21, 168:7 .
**partially** 129:4 .
**participant** 136:10, 152:1 .
**participants** 136:15 .
**participated** 11:11 .
**particularity** 7:12, 18:25, 21:8, 21:19, 22:15, 26:4, 33:13, 44:23, 53:25, 66:9 .
**particularization**

77:22 .
**particularized** 15:20, 23:9, 78:19, 79:11, 82:1, 82:6, 82:8 .
**particularly** 7:12, 8:7, 14:17, 15:14, 19:5, 48:7, 87:24, 105:17 .
**partner** 161:18 .
**party** 110:5, 123:23 .
**pass** 74:5 .
**passage** 19:23, 78:17 .
**passes** 31:9 .
**past** 53:17, 121:4, 128:23 .
**Patricia** 170:19, 170:32 .
**Pause.** 163:21 .
**pay** 108:15, 111:5 .
**PC** 1:45, 68:19, 110:6, 110:16, 113:9 .
**PDF** 9:4, 9:14, 10:9, 10:17, 10:21 .
**pending** 6:10, 150:9 .
**Pennsylvania** 102:8, 113:16 .
**people** 17:24, 19:1, 35:2, 36:13, 38:20, 39:21, 42:7, 63:15, 66:19, 88:12, 89:4, 106:6, 136:13, 136:14, 136:16, 136:25, 144:20, 144:22, 153:16, 158:2, 161:3, 161:24, 166:6 .
**per** 84:25, 85:14, 85:24 .
**percent** 4:25, 10:19, 38:12, 116:9, 154:1 .
**perfect** 62:24 .
**perfectly** 109:2 .
**Perhaps** 55:12, 58:12, 58:13, 62:3, 84:8, 84:14, 118:21, 119:5, 123:1 .
**period** 68:3, 91:14, 113:25, 115:12, 133:12, 133:14, 165:19 .
**periods** 102:5 .
**permit** 61:5 .
**permits** 61:10, 61:18 .
**permitted** 4:22, 58:16,

61:17, 68:20, 75:20 .
**permitting** 149:20 .
**person** 14:22, 19:16, 33:18, 44:20, 44:24, 78:2, 87:9, 93:9, 93:12, 97:15, 103:25, 108:12, 114:10, 122:3, 128:16, 128:22, 130:9, 151:23, 155:4 .
**personal** 35:2, 43:9, 103:25, 104:5, 104:8 .
**personalities** 27:17 .
**persons** 19:2, 19:6, 54:22, 133:3, 134:6 .
**perspective** 17:18, 28:14, 43:12, 167:25 .
**pertain** 6:16, 26:13 .
**pertained** 128:18 .
**pertaining** 101:17 .
**pertains** 35:22 .
**pertinent** 34:25, 139:24 .
**Philadelphia** 1:46, 50:15 .
**Philander** 1:42 .
**phone.** 17:7, 63:22 .
**photographs** 10:24, 11:3, 139:3 .
**photos** 59:16 .
**phrase** 62:8, 72:14, 72:22, 74:23 .
**physical** 107:17, 143:23, 156:18, 157:7, 158:15 .
**pick** 14:25, 69:18, 86:23 .
**picking** 34:19, 133:10 .
**picture** 139:7, 146:15, 146:17, 146:18 .
**pictures** 139:18, 146:17 .
**piece** 13:23, 13:25 .
**pike** 168:17 .
**Pin** 60:5 .
**pinging** 114:19, 115:2, 115:10, 115:16 .
**pipe** 168:6 .
**Pittsburgh** 102:8, 102:11, 102:23, 111:19, 114:6,

114:7, 114:10, 114:13,
114:15, 114:18,
116:13 .
**placed** 147:5 .
**placement** 124:22,
125:6 .
**places** 30:1, 37:19, 45:5,
45:24, 137:3 .
**plain** 37:20, 38:25, 39:9,
142:8, 153:6 .
**plain-view** 39:14,
92:24 .
**Plaintiff** 1:7, 1:26 .
**plan** 60:20, 87:21, 165:20,
168:15 .
**planning** 167:20 .
**plans** 87:13, 104:18, 111:4,
117:4 .
**plastic** 8:20, 26:23,
26:24 .
**plate** 93:14, 93:15,
93:16 .
**plates** 118:9, 154:19,
154:20, 157:10,
160:24 .
**platform** 59:21 .
**playing** 60:5 .
**Please** 3:3, 4:14, 4:15,
65:12, 67:6, 75:19,
95:16 .
**plenty** 48:10, 90:6 .
**plugged** 6:7 .
**plus** 144:1 .
**pocket** 15:12 .
**podium** 4:15, 85:22 .
**pointed** 54:13, 71:7, 73:19,
75:18, 78:23, 119:6,
154:1, 163:2 .
**points** 56:14, 67:6, 70:11,
121:14 .
**Police** 60:6, 60:18, 60:24,
61:6, 61:10, 68:3, 68:16,
68:19, 142:19, 155:7,
158:5 .
**political** 104:2 .
**pornography** 46:24 .
**portion** 22:14, 22:16,
22:17, 66:8, 66:11,
66:12, 66:21 .
**position** 7:4, 42:13,

168:10 .
**positive** 161:19 .
**positively** 87:5,
102:16 .
**possessed** 128:25 .
**possession** 54:22,
89:17 .
**possessions** 20:2,
20:10 .
**possibility** 21:6, 68:7,
108:11, 112:17, 166:5,
169:23 .
**possible** 7:7, 17:15, 34:18,
34:24, 62:3, 67:5, 87:23,
113:3, 120:2, 137:24,
142:22, 151:23 .
**possibly** 57:22, 57:24,
58:1, 73:4, 73:17, 74:3,
75:10, 136:22,
142:3 .
**potential** 33:5 .
**potentially** 104:15 .
**Powerpoint** 5:15, 7:23,
103:13 .
**practical** 57:2 .
**practicality** 13:15 .
**Practically** 75:15 .
**practice** 38:16, 166:24 .
**precedes** 101:21 .
**precise** 39:12 .
**precision** 67:14 .
**precludes** 67:23 .
**prefacing** 139:20 .
**prejudicial** 128:8 .
**preliminary** 155:3 .
**premature** 103:7 .
**premise** 34:1 .
**premises** 32:18, 36:3,
139:22, 140:2 .
**premises.** 54:22 .
**preparation** 166:12 .
**prepare** 169:4 .
**prepared** 7:22, 103:12 .
**preponderance**
153:25 .
**presence** 3:24, 5:1, 5:2,
100:4, 123:17,
161:20 .
**present** 5:3, 19:18,
129:14 .

**presentation** 5:16, 7:23,
8:1, 8:2, 10:7,
103:13 .
**presentations** 48:1 .
**presented** 127:16,
148:3 .
**preserve** 116:12,
147:24 .
**press** 8:22, 27:1 .
**Presumably** 18:18, 29:16,
43:20, 50:11, 88:21,
105:6, 115:2 .
**presume** 53:4, 63:16,
112:11, 132:12,
163:20 .
**pretty** 30:2, 30:3, 65:11,
73:10, 96:24, 97:10,
106:12, 120:11 .
**prevail** 80:25 .
**preventing** 75:14 .
**prevents** 112:22 .
**previous** 83:5, 83:8,
101:21, 106:3,
138:6 .
**previously** 83:4,
97:25 .
**Price** 130:3 .
**primarily** 67:9, 72:5, 72:6,
100:6 .
**primary** 99:12, 116:18 .
**principle** 33:21, 55:4, 56:9,
56:14, 65:23, 73:7 .
**principles** 11:24, 12:2,
32:22, 35:23, 41:9,
41:13, 42:16, 42:23,
44:19, 47:4, 80:16 .
**prior** 36:23, 84:3, 123:2,
123:11, 166:4 .
**priority** 166:6 .
**probability** 153:14, 153:25,
155:19, 158:25, 160:17,
162:3 .
**probably** 15:11, 38:7, 40:4,
51:8, 78:10, 122:3,
137:5, 137:10,
167:16 .
**problem** 4:22, 24:6, 28:1,
34:3, 34:13, 38:7, 40:2,
40:20, 92:9, 103:14,
131:4, 169:20 .

**problematic** 63:7 .
**problematically** 14:15 .
**problems** 8:6, 92:11 .
**procedural** 77:25 .
**Procedure** 58:21, 59:7,
59:23 .
**proceed** 5:25, 99:24 .
**proceeded** 149:24 .
**Proceedings** 1:20, 170:16,
170:23 .
**proceeds** 52:4, 74:21,
113:23, 158:21 .
**process** 58:7, 58:16,
58:22, 58:24, 59:2,
76:23, 165:25, 166:16,
166:20, 170:2 .
**procure** 145:20 .
**production** 127:25 .
**professional** 104:2 .
**proffered** 10:14 .
**program** 58:8 .
**prohibit** 21:13 .
**prominently** 32:14 .
**prompt** 169:23 .
**promptly** 168:6 .
**promulgating** 59:6 .
**pronouncing** 129:10 .
**proof** 107:8 .
**proper** 23:24, 60:2 .
**properly** 62:13, 79:1,
82:20, 166:22 .
**property** 12:4, 20:2, 20:10,
20:17, 24:20, 54:16,
92:16, 92:17, 92:20,
139:9 .
**proposal** 5:25, 166:25,
167:7, 167:13 .
**propose** 131:8 .
**proposed** 167:9 .
**prostitution** 114:23 .
**protect** 112:14 .
**protective** 43:18,
43:25 .
**protests** 115:21 .
**protocol** 56:21, 58:5, 73:2,
154:11, 165:23,
166:11 .
**protocols** 4:13, 56:15,
57:1 .
**prove** 61:13 .

**provide** 7:19, 19:20, 55:6, 102:19, 105:15, 107:25, 111:3, 150:25, 151:1, 153:23, 155:21, 166:25, 167:13 .
**provided** 24:19, 31:3, 135:21, 135:22, 151:21, 154:12, 159:6 .
**provides** 8:5, 103:25, 109:22, 152:4 .
**proving** 144:25 .
**provision** 23:4, 23:11, 37:10 .
**proximity** 28:16, 142:16 .
**prudent** 19:16 .
**Public** 1:38, 3:16, 145:8, 151:10 .
**pull** 71:24, 81:10 .
**pulled** 87:7, 108:16, 141:1 .
**purchase** 51:19, 128:15, 129:1, 129:2, 129:15, 131:3, 133:5, 136:9, 136:17, 141:8, 143:15, 143:25, 144:24, 146:5, 148:15, 151:6, 152:10, 152:13, 154:3, 154:6, 154:11, 154:13, 155:1, 157:2, 162:22 .
**purchased** 125:14, 141:13, 160:24 .
**purchases** 128:23, 136:25, 153:10 .
**purchasing** 117:15 .
**purely** 43:16 .
**purported** 123:12, 124:5, 131:3 .
**purportedly** 125:16 .
**purpose** 22:2, 77:6, 77:19, 78:8, 79:3, 81:12, 144:21, 146:22 .
**purposes** 79:7, 92:3 .
**pursuant** 11:6, 22:16, 23:7, 23:8, 23:9, 23:21, 26:15, 32:17, 41:2, 41:6, 66:10, 66:21, 93:2, 126:1, 170:22 .
**push** 46:2 .
**put** 5:5, 15:1, 38:18, 119:17, 131:8, 140:24, 146:24, 150:23, 167:7, 168:25 .
**puts** 77:24, 164:24 .
.
.
**< Q >.**
**qualified** 72:22 .
**quantities** 159:10 .
**quantity** 49:19 .
**quarrel** 143:8 .
**quash** 60:22 .
**question** 11:16, 19:8, 21:23, 26:14, 26:15, 29:23, 32:8, 34:1, 43:3, 43:11, 46:13, 52:24, 71:21, 75:14, 80:21, 84:23, 131:11, 165:7, 169:15 .
**questioning** 24:10 .
**questions** 65:14, 67:7, 83:12, 91:11, 120:8, 127:3, 127:7, 148:24, 162:23, 166:17, 166:22, 167:4 .
**quibbling** 42:13 .
**quick** 138:12 .
**quickly** 64:25, 120:11, 145:11, 154:22 .
**Quite** 5:15, 28:5, 72:16, 85:9, 90:21, 95:12, 108:4, 115:23, 122:1, 130:1, 167:18 .
**quote** 60:11, 105:25 .
**quoted** 37:11, 66:8 .
**quoting** 19:24 .
.
.
**< R >.**
**raise** 70:10, 70:22, 75:19, 140:18 .
**raised** 17:13, 25:1, 70:22, 89:20, 110:9 .
**raises** 21:5, 25:10, 101:25 .
**range** 130:6, 135:1 .
**rather** 16:8, 21:11, 27:17, 28:1, 166:15, 168:11 .
**re-up** 104:15, 104:23 .

**reach** 167:2 .
**reaching** 45:1 .
**react** 167:1, 167:14 .
**read** 28:6, 42:14, 46:7, 55:20, 56:2, 61:3, 62:5, 67:17, 67:19, 69:6, 70:23, 114:11, 123:20, 166:13, 170:7 .
**reading** 12:16, 135:13, 144:16 .
**ready** 6:5, 95:17, 167:24, 167:25, 168:2, 168:3 .
**real** 138:12, 146:11 .
**real-time** 8:11, 103:5, 105:11, 106:17, 106:20, 107:8, 148:6, 148:22, 153:19 .
**reality** 116:6 .
**realize** 71:18, 114:11 .
**realized** 64:25 .
**Realtime** 170:20 .
**rear** 139:2, 146:18, 157:8, 157:10, 157:24, 160:3 .
**reason** 17:4, 17:5, 31:10, 36:10, 37:3, 37:6, 38:12, 40:6, 43:22, 44:9, 44:13, 78:21, 89:15, 90:14, 91:17, 101:10, 106:18, 130:17, 136:5, 149:8, 149:12, 165:24 .
**reasonable** 20:15, 53:4, 63:15, 64:6, 64:15, 88:4, 88:23, 109:2, 111:19, 112:24, 118:3, 142:2, 142:17, 142:21, 142:24, 145:13, 145:15, 145:18, 145:19, 147:17, 168:2 .
**reasonably** 19:12, 19:14 .
**reasons** 15:14, 58:10, 73:25, 82:24, 98:23, 99:20, 103:1, 140:3, 142:22 .
**rebuttal** 95:1, 121:5, 162:25 .
**recall** 112:9, 125:19, 133:18, 134:3,

134:15 .
**receipt** 26:22 .
**receipts** 16:16 .
**receive** 4:19 .
**received** 5:24, 80:5, 114:5 .
**recent** 15:4, 114:9 .
**recently** 160:24 .
**Recess** 95:14, 95:15 .
**recites** 77:2 .
**recklessness** 60:21 .
**recognize** 35:25 .
**recognized** 5:20, 59:7, 102:12 .
**recognizes** 36:11, 60:10 .
**record** 4:5, 5:5, 16:13, 74:17, 86:25, 95:22, 109:13, 131:24, 138:17, 148:9 .
**records** 12:5, 16:15, 54:19, 74:21, 75:1, 75:2, 97:14, 118:18 .
**recovered** 95:23, 109:25, 156:2 .
**recovers** 159:24 .
**recreational** 108:6 .
**redact** 112:21 .
**redacted** 97:13 .
**redaction** 112:18 .
**Redmen** 84:13, 85:8, 89:10, 124:17 .
**refer** 13:9, 45:9, 54:11, 57:25, 60:8, 81:5, 105:7 .
**referee** 167:7 .
**reference** 10:4, 41:10, 42:14, 76:16, 76:21, 80:18, 80:21, 91:7, 91:8, 94:2, 110:23, 117:8, 129:9, 133:23, 134:2, 148:14 .
**referenced** 85:5, 110:7 .
**references** 97:3 .
**referencing** 5:18, 41:11, 85:17 .
**referred** 18:21, 93:7 .
**referring** 12:13, 32:3, 49:19, 67:17, 97:7 .

**refers** 18:9, 42:3, 42:4, 49:24, 51:9 .

**refuting** 99:8 .

**regard** 5:10, 48:1, 75:20, 76:18, 78:12, 78:15, 80:14, 80:16, 81:2, 82:8, 83:5, 93:6, 93:25, 95:7, 119:2, 122:1, 143:11 .

**Regarding** 6:11, 8:2, 21:20, 27:12, 35:23, 76:12, 77:10, 83:15, 96:5, 96:24, 97:25, 99:3, 99:9, 100:1, 101:9, 103:21, 128:20, 148:17, 153:23 .

**Regardless** 20:8, 54:9, 95:25, 165:16 .

**regards** 32:12 .

**Registered** 87:6, 93:22, 97:12, 160:12, 160:25, 161:1, 170:19 .

**registration** 87:6 .

**regular** 119:3, 120:3 .

**regularly** 51:23 .

**regulations** 170:25 .

**rehash** 120:22, 129:7 .

**relate** 91:12 .

**related** 19:12, 23:4, 24:6, 65:21, 76:11, 77:11, 80:14, 80:20, 82:5, 93:22, 98:10, 133:4, 133:10 .

**relates** 84:15, 85:2 .

**relating** 60:20, 159:4 .

**relationship** 90:24, 128:24, 129:10, 129:11, 130:13, 137:8, 138:11 .

**relationships** 130:2 .

**relatively** 5:2, 101:9 .

**relatives** 52:5 .

**relax** 47:10, 47:11 .

**relevant** 44:10, 59:14, 74:23, 85:10, 96:10, 116:17, 118:24, 142:18, 151:13, 151:21 .

**reliable** 102:7, 114:5 .

**reliance** 34:23 .

**relied** 67:20, 162:16 .

**relief** 128:7 .

**relies** 22:8, 96:23, 100:4 .

**religious** 104:2 .

**rely** 77:15, 106:13 .

**relying** 33:20, 129:4 .

**remain** 4:14, 6:10, 6:24 .

**remainder** 22:16, 66:10 .

**remaining** 47:8, 47:17, 103:3, 103:4, 105:2, 121:6 .

**remains** 166:10 .

**remedy** 21:25, 35:15 .

**remember** 168:20 .

**render** 66:7 .

**Rent-a-car** 160:12 .

**rental** 100:6, 102:4, 113:21, 113:22, 114:3, 146:3, 146:5, 148:17 .

**rented** 102:6, 114:4, 154:19, 160:13 .

**renting** 154:22 .

**rents** 102:4 .

**repeat** 76:13 .

**repeating** 145:21 .

**reply** 150:1 .

**report** 5:18, 31:4, 32:3, 32:6, 59:11, 59:19, 79:21, 79:24, 80:5, 90:13, 90:15, 90:25, 91:4, 91:25, 163:25, 164:17, 164:20 .

**Reporter** 152:6, 170:17, 170:19, 170:20, 170:33 .

**reports** 10:21, 90:16, 132:24, 137:20 .

**represent** 4:10 .

**representing** 3:17 .

**request** 4:1, 132:2, 132:20, 148:6 .

**requested** 3:24, 4:20, 155:22 .

**requests** 133:4, 167:20 .

**require** 5:1, 17:7, 58:4, 67:11, 67:14, 152:21, 156:8 .

**required** 4:1, 21:9, 55:5, 56:11, 56:15, 57:2, 62:16, 70:19, 72:25, 73:1, 73:6, 73:11, 86:4, 88:5, 88:7, 115:6, 151:19, 151:25, 152:9, 152:12, 158:9 .

**requirement** 18:25, 33:12, 33:13, 44:23, 98:8, 134:20, 158:8, 161:21 .

**requirements** 21:20, 35:9 .

**requires** 5:1, 19:19, 21:3, 79:14, 130:10, 166:11 .

**requisite** 7:9 .

**reserved** 166:7 .

**reserving** 128:9 .

**resided** 133:20, 160:22 .

**residence.** 68:14 .

**residences** 52:5, 54:1, 56:10, 63:1, 63:13, 63:16, 63:17, 74:23, 88:6, 95:7, 116:24, 120:3, 120:5, 135:6, 139:10, 158:22 .

**resident** 97:15, 99:12 .

**residential** 112:10, 121:15 .

**resides** 97:12 .

**resolve** 167:19, 167:23, 169:6 .

**resolved** 47:20, 166:17, 169:4 .

**resources** 35:18 .

**respect** 47:17, 69:2, 76:22, 77:16, 80:25, 81:4, 82:12, 83:6, 83:11, 122:2, 122:3, 127:11, 130:8, 132:8, 147:3, 152:19 .

**respectfully** 151:18 .

**respond** 62:18, 67:5 .

**responding** 131:7 .

**responds** 48:2 .

**response** 6:4, 18:16, 32:9, 49:1, 54:9, 105:9, 107:6, 150:1 .

**responsibilities**

127:24 .

**rest** 15:1, 47:23 .

**restore** 74:17 .

**restrained** 38:19 .

**rests** 20:4, 162:24 .

**result** 15:13, 81:20, 132:5 .

**results** 84:23 .

**resume** 95:17 .

**retrieved** 10:13 .

**Return** 42:7, 113:24, 140:4 .

**returned** 140:12, 160:14 .

**reveal** 109:16, 114:14, 128:11, 132:6, 133:1, 150:19 .

**revealed** 107:15, 110:3, 112:4 .

**revealing** 104:1 .

**review** 59:3, 149:9 .

**reviewed** 31:6, 123:14 .

**reviewing** 57:14 .

**Reynolds** 49:16, 50:4 .

**rigorous** 104:9 .

**Riley** 14:19, 33:8, 34:8, 36:11 .

**rise** 27:2, 95:14, 170:15 .

**risk** 113:4 .

**Riviera** 129:24 .

**RMR** 170:32 .

**Road.** 100:13 .

**Rodriguez** 145:17 .

**rolling** 170:2 .

**room** 64:12, 64:18, 65:8 .

**round** 3:9 .

**routinely** 59:7, 59:9, 61:22, 63:14, 134:25 .

**Rovario** 151:8, 152:20 .

**row** 138:25 .

**rubber** 26:25, 113:10 .

**ruin** 114:15 .

**Rule** 5:1, 22:2, 35:4, 35:5, 35:14, 35:21, 39:10, 43:13, 58:13, 58:20, 59:6, 59:25, 122:21, 127:22, 165:12 .

**ruled** 32:18, 83:6, 128:17,

129:7, 132:20, 149:19,
165:18 .
**Rules** 58:21 .
**ruling** 6:11, 127:21 .
**rulings** 122:1, 165:16 .
**rummage** 60:24 .
**rummaging** 43:8,
81:16 .
**Run** 43:24, 76:9, 86:11,
93:18 .
**running** 72:6 .
**rush** 7:6, 34:23 .
**RUTER** 1:44, 1:45, 3:22,
4:19, 5:6, 70:9, 83:25,
84:2, 95:1, 95:2, 122:12,
122:13, 122:18, 122:24,
126:15, 127:10, 127:16,
169:11, 169:12 .

.
.

**< S >** .
**S.** 1:31 .
**safely** 165:25 .
**sales** 74:21, 85:6, 132:24,
137:8 .
**sanctioned** 59:24 .
**sanitize** 168:10 .
**satisfied** 13:3, 54:15,
61:7 .
**satisfy** 98:7 .
**save** 26:18 .
**saw** 9:25, 87:9, 98:15,
115:5, 143:13, 143:14,
143:17, 143:18, 144:13,
161:10 .
**saying** 17:4, 17:14, 24:12,
24:21, 28:15, 34:13,
35:11, 39:5, 39:6, 40:14,
46:10, 49:21, 50:23,
50:25, 56:21, 69:15,
74:24, 74:25, 100:22,
119:10, 129:8, 143:6,
144:23 .
**scales** 8:21, 26:23,
159:25 .
**scan** 141:3, 142:5, 147:1,
147:6, 147:7, 161:19,
161:22, 162:1,
163:8 .
**scant** 81:10 .

**scenario** 39:18, 40:18,
68:22 .
**scene** 163:5 .
**schedule** 166:21 .
**scheme** 60:20 .
**scope** 28:5, 57:12, 59:5,
97:20, 97:21, 99:3,
124:12, 142:24 .
**scratch** 109:21 .
**screaming** 153:17 .
**screen** 9:6, 9:13 .
**scroll** 45:8 .
**se.** 85:24 .
**seal** 149:8, 150:8,
150:14 .
**sealed** 150:11 .
**sealer** 27:2 .
**searched** 19:6, 19:11,
20:12, 20:16, 20:19,
23:13, 23:21, 24:20,
27:9, 30:1, 36:16, 55:8,
56:6, 77:9, 82:18, 92:2,
95:23, 110:11, 126:23,
134:22, 134:23, 142:7,
154:12 .
**searches** 19:3, 21:20, 58:2,
58:25, 59:8, 85:24,
142:23, 164:5 .
**searching** 13:13, 13:17,
13:19, 16:3, 31:2, 37:18,
58:22, 58:23, 64:25,
65:1, 79:4, 112:8 .
**seated** 3:3, 4:14, 6:1,
95:16 .
**Second** 25:5, 26:1, 31:23,
33:11, 36:2, 36:4, 58:15,
79:10, 84:21, 91:4,
105:20, 112:2, 120:22,
154:5, 157:14,
157:20 .
**secrete** 74:20 .
**section** 74:12, 74:20 .
**secure** 19:1, 74:22,
158:21 .
**secured** 142:15 .
**security** 116:11 .
**seeing** 33:8, 34:22, 34:23,
79:8, 141:10,
141:17 .
**seek** 62:25, 90:7 .

**seeking** 17:1, 20:17, 41:9,
104:9 .
**seem** 9:19, 10:22, 30:6,
80:10, 101:4, 135:2 .
**seemed** 139:11 .
**seems** 17:11, 130:6, 135:3,
166:24 .
**seen** 38:17, 44:1, 44:2,
44:14, 45:21, 62:19,
62:20, 102:9, 109:2,
113:12, 121:2, 123:17,
133:5, 133:16, 135:7,
164:22, 165:2 .
**seized.** 19:6 .
**seizing** 13:14, 13:16,
13:19, 35:1, 43:23,
58:23, 80:24 .
**seizures** 19:3, 32:17 .
**select** 59:15 .
**selection** 59:19,
165:25 .
**sell** 161:4, 161:10 .
**seller** 128:23 .
**selling** 86:16, 144:9, 158:2,
161:6 .
**sells** 59:24 .
**send** 22:2, 22:6, 35:8,
35:21, 92:8 .
**sense** 30:1, 48:2, 62:24,
77:21, 81:21, 82:9,
108:24, 121:25 .
**sent** 3:25 .
**separate** 11:7, 24:25, 25:8,
46:14, 46:17, 78:24,
79:14, 91:19 .
**separated** 22:15,
66:10 .
**sequential** 138:14 .
**series** 49:5, 50:17, 117:3,
132:8, 133:2,
159:23 .
**serious** 81:8, 168:5 .
**seriously** 94:24,
150:12 .
**served** 138:22 .
**serves** 61:19 .
**set** 12:1, 19:9, 22:24,
35:15, 42:23, 44:6, 73:7,
82:21, 97:16, 98:24,
152:2, 153:3, 154:14,

157:7, 165:18, 168:19,
170:9 .
**sets** 28:8 .
**setting** 44:22, 73:24,
103:14, 153:9 .
**Seventh** 60:13, 61:2,
61:4 .
**sever** 26:17, 95:9, 123:1,
168:11 .
**several** 6:10, 89:6, 125:16,
138:16, 169:20 .
**severance** 22:8, 22:10,
22:13, 22:21, 25:1,
26:13, 26:19, 65:23,
80:15, 103:5, 103:6,
103:7, 103:12, 103:15,
121:22, 128:7, 167:19,
167:24, 168:5 .
**sexual** 104:3 .
**shake** 103:8, 103:19 .
**shall** 19:3, 19:4, 84:9 .
**She'll** 119:21 .
**sheet** 166:14 .
**Sheriff** 160:4 .
**shooting** 60:17 .
**shop** 117:12 .
**short** 102:5, 113:25,
115:11, 133:12 .
**shortly** 118:8 .
**shouldn't** 65:25, 73:3,
74:3 .
**show** 20:3, 36:15, 113:7,
119:3, 120:4, 138:10,
140:3, 153:23 .
**showed** 125:1, 157:18,
161:17 .
**showing** 12:5, 15:25, 21:6,
23:9, 107:11, 113:4,
118:18, 146:22 .
**shown** 51:23 .
**shows** 28:15, 31:4, 31:17,
31:18, 31:19, 31:23,
49:12, 50:1, 50:5, 51:12,
51:14, 89:13, 97:14,
114:19, 158:14 .
**side** 3:10, 139:2, 139:8,
139:12, 139:13, 139:15,
167:6 .
**signed** 4:23, 123:5, 123:11,
126:17 .

**significant** 48:19, 49:3, 76:14, 82:15, 87:25, 140:2 .
**similar** 8:2, 32:15, 48:3, 55:23, 57:7, 58:8, 61:23, 78:18, 97:17, 99:2, 150:18 .
**Similarly** 57:24, 75:11 .
**simply** 5:25, 27:2, 77:2, 120:1, 122:6, 129:23, 133:8, 162:12 .
**simultaneously** 53:16 .
**single** 10:20, 18:3, 58:17, 97:10, 98:7, 98:14 .
**singular** 52:13 .
**sit** 47:11, 47:14 .
**site** 7:1, 8:11, 73:20, 103:5, 103:21, 103:24, 104:4, 105:12, 106:17, 106:20, 137:5 .
**sitting** 5:21, 15:11, 169:16, 169:17 .
**situation** 31:9, 35:3, 35:14, 38:1, 38:3, 38:16, 39:3, 39:23, 43:20, 67:25 .
**six** 26:23 .
**sleeping** 29:5 .
**sleeps** 29:4, 37:1 .
**slept** 64:11 .
**sliding** 166:3, 166:4 .
**slightly** 30:24, 42:19, 166:16 .
**sloppiness** 34:22 .
**Slow** 152:6, 152:8 .
**slowly** 4:17 .
**small** 152:13 .
**smartphones** 15:7, 15:8 .
**Smith** 2:8, 105:23, 129:9, 129:10 .
**sniff** 47:21, 76:12, 83:6, 83:7, 83:9, 145:16, 147:13 .
**so-called** 42:16 .
**software** 90:1 .
**sold** 155:4 .
**solution** 145:21 .
**somebody** 41:16, 68:5, 68:18, 108:15, 143:21 .

**somehow** 119:25 .
**someone** 30:6, 40:5, 40:21, 43:21, 43:24, 57:23, 63:23, 89:13, 98:6, 98:18, 104:15, 108:21, 157:6 .
**sometime** 167:16 .
**Sometimes** 64:12, 89:25, 138:8, 146:19, 169:3, 169:4 .
**somewhat** 93:24, 115:20 .
**somewhere** 136:4, 137:25, 138:2, 143:22 .
**soon.** 69:16 .
**sooner** 115:25 .
**sophisticated** 154:25 .
**sophistication** 154:24 .
**sorry** 11:22, 24:11, 31:14, 57:8, 74:10, 88:21, 92:13, 109:21, 120:10, 140:8, 140:21, 152:6, 152:8 .
**sort** 14:16, 17:9, 17:12, 19:24, 21:22, 24:14, 24:15, 28:4, 34:19, 37:4, 40:1, 41:10, 44:5, 45:7, 97:18, 97:21, 99:15, 101:25, 104:16, 104:25, 105:3, 107:3, 170:2 .
**sought** 19:16, 23:10, 81:14 .
**sounds** 42:9, 70:24, 71:7, 116:17 .
**source** 59:21, 64:21, 85:6, 94:23, 152:12 .
**sources** 109:16, 113:17, 155:15 .
**spaces** 21:20 .
**spare** 120:20 .
**speaking** 3:11, 4:15, 48:3, 75:15, 131:22 .
**speaks** 150:1 .
**specific** 20:15, 21:20, 21:21, 44:3, 45:2, 45:23, 47:2, 56:23, 73:23, 73:25, 82:1, 86:9, 91:10, 95:6, 96:25, 107:23, 108:1, 113:12, 114:16, 116:25, 156:22,

156:23 .
**Specifically** 18:21, 23:21, 44:11, 48:21, 117:2, 121:18, 131:7, 136:1, 150:20 .
**specificity** 116:3 .
**specifics** 46:10, 116:12 .
**specified** 45:5 .
**specify** 84:9, 82:17 .
**spectrum** 130:2, 130:9, 134:25, 135:1, 135:11 .
**speculate** 60:7, 68:17 .
**speculation** 151:16, 151:21, 151:24, 162:10 .
**speculations** 162:7 .
**speedily** 122:20 .
**spent** 115:23 .
**splitting** 144:16 .
**spoke** 134:6 .
**spoken** 84:19 .
**Spruce** 124:5, 126:21 .
**St.** 1:39 .
**stacks** 122:17 .
**stage** 127:19 .
**stagger** 165:24 .
**stairway** 139:14 .
**stake** 8:23, 35:13 .
**stamp** 113:10 .
**stamped** 12:24, 54:10, 54:11 .
**stamps** 9:5, 9:12 .
**stand** 38:21, 134:17, 170:13 .
**standard** 38:11, 40:8, 71:2, 104:10, 107:5, 107:8, 153:13, 156:10, 158:1 .
**standards** 107:11 .
**standing** 108:22, 137:10, 137:11, 141:15, 141:21, 144:11, 145:4, 161:12 .
**standpoint** 47:25, 121:21 .
**stands** 95:14, 170:15 .
**start** 48:15, 107:1, 150:18, 151:4, 152:25, 159:15,

165:22, 166:8 .
**started** 64:25, 84:10, 132:7, 166:7 .
**starting** 165:23 .
**starts** 74:12, 105:21, 129:8, 146:8, 156:11, 159:20 .
**stash** 109:16, 120:6, 137:22, 137:23, 155:15 .
**state** 29:8, 44:11, 67:13, 72:5, 72:8, 112:13 .
**state-level** 72:5 .
**stated** 86:12, 99:8 .
**statement** 63:3, 63:10, 66:16, 69:6, 76:18, 89:7, 98:23, 104:14, 111:16, 132:15, 134:9, 143:9, 144:4, 146:8, 148:11, 148:16, 149:2, 149:3, 155:7, 168:11 .
**statements** 27:16, 30:7, 54:3, 77:5, 77:15, 78:1, 105:24, 141:13, 144:25, 145:1, 149:14 .
**States** 1:1, 1:5, 1:30, 3:6, 3:7, 19:25, 21:13, 22:9, 31:12, 32:13, 54:14, 57:4, 70:15, 81:6, 83:16, 129:25, 135:3, 135:12, 151:8, 170:20, 170:26 .
**stating** 61:25, 94:7, 105:17 .
**status** 150:12 .
**statutes** 158:9 .
**stay** 47:15 .
**stayed** 115:11 .
**staying** 135:7 .
**stays** 50:5 .
**stenographically-reported** 170:23 .
**stenotype** 1:49 .
**step** 14:9, 24:15, 58:15, 79:10 .
**steps** 7:7 .
**stood** 125:24 .
**stop** 25:17, 112:2 .
**stopped** 26:10, 28:17, 28:22, 31:10, 65:1 .

**storage** 59:3 .
**store** 16:13, 50:9, 63:14,
   75:1, 116:23, 143:7,
   160:10 .
**stored** 23:20, 29:18, 29:19,
   55:1, 58:25, 59:4, 72:21,
   98:9 .
**stores** 30:8 .
**storing** 137:16,
   157:25 .
**straightforward** 73:10,
   120:23, 121:4 .
**street-level** 27:22, 132:16,
   156:15 .
**strength** 84:14 .
**stretch** 33:21 .
**strictly** 82:19, 84:18 .
**striking** 43:19 .
**string** 55:25 .
**strong** 110:6 .
**stronger** 89:3 .
**strongly** 28:9 .
**struck** 73:16 .
**structure** 57:23 .
**structured** 48:14 .
**struggling** 71:11,
   71:16 .
**subject** 40:24, 91:5,
   131:8 .
**submissions** 167:5 .
**submit** 67:18, 83:10, 83:11,
   85:20, 123:19, 125:4,
   125:24, 127:2, 127:6,
   131:12, 147:22, 148:21,
   151:18, 160:7, 167:4,
   167:15 .
**subsequent** 15:25, 17:3,
   26:10, 31:11, 33:10,
   43:23, 44:4, 51:9, 83:1,
   125:14 .
**subset** 167:22 .
**substance** 54:21, 55:9,
   55:11, 57:17, 62:9,
   62:12, 72:24 .
**substances** 12:4, 23:19,
   23:24, 24:3, 54:18, 55:2,
   105:8, 141:25 .
**substantial** 7:19, 7:20,
   8:13, 8:23, 28:6,
   35:6 .

**substantive** 41:5,
   121:21 .
**suffers** 126:20, 126:21 .
**sufficient** 19:15, 24:20,
   25:6, 26:4, 28:20, 53:21,
   56:8, 66:24, 81:9, 96:14,
   101:16, 106:16, 115:13,
   116:18, 116:20, 128:19,
   134:21, 141:22, 145:25,
   153:4 .
**sufficiently** 30:21, 99:6,
   105:14 .
**suggest** 29:11, 29:13,
   78:21, 94:15, 98:9,
   98:18, 98:20, 99:14,
   100:24 .
**suggested** 77:5, 85:4,
   92:15, 93:20, 110:9,
   118:21 .
**suggesting** 23:2, 29:6,
   42:20, 75:12, 77:18,
   81:19, 81:24, 90:6,
   94:14, 163:11 .
**suggestion** 116:8 .
**suggests** 14:19, 28:22,
   156:7 .
**Suite** 1:46, 2:8 .
**sum** 102:18 .
**summary** 107:14,
   113:13 .
**supplement** 83:8 .
**supplemental** 121:17,
   122:9, 149:17 .
**supplied** 27:22, 69:10,
   88:19 .
**supplier** 27:20, 28:3,
   69:13, 69:16, 69:22,
   86:24, 87:14, 87:16,
   87:17, 107:18,
   156:14 .
**suppliers** 53:10, 86:18,
   86:20, 94:4 .
**supplies** 152:3 .
**supply** 32:20, 49:7, 50:16,
   59:21, 61:14, 64:21,
   81:2, 100:20, 104:15,
   109:16, 113:17, 114:6,
   118:12, 147:14, 155:15,
   157:6 .
**supplying** 111:1, 113:19,

   156:16 .
**support** 12:13, 16:8, 19:21,
   27:23, 42:14, 132:2,
   154:2, 160:16 .
**supported** 19:4, 27:24 .
**supporting** 54:4, 82:22,
   153:22 .
**suppose** 80:23, 92:23 .
**supposed** 108:21 .
**supposedly** 93:22 .
**suppress** 6:13, 30:23,
   47:18, 67:1, 99:18,
   103:1, 106:19, 121:14,
   121:17, 123:3, 123:21,
   124:1, 124:4, 124:21,
   125:6, 125:25, 126:5,
   126:16, 127:1, 131:14,
   138:15, 149:2, 149:13,
   149:15, 149:22, 153:19,
   155:22, 156:1 .
**suppressed** 8:13, 22:17,
   24:23, 25:24, 30:14,
   30:19, 35:8, 66:11,
   66:22, 83:2, 124:14 .
**suppression** 22:1, 30:22,
   101:17, 149:7 .
**Supreme** 55:17, 56:2, 59:6,
   103:24, 151:8 .
**sur-reply** 150:4 .
**Surely** 57:17 .
**surmised** 78:16, 81:17,
   94:9 .
**surmising** 76:18, 91:1 .
**surprised** 84:4 .
**surveil** 111:8, 117:17,
   117:18 .
**surveillance** 27:25, 50:1,
   51:12, 51:21, 89:12,
   93:9, 97:1, 97:5, 97:11,
   98:15, 107:17, 116:22,
   117:18, 120:4, 123:9,
   123:10, 123:15, 123:16,
   124:25, 137:9, 153:5,
   154:14, 156:18, 157:7,
   158:15, 160:21 .
**suspect** 20:2, 20:5, 50:16,
   60:19, 61:14, 102:14,
   102:22 .
**suspected** 8:18, 8:19,
   8:20, 20:8, 26:22, 26:23,

   28:23, 60:16, 68:1,
   98:2 .
**suspicion** 81:7, 142:2,
   142:22, 142:24, 145:13,
   145:15, 145:18, 145:19,
   147:17 .
**suspicious** 108:5, 108:17,
   115:12, 118:1 .
**swearing** 101:1 .
**sweeping** 70:19 .
**switch** 53:3, 53:7, 110:24,
   111:2, 152:24 .
**switched** 53:4, 125:14 .
**switches** 110:19,
   110:20 .
.
.
**< T >.**
**T.** 1:37, 2:4 .
**table** 3:8, 4:11 .
**tactic** 106:17, 108:14 .
**tactics** 7:6, 17:15, 34:18,
   34:24 .
**tags** 146:16 .
**Tail** 60:5 .
**tailored** 16:5, 21:10 .
**talked** 37:6, 52:25, 68:5,
   76:17, 83:3, 86:3, 97:24,
   135:1, 150:9, 151:7,
   154:4, 156:11, 156:23,
   159:21, 160:2 .
**talks** 16:9, 24:7, 32:7,
   44:22, 74:13, 100:6,
   105:22, 161:2,
   161:8 .
**target** 33:19, 54:16, 78:1,
   78:3, 114:3, 114:7,
   114:17, 114:24, 115:2,
   115:14, 115:18, 143:7,
   144:10, 158:5, 158:12,
   158:16, 162:18 .
**targeted** 16:3, 58:2 .
**targets** 63:2 .
**Task** 11:13, 31:20, 31:21,
   42:24, 43:20, 72:1, 72:3,
   75:11, 102:11, 154:5,
   154:12, 155:10 .
**telephone** 84:10, 86:18,
   94:3, 94:8, 94:10, 110:3,
   110:8, 123:4, 123:18,

124:16, 124:24 .
**telephones** 13:8, 16:13,
23:19, 54:25, 72:21,
86:13 .
**tells** 14:22, 49:15, 51:10,
108:20, 110:20, 117:7,
135:25, 161:6 .
**templates** 72:7 .
**term** 56:20, 109:10 .
**Terrific** 4:12 .
**Terry** 142:25 .
**test** 6:8 .
**testament** 64:5 .
**testimony** 151:20 .
**tests** 155:1, 155:3 .
**text** 9:4, 9:11, 9:22, 9:23,
10:5, 17:11, 28:6, 59:15,
59:20, 75:2, 97:6, 97:9,
110:18, 117:3,
154:8 .
**texts** 74:7, 113:14 .
**TFO** 31:6, 31:23, 53:12,
53:19, 158:19,
161:10 .
**Thamar** 105:23, 129:9 .
**Thanks** 70:12, 83:13,
122:8 .
**that.** 49:9 .
**theft** 155:6 .
**themselves** 125:3,
142:9 .
**They'll** 53:8, 53:16, 59:13,
59:15, 59:17,
168:10 .
**They've** 51:16, 97:8,
105:23, 107:18, 107:19,
113:14, 113:17,
113:18 .
**thinking** 168:12 .
**thinks** 25:6, 167:6,
168:5 .
**third** 13:2, 25:25, 54:13,
110:5 .
**thorny** 15:6 .
**thoroughness** 84:4 .
**though** 81:23, 116:8,
144:12, 163:13 .
**thoughts** 85:10 .
**threads** 48:13, 56:16 .
**three** 18:17, 31:25, 79:19,

88:9, 91:2, 122:18,
135:6, 135:8, 135:9,
157:2, 157:3 .
**three-week** 165:19 .
**threshold** 27:12 .
**throughout** 154:4,
162:15 .
**thwart** 155:13 .
**tie** 24:17 .
**tied** 56:1, 93:19 .
**ties** 122:5 .
**timeliness** 110:9 .
**timely** 89:25, 90:4, 110:11,
110:15 .
**timing** 147:25, 148:1 .
**Timonium** 2:16 .
**tipster** 130:7, 130:25,
135:20, 152:2 .
**Title** 132:9, 132:17, 133:1,
145:1, 146:9, 148:11,
149:6, 149:10, 149:15,
149:23 .
**Today** 3:17, 7:24, 11:23,
103:12, 122:2, 127:16,
136:14, 137:11, 137:13,
162:8 .
**together** 167:7, 168:7,
168:8 .
**toll** 97:13, 118:18 .
**tomorrow** 95:11,
170:9 .
**tons** 161:24 .
**took** 39:20, 119:20, 128:15,
132:5, 134:3, 137:4,
148:15, 163:7,
169:14 .
**top** 5:15, 118:7,
169:22 .
**total** 77:13, 79:1,
102:18 .
**totality** 19:15, 136:20 .
**totally** 77:24, 78:8, 78:18,
84:8 .
**touched** 76:11 .
**tow** 140:21, 142:20, 160:7,
164:10, 165:3 .
**towed** 140:16, 140:19,
143:4, 145:14, 146:1,
147:5, 160:4, 162:9,
162:12, 163:3, 163:5,

163:22, 164:7, 164:14,
164:21, 164:22 .
**Tower** 1:39 .
**towing** 142:21, 147:18,
164:5 .
**town** 50:19 .
**towns** 87:25 .
**trace** 93:15 .
**tracing** 93:15 .
**tracker** 8:10, 49:12, 50:5,
51:22, 101:20, 114:19,
157:17 .
**trackers** 73:21 .
**tracking** 6:16, 73:20, 77:8,
102:19, 102:20, 103:2,
105:15, 107:2, 109:20,
111:11, 111:13, 115:24,
152:25, 153:18, 153:19,
154:3 .
**trafficked** 58:1 .
**trafficker** 60:7, 102:1,
132:4 .
**traffickers** 16:12, 52:4,
52:6, 53:7, 53:14, 53:20,
74:15, 74:20, 74:25,
108:14, 109:14, 114:2,
116:23, 155:11,
158:21 .
**train** 104:19 .
**trained** 161:24 .
**training** 16:11, 53:13,
74:13, 74:15, 108:13,
109:13, 114:1, 155:9,
158:19 .
**transacting** 132:23, 135:7,
146:10 .
**transaction** 28:23, 50:14,
98:16, 114:17, 115:19,
143:23, 144:1, 145:3,
148:16, 152:14 .
**transactions** 12:6, 46:3,
66:19, 74:22, 75:1, 75:3,
87:12, 87:21, 136:2,
145:6 .
**transcribed** 18:6, 30:7,
97:4, 98:13 .
**TRANSCRIPT** 1:20,
170:23, 170:24 .
**transcription** 1:49 .
**transcriptions** 98:19 .

**transfer** 16:13, 16:16,
74:17, 88:22 .
**translate** 142:2 .
**transpired** 134:7 .
**transpires** 128:9 .
**transport** 113:22, 143:7,
160:10 .
**trash** 81:10 .
**travel** 159:13 .
**traveled** 29:8, 49:13,
144:8, 161:9 .
**traveling** 77:5, 102:8,
114:6, 158:16,
159:11 .
**travels** 50:15 .
**trial** 4:11, 7:21, 64:20,
65:17, 121:24, 123:2,
165:17, 166:8, 167:10,
168:8, 168:15, 169:6,
169:7 .
**trials** 165:22 .
**tried** 48:17, 170:7 .
**trip** 88:18, 104:18, 108:6,
108:8 .
**trips** 114:9 .
**trouble** 71:15 .
**troubled** 71:12 .
**truck** 117:25 .
**true** 34:4, 62:21, 88:14,
89:2, 107:22, 115:4,
166:18, 170:22 .
**trunk** 100:7 .
**trustworthy** 19:14 .
**truthful** 107:14, 111:25,
116:9 .
**try** 4:17, 48:13, 53:7, 60:6,
67:23, 127:9,
165:13 .
**trying** 14:18, 29:16, 29:17,
49:9, 145:6, 148:18,
154:18, 165:9 .
**TT-10** 7:1, 8:11, 53:3, 65:9,
65:10, 95:24, 105:21,
106:8, 106:18, 109:21,
110:20, 117:4 .
**TT-3** 148:3, 148:5 .
**TT-5** 53:3, 107:16 .
**TT-6** 69:12, 86:14, 86:15,
124:1 .
**TT-8** 7:1, 8:11, 53:3,

104:12, 106:5, 106:7, 107:2, 107:16, 108:2, 109:23, 110:20 .
**TT-9** 117:4, 128:19, 129:6, 132:20, 133:3, 148:5, 148:7, 153:20, 153:23, 154:9, 155:20, 156:17, 161:9 .
**turn** 3:10, 58:11, 59:17, 112:13 .
**turned** 9:6, 9:13, 58:9, 58:15, 59:11, 59:22, 79:25, 89:22, 111:25, 162:12 .
**turning** 18:22, 110:16, 169:21 .
**turns** 72:14 .
**twice** 28:22 .
**two-day** 170:6 .
**two-step** 58:6, 58:22, 58:24, 59:2, 59:7 .
**Ty** 108:12 .
**Tyesha** 89:5, 89:9 .
**type** 5:3, 13:22, 16:7, 23:5, 35:3, 77:10, 77:18, 78:5, 81:6, 81:14, 81:15, 81:17, 81:25, 146:18 .
**typical** 114:1 .
**typically** 63:22, 113:24 .
**typos** 72:13 .

.

**< U >** .

**U.S.** 43:21, 55:22, 129:25, 130:3, 130:14, 130:17, 134:23, 142:14 .
**ubiquitous** 40:3 .
**ubiquity** 36:12 .
**ultimately** 15:25, 64:17, 77:9, 93:17, 101:15, 103:10, 104:19 .
**uncontroverted** 100:15, 100:23 .
**underlying** 93:2 .
**undermines** 94:24 .
**understand** 4:18, 4:23, 10:24, 11:8, 33:6, 41:4, 46:9, 52:19, 52:23 .

**understanding** 5:9 .
**Understood** 128:6, 138:5 .
**undertaken** 41:15 .
**undertook** 45:14 .
**undescribed** 100:7 .
**undue** 92:18 .
**unidentified** 125:17, 125:22, 133:3 .
**Union** 26:22 .
**United** 1:1, 1:5, 1:30, 3:6, 3:7, 19:25, 21:13, 22:9, 31:12, 32:13, 57:4, 70:15, 81:5, 83:16, 129:25, 135:3, 135:12, 151:8, 170:20, 170:26 .
**unknown** 49:7, 49:9, 49:15, 49:18, 49:22, 50:3, 50:12, 70:2, 105:2, 107:20, 157:1, 157:15, 159:21, 162:20 .
**unlawful** 25:18, 129:17, 141:23 .
**Unless** 4:14, 4:15, 83:11, 120:19, 127:2, 127:6, 140:19, 148:23, 162:23 .
**Unlike** 5:24, 84:8, 99:7, 112:7 .
**unnecessarily** 73:4 .
**unreasonable** 19:2 .
**unsealed** 149:11 .
**unsupported** 102:1 .
**until** 13:24, 58:2, 72:4, 73:5, 90:10, 95:15, 121:23, 123:2, 142:3, 147:6, 147:18, 161:25, 163:5, 163:22, 164:14, 167:10, 169:6 .
**unusual** 108:9 .
**unwarranted** 32:19 .
**upfront** 15:17 .
**upheld** 135:15, 156:13 .
**USA** 16:10, 54:12, 74:12, 129:5, 131:23, 133:21, 144:6, 148:9 .
**usage** 10:7, 129:22 .
**useful** 152:18 .
**usefulness** 151:16 .

**user** 151:23 .
**uses** 21:4, 49:6, 86:15, 86:19, 88:2, 113:22 .
**usual** 142:6 .
**utilities** 134:17, 158:10, 158:12 .
**utility** 134:12 .
**utilize** 16:12 .
**utilized** 10:6 .

.

.

**< V >** .

**v.** 19:25, 21:13, 22:9, 31:12, 32:13, 55:17, 55:20, 57:4, 61:16, 70:15, 81:6, 83:16, 129:24, 130:3, 130:4, 130:17, 134:23, 135:4, 135:12, 136:19, 142:14, 151:8 .
**vaccinated** 4:16 .
**vagaries** 133:25 .
**vague** 104:20, 108:4 .
**valid** 22:17, 27:13, 61:24, 66:12, 66:21, 91:13, 91:15 .
**validity** 162:1 .
**validly** 20:8 .
**valuable** 53:18 .
**value** 12:18, 14:8, 104:21, 105:6 .
**various** 53:10, 54:1, 66:19, 97:20, 101:7, 103:11, 104:18, 113:21 .
**vast** 33:8 .
**vehicles** 113:22, 138:11, 138:16, 139:16, 140:10, 140:16, 141:9, 141:11, 142:12, 145:23, 146:25, 147:2, 147:5, 147:6, 147:9, 148:17, 153:4, 159:14, 159:19, 161:22, 162:7, 164:6 .
**veil** 104:7 .
**version** 54:9 .
**versus** 3:6, 18:9, 43:13 .
**via** 58:8, 69:24 .
**Vic** 140:1, 141:14, 141:15, 143:3, 143:5, 144:5,

144:23, 145:4, 146:17, 159:15, 160:15, 160:24, 161:6, 161:11, 161:19, 163:4, 163:9, 163:24 .
**vicinity** 136:11 .
**Victoria** 161:16 .
**view** 17:4, 37:21, 38:25, 39:9, 57:10, 142:8, 145:8, 146:21, 153:7 .
**violated** 19:3 .
**violation** 83:7 .
**violations** 54:21, 55:3, 55:9, 55:11, 56:1, 62:12 .
**violations.** 62:9, 72:24 .
**violence** 158:6 .
**Virginia** 50:4, 118:9 .
**virtually** 59:24 .
**vis-a-vis** 65:6 .
**visibly** 71:17 .
**visit** 119:3 .
**visited** 28:13 .
**voir** 166:10, 166:13, 166:16, 166:17, 169:1 .
**voluntarily** 5:4 .
**vs** 1:8 .

.

.

**< W >** .

**wait** 121:23, 123:2 .
**Waiting** 103:16 .
**waived** 3:25 .
**waiver** 4:23, 5:2 .
**waives** 5:4 .
**waking** 18:8 .
**walk** 141:20, 157:11, 157:22 .
**walks** 49:14 .
**wall** 139:8, 139:9, 139:14 .
**wallet** 8:17, 26:25 .
**Walsh** 118:18 .
**wanted** 60:11, 63:6, 71:19, 71:20, 71:21, 73:22, 74:4, 74:19, 86:9, 88:8, 117:16, 138:10,

139:17 .
**wanting** 104:17 .
**wants** 47:25, 49:20, 49:23,
   51:4, 51:5, 117:13,
   120:19 .
**Ware** 84:13, 123:13,
   123:17, 123:21, 124:17,
   125:17, 129:11,
   132:13 .
**warrant.** 59:5 .
**warrantless** 92:20, 92:21,
   92:22, 142:22 .
**warrantlessly** 46:18 .
**Washington** 27:21, 28:3,
   113:16, 113:20, 131:18,
   132:19, 140:17, 143:8,
   156:14, 160:4,
   163:19 .
**water** 138:12 .
**ways** 16:4, 44:19, 112:14,
   116:2 .
**weak** 105:17 .
**weaker** 144:3 .
**weapon** 60:21 .
**weapons** 12:7, 23:18,
   54:19 .
**wear** 4:15 .
**wearing** 4:13 .
**Weedon** 89:5, 89:9,
   89:14 .
**week** 4:19, 7:24, 101:24,
   123:11, 129:21, 154:5,
   166:4 .
**weeks** 31:25, 128:10,
   162:22, 169:21, 170:4,
   170:5 .
**well-supported** 63:2 .
**Wesley** 116:10 .
**West** 118:9 .
**Western** 26:22 .
**Westlaw** 21:2, 170:8 .
**whatever** 6:3, 78:6, 90:2,
   90:4, 91:17, 94:17,
   94:24, 145:9 .
**whatnot** 59:16, 115:6 .
**Whatsapp** 9:5, 9:12, 11:14,
   59:21, 64:21, 65:16,
   65:18, 65:19, 74:7, 75:2,
   95:25 .
**whatsoever** 68:7,

99:11 .
**wheels** 140:24 .
**white** 117:19, 118:8,
   139:15 .
**whoever** 148:19 .
**whole** 47:23, 62:5, 70:1,
   104:20, 116:11, 120:24,
   139:15, 153:2 .
**wholesale** 8:7, 9:2, 10:14,
   16:2, 26:4, 97:23,
   99:4 .
**whom** 125:1 .
**wide-ranging** 21:11 .
**Wilkinson** 83:24 .
**Williams** 57:4, 57:20,
   59:25, 71:5, 73:2,
   73:8 .
**Wilson** 159:17 .
**window** 103:25 .
**wire** 77:3, 78:2, 94:12,
   107:16, 113:14, 129:12,
   132:9, 132:18, 134:4,
   141:12, 146:9, 149:10,
   149:23 .
**wires** 105:25 .
**wiretaps** 5:24, 6:11, 6:22,
   6:23, 7:18, 8:3, 9:22,
   9:25, 65:17, 73:19,
   153:9 .
**wiring** 110:4 .
**wish** 5:5, 6:1 .
**wish.** 105:9 .
**wishes** 7:23 .
**withheld** 116:11 .
**withhold** 151:9 .
**within** 57:12, 59:4, 74:22,
   76:12, 76:15, 81:23,
   85:15, 90:3, 90:17,
   90:23, 91:14, 91:20,
   93:4, 97:23, 98:22,
   118:12, 133:12, 137:2,
   158:22 .
**Without** 7:7, 25:4, 25:14,
   29:11, 32:22, 38:25,
   63:18, 77:22, 84:21,
   130:14, 140:22, 142:25,
   145:5, 160:8, 162:9,
   168:11 .
**witness** 151:1 .
**witnesses** 5:10, 5:22,

150:20, 169:20 .
**woman** 60:17, 118:3 .
**word** 22:10, 69:18, 109:1,
   141:24 .
**worded** 12:11, 55:13, 62:4,
   75:4, 94:16 .
**wording** 61:23, 134:1,
   167:3 .
**words** 57:25, 60:7, 81:16,
   91:13, 91:24, 92:19,
   94:9 .
**work** 166:24 .
**worked** 115:15 .
**working** 6:8 .
**works** 100:22, 102:17 .
**write** 46:19, 165:14 .
**writing** 135:13, 165:3,
   168:4 .
**written** 84:20, 116:2, 116:3,
   124:10, 126:25,
   166:13 .
**wrongdoing** 81:18, 82:2,
   96:21, 98:25,
   105:16 .
**wrongly** 159:3 .
**Wynell** 2:15 .
.
.
**< Y >** .
**year** 68:2, 103:22 .
**years** 129:21 .
**yes-or-no** 166:14 .
**yesterday** 108:21 .
**York** 104:16, 104:17,
   104:22, 106:2, 108:7,
   108:9, 113:18 .