```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION

 3    UNITED STATES OF AMERICA, )
            Plaintiff ,         )
 4                              )
            vs.                 )   CRIMINAL CASE NO. 20-0038
 5                              )
      ERIC TYRELL JOHNSON,      )
 6    and JARVIS COLEMAN-FULLER,)
            Defendants.         )
 7    _____  )

 8                    Friday, March 24, 2023
                        Courtroom 3D
 9                    Baltimore, Maryland

10               Motions Hearing/Sentencings

11    BEFORE:  THE HONORABLE DEBORAH K. CHASANOW, Judge

12
      For the Plaintiff:
13    Cassie Mathias, Esquire
      Assistant United States Attorney
14    36 S. Charles Street, 4th Floor
      Baltimore, Maryland  21201
15

16    For the Defendants:
            For Eric Tyrell Johnson
17              Joseph Balter, Esquire
                Law Office of Joseph A. Balter, LLC
18              Mt. Washington Mill
                1340 Smith Avenue, Suite 200
19              Baltimore, Maryland  21209

20          For Jarvis Coleman-Fuller
                David Walsh-Little, Esquire
21              The Law Office of David Walsh-Little, LLC
                1014 West 36th Street
22              Baltimore, Maryland  21211

23    Also Present:
      Danielle Sanger, Probation Officer
24    Nikki Martin, Probation Officer

25          **Computer-Aided Transcription of Stenotype Notes*
```

1          **(Proceeding commenced at 9:33 a.m.)**

2          **THE CLERK:** Calling United States of America versus

3    Eric Johnson and Jarvis Coleman-Fuller, Criminal Case Number

4    DKC-20-38. We're here today for the defendants' motions for

5    judgment of acquittal and for a new trial, as well as for

6    sentencings. I'm Cassie Mathias on behalf of the United

7    States.

8          **THE COURT:** Mr. Balter.

9          **MR. BALTER:** Good morning, Your Honor. Joseph

10   Balter on behalf of Eric Johnson.

11         **MR. WALSH-LITTLE:** And good morning, Your Honor.

12   David Walsh-Little on behalf of Mr. Jarvis Coleman-Fuller.

13   He's to my right.

14         **THE COURT:** Okay, very good. Good to see everybody

15   on this rainy, awful Friday morning.

16         Well, we have a lot of material and we'll see how we work

17   through. My suggestion is that we address the motions for

18   judgment of acquittal and for a new trial first with both

19   defendants and see where we are at the end of that. If we're

20   going forward with sentencing, then it's possible I think to

21   talk about some of the issues surrounding use of criminal

22   history for a variety of purposes, because there's some

23   overlap, and then possibly talk about how quantity is

24   determined under the guidelines, but then we need to separate

25   and talk about the defendants' issues separately. But I think

1    we can begin together on the motions.

2        Does that sound a little bit logical?  I see Ms. Mathias

3    is saying yes.  Mr. Balter, is that all right?

4              **MS. MATHIAS:**  Yes, Your Honor.

5              **MR. BALTER:**  Yes, Your Honor.

6              **THE COURT:**  Mr. Walsh-Little?

7              **MR. WALSH-LITTLE:**  Yes, Your Honor.

8              **THE COURT:**  As we did at trial and it doesn't matter

9    which of the defense attorneys want to go first, I don't know

10    if you've talked about it. If we have to break the time, Mr.

11    Balter will have the first go.

12              **MR. BALTER:**  I'm happy to go first.

13              **THE COURT:**  Okay.

14              **MR. BALTER:**  Your Honor, as the Court is aware, we

15    have -- we filed a consolidated motion for a judgment of

16    acquittal on all counts and also for a new trial. I filed a

17    subsequent pleading and my first -- our first pleading, of

18    course, was for the combined post-trial motions pursuant to

19    Rule 29 and 33. That was ECF 589. And then I filed a

20    subsequent memorandum, ECF 623 in which I set forth our

21    arguments with regard specifically to the judgment of

22    acquittal with regard to the firearms charge. And that is

23    going to be the thrust of my argument today.

24        As the Court is aware, the basic facts behind that Count

25    Four arose from the execution of a search warrant on August

 1      12th of 2019. That was at Mr. Johnson's residence which he

 2      shared with his partner, Latrice Campbell in Owings Mills,

 3      Maryland.

 4          As the Court is aware, the warrant was executed in the

 5      wee hours of the morning. It was about 5 a.m. The tactical

 6      squad gained entrance to the apartment through the use of a

 7      battering ram.  Once inside, the officers found Mr. Johnson

 8      and Ms. Campbell in bed. They were taken out of the bedroom

 9      and brought into a common area outside there where they were

10      both Mirandized and briefly questioned with regard to just a

11      very few matters regarding the search that was going to ensue.

12          The search of the apartment revealed in the bedroom area

13      in a child's crib there was, like, a pocket within which they

14      found a lavender colored Glock handgun that had a clip in it

15      that was loaded.  In a safe in a closet area they had found a

16      clip that had some of the ammo that's charged in the same

17      count and a quantity of drugs that were also charged in the

18      indictment.

19          When the -- when the two, when Mr. Johnson and Ms.

20      Campbell were briefly questioned, Mr. Johnson made a statement

21      according to Officer Sterling that there were a couple of bags

22      of dope in the closet of the bedroom. There was some dispute

23      as to exactly what he said. There was also -- there was a

24      report that was filed by one of the other officers, Kelly

25      Afori who said that he said that there was some dope in some

1    other matters that were simply in the bedroom. So it was a

2    nuanced difference, but one that potentially is important.

3         As the Court is aware, there was testimony in the trial

4    as a whole as to what the meaning of "dope" was. Several

5    witnesses said that the meaning of "dope" was heroin and

6    fentanyl. A couple of witnesses conceded that on occasion it

7    was used within the context of marijuana. One witness

8    acknowledged that the concept of smoking dope might have to do

9    with smoking marijuana.

10        In any event, that is generally the evidence that was

11   recovered at the scene and from which the circumstantial

12   evidence would arise as to Mr. Johnson's alleged possession of

13   the handgun.

14        It was clear from what was -- from the evidence that was

15   seized at the time that the Government was proceeding on a

16   theory of constructive possession. There was no statement that

17   was made by Mr. Johnson himself with regard to the handgun.

18   There was no evidence physically connecting him to the

19   handgun. The handgun was never printed. There was no DNA taken

20   off of the handgun.  And when Ms. Campbell was questioned, she

21   indicated that the gun was hers. And as the Court is aware,

22   there were documents from the state of Maryland that were

23   introduced at trial which showed that she had been the

24   purchaser in 2018 and that she also had a license to carry

25   that weapon back and forth to work. So she was also the

1    lessee.  Her name was on the lease for the apartment.

2        So this is a situation in which there are two residents

3    of the apartment who are there at the same time. There is

4    obviously evidence that Ms. Campbell had some connection to

5    the gun herself and quite frankly, there was no evidence with

6    respect to Mr. Johnson's connection with that gun in any way.

7        The only other evidence that came up in this trial that

8    the Government alleges has some bearing on the question of Mr.

9    Johnson's possession or knowledge of a firearm had to do with

10   one cooperating witness who testified at trial, Ms. Wheaton,

11   who was as the Court may recall, was the girlfriend of

12   co-defendant Philander Spruill who was not in trial, but had

13   previously pled guilty in this case. And she testified

14   generally about the connections which she alleged to be drug

15   connections between Mr. Johnson and Mr. Spruill.

16       But specifically with regard to the firearm, she made a

17   statement that she had heard -- overheard some apparently

18   FaceTime communication between the two of them.  And she

19   testified that Mr. Johnson made a statement indicating that he

20   was going to meet somebody he didn't trust and she interpreted

21   him to mean that he was going to bring a gun with him to that

22   meeting. There was no time frame at all with regard to when

23   that statement took place. There was nothing in the statement

24   that indicated that it was a reference to just the firearm

25   specifically charged in Count Four which was the Glock or any

1    specific firearm for that matter. It was just a statement

2    given -- looking at just at face value which reflected a

3    reference to a firearm, but nothing with respect to the

4    firearm that was recovered and charged in the indictment.

5    The Government also alleges that there were text

6    communications between Mr. Johnson and Ms. Campbell that they

7    interpreted to mean that they were communicating about what

8    they believed was a firearm. There was no reference to any

9    word that reflected that they were talking about a firearm.

10   Quite frankly in terms of what the Government alleged, it was

11   the type of communications that two domestic partners might

12   have just about routine things that might come up, talking

13   about having something in the car without referring to it

14   directly. Something that might be needed out of a vehicle,

15   things of that sort. But there is, again, no reference to a

16   firearm.

17   And I think -- and there are many instances that the

18   Government refers to with respect to the quantities as well in

19   which they're simply looking at every communication through

20   the prism that this is all drug dealing; therefore, every

21   communication must be a drug-related or weapons-related

22   communication. But again, without looking at it through that

23   prism, there was nothing in those communications between the

24   two of them.

25   So Your Honor, where we are with respect to where the

1    evidence sorts itself out is that we have a joint -- two

2    individuals jointly residing in the premises. There is

3    nothing, no fact which is in evidence which specifically ties

4    Mr. Johnson to that firearm at all.

5         We've cited a number of cases in our papers that I

6    believe show that under exactly these type of circumstances,

7    this kind of situation does not lend itself to an inference

8    that the defendant intended to exercise dominion and control.

9    And I think that is the key concept here. There has to be that

10   intention. The fact that there is his presence in the general

11   area where a firearm might be found is not sufficient. The

12   fact that he might have had access to that firearm is not

13   sufficient. The fact that he had knowledge of its presence

14   there by itself is not sufficient. And while there's no

15   evidence he ever touched it, even in cases in which there is

16   evidence that a defendant may have touched a firearm, that

17   itself would not establish that there was an intent to

18   exercise dominion and control.

19        Perhaps the best example of just what the parameters of

20   the issue are, we cited the case of *United States v. Little* at

21   829 F.3d in which the Court gave an example of a situation in

22   which a defendant has knowledge and a defendant has access,

23   but would not intend to exercise dominion and control. That

24   would be if a defendant were given a key to another

25   individual's home, he might have knowledge of the fact that

1   that individual had a firearm in the home. There would be no

2   question about that, but just the fact that he had access, the

3   fact that he had knowledge would not in itself be sufficient

4   to establish dominion and control.

5       A very significant case is *United States v. Beverly*, at

6   750 F.2nd 34. That's Sixth Circuit 1984. Search warrant being

7   executed in a home. Police encounter two individuals in the

8   home, each standing on opposite sides of a trash can which is

9   located in a kitchen area. The police instruct both of them to

10  put their hands up so that they can frisk them. They're

11  essentially equal distance from the trash can. Turns out the

12  trash can has two firearms in it. One of those trash cans held

13  a firearm in which the fingerprints of the charged defendant

14  were found. That was not sufficient to establish intent to

15  exercise dominion and control.

16      In the Fourth Circuit case of *United States v. Blue* which

17  is a passenger in a vehicle case, the Court made it clear,

18  accessibility to the firearm is not sufficient to establish

19  that there's an intent for dominion and control.

20      In *United States v. Smith*, 997 F.3d 215, the mere

21  touching is not enough.

22      In an important case, *United States v. Griffin*, 684 F.3d

23  691, Seventh Circuit 2012. This is a house in which there were

24  a large number of weapons that were recovered. The defendant

25  was residing with his father who is the gun owner. There

1    didn't appear to be any question as to the defendant's

2    knowledge of the fact the guns were there.  In fact, he was a

3    probationer. That was not sufficient to establish that there

4    was intent to exercise dominion and control.

5         In *United States v. Thomas* at 321 F.3d 627, a Seventh

6    Circuit 2003, even a felon who had acquired the weapon before

7    he acquired his felon status, if that weapon was still within

8    his accessible area following his acquiring the felon status,

9    that was not sufficient.

10        And also the case of *United States v. Ricks* at 573 F.3d

11   198, Fourth Circuit 2009. In that case there was an incident

12   between two domestic partners in which the defendant who was a

13   felon saw his partner acting in an erratic way, slapped the

14   gun out of his hand and after the gun had been slapped out of

15   his hand, the partner had left the area, took possession

16   briefly of the firearm and placed it on a dresser in the area.

17   And the police later came and recovered the firearm. That was

18   not sufficient. That incidental contact was not sufficient to

19   establish dominion and control.

20        I think that what the Government's basic argument is is

21   that the evidence of Mr. Johnson allegedly being involved in

22   the drug trade and the fact that the firearm is considered to

23   be a tool of the drug trade is sufficient and which creates

24   the inference that they believe supplies the element of intent

25   and dominion and control. And again, I don't think that by

1    itself, that by itself can establish it. And especially in

2    this particular circumstance where there is just a total

3    paucity of evidence of him being connected to that firearm,

4    other than him simply being found in the apartment and the

5    firearm later being located in the apartment that there is

6    sufficient evidence.

7        The Government makes much of the fact that the firearm

8    was found in a crib located in the child's -- a crib located

9    next to the bed in the master bedroom as if this by itself,

10   again, indicated some kind of malice or recklessness or

11   something else that added to the equation of Mr. Johnson

12   possessing and exercising dominion and control.

13       As I indicated in my arguments to the jury and my

14   previous arguments to the Court, I think certainly under all

15   the circumstances it's just as plausible that upon this

16   intrusion occurring in the middle of the night, a battering

17   ram being used to enter into the apartment, that one of the

18   residents -- and there's no reason to not believe it wouldn't

19   be the owner, the registered owner in possession of the

20   firearm, Ms. Campbell, would have temporarily taken hold of

21   the firearm.

22               **THE COURT:**  Is that the test on the Rule 29 motion?

23               **MR. BALTER:**  What's that?

24               **THE COURT:**  You said it's just as plausible that and

25   then you were giving a --

1        **MR. BALTER:**  What I'm saying is that if there is an

2   inference just as plausible, consistent with innocence as

3   there is with guilt, then a rational factfinder could not come

4   to the conclusion that there was proof beyond a reasonable

5   doubt with regard to the -- with regard to whether there was

6   intent to exercise dominion and control.

7        **THE COURT:**  Is that really the test, if there are

8   two equally plausible inferences that the jury is required to

9   take the one?  Is that the test?

10       **MR. BALTER:**  No.  The jury is not required. The

11  question is whether or not a factfinder --

12       **THE COURT:**  A reasonable finder of fact could accept

13  as adequate and sufficient to support a conclusion of guilt

14  beyond a reasonable doubt.

15       **MR. BALTER:**  That's correct. And what I'm suggesting

16  is as a question of proof beyond a reasonable doubt, if the

17  inferences are just as -- if the inferences align just as

18  closely with innocence as they might with guilt, then that

19  can't constitute proof beyond a reasonable doubt. So for all

20  those reasons, Your Honor, I would request the Court grant our

21  motion for a judgment of acquittal with regard to the firearm

22  count.  I will submit with regard to the judgment, motion for

23  judgment of acquittal with regard to the other counts of the

24  indictment and the motion for new trial.

25       **THE COURT:**  Ms. Mathias?

1        **MS. MATHIAS:**  Your Honor, the Government

2   respectfully believes that there should not be a judgment of

3   acquittal or a new trial. I think this is really one of the

4   easier motions that we've ruled on this.

5        As Your Honor had mentioned, the test here is viewing the

6   evidence in the light most favorable to the Government whether

7   a rational trier of facts could have found the defendants

8   guilty beyond a reasonable doubt on the counts of conviction.

9        Clearly there was enough evidence.  You know, for Mr.

10  Johnson it included with respect to the 922(g)(1) count

11  against Mr. Johnson, the verdict was amply supported by his

12  close proximity to the firearm; the recovery of the match and

13  magazine right next to the bag of drugs that he admitted were

14  his; the recovery of matching ammunition adjacent to his

15  tools; the other tools of the drug trade found in his

16  apartment, including a digital scale, cutting agents, baggies,

17  over $4,000 in cash and a drug ledger.

18       Moreover, we had a cooperator, Ms. Wheaton testify that

19  she saw Mr. Johnson talking about -- talking on a FaceTime

20  call. She saw him -- heard him through the FaceTime call

21  talking about how he was going to bring a firearm with him to

22  deliver drugs to someone who he did not trust.

23       We also have additional evidence of Mr. Johnson's motive

24  to possess the firearm and then we have text messages between

25  Mr. Johnson and his girlfriend who was the registered owner of

 1     the firearm in which we argued they were covertly discussing

 2     the use of the firearm.

 3          Moreover, putting things in Ms. Campbell's name was a

 4     part of the way that Mr. Johnson operated this conspiracy. He

 5     put the apartment in her name, he had her send money orders.

 6     He had her purchase the firearm and, you know, that is common

 7     with drug dealers and it's what the Government put on evidence

 8     for nearly two weeks for. And it was very rational for the

 9     jury to conclude that he possessed the firearm that was found

10     in his baby's crib.

11          The Government has thoroughly briefed the cases. I'm

12     happy to go into the individual cases if Your Honor has

13     questions, but I just think that the bar here, I mean, a

14     rational trier of fact could have found that he possessed the

15     firearm. And we submitted lots of evidence. You know, the

16     cases, we heard about a lot of cases from other districts and

17     old cases. They're distinguishable here. I'm happy to go into

18     each one if there's any questions, but really I'm happy to

19     submit the rest of it on the papers because I think that has

20     been so thoroughly briefed.  Thank you.

21               **THE COURT:**  Any rebuttal on this, Mr. Balter?

22          **MR. BALTER:**  Your Honor, just -- the Government's

23     premise here is that simply the fact that it boils down to and

24     I believe that they just said that it was his presence and

25     apparent accessibility of the firearm were the most salient,

1    the most salient facts that existed here. And that is just not

2    what the standard is. The standard has to be that there has to

3    be an intent and the standard has to be that there's an intent

4    to exercise that type of control. And the cases that I went

5    through were very clear with respect in each one of those

6    cases you had an individual in premises, you had an individual

7    that there was another individual who apparently had some --

8    was either present in the location or potentially had access

9    to the firearm as well. And that simply the fact that the

10   firearm was there and it was accessible to the defendant was

11   not enough.

12       Here, there's simply no evidence, no evidence that the

13   sole possessor of the firearm was not Ms. Campbell, was not

14   the other resident. And the Government, the fact that the only

15   way in which you get to the point of saying that it was Mr.

16   Johnson who had possession, was to ignore that fact. All of

17   the factors that we know about what existed with regard to

18   that particular handgun and what happened in that particular

19   apartment on that particular night are, frankly, far more

20   indicative of the fact that Ms. Campbell was the possessor

21   rather than Mr. Johnson.

22       The Government shrouds itself on our argument is she was

23   the straw purchaser. Our argument is she was helping him, but

24   the arguments aren't the facts. The Government is entitled to

25   draw whatever inference they choose. But those inferences did

1    not establish what has to be found which is that there has to

2    be -- a rational trier of fact would have to find that there

3    was a basis for finding that there was proof beyond a

4    reasonable doubt with regard to possession. And they just

5    haven't done that.

6         **MS. MATHIAS:**  May I briefly say something?

7         **THE COURT:**  Okay.

8         **MS. MATHIAS:**  In his rebuttal he exercised the same

9    thought process that he was in his original argument which is

10   viewing all of the evidence in the light most favorable to Mr.

11   Johnson.  Is there any other explanation that possibly could

12   have existed other than the one that the jury, rational triers

13   of fact did, in fact, find and did, in fact, convict on and

14   that's simply not the test. Thank you.

15        **THE COURT:**  Mr. Walsh-Little?

16        **MR. WALSH-LITTLE:**  Yes, Your Honor. So Your Honor,

17   we're asking the Court pursuant to the written pleadings and

18   I'll try to supplement that for a moment on the conviction on

19   Count Thirteen which is the 924(c) count for Mr.

20   Coleman-Fuller, I'd ask the Court to find and we recognize the

21   high standard, but that it was an irrational finding by the

22   jury.

23        As the Court is well aware, there was no evidence that

24   Mr. Coleman-Fuller ever possessed a gun while there was drug

25   dealing. There was no witness who said that they saw him while

1    drug dealing with the gun. What we have in this case is when

2    the officers arrive and raid the house, they towed a Crown

3    Victoria back to the police station. They searched the car and

4    in the trunk of the vehicle which was locked at the time was a

5    bag of I believe it was 63 grams of a mix of fentanyl and

6    heroin and an Anderson rifle and a .40 caliber Taurus pistol.

7         Some of the text messages that the Government relies on

8    and also introduced at trial, that there was some evidence

9    that Mr. Coleman-Fuller had a .9 millimeter that he carried in

10   his boxers.  And I point that out to say that obviously for

11   the indictment and for the jury, I don't believe that that's

12   relevant to finding that these two guns were done in

13   furtherance of the drug dealing.  And, in fact, if anything,

14   it cuts the other way, that if he did have a gun it was some

15   other gun and not these two guns.

16        There was evidence that the Ford Crown Victoria was used

17   at times with drug dealing. However, I think it's important to

18   note, Your Honor, that we really don't know when the firearms

19   were placed in the trunk. We know that they were there

20   obviously when the police arrived. They could have been put

21   there and the drugs, five minutes before the police arrived, a

22   month before the police arrived. We just don't know. And I

23   think the evidence is --

24             **THE COURT:**  Why would that matter?

25             **MR. WALSH-LITTLE:**  Well, only in that if as I

```
 1        understand it, the Government's argument is that because the
 2        drugs are so close to the firearm, right, that essentially if
 3        Mr. Coleman-Fuller is selling from the car and he goes back
 4        and accesses the drugs and has the firearm there so therefore
 5        it's in furtherance of the drug conspiracy.  But if it were
 6        true that those two guns were put, I don't know, 15 minutes
 7        before the police arrived, as far as we know no drug dealing
 8        occurred in that time. And obviously I would just suggest that
 9        being next to each other is not enough. It has to be in
10        furtherance of.
11              And their argument as I see it is that they're next to
12        each other.  And because there's case law that says a pistol
13        or a firearm is a tool of the drug trade and they're next to
14        each other, that that's sufficient. And I would suggest that's
15        not sufficient.
16              I point out that it's a locked trunk. Some of the cases
17        that the Government relies on, there is proximity between the
18        gun and the drugs in a number of cases they cite. I didn't see
19        any of that in which the items were actually locked away.
20        They're not accessible to someone in the vehicle itself, at
21        least not immediately. You have to at least get out of the
22        car, go to the trunk and open the trunk.  And it seems to me
23        that the way it sort of presents is more like that's sort of
24        being used as a place to store things, which includes both
25        these two firearms and the drugs that are there.
```

As I understand the Government's position, again, the theory would be that the evidence is supported by Mr. Coleman-Fuller going to the trunk, opening up the trunk if he was going to engage in a drug transaction.  The drugs are there and the guns are there.  So therefore they're there for his protection or furtherance or whatever use he may or may not have used it for during the drug transaction.

But I would point out that the drugs are there -- I think it's one bag.  I think it's 63 grams. There's no packaging material seized from the trunk.  There's one bag. It's not as if it's broken up into, I don't know, 20 baggies or 20 vials as if it's ready to be distributed.

The evidence at trial as presented was Mr. Coleman-Fuller is a person who sells to addicts on the street in small amounts, small ounce amounts, small ground amounts. That bag of 63-some grams of the fentanyl heroin mixture, I believe it was just being stored there. I believe that's the inference that you can draw and I'm not sure that you can conclude based on that that the guns were used in furtherance of any of the drug transactions that were made.

So for all those reasons, I'd ask the Court to enter a judgment for Mr. Coleman-Fuller on Count Thirteen.  Thank you.

**THE COURT:**  Ms. Mathias?

**MS. MATHIAS:**  Similarly in the case of Mr. Coleman-Fuller, we respectfully submit that the motion should

```
1    be denied and the jury's verdict should be upheld. Viewing the
2    evidence in the light most favorable to the Government, a
3    rational trier of facts could have found the defendants guilty
4    beyond a reasonable doubt on all counts of conviction.
5         With respect to the 924(c) count against Mr.
6    Coleman-Fuller, the verdict was amply supported by the close
7    proximity of the firearms to the drugs. Again, they were in
8    the same rifle bag in the trunk of his Crown Victoria.
9    Coleman-Fuller's recent use of the Ford Crown Vic to make drug
10   sales, the fact that both firearms were loaded and the fact
11   that other tools of the drug trade were found in Mr.
12   Coleman-Fuller's apartment and vehicles, including digital
13   scales, cutting agents, blenders, over $8,000 in cash,
14   ammunition and body armor marked "Sheriff."
15        Moreover, we had presented evidence Mr. Coleman-Fuller
16   had handled both the guns and the drugs in the previous few
17   days, as well as recent text messages in which Mr.
18   Coleman-Fuller discussed obtaining and/or carrying firearms
19   while dealing drugs.
20        Based on the Lomax factors, the jury was entitled to
21   infer from the evidence that his possession of the firearm
22   further advanced or helped forward his drug trafficking
23   crimes. Mr. Walsh-Little engaged in a similar argument-style
24   as Mr. Balter saying what if there were these other
25   hypothetical possibilities, what if someone had put it there
```

1    15 minutes ago or 30 days ago.  And again, that's just simply

2    not the test. The test is could any rational trier of fact

3    have found that we fulfilled our burden and we did and the

4    jury did find that.

5         There's a very long -- again, we've thoroughly briefed

6    this and have gone through many of the factors.  So again,

7    unless Your Honor has questions, I don't see the need to go

8    back through and talk about all of the cases that we've

9    already outlined.  But I'm happy to answer questions if you'd

10   like me to.

11            THE COURT:  Anything in rebuttal, Mr. Walsh-Little?

12            MR. WALSH-LITTLE:  Your Honor, just very briefly.

13   My recollection from the trial testimony is that one of the

14   officers testified that he did see what he believed to be a

15   drug transaction while Mr. Coleman-Fuller was in the Ford

16   Crown Victoria, but my recollection at least, that was about a

17   month before the raid was. And I could be mistaken about that,

18   but I'm not sure that that's "recently."  So I'd ask you to

19   consider that as well.

20            THE COURT:  All right, each of the defendants has

21   specifically challenged the sufficiency of the evidence on one

22   of the firearm counts. Mr. Johnson challenges Count Four which

23   was possession of a firearm. Mr. Walsh-Little on behalf of Mr.

24   Coleman-Fuller challenges Count Thirteen which was possession

25   of a firearm in furtherance of drug trafficking. Mr. Johnson

1   challenges whether there was even sufficient evidence to show

2   his possession, constructive possession of the firearm. Mr.

3   Coleman-Fuller challenges not so much that aspect of the

4   evidence, but whether the in furtherance element had been

5   proven.

6        I'm afraid I agree with the Government, gentlemen, that

7   your arguments are more addressed to a jury who has to make a

8   fact finding rather than to the Court that is making a legal

9   ruling as to whether there is sufficient evidence from which a

10  jury could conclude that this element was present.

11       The test is not taking evidence in the light most

12  favorable to the defendant, but rather taking the evidence in

13  the light most favorable to the Government. There is

14  sufficient evidence such that a reasonable or rational finder

15  of fact could make that determination. This isn't one of those

16  mere single factor cases in either of the cases.

17       As to Mr. Johnson, the two of them were awakened and I

18  think a fair inference, they hadn't even gotten out of bed at

19  the time the law enforcement officers made entry. The firearm

20  was immediately adjacent to the bed. It was not hidden. That

21  is, it was visible, observable. So the knowledge of Mr.

22  Johnson that it was there is a fair point.

23       The presence of additional magazine in close proximity to

24  the drugs, the other ammunition I believe near some shoes are

25  all contributing pieces of information. There can be joint

1    possession. Two people can have the power and intention to

2    exercise control over an item and the jury I hope was properly

3    instructed on what they should consider.

4        Surely there's arguments that were made and made

5    energetically to the jury, but it was the jury's role to make

6    this determination. So as to Mr. Johnson, I deny the Rule 29

7    motion as to Count Four.

8        Rule 33 says that I should grant a new trial if the

9    interest of justice so requires and that's when evidence might

10   lay so heavily against the verdict that it would be unjust to

11   enter judgment. Here I don't have to weigh the evidence in the

12   light most favorable to the Government, but I can evaluate a

13   little bit more robustly the evidence.

14       But nevertheless, under that standard, I reject Mr.

15   Johnson's contention that the evidence on this issue was so

16   tilting to his side that the verdict is against the weight of

17   the evidence. So his motions on Count Four are denied.

18       As I indicated, Mr. Coleman-Fuller does not so much

19   challenge the sufficiency of his possession of his firearms in

20   the trunk in the rifle bag as much as he does the in

21   furtherance. Again, here I find there was sufficient evidence

22   for a reasonable factfinder to conclude that element of this

23   offense. The sizeable, although not packaged for individual

24   sale, sizeable amount of drugs in the same bag, not the same

25   apartment, not even just the same car, not even just in the

1    trunk, but within the same bag as the firearms I find is a

2    significant circumstance. The car itself had been shown to be

3    one that was used and obviously it had drugs in the trunk. It

4    was used by Mr. Coleman-Fuller in the drug dealing. The jury

5    was given, I hope, a proper list of factors to consider as to

6    whether this furthered in some way the drug dealing, the drug

7    offense. It's available. The ammunition is loaded. It's in the

8    same place.  So one who goes to pick up the drugs to give it

9    to another wholesaler or to even just take where it can be

10    divided up again, has ready access to these firearms. So I

11    don't find that there is a concern about the jury's verdict

12    under Rule 29.

13         Similarly, under Rule 33 the evidence simply is not so

14    compelling in the other direction that I find that it would be

15    in the interest of justice to have a new trial. So I'm going

16    to deny Mr. Coleman-Fuller's motion on Count Thirteen.

17         Particularly, Mr. Balter, I don't have a transcript. I

18    don't know exactly what motions were made at the end of the

19    Government's case. I might have notes, but if you're renewing

20    those motions, you need to be explicit so I can consider.

21         **MR. BALTER:**  Your Honor, those were generic motions.

22         **THE COURT:**  Okay, so I don't need to say anymore

23    about that.

24         **MR. BALTER:**  Correct.

25         **THE COURT:**  Okay. I'm trying not to get all of my

1    papers here terribly confused, although that's probably not

2    possible. As I understand, the Government is not -- well, has

3    been conceded that there can be no consideration of armed

4    career criminal because there was no indictment allegation or

5    jury determination that multiple prior offenses were committed

6    on occasions different from one another. I don't know if

7    they're right to make that concession.  I'm happy to let some

8    other court do that, but in light of that, I'm not going to

9    consider further any proposal in the presentence report of

10   ACCA status for Mr. Johnson.

11           **MR. BALTER:**  Thank you.

12           **THE COURT:**  But whether that concession is

13   appropriate or not, there's this underlying issue of what

14   constitute proper predicate offenses for career offender or

15   for guideline purposes, in any event. The courts are -- well,

16   trial courts are struggling.  Appellate courts seem to be

17   enjoying the question of what prior offenses under state or

18   federal law qualify for either crime of violence or drug

19   trafficking under the appropriate definitions. Fortunately for

20   me I'm not the first judge in this district to have had some

21   of these issues presented to me and I'm content to rest on the

22   determinations of my colleagues with regard to whether

23   Maryland possession with distribution qualifies as drug

24   trafficking because it includes attempted transfers. I find

25   the Government's counter-argument interesting and if I'm an

1      appellate judge or I'm the Supreme Court I might spend some

2      time with it, but I'm not, so I'm not going there. And we will

3      not consider Maryland prior distribution, possession with

4      intent to distribute offenses to be drug trafficking crimes

5      for career offender or other purposes under the guidelines.

6           That leaves, I believe, the first degree assault

7      conviction. And I come out at least before hearing your

8      argument today tentatively in the other direction, that if

9      there's to be a determination that it no longer qualifies as a

10     crime of violence, that determination will be made by the

11     Fourth Circuit. I believe there's argument in May in the *Redd*

12     case, R-e-d-d that everyone was mentioning. But like Judge

13     Bennett in his recent decision in that case, it's the Fourth

14     Circuit or the Supreme Court that's going to have to tell us

15     why those earlier decisions were incorrect. But I'm happy to

16     hear if anybody thinks I've overlooked something terribly,

17     terribly important. So Ms. Mathias?

18                **MS. MATHIAS:**  Your Honor, just for the record for

19     appeal, we renew our objections to the career offender

20     predicate issue and I apologize for the late submission, but

21     I'm sure Your Honor recognized that brief so we're just

22     renewing it for the record.

23                **THE COURT:**  Well, I see the similarities all over

24     the place which is why I don't think I've been given something

25     that's totally different than my colleagues have been.

 1          Mr. Balter, any comments on the criminal history type

 2     information here?

 3               **MR. BALTER:**  With regard to the ACC and career

 4     offender, no. I would note, Your Honor, I obviously received

 5     the Government's motion late yesterday. It was after close of

 6     business.

 7               **THE COURT:**  Sure.

 8               **MR. BALTER:**  And I frankly don't know whether or not

 9     there is, you know, anything at this point to be brought up

10     which is going to make a difference on the appellate record. I

11     mean, the only thing I can say at this point and I want the

12     record to be clear is I just didn't have the fair opportunity

13     to respond to what the Government -- to what the Government

14     set forth. I understand what they're saying is they simply

15     want to preserve the record, but hopefully that is all it

16     becomes a matter of.

17          To the extent that there would be a question of well, the

18     Government brought up this even though the Court ruled against

19     it and you didn't say anything about it, I'm saying right now

20     the reason I didn't say anything about it is because I got

21     that motion after close of business the day before this

22     hearing. And, frankly, it's a very complicated matter.  The

23     Government's arguments with regard to drawing distinctions

24     between Campbell and these other cases, you know, would

25     require extensive consideration and research.  And if the

1   Fourth Circuit is going to be thinking about that at some

2   point, I just want the record to be clear as to why I'm not

3   putting forward anything explicit with regard to what their

4   finding was.

5            **THE COURT:**  Well, certainly with regard to the issue

6   there's no question a waiver because it's been raised and it's

7   been ruled on in your favor. Whether on appeal people are held

8   to have abandoned a case citation or a particular argument, I

9   don't know.  But as far as I'm concerned, everything is

10  preserved because we are simply following in the footsteps of

11  other cases that are -- my understanding is there's already

12  one on a Government's appeal that's on its way. The other

13  decisions were not appealed. I don't know. Who knows where

14  we'll end up today whether it makes any difference. So let's

15  -- yes, I think everybody's record as far as I'm concerned is

16  fully preserved. Mr. Walsh-Little?

17           **MR. WALSH-LITTLE:**  Your Honor, just a follow-up on

18  that.  If I understand, just so the record is clear, Your

19  Honor is ruling on the assault first conviction then is that

20  Your Honor is making a finding that assault first cannot be

21  committed with a reckless state of mind, that assault in the

22  first degree in Maryland cannot be committed with de minimis

23  force because I think that would also take it outside of the

24  guidelines. And I just wanted to put that on the record for

25  whatever reviewing party may look at that.

```
 1            THE COURT:  I'm failing at my quest to keep myself
 2    somewhat organized and I don't know why. There we go. The 2008
 3    assault first degree in paragraph 76 is the one we're talking
 4    about?
 5            MR. WALSH-LITTLE:  Yes, Your Honor.
 6            THE COURT:  Okay.  My finding is that based upon
 7    Redd and the prior cases, that that qualifies as a crime of
 8    violence for guideline determination purposes, that I don't
 9    need to do any further parsing. That was in 2008. Whatever the
10    current statute is is not what it is. It is what it looked
11    like back in 2008. I guess, yeah. It was a December 7, 2008
12    offense for guideline purposes. That's all we're doing.
13            MR. WALSH-LITTLE:  Yes, Your Honor.
14            THE COURT:  All right. Mr. Walsh-Little, I'm now
15    told we have two people this afternoon; is that right?
16            MR. WALSH-LITTLE:  Yes, Your Honor. And they're both
17    professors who have taught my client. I've got one e-mail that
18    one of the professors may be coming in person so whatever we--
19            THE COURT:  Great, because that makes it easy to
20    figure out what we're going to do now which is to excuse you
21    if you wish and Mr. Coleman-Fuller, and we will proceed.
22    Unless you think there's some other -- I'm assuming you've
23    read each other's papers. Unless you think there's some issues
24    that we could productively or really logically need to take up
25    together. I did mention drug quantity perhaps because I think
```

1      both of you are challenging that. If you want to do that now

2      together we can or we can do them separately.

3              **MR. WALSH-LITTLE:**  I'm fine to do that now, Your

4      Honor.

5              **THE COURT:**  Do that now?  All right, then for Mr.

6      Johnson the presentence report -- what I'll do when we get to

7      our individual portions is make sure I have everything you

8      give me in writing. It's something I usually do right at the

9      outset. But I don't want to -- I don't need to do that

10     immediately.

11         The presentence report for Mr. Johnson suggests a level

12     30 for a base offense. For Mr. Coleman-Fuller, the presentence

13     report suggests a 32. Obviously the facts are different as

14     pertains to each of them although they are alleged to

15     participate in the same conspiracy. But the concept -- I guess

16     for Mr. Johnson I have some very specific objections to

17     portions of the presentence report's statement of facts. It's

18     the inferences. Although I don't think there's an objection to

19     the concrete basic facts, you know, the words on a phone call

20     or that sort of thing. It's the inferences that are objected

21     to.

22         For Mr. Coleman-Fuller, it's more the inferences, again,

23     rather than the basic facts.  But the way those objections

24     were articulated to the probation office, they don't do me

25     paragraph by paragraph in the statement of facts. So if you

 1     want to focus on that and tell me where I should be crossing

 2     facts out and that sort of thing, I'll be happy to hear them.

 3         For any disputed portion, I must make some sort of a

 4     ruling, but I won't go into really everything I can look at

 5     for determining quantity.  I must make obviously a reasonable

 6     conclusion, estimate, what have you.

 7         So Mr. Balter, do you want to talk to me about quantity?

 8         **MR. BALTER:**  Well, Your Honor, I think perhaps the

 9     best place to start because I was somewhat unclear with

10     respect to exactly what the Government is contending with

11     respect to the quantities. I believe it's on page 3 of the

12     Government's brief they make reference to a series of facts

13     which they believe constitutes just over -- let me just give

14     the Court a specific reference to -- so starting on the

15     Government's brief -- and I'm sorry, I don't have the ECF

16     number because this was filed under seal, but it starts on

17     page 2 and proceeds to page 3. And they cite a series of

18     factors which they claim adds up to 465.

19         **THE COURT:**  They have two theories. They have some

20     hard quantities and then they say eight or nine trips at 100

21     grams minimum each. So yeah, they have two different

22     approaches.

23         **MR. BALTER:**  Well, they have two different

24     approaches with regard to the -- right, with regard to the

25     specifics of it.  As I understand it they're saying the bare

1    minimum of the following incidents add up to just over 400.

2    And then there are the other extrapolations and I've already

3    -- I'm not going to go through every single thing that I

4    noted, but I'll -- I want to respond to every one of those.

5        And, of course, the Government starts with what was

6    obtained during the search warrant. And with regard to just

7    the sheer quantity of drugs, there was 128 grams. And it's not

8    absolutely clear, but, of course, the 128 grams puts us up at

9    the level that necessarily would flow from the jury verdict.

10   So the lowest -- we are contending that the appropriate

11   offense level is 24. Level 24 goes from 40 grams to 160 grams.

12   So that if we were to just be at the point of what was seized

13   in terms of the drugs in connection with the search warrant,

14   that would still leave us at level 24.

15       Then the Government extrapolates a wake from the cash

16   that's recovered in connection with the search on August 12th.

17   So that was they seized $4,423.  They, number one, are

18   operating that that is inferentially connected to drug dealing

19   money.  And our primary argument is that there is nothing that

20   establishes that that, in fact, was drug money. It was found

21   in the apartment.

22       The Government makes much of the fact that Mr. Johnson

23   was not employed. By the same token, Ms. Campbell was

24   employed. She was employed at the time when she got her

25   firearms license in '18. The police report that was -- that

1    was provided established that she made a statement to the

2    investigating officers that she was employed at the time. So

3    she would be an individual being employed who would be in a

4    position to acquire that amount of cash under any

5    circumstance. There's certainly nothing to suggest that that

6    wasn't her money and the Government infers coming out of that

7    would be 63 grams which is simply a matter of dividing the

8    $4,423 by $70 per gram which there was some testimony about

9    that being an average amount. So they're extrapolating that

10   that represents 63 grams.

11        Then there is the Government is adding in the drugs that

12   were recovered in connection with the Spruill search on Spruce

13   Street in Hagerstown on the same date. And this amount of

14   drugs -- that amount of drugs was, I believe, 101 grams. And

15   as Your Honor will recall, there was testimony at the trial

16   with respect to what the chemical composition was of the drugs

17   that were recovered from Mr. Johnson's apartment which were a

18   mixture of both heroin and fentanyl and the drugs that were

19   seized from Mr. Spruill which was pure fentanyl or there was

20   no heroin in it.

21        The Government chemist acknowledged that a mixture of the

22   type that was seized from Mr. Johnson could not be converted

23   into the pure fentanyl that Mr. Spruill had.  The Government

24   did not contest this fact.

25        There was some testimony that Ms. Wheaton said that those

1    drugs that Spruill had he got from Johnson, but it belies the

2    fact that it would be reasonable to infer that any drugs that

3    Spruill was obtaining from Johnson would have come from a

4    stash that Johnson would have had.

5         So I think that the overall -- if all this evidence is

6    viewed together, this inference that those drugs that Spruill

7    had are attributable to Johnson just doesn't hold together.

8         I would also note, Your Honor, the Government makes much

9    of the fact that some of the drugs that were recovered from

10   Nelson on the day that the search warrant was executed against

11   him which was about a month later, and they compared the

12   chemical composition of those drugs with the drugs that were

13   obtained from Coleman-Fuller on the search that was conducted

14   on the same day in putting forth the inference that if the two

15   drugs appear to match up, then that adds to the Government's

16   argument of the conspiratorial action between Nelson and

17   Spruill. In other words, the Government thought that that was

18   a very important factor.

19        The Government on the other hand was silent about this

20   disparity between the chemical composition of the drugs that

21   were with Johnson and the drugs that were with Spruill. I

22   submit that that disparity is just as significant as what the

23   Government said was important about the similarity between the

24   Coleman-Fuller and Nelson drugs were. So I would submit that

25   the Court should not consider that 101 grams seized from

1    Spruill on August 12th in making its calculation.

2         The next factor that the Government alleges should be

3    counted are 86 grams. And 86 grams are the amount that the

4    Government extrapolates are attributable to the $6,000 in

5    transfers which either Mr. Johnson or Ms. Campbell made to

6    Nelson during the time frame of I believe it was May and June

7    of 2019. And again, without anything explicit within the

8    transfers themselves, the Government is inferring through the

9    prism of looking at all of this as drug dealing activity, that

10   these amounts must have been tied to some type of drug

11   transaction.

12        As the Court is aware, at the time of trial when this

13   came up and we reviewed what the communications were between

14   Johnson and Nelson at the time, they were talking back and

15   forth during this exact same time frame about what was going

16   on with respect to the basketball playoffs that were taking

17   place between Golden State and Toronto. There was the name of

18   the star for Toronto, Kawhi. There was reference to the Oracle

19   Center and all these things that -- it was like a running

20   back-and-forth that was going on between Johnson and Spruill--

21   Johnson and Nelson.  Even the word "bet" came up. And we

22   argued that it was reasonable to infer from this that what was

23   going on is they were talking about betting back and forth on

24   this and that those -- the $6,000 which was being transferred

25   was totally consistent with that type of activity. And the

1    Government didn't establish otherwise.  And therefore, we

2    argue that that shouldn't be counted.

3        With regard to the 15 grams attributable to Mr. Johnson

4    based on a transfer of $1,050 dollars that Spruill made to him

5    and again, that's an extrapolation based on you divide that by

6    $70 per gram coming up with 15 grams, this is totally

7    speculative as to what this transfer was about.

8        There was testimony from Ms. Wheaton that on occasion

9    Spruill and Wheaton would socialize with Johnson and Ms.

10   Campbell. They went up to a concert, some kind of music

11   festival up in the New Jersey area. I mean, in terms of what

12   the Government -- you would think it's talking about in terms

13   of amounts attributable to drug dealing, this is a relatively

14   small amount.  And it certainly would be just as consistent

15   with some other financial arrangement that they were all

16   making just in regards to the social life that they were

17   enjoying together. So I think that there's -- it's totally

18   speculative to consider those 15 grams to be attributable to

19   Mr. Johnson.

20       And finally, the Government makes reference to two

21   amounts that were simply stated in the context of text

22   messages. And we believe that it's totally speculative that

23   this had anything to do with the drug trade. There was a

24   reference to 45. And this came in the context of supposedly

25   Johnson talking to Spruill with respect to Spruill giving

1    Johnson, I believe, 45. And that's totally inconsistent with
2    what the Government's entire theory was was that Mr. Johnson
3    was the distributor to Spruill as opposed to vice versa. So it
4    doesn't make sense within that context that that's what they
5    were talking about. And certainly within the context of just a
6    portion of a text message which made reference to 45, it's
7    speculative that that had to do with foreseeable amounts of
8    drugs being distributed and the same amounts to 26.6 which was
9    also referenced to.
10       So if one considers -- this was the basics that the
11   Government was talking about and for which they calculated a
12   total of 465 grams, that that, Your Honor, we submit it's for
13   the most part is not established in terms of reliable evidence
14   that there are amounts attributable to Mr. Johnson. It's all
15   speculative with respect to whether or not what the Government
16   argues there in fact is actually communications or actions
17   which are within the course of the conspiratorial conduct.
18       I don't know how the Court was planning on proceeding,
19   whether you were going to consider the other more far reaching
20   arguments that the Government was making as with respect to
21   the trips that were being made by Spruill to Owings Mills.  As
22   the Court is aware, the wiretap excerpts that the Government
23   relies upon had nothing to do with Mr. Johnson himself. He was
24   not a party to any of those communications with Spruill. He
25   and Spruill were never intercepted over a phone call. They

```
1    inferred that when Spruill was going to Owings Mills, he was
2    always going to visit and be reupped by Mr. Johnson. But the
3    evidence for that is incredibly thin, as the Court is aware.
4    There was never an incident in which there was a surveillance
5    observation of Mr. Johnson and Mr. Spruill together in Owings
6    Mills. Spruill himself was seen in Owings Mills on apparently
7    two occasions. On one occasion there was video surveillance
8    that the Government introduced at trial which appeared to show
9    Spruill coming out of that multi-unit complex where the search
10   warrant was executed on Mill Run Road. I mean, the Court saw
11   all the pictures of it. From what I understand there are
12   hundreds of units that were within that complex and Spruill
13   wasn't actually even seen in the complex. He was seen
14   apparently walking away from it with his son or a child with
15   him. All right?  But there was no visual observation of Mr.
16   Johnson.
17        The other time where Spruill was seen was on the early
18   morning hours of August 5th. And on that particular occasion,
19   you'll recall one of the agents who testified at trial
20   observed Spruill there with apparently five other individuals,
21   all had cars there. They were meeting in that parking area
22   right across the way from where Spruill was seen earlier going
23   into the apartment. There was nothing that was reported that
24   indicated Mr. Johnson was a part of that. No car that was
25   observed there was associated with him. It certainly raised
```

1      more questions than it answered about why Spruill would be in

2      this area across from the apartment with five other

3      individuals in the early morning hours apparently for the

4      purpose of conducting some kind of business that it would be

5      reasonable to believe that Spruill was -- that Spruill was

6      involved in. And because of the fact that there was a lack of

7      evidence that Mr. Johnson was involved in that, I think it

8      damaged the Government's theory that all of these trips that

9      were being made back and forth were trips that Spruill was

10     making to be reupped by Mr. Johnson. So I think that there is

11     basically no probative value that goes along with that and any

12     extrapolation that the Government wants to pursue with respect

13     to that is just not reliable.

14          With respect to charging Mr. Johnson or attributing to

15     him any of those amounts that were found in connection with

16     the search warrant at Nelson's a month later, he had been

17     locked up for a month at that point. The Government I'm sure

18     was monitoring those phone calls that were being made from the

19     jail as they always do. There was absolutely no evidence that

20     there were any communications going on or anything that would

21     lead one to believe that what happened a month later was in

22     any way foreseeable or attributable to Mr. Johnson.

23          So for those reasons, Your Honor, I would suggest that

24     the Government simply has not met their burden of establishing

25     that an amount that exceeded 160 grams which is the top level

1    of 24 had been reached in terms of these amounts that they're

2    claiming were either foreseeable or directly attributable to

3    Mr. Johnson.  And therefore, the base offense level should be

4    24.

5              THE COURT:  Ms. Mathias?

6              MS. MATHIAS:  Your Honor, the base offense level is

7    clearly 30 here. It's more than 400 grams of fentanyl. This

8    was an extremely conservative approach. I can go through Mr.

9    Balter's arguments one by one. I'll start with the last one

10   where he argues that the drugs for Nelson shouldn't be

11   foreseeable. We didn't count that, so now Mr. Balter is

12   arguing against things we haven't even raised.  My position is

13   he's gone through all of his arguments.  He tried them at

14   trial, he tried them at motions, he tried in his briefing.

15   We've responded to them. I don't think there's really any --

16   this was a drug conspiracy. There were drugs found.

17        The conversations about the money, it wasn't about --

18   maybe there were sports ones, maybe there was a game, but

19   there's just overwhelming evidence of this drug trafficking

20   and we've gone back into the surveillance again.  I mean,

21   obviously that was Johnson.  We just didn't get surveillance

22   in the middle of the night that you wouldn't have seen. And

23   everything was corroborated and we've gone through this at

24   trial and again throughout the briefing.

25        If Your Honor has any questions, I'm happy to continue,

but I think it's really pretty well laid out already so I'm happy to submit on papers.

THE COURT:  Okay. In light of that, anything more, Mr. Balter, right now?

MR. BALTER:  Just that "obviously" is not a legal term, Your Honor.

THE COURT:  Okay.  Mr. Walsh-Little?

MR. WALSH-LITTLE:  Yes, Your Honor. So the Government or the PSR attributes for Mr. Coleman-Fuller's drug guidelines in group one for having over 1.2 kilos of fentanyl and heroin and that's a 32. So we do take exception to that.

I think there's three categories that are attributed to Mr. Coleman-Fuller of drugs. The drugs that are found in the Ford, we don't have any issue with that. The amounts attributed to the money that's found in his apartment, we don't have any issues with that.  The disagreement is whether the drugs seized from Mr. Nelson's apartment are reasonably foreseeable to Mr. Coleman-Fuller and that's where we disagree with the PSR.

The evidence as I see it is that they are not reasonably foreseeable to Mr. Coleman-Fuller and that he would have no basis for knowing whether Mr. Nelson was supplying one other person, or five other people, or ten other people, or how much drugs he was bringing in from Mexico. And I think the Government's arguments on that fall short.

1          The first argument they make is that there is text

2    messages and they included in their facts on -- Mr.

3    Coleman-Fuller's presentence report is ECF 654. And at page 6,

4    Your Honor, paragraph 12, at the end of paragraph 12 there's

5    an inclusion of text messages regarding -- you may remember

6    this -- about money and stacks of money being discussed

7    between Mr. Coleman-Fuller and Mr. Nelson over text or phone

8    call. I think we raised and did in our facts that it seems

9    clear that that's a discussion that references a trip to a

10   strip club the day before.

11         The last sentence in paragraph 12 in the PSR says the

12   Government's position is that Coleman-Fuller and Nelson were

13   discussing money that would be used to pay the Mexican source

14   of supply for the new kilogram brick of fentanyl and heroin.

15   There was some evidence that Mr. Nelson had conversations with

16   someone from Mexico about possibly picking up a brick from

17   Newark Airport. I don't believe it was ever established that

18   Mr. Nelson went to Newark Airport to pick up this kilo of

19   drugs, but Mr. Coleman-Fuller was never on any of those calls.

20   There's no way that Mr. Coleman-Fuller would know how much

21   drugs Mr. Nelson was bringing in. And I don't think the

22   evidence supports attributing the amount of drugs, basically

23   the kilo to Mr. Coleman-Fuller as reasonably foreseeable.

24         The Government makes an argument in their pleadings that

25   because there's evidence that Mr. Coleman-Fuller was in Mr.

1    Nelson's apartment, that he must have seen this kilo. I don't

2    think that's an inference the Court can draw. There's no -- we

3    don't know what exactly happened when he was inside, but it

4    isn't necessarily true that when you visit someone, you know

5    about everything in their house and there is no evidence that

6    he saw that or knew that it was there.

7        There's no evidence that Mr. Coleman-Fuller ever dealt

8    directly with whoever these individuals are who are supplying

9    Mr. Nelson. And with all that in that context, it would be our

10   position that he should be only attributed to the drugs found

11   in the Ford and the equivalent of the money that's found in

12   his apartment. And that would put him at a base offense level

13   of 24. Thank you, Your Honor.

14        **THE COURT:**  Ms. Mathias?

15        **MS. MATHIAS:**  Thank you, Your Honor. We appreciate

16   those arguments but again, I think this is a pretty easy call.

17   I do want to make note that on page 2 of my sentencing

18   memorandum I accidentally said 1.2 grams of fentanyl.  I meant

19   1.2 kilograms, so I sincerely apologize for that.

20        As to whether the drugs that Mr. Nelson had in his

21   apartment were foreseeable to Mr. Coleman-Fuller, I mean,

22   that's the thing about conspiracy laws. It's reasonably

23   foreseeable. He was in a conspiracy with Mr. Nelson and now

24   therefore those drugs are reasonably foreseeable to him.

25        We did say he was at the apartment three days before. It

 1     would be reasonable that he saw the kilogram, but even if he

 2     didn't it's still reasonably foreseeable to him. But all of

 3     the evidence we presented, they were in a conspiracy together.

 4     Mr. Nelson is getting kilogram quantities from the Mexican

 5     source of supply.

 6         So here, again, very conservatively, we just included

 7     physically what we found at the takedown for that prong which

 8     Mr. Walsh-Little objects to, but really the quantity

 9     foreseeable is really much higher. This is not the only time

10     that Mr. Nelson was -- it was reasonably foreseeable that Mr.

11     Nelson and therefore the drug trafficking organization would

12     have had to be reasonably foreseeable for the kilogram

13     quantity of fentanyl.

14         So again, I think these base offense levels that we

15     submitted are extremely conservative. They could have been

16     much higher and I don't think -- again, I keep repeating

17     myself, but that we need to go back and relive the entire

18     trial or read aloud all these briefings that we've already

19     done. But again, these conservative estimates are appropriate

20     base offense levels.

21              **THE COURT:**  Okay.  With regard to Mr. Johnson, the

22     presentence report and supported by the Government requests

23     the finding that the base offense level is 30 based upon at

24     least 400 grams, but less than 1.2 kilograms of fentanyl,

25     heroin, or reasonably foreseeable to Mr. Johnson.

```
1            I have no difficulty concluding that that level is at
2      least appropriate. There was I find significant testimony with
3      regard to the quantities that were ongoing and the
4      relationship between Mr. Johnson and Mr. Spruill.
5            I was -- wiretaps, listening to them had a lot of
6      repetitive type of information with various addicts and users
7      who are purchasing. But the discussion between Mr. Lyles and
8      Mr. Spruill as to what Mr. Spruill was planning to do in July
9      of 2019 was quite revealing, that he rides back with a buck
10     two or three. There was I found credible evidence indicating
11     that was 100, 200 or 300 grams of the fentanyl/heroin mixture,
12     that Mr. Spruill was telling this to Mr. Lyles during the
13     scope of the conspiracy, not thinking he was talking to jurors
14     and it was to justify why he wasn't willing to make the detour
15     to sell four or five grams to Mr. Lyles for his use and the
16     use of the others he lived with.
17           I am also satisfied that the evidence supports a finding
18     that Mr. Spruill made eight or nine trips to Baltimore, to
19     Baltimore County to obtain quantities of fentanyl and heroin.
20           I am also satisfied that it was Mr. Johnson who was the
21     source on those occasions. It's true that the Government
22     wasn't able to put either through wiretap or surveillance
23     direct connections there, but they had evidence that these two
24     were dealing together. Ms. Wheaton certainly surveillanced in
25     Hagerstown certainly and I'm satisfied that the evidence
```

1    supports a finding that -- well, at least on four occasions

2    and likely a lot more, Mr. Spruill went to Mr. Johnson and

3    obtained at least 100 grams of heroin and fentanyl. So I'm not

4    going to parse through translating various smaller sums into

5    grams. It's just not necessary because for guideline purposes,

6    the conclusion that Mr. Johnson was responsible himself or

7    with reasonably foreseeable quantities involved in the

8    conspiracy is responsible for at least 400 grams. I agree that

9    that's a conservative estimate in this case.

10         For Mr. Coleman-Fuller, the Government and the probation

11    office are seeking, suggesting a higher level, that is a

12    minimum of 1.2. Believe it or not it's only two levels in the

13    guidelines to go from 400 grams to 1.2 kilograms of fentanyl.

14    Mr. Coleman-Fuller does not challenge the 62.7 grams found in

15    the car and that cash conversion into grams found in the

16    residence.

17         The Government in this instance is relying on the 1,200

18    grams found in Mr. Nelson's residence as being indicative of

19    the quantities that was reasonably foreseeable to Mr.

20    Coleman-Fuller as part of his conspiracy. I find that the

21    evidence is more than sufficient to demonstrate that Mr.

22    Coleman-Fuller and Mr. Nelson were, indeed, in this together

23    and that Mr. Coleman-Fuller would have been well aware of the

24    quantities of product that Mr. Nelson was able to obtain and

25    that this involved bricks at a time, kilograms at a time. So

1   again, I believe that the evidence supports a finding that

2   what was reasonably foreseeable to Mr. Coleman-Fuller as part

3   of this conspiracy easily surpasses the 1.2 level.

4        There's certainly case law supporting converting cash to

5   drug equivalence and the quantity has to be proven by a

6   preponderance, not beyond a reasonable doubt.  So I'm

7   sustaining the proposed guideline findings in each of the

8   presentence reports as to the base offense level for quantity

9   purposes.

10       Shall we take a brief recess and then we will reconvene

11  with Mr. Johnson and Mr. Balter to go through the rest of the

12  guideline issues and 3553(a)?  Is that clock correct?  It's

13  11:00. Do you want to get back together say at 1:30?

14            **MR. WALSH-LITTLE:**  Your Honor, could I ask for 2:30?

15  One of the professors teaches until 2.

16            **THE COURT:**  No, I know that. We're not going to do

17  the Zoom calls or whatever until then, but are there other

18  things we can talk about productively before that?

19            **MR. WALSH-LITTLE:**  Yes, Your Honor.  We can do that

20  for sure.

21            **THE COURT:**  So that's why I thought we should maybe

22  in that way -- I won't make any final -- that's a 3553(a)

23  contribution, right?

24            **MR. WALSH-LITTLE:**  Exactly, Your Honor, yes.

25            **THE COURT:**  So we've got, I mean, I haven't parsed

1    it all through, but we may have other things because aren't

2    you -- well, I guess I have more criminal history objections

3    in terms of Mr. Johnson than I do from Mr. Coleman-Fuller so

4    should we compromise, 2:00?  That should give us enough time

5    to be ready to listen to the witnesses at 2:30.  But can we

6    take a 10-minute recess and then we'll regroup here?  All

7    right, thank you.

8              **(Recess was taken from 11:05 to 11:18 a.m.)**

9              **(Mr. Walsh-Little and Mr. Coleman-Fuller are no**

10   **longer present.)**

11             **THE COURT:**  Just give me a second here. The

12   presentence report is paper 651. It was revised as of February

13   27th and filed on February 28, 2023. Mr. Balter, I can tell

14   from the papers that you filed that you've gone over this

15   carefully. Have you reviewed it fully with Mr. Johnson?

16             **MR. BALTER:**  Yes, Your Honor.

17             **THE COURT:**  And we're going to go over some of the

18   objections and issues that were generated by that.

19        I have received as well the defendant's sentencing

20   memorandum with a request to seal. It's paper 660. The motion

21   to seal will be granted. There's a supplemental sentencing

22   memorandum on enhancements for armed career criminal and

23   career offender which I've resolved and, in essence, granted,

24   although maybe not for the exact reasons requested. Let's see

25   what else. The Government's sentencing memorandum is paper

```
1    665, again with a request to seal that will be granted. The
2    defendant's opposition to the Government's sentencing
3    memorandum is 670, again with a request to seal that will be
4    granted. And we have also received some letters, papers 672.
5    Was there a request?  I don't think a request to seal those
6    came in.
7            MR. BALTER:  No, there was. That was filed under
8    seal.
9            THE COURT:  It was?  Oh, you're right. There it is
10   right at the top and that will be granted.
11           MR. BALTER:  And I will note, Your Honor, there were
12   letters attached to the original --
13           THE COURT:  Sentencing memo.
14           MR. BALTER:  --defense motion 660 as exhibits. So
15   that there are two stashes of character letters.
16           THE COURT:  Okay, yeah. It's all right here in front
17   of me. And finally, we have the Government's very late memo
18   last night, 673 which is now no longer at issue. But have I
19   now at least mentioned the filing numbers of all of the papers
20   that I should have, Mr. Balter?
21           MR. BALTER:  Yes.
22           MS. MATHIAS:  Yes, Your Honor.
23           THE COURT:  Okay. Was there a forfeiture filed for
24   this defendant or not?
25           MS. MATHIAS:  There was forfeiture, Your Honor. I
```

1    have to admit I can't recall whether a final order of

2    forfeiture has been submitted or not. I can check as soon as

3    the proceeding concludes. I apologize. But there was a finding

4    and we are pursuing it.

5              THE CLERK: Paper number 652 as to Mr. Johnson.

6              THE COURT:  Okay, I have 653 which is Mr.

7    Coleman-Fuller's, but I'm sure I have it up here. So there's

8    also a request for forfeiture that I have to put my hand on

9    that I will talk about at some point. So I have paper 660 here

10   and it has a number of letters, all of which I have read.

11   That's on exhibit number 1.

12        Let's then look at this and see what I've already changed

13   in the presentence report. As I go through it, there's nobody

14   here from the probation office?

15             THE CLERK:  I just e-mailed her and told her that we

16   resumed.

17             THE COURT:  Okay, because I'm going to direct the

18   filing of a amended report so I want to make sure that I note

19   it. First of all on page 2 of the cover sheet where it lists

20   Count Four, I mean it says armed career criminal. And that

21   needs to be eliminated on page -- well, I don't know if the

22   page numbers come out the same. Mine is 13 where the base

23   offense level will remain at 30, but then we have paragraphs

24   46 and 47 are eliminated.  And then on the next page at the

25   very least we won't have -- the total offense level will

1    become 32 because we're not doing any other increases, if I

2    understand it correctly.

3            **MR. BALTER:**  Your Honor, just -- I'm just going to

4    make a quick record. With respect to -- so we are at offense

5    level 30. There are the two points added for possession of a

6    firearm. I'm going to object to the two-point addition of the

7    firearm, but submit with respect to further argument and just

8    incorporate my other arguments.

9            **THE COURT:**  Is that because you want a motion for

10   judgment on the firearm?

11           **MR. BALTER:**  Well, we did -- I did note that. I

12   believe that with respect to the guideline itself, I don't

13   think it's been established that this is a situation where two

14   levels should be added for possession of a firearm. But I will

15   submit on further argument on that. So that was --

16           **THE COURT:**  2D1.1(b)(1).

17           **MR. BALTER:**  Correct, paragraph 41 it was added.

18           **THE COURT:**  Right. I thought -- okay, if a dangerous

19   weapon including a firearm was possessed, increase by two

20   levels. As I remember the explanation it said if there is a

21   firearm that was present, we add this unless it's clearly not

22   connected. It sort of flips it away from what we were talking

23   about with Mr. Coleman-Fuller; is that right, Mr. Balter?

24           **MR. BALTER:**  That is what the commentary is.

25           **THE COURT:**  Right.

1        **MR. BALTER:**  Again, I've often been confused by

2    this. The initial -- the guideline itself just says if a

3    firearm was possessed. It says nothing about the connection to

4    the crime, it says nothing about when, where, anything of that

5    sort. It seems like incredibly vague. And then the commentary

6    makes the reference to the fact that it has to be clearly

7    improbable. I suppose, you know, as I speak about it, there's

8    the question as to whether or not that is an interpretation of

9    the underlying guideline or whether or not it is something

10   more than that that goes beyond what should be in a commentary

11   that may be in conflict with what the underlying guideline

12   was. I think that both those provisions are frankly incredibly

13   vague, but I don't think that for all those reasons two levels

14   should be added.

15       **THE COURT:**  Interesting. If they're not added, then

16   some of the offenses won't group. But be that as it may, I

17   find that it is properly added here.

18       **MR. BALTER:**  Well, you know what?  I don't think

19   they're going to group, Your Honor, because when you compute

20   -- so what probation did with respect to their calculation

21   based on what we knew at the time was accurate, I think. To

22   the extent that they said it's one group, it's all

23   transactional. What the Government did in their pleading was

24   something different.

25       **THE COURT:**  And they're wrong.

1      **MR. BALTER:**  I think that it was -- that's correct

2   that it was wrong. However, if we got to the point as to

3   determining whether or not the firearm would group and require

4   an increase in the offense level it wouldn't, because the new

5   offense level for the firearm after the Court's ruling with

6   respect to career offender would be 14, not 24.

7      **THE COURT:**  Okay, fine. The guidelines are

8   irrational sometimes it seems.

9      **MR. BALTER:**  Well again, that just comes out of the

10   other issue.

11      **THE COURT:**  Right. In any event, I'm not troubled

12   because I find that a dangerous weapon was possessed and if I

13   needed to make a finding, it's certainly not -- well, I do

14   need to make it -- it's not clearly improbable that the weapon

15   was connected with the offense. Some of the factors that I

16   mentioned with regard to the intent to exercise control over

17   it make that pretty clear too.  The location of the other

18   magazine and the ammunition and, frankly, all of the

19   circumstances of the offense. So I think it is appropriately

20   added so that we will reach a 32 on here.

21      The defense has raised issues -- as I understood it with

22   regard to the criminal history, there should be a policy to

23   exclude the three points in paragraph 53 and it results in an

24   overrepresentation of seriousness, overrepresentation -- but

25   you're not questioning the facts, that is, that these

```
 1   convictions occurred on the dates that it says.
 2              MR. BALTER:  No.
 3              THE COURT:  And the sentences and all of that.
 4              MR. BALTER:  That's accurate.
 5              THE COURT:  Right.  So it's an argument for a
 6   departure.
 7              MR. BALTER:  I did note, Your Honor, and again I
 8   don't know how this should be entered. For paragraph 53, it
 9   has a date of arrest, 2/28/2002 which wasn't actually date of
10   arrest. That was the date that it was waived to adult court.
11              THE COURT:  We learned that -- you did point that
12   out. We learned that from some of the other --
13              MR. BALTER:  Correct.  And I don't know the proper
14   way -- I brought this up with Ms. Martin. I don't know what
15   the proper way of entering that would be, but to the extent
16   that date of arrest means taken into custody, I don't think
17   that that's accurate. And to the extent that the fact that he
18   was 17 at the time of the date of arrest and not 18 might
19   conceivably with Bureau of Prisons be an issue later on.
20              THE COURT:  It's paragraph 72. That shows that
21   arrest February 1, 2002.
22              MR. BALTER:  Well --
23              THE COURT:  So there isn't much difference. But it
24   is correct that the original arrest was at age 17.
25              MR. BALTER:  Right, it was -- the original arrest
```

 1    was March 21st '01.

 2              THE COURT:  Well, that's what it says lower down.

 3    The defendant was placed under arrest on March 21st, in the

 4    narrative portion.

 5              MR. BALTER:  Right.

 6              THE COURT:  But you referred to the waiver and

 7    that's paragraph 72. And that shows February 1, 2002. That's

 8    got to be a mistake?

 9              MR. BALTER:  I don't know. Because if you see to the

10    right, on the right it's got that 2/28 --

11              THE COURT:  Waiver.

12              MR. BALTER:  --'02 waiver, right. That's what I was

13    going on. I frankly don't know where the 2/1/02 went unless

14    that's when the paperwork arrived. I don't know. But I think

15    the only --

16              THE COURT:  It's possible -- I understand that he

17    was 17 at the time of the event and the initial arrest, he was

18    raised by juvenile to adult court, convicted there in 2003. So

19    I understand those facts. I don't know if -- wait a minute.

20    Paragraph 69 --

21              PROBATION AGENT:  Your Honor --

22              THE COURT:  Yeah, it's 69 and not 72.

23              PROBATION AGENT:  Well, it appears that the offenses

24    listed in paragraphs 69, 70, 71 and 72 were all waived to

25    adult court under the same case number.

1           **THE COURT:**  Oh, okay. Well then paragraph 69 does

2     provide all of that information.

3           **MR. BALTER:**  Correct.

4           **THE COURT:**  And the last sentence, two sentences in

5     paragraph 53 says, "As noted below in paragraph 69 the

6     original arrest date was March 21, 2001 when the defendant

7     was"-- it's all right there. So there's nothing there.

8       And then you point to paragraph 58 for overrepresentation

9     as well. So you don't really quarrel with a Criminal History

10    Category of what, it's VI with four points, you just think it

11    should be something -- it should be a departure to five?

12    Well, I don't know. You think it should be a departure. I can

13    only go one level on a departure, right?

14          **MR. BALTER:**  I don't think that that's correct. That

15    would only be if he was ACCA, I believe.

16          **THE COURT:**  Let me get -- that's under four?

17    Elimination on page 392 of the guideline book I'm looking at

18    it's 4A1.3(b)(3). The extent of a downward departure under

19    this subsection for a career offender may not exceed one

20    criminal history. So you're right. It doesn't apply more

21    broadly.

22          **MR. BALTER:**  Correct.

23          **THE COURT:**  Okay. Do you want to be heard on that

24    departure request before we move to other things or is there

25    something else?

```
 1              MR. BALTER:  No, that will be fine. I can address

 2    both of those.

 3              THE COURT:  Okay.

 4              MR. BALTER:  So Your Honor is correct in

 5    characterizing my arguments in both kind of a combination of

 6    policy and departure. The bottom line in terms of what I'm

 7    asking is that he -- the calculation is a Criminal History VI

 8    at this point based on 14 total points which includes the two

 9    levels that are added for being on supervision at the time of

10    the current offense. We're asking the Court to consider

11    reducing or excluding the three points entirely on paragraph

12    53 and then on paragraph 58 we're asking for a reduction of

13    two points for that total of five.  That would reduce the

14    total down to nine which would put us in Criminal History

15    Category IV, just for purposes of trying to structure the

16    argument of what we're asking for.

17              With respect to the conviction at paragraph 53, I start

18    out by noting we are right at the cusp at this point of the

19    15-year limitation period. This offense, the start date in the

20    indictment was April of '19.  15 years would have brought us

21    back to I suppose April of '04, but I am conscious of the fact

22    that they're contending that there was an intervening period

23    of imprisonment relating to the violation of probation in '05

24    which led to a release later on. It notes in the report that

25    he was released on 6/22/'09 on this particular matter.
```

1        Your Honor, with regard to the policy matter, I note that

2    with regard to the limitation periods under the guidelines in

3    general, for the offenses for a year and a month there is a

4    15-year limitation period. If you go back beyond 15 years it

5    doesn't count. And for two point offenses and one point

6    offenses for adults that generally goes back for ten years.

7        Now this is a peculiar situation because for individual

8    -- for one and two point offenses, for individuals who are

9    under the age of 18 when they committed the offenses, the

10    limitation period is five years for both of those. All right?

11    And so it's our position that that reduced limitation period

12    -- and Your Honor, that goes I believe if the Court is looking

13    for a citation on that -- so the offense is under age 18,

14    4A1.2(d).  And under (d)(2)(A) and (B) it notes the five-year

15    limitation period. However, for (d)(1) it's the same as any

16    other adult sentence. And it's our position that the reduced

17    limitation period for people who commit the offenses under age

18    18 of five years rather than ten makes a logical

19    differentiation between younger offenders and older offenders

20    and that is for two reasons:

21        First of all, in terms of just kind of the modern

22    development of criminal law and especially issues related to

23    the development of young people, brain science, and

24    developmental and behavioral issues with regard to young

25    offenders as is probably articulated no better than it was by

the Supreme Court in their case in which they found that --
that under *Roper v. Simmons* that the death penalty doesn't
apply to offenders under the age of 18. And in that case what
the Supreme Court explained was that juveniles shouldn't be
subjected to the death penalty and noted that they have an
increased susceptibility to immature, irresponsible behavior
that means their irresponsible conduct is not as morally
reprehensible as that of an adult.  They have apparent lack of
controls over their immediate surroundings and they have --
and that means that juveniles have a greater claim than adults
to be forgiven for failing to escape the negative influences
of their environment. And that has to do with generally as a
matter of character, how we would deal with juveniles.

　　　　And the other issue always is under the guideline
sentencing structure, is what is the likelihood of recidivism.
And I think that these two things go together. In a
categorical way I believe that an offense that is committed
before the age of 18 because of the fact that it is less
likely to reflect exactly who that person will become later on
that it has less probative value with regard to the potential
for recidivism.

　　　　So I think that those are two reasons why the guidelines
coming to the conclusion that for one and two point offenses
the limitation period should be five years instead of ten
years is a rational one and a good one.

1    What's not clear is why that would mean that there is a

2    differentiation between the preferred treatment of offenders

3    for these more minor offenses which is not extended to

4    offenders under the age of 18 for offenses that were punished

5    by a sentence greater than a year and a month. For that their

6    limitation period goes all the way back 15 years. And I think

7    that if the guidelines were going to be consistent, even for

8    those greater offenses it wasn't going to go -- it wasn't

9    going to be made say five years the same as it was for one and

10   two point offenses, it certainly should not be anywhere near

11   the 15-year limitation that it remains for those which treat

12   offenders like Mr. Johnson was back in 2002 exactly the same

13   as an adult.

14       When that policy difference with the guideline is coupled

15   with the fact that this offense goes back almost to the cusp

16   of when -- the cusp of the 15-year period, that becomes the

17   type of factor the courts often look to in terms of how long

18   we should look -- whether or not a particular conviction

19   creates a danger of overrepresentation. And even when the

20   violation occurred here, it was a period -- and he was -- he

21   offended again during the period of supervision and then was

22   released, that went back at least another ten years before his

23   release on that.

24       So for all of those reasons, Your Honor, I think that it

25   would be appropriate in this case for the Court to not count

```
 1          the three points on this conviction.

 2               I also noted, Your Honor, there's a case out of the

 3          circuit in West Virginia by the name of Mason.  And it's a

 4          slightly different circumstance that they have in West

 5          Virginia.  But there is -- in West Virginia, the state courts

 6          have a rule that a person can be convicted as an adult the

 7          equivalent of our Maryland waiver. However, they can be

 8          sentenced as a juvenile. So the sentencing is -- it's kind of

 9          a hybrid in which they're convicted as an adult, sentenced as

10          a juvenile which most likely would result in them being

11          detained in a juvenile facility.

12               But in the Mason case, the Court was asked to consider

13          whether or not the limitation period under the guideline would

14          apply to this kind of West Virginia hybrid sentence. And they

15          found that it didn't. Because of the fact that the sentencing

16          was for a -- the sentencing applied as a juvenile, it wouldn't

17          convert this adult conviction into an adult sentence for

18          purposes of the guidelines.

19               And while the situation is different, I think what the

20          case recognizes is this is a challenging area with regard to

21          how to treat juveniles. And certainly in the Mason case, the

22          determination that was made was to an extent to giving more

23          favorable treatment to the person who committed the offense

24          under the age of 18 simply because of the onerous impact of

25          what either adding criminal history points or in that case it
```

 1    was whether or not it was going to make him a career offender.

 2    And implicitly what's involved in that is the question as to,

 3    you know, for these marginal cases, is a juvenile such as Mr.

 4    Johnson was at the time when this offense was committed going

 5    to be treated in exactly the same way as an adult.

 6        And I made reference to the fact that there was a

 7    question that came up in that case as to whether or not in

 8    fact if he was sentenced as a juvenile, a later violation

 9    should thereby -- and an adult sentence was imposed upon the

10    violation, whereby that later sentence should convert the

11    entire proceeding against that juvenile into an adult

12    conviction. And again, even the Government in that case found

13    that it should not.

14        So I think that these are all important factors that

15    suggest that this, this conviction that took place in 2002 or

16    actually for an arrest that took place in '01, a conviction

17    that took place in '03, all of it 20 years ago should count in

18    such a severe way as imposing a three-level increase. And I

19    submit that it shouldn't and the Court should either just

20    discount these three criminal history points or incorporate

21    them into a departure to bring us down by three points.

22        The next conviction that we asked the Court to consider

23    is the conviction at paragraph 58 in which Mr. Johnson was

24    convicted on April 25th of '11 for possession.  An 18-month

25    sentence was imposed and three points are therefore assessed

1     on the criminal history record.

2          And subsequent to that conviction, the Maryland law which

3     previously had provided for punishments of up to four years

4     was amended. And it changes so that a first-time offender

5     would be subject only to a sentence of imprisonment of one

6     year.

7          And the Court in making reference to this change in the

8     law in *Robinson v. State* at 451 Md. 94 noted that the change

9     in the law -- and they are referring then to marijuana --

10    noted that in the modern day, punishments are more geared

11    towards participation in drug education programs, assessment

12    for substance abuse disorders, and possible substance abuse

13    treatment. In other words, we're moving in the direction where

14    rather than punitive punishments for the possession of a

15    controlled substance, we're moving in the direction that this

16    is a public health issue that ought to be treated by

17    treatment, by drug treatment and rehabilitation.

18         And I bring that up from the standpoint had this

19    conviction occurred after the change in the law when these

20    more modern ideas about criminal justice existed in the state

21    system, it's very likely that the sentence he would have

22    gotten would have resulted in a one-point conviction, rather

23    than a three-point conviction.

24         So that's where I come up with my total request, Your

25    Honor, for a downward departure in terms of points of five

```
 1        points, going from 14 down to 9 which would put us in a
 2        Criminal History IV and I would ask the Court to make that
 3        adjustment in the criminal history score.
 4                 THE COURT:  Ms. Mathias?
 5                 MS. MATHIAS:  Your Honor, I agree with pretrial that
 6        his criminal history is properly counted and that these
 7        convictions should be included in his criminal history.  That
 8        is the state of the law as reflected. What Mr. Balter brought
 9        up were policy concerns and things that were happening in
10        other districts.
11            I will note that with respect to the first conviction,
12        the 2002 one, part of Mr. Balter's reasoning was that when
13        you're younger there's less time -- I wrote it down.  He said,
14        you're less -- the conviction is less likely to reflect who
15        the individual will be later on.  That might be true in
16        theory.  In this case it was the manufacturing and
17        distribution of crack cocaine in 2002 at age 18 and for the
18        rest of his adult life he continues to be involved in the drug
19        trade and arrested for those types of things.  So, in fact, it
20        very accurately represented who he would become.
21            Also, with respect to the marijuana manufacturing or the
22        manufacturing -- the marijuana, excuse me, Mr. Balter
23        completely glosses over the fact there was a handgun loaded in
24        the hotel room as part of that offense. This case was way more
25        than just marijuana.
```

```
 1              THE COURT:  What one are you talking about?
 2              MS. MATHIAS:  59, paragraph 59. That's not the one.
 3    58. We don't have the notes on that. Nothing further on that.
 4              THE COURT:  Yeah, there isn't a prior marijuana
 5    conviction, is there?
 6              MS. MATHIAS:  Sorry, I'm looking at the juvenile
 7    one. No, I'm looking at --
 8              THE COURT:  His argument on 58 is that today
 9    possession, simple possession under Maryland law would be
10    limited to one year.
11              MS. MATHIAS:  I see.
12              THE COURT:  So that the 18 months he got in 2010
13    shouldn't put it up to a three point, it should still just be
14    a one point.
15              MS. MATHIAS:  That's my fault.  We were flipping
16    back and forth.  Since we didn't have a description of the
17    facts I sort of conflated 58 and 59 and got confused, so thank
18    you for clarifying that for me.  We don't actually have the
19    statement of facts for what happened there, but regardless, at
20    the time three points were how it was accurately applied.  And
21    we maintain that that is how it should be applied today.
22         But regardless of whatever departures or however all the
23    guidelines are calculated and if Mr. Balter wants to go
24    through them one by one which is appropriate, but at the end
25    of the day we do point out that the Government while we
```

1    believe he is a career offender category IV, we aren't seeking

2    a sentence for 32 and a VI.  That's much higher than what we

3    are seeking. So viewed as a whole, we are taking into account

4    all of these mitigating factors.

5         **THE COURT:**  Mr. Balter, anything more?

6         **MR. BALTER:**  No, Your Honor.

7         **THE COURT:**  As we've clarified, I believe that the

8    defendant is not challenging the technical accuracy of the

9    calculation of the criminal history points. That is with

10   regard to paragraph 53 he agrees that it properly was

11   allocated three points. And in paragraph 58 in that it was

12   properly allocated three points. But the argument is that for

13   both policy and overrepresentation reasons, the Court should

14   depart down to a Criminal History Category IV by eliminating

15   all of the points for paragraph 53 because of the age of that

16   conviction and two of the points or one of the points -- well,

17   two?

18        **MR. BALTER:**  Two points for --

19        **THE COURT:**  Give two points rather than one for the

20   one in paragraph 58 so that he would have -- he would be

21   treated as if he had fewer points.

22       As to the first argument, I'm going to decline the policy

23   argument. As I understand it, the argument is that the

24   guidelines should themselves recognize that any conviction for

25   juveniles shouldn't go back this far because it should be a

1      different policy decision.  And here not only did we have -- I

2      mean, if we had only had the 18 months in that first release

3      we might not have had incarceration recent enough to count

4      this, but we did. In fact, the parole was revoked in 2011. I

5      don't know what that means, but he was released on parole in

6      2009. So I don't think whatever force there might be to some

7      argument that offenses prior to the age of 18, even when

8      treated as an adult from the get-go shouldn't count. Nor do I

9      think the change in the law or judge at the time in 2010 when

10     sentencing Mr. Johnson sentenced him to 18 months, probably

11     didn't have to, could have given less. So the change in the

12     maximum, interesting, but who knows what charge would have

13     happened, what plea agreements might have been reached, all of

14     that. So I'm not persuaded that the change in Maryland law

15     should do that.

16          I'm still aware that this is possession and not

17     possession with intent to distribute or distribution. I'm also

18     aware that that first conviction was an offense when he was 17

19     and obviously under the age of 18 at the time.

20          What I'm grappling with and looking at here is whether I

21     believe a Criminal History Category of VI overrepresents the

22     seriousness of the prior criminal history or the likelihood of

23     recidivism. Certainly on the second prong it's a no-go. We

24     have several offenses that were possession with intent to

25     distribute, as well as a handgun that got no points. So this

1    is not someone whose likelihood of recidivism would justify a

2    reduction.

3         On the other hand, I believe the type of drug dealing

4    that's outlined in the ones that we have information on is

5    relatively low-level, particularly compared to what we're

6    dealing with here. And therefore, I will conclude that the

7    criminal history of VI overrepresents, but only for one level.

8    I'll reduce to a V on the finding that a Criminal History

9    Category VI while there's lots of convictions here, we kind of

10   see the same type of conduct resulting in the revocation of

11   certain releases, whether it's on probation or parole and

12   re-incarceration, but not the kind of serious criminal history

13   that should merit the highest level. So I will treat him as a

14   V, a departure for overrepresentation of criminal history.

15        As a result, for guideline purposes I think we end up

16   with a 32 and a V which is 188 to 235; is that right?

17             **MS. MATHIAS:**  Yes.

18             **THE COURT:**  All right. Ms. Mathias, I'd like a

19   clarification from the Government. Is this the one or is it

20   the other one where I saw you had at one point suggested 240.

21   You're suggesting only 180 everyplace in this memo; is that

22   right?

23             **MS. MATHIAS:**  There was one.  I think it's the very

24   last -- I saw that. That will be for Coleman-Fuller's, but --

25             **THE COURT:**  All right, that's the other one. All

1 right. Do I need to do anything else with regard to findings

2 in the presentence report, Mr. Balter?

3     **MR. BALTER:** No, Your Honor.

4     **THE COURT:** Anything from the Government on that?

5     **MS. MATHIAS:** No, Your Honor.  Thank you.

6     **THE COURT:** Does probation -- we'll talk and make

7 sure because I would like an updated --

8     **PROBATION AGENT:** Certainly.  And I think I followed

9 along with what needs to be amended so far, so thank you.

10     **THE COURT:** Thank you, very good. Is anyone going to

11 speak then other than counsel and Mr. Johnson?

12     **MR. BALTER:** No, Your Honor.

13     **THE COURT:** No?  All right, then Ms. Mathias, you

14 can go first.

15     **MS. MATHIAS:** Thank you, Your Honor. The Government

16 submits that a sentence of 180 months, or 15 years is

17 sufficient, but not greater than necessary to fulfill the

18 purposes of 3553(a). As we just calculated, his guidelines at

19 an offense level of 32 and a Criminal History Category of V

20 are 188 to 235 months. We note that this is even with the

21 recalculated guidelines, our recommendation is still below

22 guidelines despite how very, very serious this offense was.

23    So again, we first look at the nature and circumstances

24 of the offense. This was a fentanyl trafficking organization

25 in Maryland that involved very high quantities. It was over

 1    400 grams. That's enough to kill many, many people. A fatal

 2    dose is the size of a piece of sugar basically.  And so we've

 3    outlined how serious it is. He had a firearm in connection

 4    with the offense. We have him going -- testimony of him

 5    wanting to bring that firearm, somebody he wasn't sure about

 6    and just all of the other things that show what a vast

 7    conspiracy this was.

 8         Next we'll look at the history and characteristics of the

 9    offender. This is, you know, it kind of goes both ways in Mr.

10    Johnson. On the one hand I'm extremely sympathetic in the

11    environment which he was raised.  It seems like drugs were all

12    around him from a very young age and I'm sympathetic.  But

13    even now he still hasn't accepted any responsibility.  Even

14    today, even in the past few minutes, I mean, he's not

15    accepting any responsibility.  And he was born into this

16    really difficult life circumstances, but that's the same life

17    circumstances that his conduct is inflicting on other people.

18         I mean, this case was I think a really unique opportunity

19    to hear from some of the addicts himself, who Mr. Lyles who

20    overdosed on fentanyl and rat poison from drugs this

21    conspiracy gave him.  And from Taisha Wheaton who was beaten

22    into being part of this. You see so many of the many negative

23    aspects of the drug trafficking organization and why these

24    guidelines were so high.  We saw the people who were impacted

25    and it's just, you know, I feel for him and what he grew up

1   with and that really was taken into account.  We're not even

2   recommending a guideline sentence for a trial. I think that

3   shows that we're being as reasonable as we possibly can here

4   in taking all of the mitigation put forward into account. But

5   any lower would just not fulfill the purposes of 3553(a).

6       We looked, you know, just many, many convictions that

7   we've outlined of 2003, controlled dangerous substances; 2003,

8   controlled dangerous substances; 2003, failure to obey a

9   reasonable lawful command; 2005, handgun charge; a 2005

10   controlled and dangerous substances charge; 2011, controlled

11   dangerous substances charge; 2012, controlled dangerous

12   substance charge.  And again, he's on probation for those

13   offenses at the time the conduct for which he was convicted

14   was occurring. So he has at least four narcotics-related

15   convictions, a firearms-related conviction and again, was on

16   community supervision already.

17       We also discussed that one offense involving a firearm.

18   And so he spent most of his adult life either serving time for

19   the crimes he committed or committing crimes.  And the types

20   of crimes he's committed before that he spent his entire adult

21   life committing, that's the same type of crime, controlled

22   dangerous substances and a handgun.

23       There's a need for specific deterrence because obviously

24   all of these other convictions have not deterred Mr. Johnson

25   whatsoever. There's also a need for general deterrence that

1    cases like this that involve lots of firearms, that involve

2    lots of drugs, involve a firearm in a baby's crib, that these

3    are not the kind of cases that the Court will take lightly.

4        The Government is already conceding to a below guideline

5    sentence which is a huge concession, especially for a trial

6    where all of this evidence was put on and all of the motions

7    that were litigated. So again, he needs a significant term of

8    imprisonment to fulfill general deterrence.

9        We also believe that the punishment should promote

10   respect for the law and provide just punishment for the

11   offense. Again, this is especially needed here because he

12   committed this crime after sustaining multiple convictions in

13   a matter that was designed to evade the law.

14       We also do have the need to avoid unwarranted sentencing

15   disputes among defendants with similar records who have been

16   found guilty of similar conduct. We note that Nelson pled

17   guilty prior to trial, received ten years, but Nelson didn't

18   have a record like Johnson did. And a big distinguishing

19   factor for Nelson for the Government was we didn't find a gun

20   on Mr. Nelson and all the wire calls we listened to it was

21   really Johnson and Coleman-Fuller who were the ones where we

22   found the guns and who were talking about the guns. And we

23   note that Philander Spruill also got ten years.  And learning

24   all that we learned throughout the trial preparation and the

25   trial period and spending more time with witnesses, I

1    certainly think if I had to go back I would have asked for
2    more time for Mr. Nelson and Mr. Spruill.  At the same time we
3    had a real interest in finality. While they didn't accept any
4    responsibility until after the motions, they did accept
5    responsibility.  And Mr. Nelson seemed truly remorseful when
6    he spoke to us. I mean, it just seemed like he finally had
7    reached a point where he had accepted responsibility.  And to
8    me, to the Government, that's a big deal.
9        Mr. Johnson still isn't here. He still isn't at that
10   point. His past encounters with the criminal justice system
11   seem to only make him return and go become a higher dealer. We
12   believe that 15 years is necessary to fulfill the purposes of
13   3553(a) and anything less just simply would not.  Thank you.
14           **THE COURT:**  Okay, I also have found paper 652, the
15   request for forfeiture. And it's for any interest he has in
16   the Glock and $4,423; is that right?
17           **MS. MATHIAS:**  Yes.  Thank you for finding that, Your
18   Honor.
19           **THE COURT:**  Okay. All right, Mr. Balter.
20           **MR. BALTER:**  Your Honor, we made a sentencing
21   recommendation that was based on what we had hoped would be a
22   guideline, a final guideline of 30 -- I'm sorry, 24 at IV and
23   that would have resulted in a range of 77 to 96. And while
24   that is not where the Court has ended up, I think for all the
25   reasons I'm going to explain to the Court we're simply going

1        to ask for the Court to impose a sentence within that range.

2            I have several items that I want to talk about which I

3        think should impact on the Court's decision on this. First of

4        all, I'm going to request the Court consider a variance. And

5        I'm not asking for a variance outside that range I already

6        proposed, but I think it's a significant factor to be taken

7        into account.

8            Mr. Johnson has been in custody now continuously since

9        August 12th of 2019. Most of that time he has been in federal

10       custody. I believe I first came to meet him in about March of

11       2020, so that would have been right around the time where

12       COVID struck. And we're all aware of what COVID did to the

13       entire criminal justice system. I mean, basically to a large

14       extent because of COVID we're at a sentencing today,

15       three-and-a-half years after Mr. Johnson's initial arrest. And

16       certainly from what I know, it was literally years before I

17       ever had a personal meeting with Mr. Johnson. Intermittently

18       we were able to get video links at CTF. First he was at DOC.

19       As the Court is probably aware, CDF and CTF in DOC are right

20       next to one another. They're two facilities run by the DC

21       Department of Corrections. But those places were totally shut

22       down like most detention facilities were in those early times.

23       And I believe when I talked recently to Mr. Johnson, he said

24       literally it was years before he ever got to go outside after

25       COVID hit.

1      To a large extent during that period he was confined to a

2   cell 23 hours a day. I think the strategy at CTF in terms of

3   controlling the COVID spread was to limit movement within the

4   facility in any conceivable way that they could. And, I mean,

5   the way he described it to me, it was just tortuous being in

6   that facility all of that time, the fact that there was just

7   literally no movement within the facility. Occasionally they

8   would come out.  A couple times a week they might be able to

9   get a shower, but they were horrendous conditions. Like I

10  said, I was limited maybe once a month or less to getting an

11  hour or so of time with him on a Zoom. It was very, very

12  limited what we were able to do in terms of communicating

13  basic attorney/client. We never had the ability to get

14  together and meet on many of these issues.  It got down to a

15  couple of years down the road.

16      He himself contracted COVID within the facility, I

17  believe on three occasions. Each time he contracted I mean it

18  was basically the equivalent of being put in solitary

19  confinement for up to two weeks, I believe. I mean, it was

20  just a horrendous situation.

21      As the Court is probably aware, there was substantial

22  litigation that was going on all along with regard to the

23  ability of Department of Corrections in DC to be able to just

24  basically administer to the basic rights of the people being

25  detained during that period.

1    So again, I know that this is -- it's a serious case. I

2    appreciate the fact that there are other factors going on. In

3    many cases the courts in the district have taken into account

4    giving substantial variances to -- in light of the harsh

5    conditions of confinement that existed for such a substantial

6    period of time. I know, you know, Mr. Johnson suffered

7    significantly. I think it was only in the last couple of

8    months that he was able to see his family for the first time

9    in almost three years or about three years. It's very, very

10   significant. It can't be -- I think it's difficult for those

11   of us who didn't have to live through that to appreciate it.

12   We each had our own challenges during that period of time. It

13   was particularly difficult at the Department of Corrections.

14       With regard to Mr. Johnson's personal background -- and

15   the Government obviously had picked up on this and I'm going

16   to be somewhat tempered in what I say.  He has family members

17   in the courtroom. Some of the things that I put in my papers I

18   think would be very hurtful to family members with respect to,

19   you know, what he had to endure during his childhood. There

20   were many -- there was a level of what I perceive to be just

21   chaos and instability within his upbringing. The people who

22   took care of him were challenged by their own dependence on

23   drugs and that filtered down to the children as well as would

24   be the case.

25       When I talk to Mr. Johnson about this, in certain ways he

1    felt like it had all been normalized. I mean, that's what he

2    expected. I sometime use the expression, "We all go to our

3    office in the morning." Those of us who come from professional

4    families and inherit that as our legacy, you know, going to

5    the office in the morning means we do things that are very

6    rewarding because that's what we've been exposed to from the

7    earliest stages of our life.

8         For other individuals their office is not that. For Mr.

9    Johnson, his office was the chaos of the drug life. For him,

10   you know, the trauma that he experienced when he was a very

11   young child, at some points being scared to literally go out

12   of the house because of what he observed outside of some of

13   the violent incidents that he saw, it was traumatizing. And so

14   I think to a certain extent one of the ways of looking at this

15   is well, this is what you saw.  Why didn't you make different

16   choices in your own life?  The other way of looking at it

17   perhaps in a more sympathetic way is well, that's the office

18   that was presented to me and I wish it perhaps had been

19   different, but it wasn't.

20        I have to say, Your Honor, I've been working with Mr.

21   Johnson for years now. He is one of the most respectful

22   clients I have ever had. I mean, the Government harps on the

23   fact that he hasn't accepted responsibility. All I can say

24   from the lawyer standpoint and I deal with challenging

25   circumstances all the time, it is rare I've had a client so

1    appreciative of everything that's done for him. And I rarely

2    have seen a client who is as appreciative of the way the

3    system works, frankly. I mean, he had his differences and the

4    Court is aware we vigorously litigated many issues in this

5    case. And I have to say, more often than not it was Mr.

6    Johnson who was recognizing issues. And I know one of the most

7    difficult things for him when he was at CTF during COVID was

8    he couldn't get to the law library. You know, every time I saw

9    him he would bring cases to me. And one way of looking at that

10   is well, you know, you have -- your ability to use your mind

11   in this way, why didn't things just go a different direction?

12   And I don't think -- I don't have a good answer for that. I

13   really don't. I don't have a good answer for that.

14       In terms of my personal relationship with Mr. Johnson in

15   wondering why, I'm kind of baffled myself. Maybe not baffled,

16   that's the wrong word. I feel the tragedy of what a difference

17   -- what a difference there might have been had there been an

18   environment that allowed for something different. And Your

19   Honor, those were stiff sentences he got up in Frederick

20   County, there's no question about it. Looking at that rap

21   sheet it looks very, very serious. Now I know in other

22   jurisdictions in this state for the same conduct, it probably

23   would have looked a lot different.

24       The Court made note of the fact that, you know, what

25   we're looking at, a number of these three-point convictions

1    were matters of a single transaction with an undercover

2    officer. I know that there were some allegations of more

3    serious conduct, but that's basically what it was. And again,

4    there's just -- I'm not trying to minimize anything at this

5    point. I'm simply trying to put it in context.

6        Mr. Johnson is 38 years old. The Government is asking for

7    15 years. That is a long, long time. And I think, you know,

8    the Government's focus is on a lack of responsibility and I

9    want to talk about this issue of the proportionality among the

10   defendants. Because the Government raised this in their paper.

11   And the Court is well aware. There were four defendants who

12   came out, who went through the motions hearing.  Two of those

13   defendants, Nelson and Spruill entered into C pleas for ten

14   years, which obviously represented a joint recommendation by

15   the Government, by the defense, that that was an appropriate

16   sentence that was sufficient, but not greater than necessary

17   to satisfy the purposes of the 3553 factors.

18       I have no idea what kind of record Nelson and Spruill

19   had. I've heard -- my scuttlebutt is they had a record, they

20   were category VIs as well.  I have no way of knowing. I wasn't

21   at their sentencings, I've never seen their PSRs.  I wouldn't

22   know. From what I understood, they had serious records.

23   Certainly in terms of the way the Government has from day 1

24   characterized this conspiracy, they had Nelson as this central

25   figure. Nelson is the one who has imported kilo amounts with

1    Spanish writings on them which apparently signifying that he

2    was getting them from a cartel down in Mexico. I mean, he is

3    -- obviously he was a major distributor. The fact the

4    Government is saying well, there's a major difference between

5    the fact that he only had bullets and actually there was a gun

6    found with Mr. Johnson, I'm not sure that that is such a

7    significant distinction. I don't know why Nelson would have

8    had bullets if there wasn't a firearm located somewhere within

9    his realm. It doesn't make a lot of sense.

10       I only bring this up for purposes of proportionality. He

11   was obviously the main distributor. The Government itself in

12   framing the indictment and we all know that to a large extent

13   the top tier of a conspiracy is identified by the amounts of

14   drugs that are foreseeable, that they're charged with in the

15   indictment. So you've got Nelson, 400-plus grams, mandatory

16   10; Spruill, 400-plus grams, mandatory 10; Benton, 400 grams,

17   mandatory 10.  Benton pled guilty, again, with a C plea as I

18   understand it, to a C plea on an information of 72 months.

19       But what the Government is asking for is a 50 percent

20   increase for I suppose a combination of going to trial and for

21   not accepting responsibility in that way, although I'm not

22   sure that that's an appropriate way of viewing Mr. Johnson's

23   position.

24       I mean, again, one of the issues that comes up in terms

25   of a defendant making a decision on whether to go to trial is

1    what their decision is with respect to some of their appellate

2    issues. That's a valid concern of a defendant and a defendant

3    if that is a concern is not going to be making any statements

4    with regard to accepting responsibility or anything else that

5    might impact any trial rights later on if there were to be a

6    retrial or something of that nature. So I think that the

7    Government overstates what the significance of that lack of

8    responsibility is.

9         The other thing is that they gave Spruill a ten-year

10   sentence as well.  And the Court heard what Spruill was

11   responsible for. If that witness, Ms. Wheaton, is to be

12   believed, she was being beaten on a daily basis and she was

13   being beaten, at least one of the purposes was to facilitate

14   the conspiracy to have her do the bidding for Mr. Spruill. And

15   she was the one right after the search warrant took place,

16   that she ran over to warn Benton about the fact that the

17   search had taken place and so that he could make some kind of

18   arrangements.

19        You know, one of the things that happens at trial is a

20   lot of stuff gets smoked out. And I always tell a client, you

21   go to trial, a judge is going to find out a lot more about you

22   hearing all this testimony than might be known if there's a

23   plea. I don't think anything really smoked down that way

24   against Mr. Johnson. There's nothing that suggested he had a

25   greater level of culpability than Nelson. And we can point to

1    the gun as being distinguishable from the bullets, but the

2    fact is that there was never any evidence that any firearm was

3    displayed in any way, in anyplace against any person. He never

4    beat any girlfriend like Spruill did. I mean, there are good

5    arguments, there are good arguments as to why Mr. Johnson is

6    at a lesser level of culpability. And to the extent that the

7    need to avoid disparate sentences is an issue, and I'm not

8    saying that -- again, I don't know what their records are, but

9    to the extent it's a factor to be taken into account, I

10   cannot -- I still haven't heard anything from the Government

11   that justifies that Mr. Johnson should be serving 50 percent

12   longer, five years longer than Nelson and Spruill.

13        I understand a defendant who goes to trial gets longer.

14   It's built into the guidelines. But that's a significant

15   increase.

16        So, Your Honor, for all of these reasons, I'm

17   recommending a range of 77 to 96 and that the top of that

18   range is eight years. And I think taking everything into

19   account, that that would be a sentence that would take into

20   account seriousness, it would take into account deterrence,

21   protection of the public, and that it would be long enough, it

22   would be sufficient, but not greater than necessary to fulfill

23   the purposes of sentencing under 3553.

24            **THE COURT:**  I assume in light of the verdict on

25   forfeiture you don't object to the preliminary order?

1          **MR. BALTER:**  You know, Your Honor, I'm sorry.  I

2   haven't seen it. I can't imagine that I would. I just didn't--

3          **THE COURT:**  You didn't note it. It's paper 652. It

4   came in on the second of March.

5          **MR. BALTER:**  No, I'm sure it's my oversight.

6          **THE COURT:**  Okay, but we did have a verdict, so --

7          **MR. BALTER:**  We had a jury verdict and to the extent

8   of how it was characterized, the firearm and the money, that

9   comports with my understanding.

10          **THE COURT:**  All right, okay. And before -- I'm going

11   to talk to Mr. Johnson.  I just want to talk about have you

12   reviewed the proposed conditions of supervised release, Mr.

13   Johnson?

14          **MR. BALTER:**  He has reviewed them.

15          **THE COURT:**  And do you have any issues with regard

16   to either the mandatory, standard, or additional

17   recommendations?

18          **MR. BALTER:**  Just one moment. No, Your Honor.

19          **THE COURT:**  Mr. Johnson, we've spent a long time

20   today talking with you sitting there patiently. This is now

21   your opportunity yourself to tell me anything that you want me

22   to know. You're not obligated to make any statement, but I am

23   happy to hear from you if you wish to tell me anything.

24          **THE DEFENDANT:** I'm going to try to talk.

25          **THE COURT:**  You can be seated.  If you're more

```
 1      comfortable, be seated, but --
 2              THE DEFENDANT:  First of all, I can't -- I can't
 3      thank this man enough because every step of the way he's
 4      fought vigorously for me, very receptive to information,
 5      allowed me the opportunity to go over things properly. This
 6      man is one of the best men I've met in my life. I don't know
 7      what to say.
 8          Outside of that, my family is here.  I haven't seen these
 9      people in three years due to the conditions I was in at the DC
10      jail. I'm about to get vaccinated.  Due to me contracting
11      COVID I felt as though that was sufficient. I haven't seen my
12      mother in three years, probably longer than that. My cousin.
13      I just seen my lady for the first time two months ago and my
14      four-year-old son. Long story short, it's just been very
15      tough.
16          I do embrace that without law there's no order. I respect
17      what everybody does in this courtroom. You are a brilliant
18      woman, Ms. Chasanow. I wish I would have had the opportunity
19      to have a conversation with you outside the context of which
20      we are in. You are amazing at what you do. I know you are of a
21      particular age. Your diligence, the details that -- you're
22      keen on details.  I have so much respect and admiration for
23      you. I have no qualms with the Government, they're doing their
24      job.  It is what it is.
25          More or less, I'm 39 years old. Obviously I've been
```

1    through some things in my life and at the end of the day, I'm

2    in a great place today for what it's worth. If anybody cared

3    to know, I'm in a great place.

4         Like I say, I've been incarcerated for three-and-a-half

5    years. It was tough. We endured 23 and 1 for 18 months. I was

6    behind a door for 23 hours a day. I was only allowed to come

7    out for an hour a day. I was given the opportunity to take a

8    shower, within that time frame, possibly make something to

9    eat, and use the phone. Super tough time. I'm not one to

10   complain because I do believe and I embrace the axiom that man

11   creates their own conditions. I chose to exercise my right to

12   preserve -- I chose to exercise my right to trial to preserve

13   some of my rights because I do believe that some things wasn't

14   done fairly in this process.  However, I respect it and I move

15   forward to deal with it at a later date.

16        In closing, I'm embarrassed. I'm just kind of over it.

17   Like I'm embarrassed to the extent that, like, I love my

18   family. I miss my family.  It's difficult.  And I'm not really

19   asking for sympathy, I just -- I'm just asking for you to make

20   me or essentially, you know, present leniency which in the

21   confines of the court is able to give me.

22        Like I said, I'm in a great place. I've studied. I read

23   and write and I comprehend very well. Because I wasn't

24   vaccinated real quick, I wasn't granted opportunities to do

25   anything within the institution to further my education or

1   anything of that nature. But I've done something that I had a

2   desire to do for a long time now and I composed three books.

3   I wrote three-and-a-half books. I didn't share this with Mr.

4   Balter. And I personally, I believe I got a National Best

5   Seller in my compilation, but we'll see how that goes.  But

6   I'm very proud of that accomplishment.

7       And it's been tough. I've been sitting three-and-a-half

8   years.  I wish this was over like two years ago. I don't know,

9   I've never been through this type of ordeal as far as the

10  process, as far as the courts. I know the pandemic occurred

11  and there was no use of the world, so I accepted it.  It is

12  what it is. But, you know, I remain certain of my nature. I

13  love people generally. I never hurt nobody. I don't have a

14  violent record. And I just ask the Court to take all that into

15  consideration. Thank you.

16          **THE COURT:**   Thank you. Thanks for your patience. Mr.

17  Johnson is before the Court for sentencing on three counts.

18  Count One is conspiracy to distribute and possess with intent

19  to distribute heroin and fentanyl; Count Three, possession

20  with intent to distribute heroin and fentanyl; and Count Four,

21  possession of a firearm and ammunition by a prohibited person.

22      Much has been said today in the context of the statutes

23  and the guidelines about the nature and scope of the

24  distribution of the heroin and fentanyl involved in this

25  overall conspiracy. As I think was noted and I think as I've

1    remarked perhaps at some of the other sentencing hearings, the

2    fact that we went to trial and I heard some of the tape

3    recorded conversations with the customers was riveting to hear

4    the desperation in their voice.

5        And I want to start here, Mr. Johnson:  You said you

6    haven't hurt anybody and I know what you meant was physically

7    yourself, but the poison that is distributed when people

8    traffic in heroin and particularly in fentanyl, does hurt

9    people. You're not responsible for their initial addiction

10   probably. You know, there are lots of reasons people start to

11   abuse illegal drugs like fentanyl and heroin. But making this

12   poison so readily available does hurt people. Addiction is

13   horrible.  As Mr. Balter alluded to, you perhaps should

14   understand that more than others who have seen how it can

15   impact individuals, families, communities. And everybody who

16   participates in a drug distribution conspiracy from the people

17   who make this stuff, to those who import it into this country,

18   to those who distribute it to other people in the middle, down

19   to those who package it and sell it to addicts, they all

20   contribute to the problem that we have. And everybody in that

21   chain is responsible ultimately for hurting people.

22       We heard of some overdoses, fortunately no deaths. It's

23   just shocking to me how available this fentanyl is, how

24   dangerous it is and people who traffic in it need to

25   understand that what they do is very dangerous. It does hurt

 1   people. And the jury found and I agree that you were a very

 2   important part of this distribution chain.

 3       I see you graduated from your criminal history street

 4   dealing, dealing to undercover. You got smarter that you can't

 5   get caught quite as easily if you aren't at that level where a

 6   lot of the focus of law enforcement begins.

 7       So I find this very dangerous, very significant criminal

 8   activity that's deserving of harsh punishment. Congress as you

 9   know has enacted mandatory minimums for certain quantities of

10   distribution. Your mandatory is five years for anything over

11   40 grams and I found you responsible for ten times that. I

12   don't know whether they've pegged it high enough, frankly, for

13   the fentanyl. It's so dangerous. But you can't understate how

14   terrible this drug conspiracy was and fortunately has been

15   stopped by the law enforcement activity in this particular

16   case.

17       Mr. Balter talked about the others and who is more

18   culpable, less culpable, what their roles are. As I've said,

19   it takes everybody to make this succeed and continue in

20   operation. So, you know, that's sort of the nature of

21   conspiracy. But he's correct that I do need to try to be a

22   little bit more nuanced in roles. You insulated yourself from

23   the street. You succeeded in making it very difficult for law

24   enforcement to figure out who you were, where you were. And in

25   this case what I found, what I learned was that you were

1    primarily helping Mr. Spruill get what he needed to distribute
2    on the street.
3        Certainly Mr. Nelson was higher in the overall chain of
4    things. I mean, from time to time I try to adjust my chart of
5    who is where and who is with who.  And certainly Mr. Nelson
6    was right there leading this particular aspect of this, but
7    you weren't far behind, given your necessary connections with
8    Mr. Spruill who then took it further. But yes, I recognize
9    he's the one who had the contact in Mexico and was picking up
10   the drugs where he could, New Jersey, and bringing it back to
11   Maryland.
12       And he was not a neophyte to the criminal justice system.
13   I'm not going to remark any more than that. So yes, of course,
14   he had some, but he did admit guilt. He did accept
15   responsibility, and did that after participating in the same
16   motions practice although not exactly the same motions that
17   you did. And that led I think in great measure to the
18   Government being willing to agree to the C plea that they did
19   agree to. Just like you have the absolute right to go to trial
20   and not admit guilt, nobody is suggesting in any way
21   otherwise, you should understand what it means to give up some
22   of those rights and to accept responsibility. The guidelines
23   take it into account and sometimes I don't think they give
24   enough credit for accepting responsibility. They do
25   differentiate in the guidelines between basic acceptance which

1      gets two points and timely acceptance that gets one. And I

2      think what happened in this case was that the Government

3      acknowledged that agreeing to give up the right to appeal the

4      motions practice which has generated I am certain lots of

5      interesting issues for the Fourth Circuit, was a significant

6      step taken by both Mr. Nelson and Mr. Spruill. So it was part

7      of their history and characteristics that is not here with

8      you. No reason it needs to be, but you have to understand that

9      that was part of what goes into a sentencing consideration,

10     because it is part of their characteristic.

11          So I don't think I look solely at their level of

12     so-called culpability prior to arrest. That's part of it

13     certainly, but it's by no means the only measure of

14     culpability at the sentencing stage.

15          I've already remarked about your criminal history. It's

16     not enviable, obviously. I did agree in part that some of

17     these prior convictions are not as serious as some other

18     three-point convictions that I sometimes see. But I can't

19     overlook the fact that you escalated horribly your level of

20     drug dealing from the time of your release, I guess finally

21     the 2015 to what began here in 2017 -- 2019 I guess, in April

22     of 2019, demonstrating to me that even ten-year sentences were

23     not enough to deter you. I know you didn't serve the full ten

24     years.  In state you get paroled, but ten years was imposed on

25     you. It was 20 years with ten years suspended in 2005 and 40

1    years all but 10 suspended in 2010. And even facing a ten-year

2    sentence was not enough to convince you to stay away from drug

3    dealing.  And I don't think sentences should get any easier

4    when you repeat the criminal conduct. That's turning things on

5    their head.

6        The goals of sentencing are to punish people. They're to

7    deter them, that is to persuade them not to do it again, to

8    persuade -- to try to persuade others not to do it in the

9    first place.

10        I do have to consider the guidelines which we've talked

11   about perhaps much too long today. I do consider sentences

12   imposed on other people. The need to avoid unwarranted and

13   that's an important word, sentencing disparity with people who

14   are similarly situated. And ultimately I have to make a

15   judgment as to what sentence is the appropriate one under all

16   of these circumstances.

17        I recognize and I am very sympathetic to the conditions

18   under which too many people have been detained for too long

19   because of COVID. All of us in this country faced

20   circumstances that we lacked control over, didn't know how

21   dangerous and how we could get it and how it was spread and

22   all of that. But those in detention facilities had it so much

23   worse. You had no control over how to protect your own health

24   and safety. And that had to be agonizing. Never mind the fact

25   that you were so restricted in your ability to move about the

1    facility, to have any productive time in terms of programming.

2    I get it. It was horrible. I hope we've learned something and

3    can make sure that we never again face that kind of a

4    situation. And I have taken that into account in making my

5    overall assessment here.

6         I'm going to sentence you to 150 months on Counts One and

7    Three concurrent, and 120 months concurrent on Count Four

8    followed by supervised release probably five years on Counts

9    One and Three, but probably limited to three years on Count

10   Four. That will be concurrent as well. The conditions of

11   supervision will be those mandatory conditions that are

12   required under the law, as well as the standard conditions

13   that we believe are necessary for effective supervised release

14   in this district. And in addition you will participate in a

15   vocational services program following all of its rules and

16   regulations. You will participate in a substance abuse

17   treatment program and again follow all of those rules and

18   regulations. You will submit to substance abuse testing to

19   determine if you have used a prohibited substance. There will

20   be no fine, but there's a special assessment of a total of

21   $300.  It's $100 per count. This is money that goes into a

22   fund to help people who are victims of crime and for that

23   reason have financial problems that they didn't otherwise

24   have. It's required of the law that I impose the special

25   assessment and I do so.

1      And in line with the verdict on the forfeiture, I will

2  direct that you forfeit any right you might have to the Glock

3  42 .380 caliber pistol and the ammunition seized in your

4  residence, as well as the $4,423 dollars seized at that

5  location.

6      I will prepare and enter the judgment in writing and

7  copies will, of course, go out. I don't know, I guess there

8  were earlier indictments that need to be dismissed?

9          **MS. MATHIAS:**  Yes, Your Honor.  We would move to

10  dismiss the earlier indictments.

11          **THE COURT:**  Any requests for recommendations, Mr.

12  Balter?

13          **MR. BALTER:**  Yes, Your Honor. A recommendation for

14  Cumberland. I believe his jail credits should go back to

15  8/12/2019.

16          **THE COURT:**  It says on the presentence report he was

17  released on September 23, 2019, but was detained October 30,

18  2019 for violating release conditions. And then he came into

19  federal custody so with all but a week, I mean, a month in

20  there.

21          **MR. BALTER:**  He tells me he was never at liberty. I

22  mean, again, I think if BOP is going to I suppose double check

23  it --

24          **THE COURT:**  Well, they get the information from us

25  in the presentence report and that's what they use. And the

```
 1        probation -- that's on page 2.
 2                MR. BALTER:  I understand.
 3                THE COURT:  Yeah, it's under release status. Let me
 4        just see. So the records that we were able to check show a
 5        release on personal recognizance on September 23, 2019 and a
 6        detention on October 30, 2019. So here's what I'll invite you
 7        to do:  Talk to the probation officer and maybe you can see
 8        what those records are. If any of that's in error -- we are
 9        going to have to amend this report for several reasons.
10                MR. BALTER:  I can do that.
11                THE COURT:  So we hold it and then you talk to Ms.
12        Mathias and if you agree that we change that, that will be
13        fine. If you disagree we may have to have some sort of a
14        discussion. All right?  I mean, it's what, five weeks worth of
15        question which is not insignificant in the scheme of things.
16                MR. BALTER:  No, I will try to resolve it. And I
17        believe the Court can also make a recommendation for a maximum
18        transitional period at the end of his sentence which would
19        perhaps allow him to go into a halfway house and perhaps a
20        transitional period would be advantageous for Mr. Johnson.
21                THE COURT:  Well, I hear you and I do often get
22        asked to make that recommendation from people who are already
23        in. I don't know what the law will be at the time that Mr.
24        Johnson is ready for consideration and so therefore I'm not
25        going to make a recommendation one way or the other. That's a
```

1    matter for the Bureau of Prisons and Congress, frankly, to

2    figure out.

3           **MR. BALTER:**   Thank you.

4           **THE COURT:**   I think BOP assesses each person

5    individually, as well as the resources available for

6    transition housing and halfway houses and what have you. But I

7    will recommend Cumberland.  I assume that's proximity to

8    family for visits. Obviously that's important and that is

9    always the goal of the Bureau of Prisons.

10          Mr. Johnson, it takes some time for the Bureau of Prisons

11   to make a designation. So be a little patient, but I hope it

12   happens promptly and that you will be transferred.

13          You have the right to appeal. An appeal has to be noted

14   in writing within two weeks of when my order of judgment gets

15   entered on the record of the court. It probably won't be today

16   given the amendments we need to make and the things we need to

17   check, but it will be probably next week. But in any event,

18   talk it over promptly with Mr. Balter because if you want to

19   appeal, he would file the notice of appeal and, Mr. Balter, if

20   you tell us that that's what he wants we can obviously do that

21   as well. But you know how to do that--

22          **MR. BALTER:**   Sure. Yes, Your Honor.

23          **THE COURT:**   --if that needs to happen. All right,

24   what have I left unclear, forgotten to talk about?  Anything?

25   Anything?  Ms. Mathias, no?

1        **MS. MATHIAS:**  Nothing further from the Government.

2    Thank you, Your Honor.

3            **THE COURT:**  Mr. Balter?

4        **MR. BALTER:**  Nothing, Your Honor.  Thank you.

5            **THE COURT:**  All right, then that will complete the

6    sentencing proceeding for Mr. Johnson.

7            **(Proceeding concluded at 12:59 p.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF OFFICIAL REPORTER

1

2

3

4

5          I, Nadine M. Bachmann, Certified Realtime Reporter

6     and Registered Merit Reporter, in and for the United States

7     District Court for the District of Maryland, do hereby

8     certify, pursuant to 28 U.S.C. § 753, that the foregoing is a

9     true and correct transcript of the stenographically-reported

10    proceedings held in the above-entitled matter and that the

11    transcript page format is in conformance with the regulations

12    of the Judicial Conference of the United States.

13

14                    Dated this 22nd day of May, 2022.

15

16                    -S-

17    _____

18                    NADINE M. BACHMANN, CRR, RMR
                      FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25

## $

**$1,050** [1] - 36:4
**$100** [1] - 92:21
**$300** [1] - 92:21
**$4,000** [1] - 13:17
**$4,423** [4] - 32:17, 33:8, 73:16, 93:4
**$6,000** [2] - 35:4, 35:24
**$70** [2] - 33:8, 36:6
**$8,000** [1] - 20:13

## '

**'01** [2] - 55:1, 62:16
**'02** [1] - 55:12
**'03** [1] - 62:17
**'04** [1] - 57:21
**'05** [1] - 57:23
**'11** [1] - 62:24
**'18** [1] - 32:25
**'19** [1] - 57:20

## 1

**1** [5] - 50:11, 54:21, 55:7, 79:23, 85:5
**1,200** [1] - 46:17
**1.2** [7] - 41:10, 43:18, 43:19, 44:24, 46:12, 46:13, 47:3
**10** [4] - 80:16, 80:17, 91:1
**10-minute** [1] - 48:6
**100** [3] - 31:20, 45:11, 46:3
**101** [2] - 33:14, 34:25
**1014** [1] - 1:21
**11:00** [1] - 47:13
**11:05** [1] - 48:8
**11:18** [1] - 48:8
**12** [3] - 42:4, 42:11
**120** [1] - 92:7
**128** [2] - 32:7, 32:8
**12:59** [1] - 96:7
**12th** [4] - 4:1, 32:16, 35:1, 74:9
**13** [1] - 50:22
**1340** [1] - 1:18
**14** [3] - 53:6, 57:8, 64:1
**15** [11] - 18:6, 21:1, 36:3, 36:6, 36:18, 57:20, 58:4, 60:6, 69:16, 73:12, 79:7
**15-year** [4] - 57:19, 58:4, 60:11, 60:16
**150** [1] - 92:6
**160** [2] - 32:11, 39:25

## 17

**17** [4] - 54:18, 54:24, 55:17, 67:18
**18** [15] - 54:18, 58:9, 58:13, 58:18, 59:3, 59:18, 60:4, 61:24, 64:17, 65:12, 67:2, 67:7, 67:10, 67:19, 85:5
**18-month** [1] - 62:24
**180** [2] - 68:21, 69:16
**188** [2] - 68:16, 69:20
**198** [1] - 10:11
**1984** [1] - 9:6
**1:30** [1] - 47:13

## 2

**2** [5] - 31:17, 43:17, 47:15, 50:19, 94:1
**2/1/02** [1] - 55:13
**2/28** [1] - 55:10
**2/28/2002** [1] - 54:9
**20** [4] - 19:11, 62:17, 90:25
**20-0038** [1] - 1:4
**200** [2] - 1:18, 45:11
**2001** [1] - 56:6
**2002** [6] - 54:21, 55:7, 60:12, 62:15, 64:12, 64:17
**2003** [5] - 10:6, 55:18, 71:7, 71:8
**2005** [3] - 71:9, 90:25
**2008** [4] - 29:2, 29:9, 29:11
**2009** [2] - 10:11, 67:6
**2010** [3] - 65:12, 67:9, 93:1
**2011** [2] - 67:4, 71:10
**2012** [2] - 9:23, 71:11
**2015** [1] - 90:21
**2017** [1] - 90:21
**2018** [1] - 5:24
**2019** [10] - 4:1, 35:7, 45:9, 74:9, 90:21, 90:22, 93:17, 93:18, 94:5, 94:6
**2020** [1] - 74:11
**2022** [1] - 97:14
**2023** [2] - 1:8, 48:13
**21** [1] - 56:6
**21201** [1] - 1:14
**21209** [1] - 1:19
**21211** [1] - 1:22
**215** [1] - 9:20
**21st** [2] - 55:1, 55:3
**22nd** [1] - 97:14
**23** [5] - 75:2, 85:5, 85:6, 93:17, 94:5
**235** [2] - 68:16, 69:20

## 24

**24** [9] - 1:8, 32:11, 32:14, 40:1, 40:4, 43:13, 53:6, 73:22
**240** [1] - 68:20
**25th** [1] - 62:24
**26.6** [1] - 37:8
**27th** [1] - 48:13
**28** [2] - 48:13, 97:8
**29** [4] - 3:19, 11:22, 23:6, 24:12
**2:00** [1] - 48:4
**2:30** [2] - 47:14, 48:5
**2D1.1(b)(1)** [1] - 51:16

## 3

**3** [2] - 31:11, 31:17
**30** [9] - 21:1, 30:12, 40:7, 44:23, 50:23, 51:5, 73:22, 93:17, 94:6
**300** [1] - 45:11
**32** [7] - 30:13, 41:11, 51:1, 53:20, 66:2, 68:16, 69:19
**321** [1] - 10:5
**33** [3] - 3:19, 23:8, 24:13
**34** [1] - 9:6
**3553** [2] - 79:17, 82:23
**3553(a** [3] - 47:12, 47:22, 73:13
**3553(a)** [2] - 69:18, 71:5
**36** [1] - 1:14
**36th** [1] - 1:21
**38** [1] - 79:6
**380** [1] - 93:3
**39** [1] - 84:25
**392** [1] - 56:17
**3D** [1] - 1:8

## 4

**40** [4] - 17:6, 32:11, 88:11, 90:15
**400** [7] - 32:1, 40:7, 44:24, 46:8, 46:13, 70:1, 80:16
**400-plus** [2] - 80:15, 80:16
**41** [1] - 51:17
**42** [1] - 93:3
**45** [3] - 36:24, 37:1, 37:6
**451** [1] - 63:8
**46** [1] - 50:24
**465** [2] - 31:18, 37:12
**47** [1] - 50:24
**4A1.2(d)** [1] - 58:14

## 4A1.3(b)(3)

**4A1.3(b)(3)** [1] - 56:18
**4th** [1] - 1:14

## 5

**5** [1] - 4:5
**50** [2] - 80:19, 82:11
**53** [7] - 53:23, 54:8, 56:5, 57:12, 57:17, 66:10, 66:15
**573** [1] - 10:10
**58** [8] - 56:8, 57:12, 62:23, 65:3, 65:8, 65:17, 66:11, 66:20
**589** [1] - 3:19
**59** [3] - 65:2, 65:17
**5th** [1] - 38:18

## 6

**6** [1] - 42:3
**6/22/'09** [1] - 57:25
**62.7** [1] - 46:14
**623** [1] - 3:20
**627** [1] - 10:5
**63** [4] - 17:5, 19:9, 33:7, 33:10
**63-some** [1] - 19:16
**651** [1] - 48:12
**652** [3] - 50:5, 73:14, 83:3
**653** [1] - 50:6
**654** [1] - 42:3
**660** [3] - 48:20, 49:14, 50:9
**665** [1] - 49:1
**670** [1] - 49:3
**672** [1] - 49:4
**673** [1] - 49:18
**684** [1] - 9:22
**69** [5] - 55:20, 55:22, 55:24, 56:1, 56:5
**691** [1] - 9:23

## 7

**7** [1] - 29:11
**70** [1] - 55:24
**71** [1] - 55:24
**72** [5] - 54:20, 55:7, 55:22, 55:24, 80:18
**750** [1] - 9:6
**753** [1] - 97:8
**76** [1] - 29:3
**77** [2] - 73:23, 82:17

## 8

**8/12/2019** [1] - 93:15
**829** [1] - 8:21

## 86

**86** [2] - 35:3

## 9

**9** [2] - 17:9, 64:1
**922(g)(1** [1] - 13:10
**924(c** [2] - 16:19, 20:5
**94** [1] - 63:8
**96** [2] - 73:23, 82:17
**997** [1] - 9:20
**9:33** [1] - 2:1

## A

**a.m** [3] - 2:1, 4:5, 48:8
**abandoned** [1] - 28:8
**ability** [4] - 75:13, 75:23, 78:10, 91:25
**able** [9] - 45:22, 46:24, 74:18, 75:8, 75:12, 75:23, 76:8, 85:21, 94:4
**above-entitled** [1] - 97:10
**absolute** [1] - 89:19
**absolutely** [2] - 32:8, 39:19
**abuse** [3] - 63:12, 87:11, 92:16, 92:18
**ACC** [1] - 27:3
**ACCA** [2] - 25:10, 56:15
**accept** [5] - 12:12, 73:3, 73:4, 89:14, 89:22
**acceptance** [2] - 89:25, 90:1
**accepted** [4] - 70:13, 73:7, 77:23, 86:11
**accepting** [4] - 70:15, 80:21, 81:4, 89:24
**access** [5] - 8:12, 8:22, 9:2, 15:8, 24:10
**accesses** [1] - 18:4
**accessibility** [2] - 9:18, 14:25
**accessible** [3] - 10:8, 15:10, 18:20
**accidentally** [1] - 43:18
**accomplishment** [1] - 86:6
**according** [1] - 4:21
**account** [11] - 66:3, 71:1, 71:4, 74:7, 76:3, 82:9, 82:19, 82:20, 89:23, 92:4
**accuracy** [1] - 66:8
**accurate** [3] - 52:21,

54:4, 54:17
**accurately** [2] - 64:20, 65:20
**acknowledged** [3] - 5:8, 33:21, 90:3
**acquire** [1] - 33:4
**acquired** [2] - 10:6, 10:7
**acquiring** [1] - 10:8
**acquittal** [7] - 2:5, 2:18, 3:16, 3:22, 12:21, 12:23, 13:3
**acting** [1] - 10:13
**action** [1] - 34:16
**actions** [1] - 37:16
**activity** [4] - 35:9, 35:25, 88:8, 88:15
**add** [2] - 32:1, 51:21
**added** [9] - 11:11, 51:5, 51:14, 51:17, 52:14, 52:15, 52:17, 53:20, 57:9
**addiction** [2] - 87:9, 87:12
**addicts** [4] - 19:14, 45:6, 70:19, 87:19
**adding** [2] - 33:11, 61:25
**addition** [2] - 51:6, 92:14
**additional** [3] - 13:23, 22:23, 83:16
**address** [2] - 2:17, 57:1
**addressed** [1] - 22:7
**adds** [2] - 31:18, 34:15
**adequate** [1] - 12:13
**adjacent** [2] - 13:14, 22:20
**adjust** [1] - 89:4
**adjustment** [1] - 64:3
**administer** [1] - 75:24
**admiration** [1] - 84:22
**admit** [3] - 50:1, 89:14, 89:20
**admitted** [1] - 13:13
**adult** [17] - 54:10, 55:18, 55:25, 58:16, 59:8, 60:13, 61:6, 61:9, 61:17, 62:5, 62:9, 62:11, 64:18, 67:8, 71:18, 71:20
**adults** [2] - 58:6, 59:10
**advanced** [1] - 20:22
**advantageous** [1] - 94:20
**Afori** [1] - 4:25
**afraid** [1] - 22:6
**afternoon** [1] - 29:15

**age** [14] - 54:24, 58:9, 58:13, 58:17, 59:3, 59:18, 60:4, 61:24, 64:17, 66:15, 67:7, 67:19, 70:12, 84:21
**AGENT** [3] - 55:21, 55:23, 69:8
**agents** [3] - 13:16, 20:13, 38:19
**ago** [5] - 21:1, 62:17, 84:13, 86:8
**agonizing** [1] - 91:24
**agree** [8] - 22:6, 46:8, 64:5, 88:1, 89:18, 89:19, 90:16, 94:12
**agreeing** [1] - 90:3
**agreements** [1] - 67:13
**agrees** [1] - 66:10
**Aided** [1] - 1:25
**Airport** [2] - 42:17, 42:18
**align** [1] - 12:17
**allegation** [1] - 25:4
**allegations** [1] - 79:2
**alleged** [4] - 5:12, 6:14, 7:10, 30:14
**allegedly** [1] - 10:21
**alleges** [3] - 6:8, 7:5, 35:2
**allocated** [2] - 66:11, 66:12
**allow** [1] - 94:19
**allowed** [3] - 78:18, 84:5, 85:6
**alluded** [1] - 87:13
**almost** [2] - 60:15, 76:9
**aloud** [1] - 44:18
**amazing** [1] - 84:20
**amend** [1] - 94:9
**amended** [3] - 50:18, 63:4, 69:9
**amendments** [1] - 95:16
**AMERICA** [1] - 1:3
**America** [1] - 2:2
**ammo** [1] - 4:16
**ammunition** [7] - 13:14, 20:14, 22:24, 24:7, 53:18, 86:21, 93:3
**amount** [9] - 23:24, 33:4, 33:9, 33:13, 33:14, 35:3, 36:14, 39:25, 42:22
**amounts** [14] - 19:15, 35:10, 36:13, 36:21, 37:7, 37:8, 37:14, 39:15, 40:1, 41:14,

79:25, 80:13
**amply** [2] - 13:11, 20:6
**Anderson** [1] - 17:6
**answer** [3] - 21:9, 78:12, 78:13
**answered** [1] - 39:1
**anyplace** [1] - 82:3
**apartment** [22] - 4:6, 4:12, 6:1, 6:3, 11:4, 11:5, 11:17, 13:16, 14:5, 15:19, 20:12, 23:25, 32:21, 33:17, 38:23, 39:2, 41:15, 41:17, 43:1, 43:12, 43:21, 43:25
**apologize** [3] - 26:20, 43:19, 50:3
**apparent** [2] - 14:25, 59:8
**appeal** [8] - 26:19, 28:7, 28:12, 90:3, 95:13, 95:19
**appealed** [1] - 28:13
**appear** [2] - 10:1, 34:15
**appeared** [1] - 38:8
**appellate** [2] - 25:16, 26:1, 27:10, 81:1
**applied** [3] - 61:16, 65:20, 65:21
**apply** [3] - 56:20, 59:3, 61:14
**appreciate** [3] - 43:15, 76:2, 76:11
**appreciative** [2] - 78:1, 78:2
**approach** [1] - 40:8
**approaches** [2] - 31:22, 31:24
**appropriate** [10] - 25:13, 25:19, 32:10, 44:19, 45:2, 60:25, 65:24, 79:15, 80:22, 91:15
**appropriately** [1] - 53:19
**April** [4] - 57:20, 57:21, 62:24, 90:21
**area** [12] - 4:9, 4:12, 4:15, 8:11, 9:9, 10:8, 10:15, 10:16, 36:11, 38:21, 39:2, 61:20
**argue** [1] - 36:2
**argued** [2] - 14:1, 35:22
**argues** [2] - 37:16, 40:10
**arguing** [1] - 40:12
**argument** [26] - 3:23, 10:20, 15:22, 15:23,

16:9, 18:1, 18:11, 20:23, 25:25, 26:8, 26:11, 28:8, 32:19, 34:16, 42:1, 42:24, 51:7, 51:15, 54:5, 57:16, 65:8, 66:12, 66:22, 66:23, 67:7
**argument-style** [1] - 20:23
**arguments** [16] - 3:21, 11:13, 11:14, 15:24, 22:7, 23:4, 27:23, 37:20, 40:9, 40:13, 41:25, 43:16, 51:8, 57:5, 82:5
**arise** [1] - 5:12
**armed** [3] - 25:3, 48:22, 50:20
**armor** [1] - 20:14
**arose** [1] - 3:25
**arrangement** [1] - 36:15
**arrangements** [1] - 81:18
**arrest** [13] - 54:9, 54:10, 54:16, 54:18, 54:21, 54:24, 54:25, 55:3, 55:17, 56:6, 62:16, 74:15, 90:12
**arrested** [1] - 64:19
**arrive** [1] - 17:2
**arrived** [5] - 17:20, 17:21, 17:22, 18:7, 55:14
**articulated** [2] - 30:24, 58:25
**aspect** [2] - 22:3, 89:6
**aspects** [1] - 70:23
**assault** [5] - 26:6, 28:19, 28:20, 28:21, 29:3
**assessed** [1] - 62:25
**assesses** [1] - 95:4
**assessment** [4] - 63:11, 92:5, 92:20, 92:25
**Assistant** [1] - 1:13
**associated** [1] - 38:25
**assume** [2] - 82:24, 95:7
**assuming** [1] - 29:22
**attached** [1] - 49:12
**attempted** [1] - 25:24
**Attorney** [1] - 1:13
**attorney/client** [1] - 75:13
**attorneys** [1] - 3:9
**attributable** [8] - 34:7, 35:4, 36:3, 36:13, 36:18, 37:14, 39:22,

40:2
**attributed** [3] - 41:12, 41:15, 43:10
**attributes** [1] - 41:9
**attributing** [2] - 39:14, 42:22
**August** [5] - 3:25, 32:16, 35:1, 38:18, 74:9
**available** [4] - 24:7, 87:12, 87:23, 95:5
**Avenue** [1] - 1:18
**average** [1] - 33:9
**avoid** [3] - 72:14, 82:7, 91:12
**awakened** [1] - 22:17
**aware** [17] - 3:14, 3:24, 4:4, 5:3, 5:21, 16:23, 35:12, 37:22, 38:3, 46:23, 67:16, 67:18, 74:12, 74:19, 75:21, 78:4, 79:11
**awful** [1] - 2:15
**axiom** [1] - 85:10

## B

**baby's** [2] - 14:10, 72:2
**Bachmann** [1] - 97:5
**BACHMANN** [1] - 97:18
**back-and-forth** [1] - 35:20
**background** [1] - 76:14
**baffled** [1] - 78:15
**bag** [9] - 13:13, 17:5, 19:9, 19:10, 19:15, 20:8, 23:20, 23:24, 24:1
**baggies** [1] - 13:16, 19:11
**bags** [1] - 4:21
**BALTER** [62] - 2:9, 3:5, 3:12, 3:14, 11:23, 12:1, 12:10, 12:15, 14:22, 24:21, 24:24, 25:11, 27:3, 27:8, 31:8, 31:23, 41:5, 48:16, 49:7, 49:11, 49:14, 49:21, 51:3, 51:11, 51:17, 51:24, 52:1, 52:18, 53:1, 53:9, 54:2, 54:4, 54:7, 54:13, 54:22, 54:25, 55:5, 55:9, 55:12, 56:3, 56:14, 56:22, 57:1, 57:4, 66:6, 66:18,

3

69:3, 69:12, 73:20,
83:1, 83:5, 83:7,
83:14, 83:18, 93:13,
93:21, 94:2, 94:10,
94:16, 95:3, 95:22,
96:4
**Balter** [30] - 1:17,
1:17, 2:8, 2:10, 3:3,
3:11, 14:21, 20:24,
24:17, 27:1, 31:7,
40:11, 41:4, 47:11,
48:13, 49:20, 51:23,
64:8, 64:22, 65:23,
66:5, 69:2, 73:19,
86:4, 87:13, 88:17,
93:12, 95:18, 95:19,
96:3
**Balter's** [2] - 40:9,
64:12
**Baltimore** [6] - 1:9,
1:14, 1:19, 1:22,
45:18, 45:19
**bar** [1] - 14:13
**bare** [1] - 31:25
**base** [9] - 30:12, 40:3,
40:6, 43:12, 44:14,
44:20, 44:23, 47:8,
50:22
**based** [9] - 19:18,
20:20, 29:6, 36:4,
36:5, 44:23, 52:21,
57:8, 73:21
**basic** [7] - 3:24, 10:20,
30:19, 30:23, 75:13,
75:24, 89:25
**basics** [1] - 37:10
**basis** [3] - 16:3, 41:22,
81:12
**basketball** [1] - 35:16
**battering** [2] - 4:7,
11:16
**bearing** [1] - 6:8
**beat** [1] - 82:4
**beaten** [3] - 70:21,
81:12, 81:13
**become** [4] - 51:1,
59:19, 64:20, 73:11
**becomes** [2] - 27:16,
60:16
**bed** [4] - 4:8, 11:9,
22:18, 22:20
**bedroom** [5] - 4:8,
4:12, 4:22, 5:1, 11:9
**BEFORE** [1] - 1:11
**began** [1] - 90:21
**begin** [1] - 3:1
**begins** [1] - 88:6
**behalf** [4] - 2:6, 2:10,
2:12, 21:23
**behavior** [1] - 59:6

**behavioral** [1] - 58:24
**behind** [3] - 3:24,
85:6, 89:7
**belies** [1] - 34:1
**believes** [1] - 13:2
**below** [3] - 56:5,
69:21, 72:4
**Bennett** [1] - 26:13
**Benton** [3] - 80:16,
80:17, 81:16
**best** [3] - 8:19, 31:9,
84:6
**Best** [1] - 86:4
**bet** [1] - 35:21
**better** [1] - 58:25
**betting** [1] - 35:23
**between** [21] - 6:15,
6:18, 7:6, 7:23,
10:12, 13:24, 18:17,
27:24, 34:16, 34:20,
34:23, 35:13, 35:17,
35:20, 42:7, 45:4,
45:7, 58:19, 60:2,
80:4, 89:25
**Beverly** [1] - 9:5
**beyond** [10] - 12:4,
12:14, 12:16, 12:19,
13:8, 16:3, 20:4,
47:6, 52:10, 58:4
**bidding** [1] - 81:14
**big** [2] - 72:18, 73:8
**bit** [3] - 3:2, 23:13,
88:22
**blenders** [1] - 20:13
**blue** [1] - 9:16
**body** [1] - 20:14
**boils** [1] - 14:23
**book** [1] - 56:17
**books** [2] - 86:2, 86:3
**BOP** [2] - 93:22, 95:4
**born** [1] - 70:15
**bottom** [1] - 57:6
**boxers** [1] - 17:10
**brain** [1] - 58:23
**break** [1] - 3:10
**brick** [2] - 42:14,
42:16
**bricks** [1] - 46:25
**brief** [4] - 26:21,
31:12, 31:15, 47:10
**briefed** [3] - 14:11,
14:20, 21:5
**briefing** [2] - 40:14,
40:24
**briefings** [1] - 44:18
**briefly** [5] - 4:10, 4:20,
10:16, 16:6, 21:12
**brilliant** [1] - 84:17
**bring** [7] - 6:21, 13:21,
62:21, 63:18, 70:5,

78:9, 80:10
**bringing** [3] - 41:24,
42:21, 89:10
**broadly** [1] - 56:21
**broken** [1] - 19:11
**brought** [6] - 4:9,
27:9, 27:18, 54:14,
57:20, 64:8
**buck** [1] - 45:9
**built** [1] - 82:14
**bullets** [3] - 80:5,
80:8, 82:1
**burden** [2] - 21:3,
39:24
**Bureau** [4] - 54:19,
95:1, 95:9, 95:10
**business** [2] - 27:6,
27:21, 39:4

---

# C

**calculated** [3] - 37:11,
65:23, 69:18
**calculation** [4] - 35:1,
52:20, 57:7, 66:9
**caliber** [2] - 17:6, 93:3
**campbell** [2] - 5:20,
6:4
**Campbell** [11] - 4:2,
4:8, 4:20, 7:6, 11:20,
15:13, 15:20, 27:24,
32:23, 35:5, 36:10
**Campbell's** [1] - 14:3
**cannot** [3] - 28:20,
28:22, 82:10
**cans** [1] - 9:12
**car** [8] - 7:13, 17:3,
18:3, 18:22, 23:25,
24:2, 38:24, 46:15
**care** [1] - 76:22
**cared** [1] - 85:2
**career** [12] - 25:4,
25:14, 26:5, 26:19,
27:3, 48:22, 48:23,
50:20, 53:6, 56:19,
62:1, 66:1
**carefully** [1] - 48:15
**carried** [1] - 17:9
**carry** [1] - 5:24
**carrying** [1] - 20:18
**cars** [1] - 38:21
**cartel** [1] - 80:2
**CASE** [1] - 1:4
**case** [37] - 6:13, 8:20,
9:5, 9:16, 9:17, 9:22,
10:10, 10:11, 17:1,
18:12, 19:24, 24:19,
26:12, 26:13, 28:8,
46:9, 47:4, 55:25,
59:1, 59:3, 60:25,

61:2, 61:12, 61:20,
61:21, 61:25, 62:7,
62:12, 64:16, 64:24,
70:18, 76:1, 76:24,
78:5, 88:16, 88:25,
90:2
**Case** [1] - 2:3
**cases** [22] - 8:5, 8:15,
14:11, 14:12, 14:16,
14:17, 15:4, 15:6,
18:16, 18:18, 21:8,
22:16, 27:24, 28:11,
29:7, 62:3, 72:1,
72:3, 76:3, 78:9
**cash** [6] - 13:17,
20:13, 32:15, 33:4,
46:15, 47:4
**Cassie** [2] - 1:13, 2:6
**categorical** [1] - 59:17
**categories** [1] - 41:12
**Category** [6] - 56:10,
57:15, 66:14, 67:21,
68:9, 69:19
**category** [2] - 66:1,
79:20
**caught** [1] - 88:5
**CDF** [1] - 74:19
**cell** [1] - 75:2
**Center** [1] - 35:19
**central** [1] - 79:24
**certain** [6] - 68:11,
76:25, 77:14, 86:12,
88:9, 90:4
**certainly** [20] - 11:14,
28:5, 33:5, 36:14,
37:5, 38:25, 45:24,
45:25, 47:4, 53:13,
60:10, 61:21, 67:23,
69:8, 73:1, 74:16,
79:23, 89:3, 89:5,
90:13
**CERTIFICATE** [1] -
97:1
**Certified** [1] - 97:5
**certify** [1] - 97:8
**chain** [3] - 87:21, 88:2,
89:3
**challenge** [2] - 23:19,
46:14
**challenged** [2] -
21:21, 76:22
**challenges** [5] -
21:22, 21:24, 22:1,
22:3, 76:12
**challenging** [4] - 30:1,
61:20, 66:8, 77:24
**change** [7] - 63:7,
63:8, 63:19, 67:9,
67:11, 67:14, 94:12
**changed** [1] - 50:12

**changes** [1] - 63:4
**chaos** [2] - 76:21, 77:9
**character** [2] - 49:15,
59:13
**characteristic** [1] -
90:10
**characteristics** [2] -
70:8, 90:7
**characterized** [2] -
79:24, 83:8
**characterizing** [1] -
57:5
**charge** [6] - 3:22,
67:12, 71:9, 71:10,
71:11, 71:12
**charged** [6] - 4:16,
4:17, 6:25, 7:4, 9:13,
80:14
**charging** [1] - 39:14
**Charles** [1] - 1:14
**chart** [1] - 89:4
**CHASANOW** [1] - 1:11
**Chasanow** [1] - 84:18
**check** [4] - 50:2,
93:22, 94:4, 95:17
**chemical** [3] - 33:16,
34:12, 34:20
**chemist** [1] - 33:21
**child** [2] - 38:14, 77:11
**child's** [2] - 4:13, 11:8
**childhood** [1] - 76:19
**children** [1] - 76:23
**choices** [1] - 77:16
**choose** [1] - 15:25
**chose** [2] - 85:11,
85:12
**Circuit** [9] - 9:6, 9:16,
9:23, 10:6, 10:11,
26:11, 26:14, 28:1,
90:5
**circuit** [1] - 61:3
**circumstance** [4] -
11:2, 24:2, 33:5,
61:4
**circumstances** [9] -
8:6, 11:15, 53:19,
69:23, 70:16, 70:17,
77:25, 91:16, 91:20
**circumstantial** [1] -
5:11
**citation** [2] - 28:8,
58:13
**cite** [2] - 18:18, 31:17
**cited** [2] - 8:5, 8:20
**claim** [2] - 31:18,
59:10
**claiming** [1] - 40:2
**clarification** [1] -
68:19
**clarified** [1] - 66:7

clarifying [1] - 65:18
clear [10] - 5:14, 9:17, 15:5, 27:12, 28:2, 28:18, 32:8, 42:9, 53:17, 60:1
clearly [5] - 13:9, 40:7, 51:21, 52:6, 53:14
CLERK [3] - 2:2, 50:5, 50:15
client [4] - 29:17, 77:25, 78:2, 81:20
clients [1] - 77:22
clip [2] - 4:14, 4:16
clock [1] - 47:12
close [6] - 13:12, 18:2, 20:6, 22:23, 27:5, 27:21
closely [1] - 12:18
closet [2] - 4:15, 4:22
closing [1] - 85:16
club [1] - 42:10
co [1] - 6:12
co-defendant [1] - 6:12
cocaine [1] - 64:17
Coleman [52] - 1:20, 2:3, 2:12, 16:20, 16:24, 17:9, 18:3, 19:3, 19:13, 19:22, 19:25, 20:6, 20:9, 20:12, 20:15, 20:18, 21:15, 21:24, 22:3, 23:18, 24:4, 24:16, 29:21, 30:12, 30:22, 34:13, 34:24, 41:9, 41:13, 41:18, 41:21, 42:3, 42:7, 42:12, 42:19, 42:20, 42:23, 42:25, 43:7, 43:21, 46:10, 46:14, 46:20, 46:22, 46:23, 47:2, 48:3, 48:9, 50:7, 51:23, 68:24, 72:21
COLEMAN [1] - 1:6
Coleman-Fuller [45] - 1:20, 2:3, 2:12, 16:20, 16:24, 17:9, 18:3, 19:3, 19:13, 19:22, 19:25, 20:6, 20:15, 20:18, 21:15, 21:24, 22:3, 23:18, 24:4, 29:21, 30:12, 30:22, 34:13, 34:24, 41:13, 41:18, 41:21, 42:7, 42:12, 42:19, 42:20, 42:23, 42:25, 43:7, 43:21, 46:10, 46:14, 46:20, 46:22, 46:23, 47:2, 48:3, 48:9, 51:23, 72:21

COLEMAN-FULLER [1] - 1:6
Coleman-Fuller's [7] - 20:9, 20:12, 24:16, 41:9, 42:3, 50:7, 68:24
colleagues [2] - 25:22, 26:25
colored [1] - 4:14
combination [2] - 57:5, 80:20
combined [1] - 3:18
comfortable [1] - 84:1
coming [5] - 29:18, 33:6, 36:6, 38:9, 59:23
command [1] - 71:9
commenced [1] - 2:1
commentary [3] - 51:24, 52:5, 52:10
comments [1] - 27:1
commit [1] - 58:17
committed [10] - 25:5, 28:21, 28:22, 58:9, 59:17, 61:23, 62:4, 71:19, 71:20, 72:12
committing [2] - 71:19, 71:21
common [2] - 4:9, 14:6
communicating [2] - 7:7, 75:12
communication [4] - 6:18, 7:19, 7:21, 7:22
communications [7] - 7:6, 7:11, 7:23, 35:13, 37:16, 37:24, 39:20
communities [1] - 87:15
community [1] - 71:16
compared [2] - 34:11, 68:5
compelling [1] - 24:14
compilation [1] - 86:5
complain [1] - 85:10
complete [1] - 96:5
completely [1] - 64:23
complex [3] - 38:9, 38:12, 38:13
complicated [1] - 27:22
comports [1] - 83:9
composed [1] - 86:2
composition [3] - 33:16, 34:12, 34:20
comprehend [1] - 85:23
compromise [1] - 48:4

compute [1] - 52:19
Computer [1] - 1:25
Computer-Aided [1] - 1:25
conceded [2] - 5:6, 25:3
conceding [1] - 72:4
conceivable [1] - 75:4
conceivably [1] - 54:19
concept [3] - 5:8, 8:9, 30:15
concern [3] - 24:11, 81:2, 81:3
concerned [2] - 28:9, 28:15
concerns [1] - 64:9
concert [1] - 36:10
concession [3] - 25:7, 25:12, 72:5
conclude [5] - 14:9, 19:18, 22:10, 23:22, 68:6
concluded [1] - 96:7
concludes [1] - 50:3
concluding [1] - 45:1
conclusion [5] - 12:4, 12:13, 31:6, 46:6, 59:23
concrete [1] - 30:19
concurrent [3] - 92:7, 92:10
conditions [10] - 75:9, 76:5, 83:12, 84:9, 85:11, 91:17, 92:10, 92:11, 92:12, 93:18
conduct [9] - 37:17, 59:7, 68:10, 70:17, 71:13, 72:16, 78:22, 79:3, 91:4
conducted [1] - 34:13
conducting [1] - 39:4
Conference [1] - 97:12
confined [1] - 75:1
confinement [2] - 75:19, 76:5
confines [1] - 85:21
conflated [1] - 65:17
conflict [1] - 52:11
conformance [1] - 97:11
confused [2] - 25:1, 52:1, 65:17
Congress [2] - 88:8, 95:1
connected [4] - 11:3, 32:18, 51:22, 53:15
connecting [1] - 5:18
connection [8] - 6:4,

6:6, 32:13, 32:16, 33:12, 39:15, 52:3, 70:3
connections [4] - 6:14, 6:15, 45:23, 89:7
conscious [1] - 57:21
conservative [4] - 40:8, 44:15, 44:19, 46:9
conservatively [1] - 44:6
consider [15] - 21:19, 23:3, 24:5, 24:20, 25:9, 26:3, 34:25, 36:18, 37:19, 57:10, 61:12, 62:22, 74:4, 91:10, 91:11
consideration [5] - 25:3, 27:25, 86:15, 90:9, 94:24
considered [2] - 10:22
considers [1] - 37:10
consistent [4] - 12:2, 35:25, 36:14, 60:7
consolidated [1] - 3:15
conspiracy [21] - 14:4, 18:5, 30:15, 40:16, 43:22, 43:23, 44:3, 45:13, 46:8, 46:20, 47:3, 70:7, 70:21, 79:24, 80:13, 81:14, 86:18, 86:25, 87:16, 88:14, 88:21
conspiratorial [2] - 34:16, 37:17
constitute [2] - 12:19, 25:14
constitutes [1] - 31:13
constructive [2] - 5:16, 22:2
contact [2] - 10:18, 89:9
contending [3] - 31:10, 32:10, 57:22
content [1] - 25:21
contention [2] - 23:15
contest [1] - 33:24
context [9] - 5:7, 36:21, 36:24, 37:4, 37:5, 43:9, 79:5, 84:19, 86:22
continue [2] - 40:25, 88:19
continues [1] - 64:18
continuously [1] - 74:8
contracted [2] - 75:16, 75:17

contracting [1] - 84:10
contribute [1] - 87:20
contributing [1] - 22:25
contribution [1] - 47:23
control [16] - 8:8, 8:18, 8:23, 9:4, 9:15, 9:19, 10:4, 10:19, 10:25, 11:12, 12:6, 15:4, 23:2, 53:16, 91:20, 91:23
controlled [7] - 63:15, 71:7, 71:8, 71:10, 71:11, 71:21
controlling [1] - 75:3
controls [1] - 59:9
conversation [1] - 84:19
conversations [3] - 40:17, 42:15, 87:3
conversion [1] - 46:15
convert [2] - 61:17, 62:10
converted [1] - 33:22
converting [1] - 47:4
convict [1] - 16:13
convicted [5] - 55:18, 61:6, 61:9, 62:24, 71:13
conviction [25] - 13:8, 16:18, 20:4, 26:7, 28:19, 57:17, 60:18, 61:1, 61:17, 62:12, 62:15, 62:16, 62:22, 62:23, 63:2, 63:19, 63:22, 63:23, 64:11, 64:14, 65:5, 66:16, 66:24, 67:18, 71:15
convictions [10] - 54:1, 64:7, 68:9, 71:6, 71:15, 71:24, 72:12, 78:25, 90:17, 90:18
convince [1] - 91:2
cooperating [1] - 6:10
cooperator [1] - 13:18
copies [1] - 93:7
correct [13] - 12:15, 24:24, 47:12, 51:17, 53:1, 54:13, 54:24, 56:3, 56:14, 56:22, 57:4, 88:21, 97:9
Corrections [3] - 74:21, 75:23, 76:13
correctly [1] - 51:2
corroborated [1] - 40:23
counsel [1] - 69:11

**Count** [15] - 3:24, 6:25, 16:19, 19:22, 21:22, 21:24, 23:7, 23:17, 24:16, 50:20, 86:18, 86:19, 86:20, 92:7, 92:9

**count** [12] - 4:17, 12:22, 13:10, 16:19, 20:5, 40:11, 58:5, 60:25, 62:17, 67:3, 67:8, 92:21

**counted** [3] - 35:3, 36:2, 64:6

**counter** [1] - 25:25

**counter-argument** [1] - 25:25

**country** [2] - 87:17, 91:19

**Counts** [2] - 92:6, 92:8

**counts** [6] - 3:16, 12:23, 13:8, 20:4, 21:22, 86:17

**County** [2] - 45:19, 78:20

**couple** [5] - 4:21, 5:6, 75:8, 75:15, 76:7

**coupled** [1] - 60:14

**course** [6] - 3:18, 32:5, 32:8, 37:17, 89:13, 93:7

**court** [6] - 25:8, 54:10, 55:18, 55:25, 85:21, 95:15

**COURT** [104] - 1:1, 2:8, 2:14, 3:6, 3:8, 3:13, 11:22, 11:24, 12:7, 12:12, 12:25, 14:21, 16:7, 16:15, 17:24, 19:23, 21:11, 21:20, 24:22, 24:25, 25:12, 26:23, 27:7, 28:5, 29:1, 29:6, 29:14, 29:19, 30:5, 31:19, 40:5, 41:3, 41:7, 43:14, 44:21, 47:16, 47:21, 47:25, 48:11, 48:17, 49:9, 49:13, 49:16, 49:23, 50:6, 50:17, 51:9, 51:16, 51:18, 51:25, 52:15, 52:25, 53:7, 53:11, 54:3, 54:5, 54:11, 54:20, 54:23, 55:2, 55:6, 55:11, 55:16, 55:22, 56:1, 56:4, 56:16, 56:23, 57:3, 64:4, 65:1, 65:4, 65:8, 65:12, 66:5, 66:7, 66:19, 68:18, 68:25, 69:4,

69:6, 69:10, 69:13, 73:14, 73:19, 82:24, 83:3, 83:6, 83:10, 83:15, 83:19, 83:25, 86:16, 93:11, 93:16, 93:24, 94:3, 94:11, 94:21, 95:4, 95:23, 96:3, 96:5, 97:18

**Court** [52] - 3:14, 3:24, 4:4, 5:3, 5:21, 6:11, 8:21, 9:17, 11:14, 12:20, 16:17, 16:20, 16:23, 19:21, 22:8, 26:1, 26:14, 27:18, 31:14, 34:25, 35:12, 37:18, 37:22, 38:3, 38:10, 43:2, 57:10, 58:12, 59:1, 59:4, 60:25, 61:12, 62:19, 62:22, 63:7, 64:2, 66:13, 72:3, 73:24, 73:25, 74:1, 74:4, 74:19, 75:21, 78:4, 78:24, 79:11, 81:10, 86:14, 86:17, 94:17, 97:7

**Court's** [2] - 53:5, 74:3

**courtroom** [2] - 76:17, 84:17

**Courtroom** [1] - 1:8

**courts** [7] - 25:15, 25:16, 60:17, 61:5, 76:3, 86:10

**cousin** [1] - 84:12

**cover** [1] - 50:19

**covertly** [1] - 14:1

**COVID** [9] - 74:12, 74:14, 74:25, 75:3, 75:16, 78:7, 84:11, 91:19

**crack** [1] - 64:17

**creates** [3] - 10:23, 60:19, 85:11

**credible** [1] - 45:10

**credit** [1] - 89:24

**credits** [1] - 93:14

**crib** [5] - 4:13, 11:8, 14:10, 72:2

**crime** [7] - 25:18, 26:10, 29:7, 52:4, 71:21, 72:12, 92:22

**crimes** [5] - 20:23, 26:4, 71:19, 71:20

**Criminal** [9] - 2:3, 59:9, 57:7, 57:14, 64:2, 66:14, 67:21, 68:8, 69:19

**CRIMINAL** [1] - 1:4

**criminal** [28] - 2:21, 25:4, 27:1, 48:2,

48:22, 50:20, 53:22, 56:20, 58:22, 61:25, 62:20, 63:1, 63:20, 64:3, 64:6, 64:7, 66:9, 67:22, 68:7, 68:12, 68:14, 73:10, 74:13, 88:3, 88:7, 89:12, 90:15, 91:4

**crossing** [1] - 31:1

**Crown** [5] - 17:2, 17:16, 20:8, 20:9, 21:16

**CRR** [1] - 97:18

**CTF** [4] - 74:18, 74:19, 75:2, 78:7

**culpability** [4] - 81:25, 82:6, 90:12, 90:14

**culpable** [2] - 88:18

**Cumberland** [2] - 93:14, 95:7

**current** [2] - 29:10, 57:10

**cusp** [3] - 57:18, 60:15, 60:16

**custody** [4] - 54:16, 74:8, 74:10, 93:19

**customers** [1] - 87:3

**cuts** [1] - 17:14

**cutting** [2] - 13:16, 20:13

# D

**d)(1** [1] - 58:15

**d)(2)(A** [1] - 58:14

**daily** [1] - 81:12

**damaged** [1] - 39:8

**danger** [1] - 60:19

**dangerous** [13] - 51:18, 53:12, 71:7, 71:8, 71:10, 71:11, 71:22, 87:24, 87:25, 88:7, 88:13, 91:21

**Danielle** [1] - 1:23

**date** [9] - 33:13, 54:9, 54:10, 54:16, 54:18, 56:6, 57:19, 85:15

**Dated** [1] - 97:14

**dates** [1] - 54:1

**David** [3] - 1:20, 1:21, 2:12

**days** [3] - 20:17, 21:1, 43:25

**DC** [3] - 74:20, 75:23, 84:9

**de** [1] - 28:22

**deal** [4] - 59:13, 73:8, 77:24, 85:15

**dealer** [1] - 73:11

**dealers** [1] - 14:7

**dealing** [19] - 7:20, 16:25, 17:1, 17:13, 17:17, 18:7, 20:19, 24:4, 24:6, 32:18, 35:9, 36:13, 45:24, 68:3, 68:6, 88:4, 90:20, 91:3

**dealt** [1] - 43:7

**death** [2] - 59:2, 59:5

**deaths** [1] - 87:22

**DEBORAH** [1] - 1:11

**December** [1] - 29:11

**decision** [5] - 26:13, 67:1, 74:3, 80:25, 81:1

**decisions** [2] - 26:15, 28:13

**decline** [1] - 66:22

**defendant** [19] - 6:12, 8:8, 8:16, 8:22, 8:24, 9:13, 9:24, 10:12, 15:10, 22:12, 49:24, 55:3, 56:6, 66:8, 80:25, 81:2, 82:13

**DEFENDANT** [2] - 83:24, 84:2

**defendant's** [3] - 10:1, 48:19, 49:2

**defendants** [8] - 2:19, 13:7, 20:3, 21:20, 72:15, 79:10, 79:11, 79:13

**Defendants** [2] - 1:6, 1:16

**defendants'** [2] - 2:4, 2:25

**defense** [4] - 3:9, 49:14, 53:21, 79:15

**definitions** [1] - 25:19

**degree** [3] - 26:6, 28:22, 29:3

**deliver** [1] - 13:22

**demonstrate** [1] - 46:21

**demonstrating** [1] - 90:22

**denied** [2] - 20:1, 23:17

**deny** [2] - 23:6, 24:16

**depart** [1] - 66:14

**Department** [3] - 74:21, 75:23, 76:13

**departure** [10] - 54:6, 56:11, 56:12, 56:13, 56:18, 56:24, 57:6, 62:21, 63:25, 68:14

**departures** [1] - 65:22

**dependence** [1] - 76:22

**described** [1] - 75:5

**description** [1] - 65:16

**deserving** [1] - 88:8

**designation** [1] - 95:11

**designed** [1] - 72:13

**desire** [1] - 86:2

**desperation** [1] - 87:4

**despite** [1] - 69:22

**details** [2] - 84:21, 84:22

**detained** [4] - 61:11, 75:25, 91:18, 93:17

**detention** [3] - 74:22, 91:22, 94:6

**deter** [2] - 90:23, 91:7

**determination** [7] - 22:15, 23:6, 25:5, 26:9, 26:10, 29:8, 61:22

**determinations** [1] - 25:22

**determine** [1] - 92:19

**determined** [1] - 2:24

**determining** [2] - 31:5, 53:3

**deterred** [1] - 71:24

**deterrence** [4] - 71:23, 71:25, 72:8, 82:20

**detour** [1] - 45:14

**development** [2] - 58:22, 58:23

**developmental** [1] - 58:24

**difference** [8] - 5:2, 27:10, 28:14, 54:23, 60:14, 78:16, 78:17, 80:4

**differences** [1] - 78:3

**different** [14] - 25:6, 26:25, 30:13, 31:21, 31:23, 52:24, 61:4, 61:19, 67:1, 77:15, 77:19, 78:11, 78:18, 78:23

**differentiate** [1] - 89:25

**differentiation** [2] - 58:19, 60:2

**difficult** [6] - 70:16, 76:10, 76:13, 78:7, 85:18, 88:23

**difficulty** [1] - 45:1

**digital** [2] - 13:16, 20:12

**diligence** [1] - 84:21

**direct** [3] - 45:23, 50:17, 93:2

**direction** [5] - 24:14, 26:8, 63:13, 63:15, 78:11

**directly** [3] - 7:14, 40:2, 43:8
**disagree** [2] - 41:18, 94:13
**disagreement** [1] - 41:16
**discount** [1] - 62:20
**discussed** [3] - 20:18, 42:6, 71:17
**discussing** [2] - 14:1, 42:13
**discussion** [3] - 42:9, 45:7, 94:14
**dismiss** [1] - 93:10
**dismissed** [1] - 93:8
**disorders** [1] - 63:12
**disparate** [1] - 82:7
**disparity** [3] - 34:20, 34:22, 91:13
**displayed** [1] - 82:3
**dispute** [1] - 4:22
**disputed** [1] - 31:3
**disputes** [2] - 72:15
**distance** [1] - 9:11
**distinction** [1] - 80:7
**distinctions** [1] - 27:23
**distinguishable** [2] - 14:17, 82:1
**distinguishing** [1] - 72:18
**distribute** [8] - 26:4, 67:17, 67:25, 86:18, 86:19, 86:20, 87:18, 89:1
**distributed** [3] - 19:12, 37:8, 87:7
**distribution** [8] - 25:23, 26:3, 64:17, 67:17, 86:24, 87:16, 88:2, 88:10
**distributor** [3] - 37:3, 80:3, 80:11
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 97:7
**district** [3] - 25:20, 76:3, 92:14
**districts** [2] - 14:16, 64:10
**divide** [1] - 36:5
**divided** [1] - 24:10
**dividing** [1] - 33:7
**DIVISION** [1] - 1:2
**DKC-20-38** [1] - 2:4
**DNA** [1] - 5:19
**DOC** [2] - 74:18, 74:19
**documents** [1] - 5:22
**dollars** [2] - 36:4, 93:4
**domestic** [2] - 7:11, 10:12

**dominion** [11] - 8:8, 8:18, 8:23, 9:4, 9:15, 9:19, 10:4, 10:19, 10:25, 11:12, 12:6
**done** [6] - 16:5, 17:12, 44:19, 78:1, 85:14, 86:1
**door** [1] - 85:6
**dope** [5] - 4:22, 4:25, 5:4, 5:5, 5:8
**dose** [1] - 70:2
**double** [1] - 93:22
**doubt** [8] - 12:5, 12:14, 12:16, 12:19, 13:8, 16:4, 20:4, 47:6
**down** [14] - 14:23, 55:2, 57:14, 62:21, 64:1, 64:13, 66:14, 74:22, 75:14, 75:15, 76:23, 80:2, 81:23, 87:18
**downward** [2] - 56:18, 63:25
**draw** [3] - 15:25, 19:18, 43:2
**drawing** [1] - 27:23
**dresser** [1] - 10:16
**drug** [51] - 6:14, 7:20, 7:21, 10:22, 10:23, 13:15, 13:17, 14:7, 16:24, 17:1, 17:13, 17:17, 18:5, 18:7, 18:13, 19:4, 19:7, 19:20, 20:9, 20:11, 20:22, 21:15, 21:25, 24:4, 24:6, 25:18, 25:23, 26:4, 29:25, 32:18, 32:20, 35:9, 35:10, 36:13, 36:23, 40:16, 40:19, 41:9, 44:11, 47:5, 63:11, 63:17, 64:18, 68:3, 70:23, 77:9, 87:16, 88:14, 90:20, 91:2
**drug-related** [1] - 7:21
**drugs** [54] - 4:17, 13:13, 13:22, 17:21, 18:2, 18:4, 18:18, 18:25, 19:4, 19:8, 20:7, 20:16, 20:19, 22:24, 23:24, 24:3, 24:8, 32:7, 32:13, 33:11, 33:14, 33:16, 33:18, 34:1, 34:2, 34:6, 34:9, 34:12, 34:15, 34:20, 34:21, 34:24, 37:8, 40:10, 40:16, 41:13, 41:17, 41:24, 42:19, 42:21,

42:22, 43:10, 43:20, 43:24, 70:11, 70:20, 72:2, 76:23, 80:14, 87:11, 89:10
**due** [2] - 84:9, 84:10
**during** [11] - 19:7, 32:6, 35:6, 35:15, 45:12, 60:21, 75:1, 75:25, 76:12, 76:19, 78:7

## E

**e-mail** [1] - 29:17
**e-mailed** [1] - 50:15
**earliest** [1] - 77:7
**early** [3] - 38:17, 39:3, 74:22
**easier** [2] - 13:4, 91:3
**easily** [2] - 47:3, 88:5
**easy** [2] - 29:19, 43:16
**eat** [1] - 85:9
**ECF** [4] - 3:19, 3:20, 31:15, 42:3
**education** [2] - 63:11, 85:25
**effective** [1] - 92:13
**eight** [3] - 31:20, 45:18, 82:18
**either** [10] - 15:8, 22:16, 25:18, 35:5, 40:2, 45:22, 61:25, 62:19, 71:18, 83:16
**element** [4] - 10:24, 22:4, 22:10, 23:22
**eliminated** [2] - 50:21, 50:24
**eliminating** [1] - 66:14
**elimination** [1] - 56:17
**embarrassed** [2] - 85:16, 85:17
**embrace** [2] - 84:16, 85:10
**employed** [5] - 32:23, 32:24, 33:2, 33:3
**enacted** [1] - 88:9
**encounter** [1] - 9:7
**encounters** [1] - 73:10
**end** [8] - 2:19, 24:18, 28:14, 42:4, 65:24, 68:15, 85:1, 94:18
**ended** [1] - 73:24
**endure** [1] - 76:19
**endured** [1] - 85:5
**energetically** [1] - 23:5
**enforcement** [4] - 22:19, 88:6, 88:15, 88:24
**engage** [1] - 19:4

**engaged** [1] - 20:23
**enhancements** [1] - 48:22
**enjoying** [2] - 25:17, 36:17
**ensue** [1] - 4:11
**enter** [4] - 11:17, 19:21, 23:11, 93:6
**entered** [3] - 54:8, 79:13, 95:15
**entering** [1] - 54:15
**entire** [5] - 37:2, 44:17, 62:11, 71:20, 74:13
**entirely** [1] - 57:11
**entitled** [3] - 15:24, 20:20, 97:10
**entrance** [1] - 4:6
**entry** [1] - 22:19
**enviable** [1] - 90:16
**environment** [3] - 59:12, 70:11, 78:18
**equal** [1] - 9:11
**equally** [1] - 12:8
**equation** [1] - 11:11
**equivalence** [1] - 47:5
**equivalent** [3] - 43:11, 61:7, 75:18
**ERIC** [1] - 1:5
**Eric** [3] - 1:16, 2:3, 2:10
**erratic** [1] - 10:13
**error** [1] - 94:8
**escalated** [1] - 90:19
**escape** [1] - 59:11
**especially** [4] - 11:1, 58:22, 72:5, 72:11
**Esquire** [3] - 1:13, 1:17, 1:20
**essence** [1] - 48:23
**essentially** [3] - 9:11, 18:2, 85:20
**establish** [9] - 8:17, 9:4, 9:14, 9:18, 10:3, 10:19, 11:1, 16:1, 36:1
**established** [4] - 33:1, 37:13, 42:17, 51:13
**establishes** [1] - 32:20
**establishing** [1] - 39:24
**estimate** [2] - 31:6, 46:9
**estimates** [1] - 44:19
**evade** [1] - 72:13
**evaluate** [1] - 23:12
**event** [5] - 5:10, 25:15, 53:11, 55:17, 95:17
**everyplace** [1] - 68:21

**evidence** [66] - 5:10, 5:12, 5:14, 5:18, 6:4, 6:5, 6:7, 8:1, 8:3, 8:15, 8:16, 10:21, 11:3, 11:6, 13:6, 13:9, 13:23, 14:7, 14:15, 15:12, 16:10, 16:23, 17:8, 17:16, 17:23, 19:2, 19:13, 20:2, 20:15, 20:21, 21:21, 22:1, 22:4, 22:9, 22:11, 22:12, 22:14, 23:9, 23:11, 23:13, 23:15, 23:17, 23:21, 24:13, 34:5, 37:13, 38:3, 39:7, 39:19, 40:19, 41:20, 42:15, 42:22, 42:25, 43:5, 43:7, 44:3, 45:10, 45:17, 45:23, 45:25, 46:21, 47:1, 72:6, 82:2
**exact** [2] - 35:15, 48:24
**exactly** [10] - 4:23, 8:6, 24:18, 31:10, 43:3, 47:24, 59:19, 60:12, 62:5, 89:16
**example** [2] - 8:19, 8:21
**exceed** [1] - 56:19
**exceeded** [1] - 39:25
**exception** [1] - 41:11
**excerpts** [1] - 37:22
**exclude** [1] - 53:23
**excluding** [1] - 57:11
**excuse** [2] - 29:20, 64:22
**executed** [4] - 4:4, 9:7, 34:10, 38:10
**execution** [1] - 3:25
**exercise** [11] - 8:8, 8:18, 8:23, 9:15, 10:4, 12:6, 15:4, 23:2, 53:16, 85:11, 85:12
**exercised** [1] - 16:8
**exercising** [1] - 11:12
**exhibit** [1] - 50:11
**exhibits** [1] - 49:14
**existed** [5] - 15:1, 15:17, 16:12, 63:20, 76:5
**expected** [1] - 77:2
**experienced** [1] - 77:10
**explain** [1] - 73:25
**explained** [1] - 59:4
**explanation** [2] - 16:11, 51:20

**explicit** [3] - 24:20, 28:3, 35:7
**exposed** [1] - 77:6
**expression** [1] - 77:2
**extended** [1] - 60:3
**extensive** [1] - 27:25
**extent** [14] - 27:17, 52:22, 54:15, 54:17, 56:18, 61:22, 74:14, 75:1, 77:14, 80:12, 82:6, 82:9, 83:7, 85:17
**extrapolates** [2] - 32:15, 35:4
**extrapolating** [1] - 33:9
**extrapolation** [2] - 36:5, 39:12
**extrapolations** [1] - 32:2
**extremely** [3] - 40:8, 44:15, 70:10

### F

**F.2nd** [1] - 9:6
**F.3d** [5] - 8:21, 9:20, 9:22, 10:5, 10:10
**face** [2] - 7:2, 92:3
**faced** [1] - 91:19
**FaceTime** [3] - 6:18, 13:19, 13:20
**facilitate** [1] - 81:13
**facilities** [3] - 74:20, 74:22, 91:22
**facility** [6] - 61:11, 75:4, 75:6, 75:7, 75:16, 92:1
**facing** [1] - 91:1
**fact** [57] - 8:3, 8:10, 8:12, 8:13, 8:25, 9:2, 9:3, 10:2, 10:22, 11:7, 12:12, 14:14, 14:23, 15:9, 15:14, 15:16, 15:20, 16:2, 16:13, 17:13, 20:10, 21:2, 22:8, 22:15, 32:20, 32:22, 33:24, 34:2, 34:9, 37:16, 39:6, 52:6, 54:17, 57:21, 59:18, 60:15, 61:15, 62:6, 62:8, 64:19, 64:23, 67:4, 75:6, 76:2, 77:23, 78:24, 80:3, 80:5, 81:16, 82:2, 87:2, 90:19, 91:24
**factfinder** [3] - 12:3, 12:11, 23:22
**factor** [7] - 22:16,

34:18, 35:2, 60:17, 72:19, 74:6, 82:9
**factors** [10] - 15:17, 20:20, 21:6, 24:5, 31:18, 53:15, 62:14, 66:4, 76:2, 79:17
**facts** [18] - 3:24, 13:7, 15:1, 15:24, 20:3, 30:13, 30:17, 30:19, 30:23, 30:25, 31:2, 31:12, 42:2, 42:8, 53:25, 55:19, 65:17, 65:19
**failing** [2] - 29:1, 59:11
**failure** [1] - 71:8
**fair** [3] - 22:18, 22:22, 27:12
**fairly** [1] - 85:14
**fall** [1] - 41:25
**families** [2] - 77:4, 87:15
**family** [7] - 76:8, 76:16, 76:18, 84:8, 85:18, 95:8
**far** [10] - 15:19, 18:7, 28:9, 28:15, 37:19, 66:25, 69:9, 86:9, 86:10, 89:7
**fatal** [1] - 70:1
**father** [1] - 9:25
**fault** [1] - 65:15
**favor** [1] - 28:7
**favorable** [7] - 13:6, 16:10, 20:2, 22:12, 22:13, 23:12, 61:23
**February** [4] - 48:12, 48:13, 54:21, 55:7
**federal** [3] - 25:18, 74:9, 93:19
**FEDERAL** [1] - 97:18
**felon** [4] - 10:6, 10:7, 10:10, 10:13
**felt** [2] - 77:1, 84:11
**fentanyl** [24] - 5:6, 17:5, 19:16, 33:18, 33:19, 33:23, 40:7, 41:10, 42:14, 43:18, 44:13, 44:24, 45:19, 46:3, 46:13, 69:24, 70:20, 86:19, 86:20, 86:24, 87:8, 87:11, 87:23, 88:13
**fentanyl/heroin** [1] - 45:11
**festival** [1] - 36:11
**few** [3] - 4:11, 20:16, 70:14
**fewer** [1] - 66:21
**figure** [4] - 29:20,

79:25, 88:24, 95:2
**file** [1] - 95:19
**filed** [9] - 3:15, 3:16, 3:19, 4:24, 31:16, 48:13, 48:14, 49:7, 49:23
**filing** [2] - 49:19, 50:18
**filtered** [1] - 76:23
**final** [3] - 47:22, 50:1, 73:22
**finality** [1] - 73:3
**finally** [4] - 36:20, 49:17, 73:6, 90:20
**financial** [2] - 36:15, 92:23
**finder** [2] - 12:12, 22:14
**findings** [2] - 47:7, 69:1
**fine** [5] - 30:3, 53:7, 57:1, 92:20, 94:13
**fingerprints** [1] - 9:13
**firearm** [63] - 6:9, 6:16, 6:24, 7:1, 7:3, 7:4, 7:8, 7:9, 7:16, 8:4, 8:11, 8:12, 8:16, 9:1, 9:13, 9:18, 10:16, 10:17, 10:22, 11:3, 11:5, 11:7, 11:20, 11:21, 12:21, 13:12, 13:21, 13:24, 14:1, 14:2, 14:6, 14:9, 14:15, 14:25, 15:9, 15:10, 15:13, 18:2, 18:4, 18:13, 20:21, 21:22, 21:23, 21:25, 22:2, 22:19, 51:6, 51:7, 51:10, 51:14, 51:19, 51:21, 52:3, 53:3, 53:5, 70:3, 70:5, 71:17, 72:2, 80:8, 82:2, 83:8, 86:21
**firearms** [13] - 3:22, 9:12, 17:18, 18:25, 20:7, 20:10, 20:18, 23:19, 24:1, 24:10, 32:25, 71:15, 72:1
**firearms-related** [1] - 71:15
**first** [29] - 2:18, 3:9, 3:11, 3:12, 3:17, 25:20, 26:6, 28:19, 28:20, 28:22, 29:3, 42:1, 50:19, 58:21, 63:4, 64:11, 66:22, 67:2, 67:18, 69:14, 69:23, 74:3, 74:10, 74:18, 76:8, 84:2,

84:13, 91:9
**first-time** [1] - 63:4
**five** [17] - 17:21, 38:20, 39:2, 41:23, 45:15, 56:11, 57:13, 58:10, 58:14, 58:18, 59:24, 60:9, 63:25, 82:12, 88:10, 92:8, 94:14
**five-year** [1] - 58:14
**flipping** [1] - 65:15
**flips** [1] - 51:22
**Floor** [1] - 1:14
**flow** [1] - 32:9
**focus** [3] - 31:1, 79:8, 88:6
**follow** [1] - 28:17, 92:17
**follow-up** [1] - 28:17
**followed** [2] - 69:8, 92:8
**following** [4] - 10:8, 28:10, 32:1, 92:15
**footsteps** [1] - 28:10
**FOR** [1] - 1:1
**force** [2] - 28:23, 67:6
**Ford** [5] - 17:16, 20:9, 21:15, 41:14, 43:11
**foregoing** [1] - 97:8
**foreseeable** [19] - 37:7, 39:22, 40:2, 40:11, 41:18, 41:21, 42:23, 43:21, 43:23, 43:24, 44:2, 44:9, 44:10, 44:12, 44:25, 46:7, 46:19, 47:2, 80:14
**forfeit** [1] - 93:2
**forfeiture** [7] - 49:23, 49:25, 50:2, 50:8, 73:15, 82:25, 93:1
**forgiven** [1] - 59:11
**forgotten** [1] - 95:24
**format** [1] - 97:11
**forth** [9] - 3:20, 5:25, 27:14, 34:14, 35:15, 35:20, 35:23, 39:9, 65:16
**fortunately** [3] - 25:19, 87:22, 88:14
**forward** [5] - 2:20, 20:22, 28:3, 71:4, 85:15
**fought** [1] - 84:4
**four** [8] - 45:15, 46:1, 56:10, 56:16, 63:3, 71:14, 79:11, 84:14
**Four** [9] - 3:25, 6:25, 21:22, 23:7, 23:17, 50:20, 86:20, 92:7,

92:10
**four-year-old** [1] - 84:14
**Fourth** [6] - 9:16, 10:11, 26:11, 26:13, 28:1, 90:5
**frame** [4] - 6:22, 35:6, 35:15, 85:8
**framing** [1] - 80:12
**frankly** [11] - 6:5, 7:10, 15:19, 27:8, 27:22, 52:12, 53:18, 55:13, 78:3, 88:12, 95:1
**Frederick** [1] - 78:19
**Friday** [2] - 1:8, 2:15
**frisk** [1] - 9:10
**front** [1] - 49:16
**fulfill** [5] - 69:17, 71:5, 72:8, 73:12, 82:22
**fulfilled** [1] - 21:3
**full** [1] - 90:23
**Fuller** [45] - 1:20, 2:3, 2:12, 16:20, 16:24, 17:9, 18:3, 19:3, 19:13, 19:22, 19:25, 20:6, 20:15, 20:18, 21:15, 21:24, 22:3, 23:18, 24:4, 29:21, 30:12, 30:22, 34:13, 34:24, 41:13, 41:18, 41:21, 42:7, 42:12, 42:19, 42:20, 42:23, 42:25, 43:7, 43:21, 46:10, 46:14, 46:20, 46:22, 46:23, 47:2, 48:3, 48:9, 51:23, 72:21
**FULLER** [1] - 1:6
**Fuller's** [7] - 20:9, 20:12, 24:16, 41:9, 42:3, 50:7, 68:24
**fully** [2] - 28:16, 48:15
**fund** [1] - 92:22
**furtherance** [8] - 17:13, 18:5, 18:10, 19:6, 19:19, 21:25, 22:4, 23:21
**furthered** [1] - 24:6

### G

**gained** [1] - 4:6
**game** [1] - 40:18
**geared** [1] - 63:10
**general** [4] - 8:10, 58:3, 71:25, 72:8
**generally** [5] - 5:10, 6:14, 58:6, 59:12, 86:13
**generated** [2] - 48:18,

8

90:4
**generic** [1] - 24:21
**gentlemen** [1] - 22:6
**get-go** [1] - 67:8
**girlfriend** [3] - 6:11, 13:25, 82:4
**given** [8] - 7:2, 8:24, 24:5, 26:24, 67:11, 85:7, 89:7, 95:16
**Glock** [4] - 4:14, 6:25, 73:16, 93:2
**glosses** [1] - 64:23
**goal** [1] - 95:9
**goals** [1] - 91:6
**Golden** [1] - 35:17
**Government** [79] - 5:15, 6:8, 7:5, 7:10, 7:18, 11:7, 13:1, 13:6, 14:7, 14:11, 15:14, 15:22, 15:24, 17:7, 18:17, 20:2, 22:6, 22:13, 23:12, 25:2, 27:13, 27:18, 31:10, 32:5, 32:15, 32:22, 33:6, 33:11, 33:21, 33:23, 34:8, 34:17, 34:19, 34:23, 35:2, 35:4, 35:8, 36:1, 36:12, 36:20, 37:11, 37:15, 37:20, 37:22, 38:8, 39:12, 39:17, 39:24, 41:9, 42:24, 44:22, 45:21, 46:10, 46:17, 52:23, 62:12, 65:25, 68:19, 69:4, 69:15, 72:4, 72:19, 73:8, 76:15, 77:22, 79:6, 79:10, 79:15, 79:23, 80:4, 80:11, 80:19, 81:7, 82:10, 84:23, 89:18, 90:2, 96:1
**Government's** [20] - 10:20, 14:22, 18:1, 19:1, 24:19, 25:25, 27:5, 27:23, 28:12, 31:12, 31:15, 34:15, 37:2, 39:8, 41:25, 42:12, 48:25, 49:2, 49:17, 79:8
**graduated** [1] - 88:3
**gram** [2] - 33:8, 36:6
**grams** [36] - 17:5, 19:9, 19:16, 31:21, 32:7, 32:8, 32:11, 33:7, 33:10, 33:14, 34:25, 35:3, 36:3, 36:6, 36:18, 37:12, 39:25, 40:7, 43:18, 44:24, 45:11, 45:15,

46:3, 46:5, 46:8, 46:13, 46:14, 46:15, 46:18, 70:1, 80:15, 80:16, 88:11
**grant** [2] - 12:20, 23:8
**granted** [6] - 48:21, 48:23, 49:1, 49:4, 49:10, 85:24
**grappling** [1] - 67:20
**great** [5] - 29:19, 85:2, 85:3, 85:22, 89:17
**greater** [7] - 59:10, 60:5, 60:8, 69:17, 79:16, 81:25, 82:22
**grew** [1] - 70:25
**Griffin** [1] - 9:22
**ground** [1] - 19:15
**group** [5] - 41:10, 52:16, 52:19, 52:22, 53:3
**guess** [6] - 29:11, 30:15, 48:2, 90:20, 90:21, 93:7
**guideline** [19] - 25:15, 29:8, 29:12, 46:5, 47:7, 47:12, 51:12, 52:2, 52:9, 52:11, 56:17, 59:14, 60:14, 61:13, 68:15, 71:2, 72:4, 73:22
**guidelines** [21] - 2:24, 26:5, 28:24, 41:10, 46:13, 53:7, 58:2, 59:22, 60:7, 61:18, 65:23, 66:24, 69:18, 69:21, 69:22, 70:24, 82:14, 86:23, 89:22, 89:25, 91:10
**guilt** [5] - 12:3, 12:13, 12:18, 89:14, 89:20
**guilty** [6] - 6:13, 13:8, 20:3, 72:16, 72:17, 80:17
**gun** [15] - 5:21, 6:5, 6:6, 6:21, 9:25, 10:14, 16:24, 17:1, 17:14, 17:15, 18:18, 72:19, 80:5, 82:1
**guns** [9] - 10:2, 17:12, 17:15, 18:6, 19:5, 19:19, 20:16, 72:22

## H

**Hagerstown** [2] - 33:13, 45:25
**half** [4] - 74:15, 85:4, 86:3, 86:7
**halfway** [2] - 94:19, 95:6

**hand** [6] - 10:14, 10:15, 34:19, 50:8, 68:3, 70:10
**handgun** [11] - 4:14, 5:13, 5:17, 5:19, 5:20, 15:18, 64:23, 67:25, 71:9, 71:22
**handled** [1] - 20:16
**hands** [1] - 9:10
**happy** [11] - 3:12, 14:12, 14:17, 14:18, 21:9, 25:7, 26:15, 31:2, 40:25, 41:2, 83:23
**hard** [1] - 31:20
**harps** [1] - 77:22
**harsh** [2] - 76:4, 88:8
**head** [1] - 91:5
**health** [2] - 63:16, 91:23
**hear** [6] - 26:16, 31:2, 70:19, 83:23, 87:3, 94:21
**heard** [9] - 6:17, 13:20, 14:16, 56:23, 79:19, 81:10, 82:10, 87:2, 87:22
**hearing** [4] - 26:7, 27:22, 79:12, 81:22
**Hearing/ Sentencings** [1] - 1:10
**hearings** [1] - 87:1
**heavily** [1] - 23:10
**held** [3] - 9:12, 28:7, 97:10
**help** [1] - 92:22
**helped** [1] - 20:22
**helping** [2] - 15:23, 89:1
**hereby** [1] - 97:7
**heroin** [15] - 5:5, 17:6, 19:16, 33:18, 33:20, 41:11, 42:14, 44:25, 45:19, 46:3, 86:19, 86:20, 86:24, 87:8, 87:11
**herself** [1] - 6:5
**hidden** [1] - 22:20
**high** [4] - 16:21, 69:25, 70:24, 88:12
**higher** [6] - 44:9, 44:16, 46:11, 66:2, 73:11, 89:3
**highest** [1] - 68:13
**himself** [6] - 5:17, 37:23, 38:6, 46:6, 70:19, 75:16
**History** [8] - 56:9, 57:7, 57:14, 64:2,

66:14, 67:21, 68:8, 69:19
**history** [20] - 2:22, 27:1, 48:2, 53:22, 56:20, 61:25, 62:20, 63:1, 64:3, 64:6, 64:7, 66:9, 67:22, 68:7, 68:12, 68:14, 70:8, 88:3, 90:7, 90:15
**hit** [1] - 74:25
**hold** [3] - 11:20, 34:7, 94:11
**home** [4] - 8:25, 9:1, 9:7, 9:8
**Honor** [75] - 2:9, 2:11, 3:4, 3:5, 3:7, 3:14, 7:25, 12:20, 13:1, 13:5, 14:12, 14:22, 16:16, 17:18, 21:7, 21:12, 24:21, 26:18, 26:21, 27:4, 28:17, 28:19, 28:20, 29:5, 29:13, 29:16, 30:4, 31:8, 33:15, 34:8, 37:12, 39:23, 40:6, 40:25, 41:6, 41:8, 42:4, 43:13, 43:15, 47:14, 47:19, 47:24, 48:16, 49:11, 49:22, 49:25, 51:3, 52:19, 54:7, 55:21, 57:4, 58:1, 58:12, 60:24, 61:2, 63:25, 64:5, 66:6, 69:3, 69:5, 69:12, 69:15, 73:18, 73:20, 77:20, 78:19, 82:16, 83:1, 83:18, 93:9, 93:13, 95:22, 96:2, 96:4
**HONORABLE** [1] - 1:11
**hope** [4] - 23:2, 24:5, 92:2, 95:11
**hoped** [1] - 73:21
**hopefully** [1] - 27:15
**horrendous** [2] - 75:9, 75:20
**horrible** [2] - 87:13, 92:2
**horribly** [1] - 90:19
**hotel** [1] - 64:24
**hour** [2] - 75:11, 85:7
**hours** [5] - 4:5, 38:18, 39:3, 75:2, 85:6
**house** [5] - 9:23, 17:2, 43:5, 77:12, 94:19
**houses** [1] - 95:6
**housing** [1] - 95:6
**huge** [1] - 72:5

**hundreds** [1] - 38:12
**hurt** [5] - 86:13, 87:6, 87:8, 87:12, 87:25
**hurtful** [1] - 76:18
**hurting** [1] - 87:21
**hybrid** [2] - 61:9, 61:14
**hypothetical** [1] - 20:25

## I

**idea** [1] - 79:18
**ideas** [1] - 63:20
**identified** [1] - 80:13
**ignore** [1] - 15:16
**illegal** [1] - 87:11
**imagine** [1] - 83:2
**immature** [1] - 59:6
**immediate** [1] - 59:9
**immediately** [3] - 18:21, 22:20, 30:10
**impact** [4] - 61:24, 74:3, 81:5, 87:15
**impacted** [1] - 70:24
**implicitly** [1] - 62:2
**import** [1] - 87:17
**important** [10] - 5:2, 9:22, 17:17, 26:17, 34:18, 34:23, 62:14, 88:2, 91:13, 95:8
**imported** [1] - 79:25
**impose** [2] - 74:1, 92:24
**imposed** [4] - 62:9, 62:25, 90:24, 91:12
**imposing** [1] - 62:18
**imprisonment** [3] - 57:23, 63:5, 72:8
**improbable** [2] - 52:7, 53:14
**IN** [1] - 1:1
**incarcerated** [1] - 85:4
**incarceration** [2] - 67:3, 68:12
**incident** [2] - 10:11, 38:4
**incidental** [1] - 10:18
**incidents** [2] - 32:1, 77:13
**included** [4] - 13:10, 42:2, 44:6, 64:7
**includes** [3] - 18:24, 25:24, 57:8
**including** [3] - 13:16, 20:12, 51:19
**inclusion** [1] - 42:5
**inconsistent** [1] - 37:1
**incorporate** [2] - 51:8, 62:20

**incorrect** [1] - 26:15
**increase** [5] - 51:19, 53:4, 62:18, 80:20, 82:15
**increased** [1] - 59:6
**increases** [1] - 51:1
**incredibly** [3] - 38:3, 52:5, 52:12
**indeed** [1] - 46:22
**indicated** [6] - 5:21, 6:24, 11:10, 11:13, 23:18, 38:24
**indicating** [2] - 6:19, 45:10
**indicative** [2] - 15:20, 46:18
**indictment** [8] - 4:18, 7:4, 12:24, 17:11, 25:4, 57:20, 80:12, 80:15
**indictments** [2] - 93:8, 93:10
**individual** [10] - 9:1, 14:12, 15:6, 15:7, 23:23, 30:7, 33:3, 58:7, 64:15
**individual's** [1] - 8:25
**individually** [1] - 95:5
**individuals** [8] - 8:2, 9:7, 38:20, 39:3, 43:8, 58:8, 77:8, 87:15
**infer** [3] - 20:21, 34:2, 35:22
**inference** [9] - 8:7, 10:24, 12:2, 15:25, 19:17, 22:18, 34:6, 34:14, 43:2
**inferences** [7] - 12:8, 12:17, 15:25, 30:18, 30:20, 30:22
**inferentially** [1] - 32:18
**inferred** [1] - 38:1
**inferring** [1] - 35:8
**infers** [1] - 33:6
**inflicting** [1] - 70:17
**influences** [1] - 59:11
**information** [8] - 22:25, 27:2, 45:6, 56:2, 68:4, 80:18, 84:4, 93:24
**inherit** [1] - 77:4
**initial** [4] - 52:2, 55:17, 74:15, 87:9
**innocence** [2] - 12:2, 12:18
**inside** [2] - 4:7, 43:3
**insignificant** [1] - 94:15

**instability** [1] - 76:21
**instance** [1] - 46:17
**instances** [1] - 7:17
**instead** [1] - 59:24
**institution** [1] - 85:25
**instruct** [1] - 9:9
**instructed** [1] - 23:3
**insulated** [1] - 88:22
**intend** [1] - 8:23
**intended** [1] - 8:8
**intent** [14] - 8:17, 9:14, 9:19, 10:4, 10:24, 12:6, 15:3, 26:4, 53:16, 67:17, 67:24, 86:18, 86:20
**intention** [2] - 8:10, 23:1
**intercepted** [1] - 37:25
**interest** [4] - 23:9, 24:15, 73:3, 73:15
**interesting** [4] - 25:25, 52:15, 67:12, 90:5
**intermittently** [1] - 74:17
**interpretation** [1] - 52:8
**interpreted** [2] - 6:20, 7:7
**intervening** [1] - 57:22
**introduced** [3] - 5:23, 17:8, 38:8
**intrusion** [1] - 11:16
**investigating** [1] - 33:2
**invite** [1] - 94:6
**involve** [2] - 71:2, 72:2
**involved** [9] - 10:21, 39:6, 39:7, 46:7, 46:25, 62:2, 64:18, 69:25, 86:24
**involving** [1] - 71:17
**irrational** [2] - 16:21, 53:8
**irresponsible** [2] - 59:6, 59:7
**issue** [8] - 8:20, 23:15, 25:13, 26:20, 28:5, 41:14, 49:18, 53:10, 54:19, 59:14, 63:16, 79:9, 82:7
**issues** [17] - 2:21, 2:25, 25:21, 29:23, 41:16, 47:12, 48:18, 53:21, 58:22, 58:24, 75:14, 78:4, 78:6, 80:24, 81:2, 83:15, 90:5
**item** [1] - 23:2
**items** [2] - 18:19, 74:2
**itself** [14] - 8:1, 8:7,

8:14, 8:17, 9:3, 11:1, 11:9, 15:22, 18:20, 24:2, 51:12, 52:2, 80:11
**IV** [5] - 57:15, 64:2, 66:1, 66:14, 73:22

## J

**jail** [3] - 39:19, 84:10, 93:14
**JARVIS** [1] - 1:6
**Jarvis** [3] - 1:20, 2:3, 2:12
**Jersey** [2] - 36:11, 89:10
**job** [1] - 84:24
**JOHNSON** [1] - 1:5
**Johnson** [102] - 1:16, 2:3, 2:10, 4:7, 4:19, 4:20, 5:17, 6:15, 6:19, 7:6, 8:4, 10:21, 11:11, 13:10, 13:11, 13:19, 13:25, 14:4, 15:16, 15:21, 16:11, 21:22, 21:25, 22:17, 22:22, 23:6, 25:10, 30:6, 30:11, 30:16, 32:22, 33:22, 34:1, 34:3, 34:4, 34:7, 34:21, 35:5, 35:14, 35:20, 35:21, 36:3, 36:9, 36:19, 36:25, 37:1, 37:2, 37:14, 37:23, 38:2, 38:5, 38:16, 38:24, 39:7, 39:10, 39:14, 39:22, 40:3, 40:21, 44:21, 44:25, 45:4, 45:20, 46:2, 46:6, 47:11, 48:3, 48:15, 50:5, 60:12, 62:4, 62:23, 67:10, 69:11, 70:10, 71:24, 72:18, 72:21, 73:9, 74:8, 74:17, 74:23, 76:6, 76:25, 77:9, 77:21, 78:6, 78:14, 79:6, 80:6, 81:24, 82:5, 82:11, 83:11, 83:13, 83:19, 86:17, 87:5, 94:20, 94:24, 95:10, 96:6
**Johnson's** [10] - 4:1, 5:12, 6:6, 6:9, 13:23, 23:15, 33:17, 74:15, 76:14, 80:22
**joint** [3] - 8:1, 22:25, 79:14
**jointly** [1] - 8:2
**Joseph** [3] - 1:17,

1:17, 2:9
**judge** [4] - 25:20, 26:1, 67:9, 81:21
**Judge** [2] - 1:11, 26:12
**judgment** [14] - 2:5, 2:18, 3:15, 3:21, 12:21, 12:22, 12:23, 13:2, 19:22, 23:11, 51:10, 91:15, 93:6, 95:14
**Judicial** [1] - 97:12
**July** [1] - 45:8
**June** [1] - 35:6
**jurisdictions** [1] - 78:22
**jurors** [1] - 45:13
**jury** [18] - 11:13, 12:8, 12:10, 14:9, 16:12, 16:22, 17:11, 20:20, 21:4, 22:7, 22:10, 23:2, 23:5, 24:4, 25:5, 32:9, 83:7, 88:1
**jury's** [3] - 20:1, 23:5, 24:11
**justice** [6] - 23:9, 24:15, 63:20, 73:10, 74:13, 89:12
**justifies** [1] - 82:11
**justify** [2] - 45:14, 68:1
**juvenile** [9] - 55:18, 61:8, 61:10, 61:11, 61:16, 62:3, 62:8, 62:11, 65:6
**juveniles** [5] - 59:4, 59:10, 59:13, 61:21, 66:25

## K

**Kawhi** [1] - 35:18
**keen** [1] - 84:22
**keep** [2] - 29:1, 44:16
**Kelly** [1] - 4:24
**key** [2] - 8:9, 8:24
**kill** [1] - 70:1
**kilo** [4] - 42:18, 42:23, 43:1, 79:25
**kilogram** [4] - 42:14, 44:1, 44:4, 44:12
**kilograms** [4] - 43:19, 44:24, 46:13, 46:25
**kilos** [1] - 41:10
**kind** [17] - 8:7, 11:10, 36:10, 39:4, 57:5, 58:21, 61:8, 61:14, 68:9, 68:12, 70:9, 72:3, 78:15, 79:18, 81:17, 85:16, 92:3

**kitchen** [1] - 9:9
**knowing** [2] - 41:22, 79:20
**knowledge** [7] - 6:9, 8:13, 8:22, 8:25, 9:3, 10:2, 22:21
**known** [1] - 81:22
**knows** [2] - 28:13, 67:12

## L

**lack** [4] - 39:6, 59:8, 79:8, 81:7
**lacked** [1] - 91:20
**lady** [1] - 84:13
**laid** [1] - 41:1
**large** [4] - 9:24, 74:13, 75:1, 80:12
**last** [6] - 40:9, 42:11, 49:18, 56:4, 68:24, 76:7
**late** [3] - 26:20, 27:5, 49:17
**Latrice** [1] - 4:2
**lavender** [1] - 4:14
**law** [23] - 18:12, 22:19, 25:18, 47:4, 58:22, 63:2, 63:8, 63:9, 63:19, 64:8, 65:9, 67:9, 67:14, 72:10, 72:13, 78:8, 84:16, 88:6, 88:15, 88:23, 92:12, 92:24, 94:23
**Law** [2] - 1:17, 1:21
**lawful** [1] - 71:9
**laws** [1] - 43:22
**lawyer** [1] - 77:24
**lay** [1] - 23:10
**lead** [1] - 39:21
**leading** [1] - 89:6
**learned** [5] - 54:11, 54:12, 72:24, 88:25, 92:2
**learning** [1] - 72:23
**lease** [1] - 6:1
**least** [14] - 18:21, 21:16, 26:7, 44:24, 45:2, 46:1, 46:3, 46:8, 49:19, 50:25, 60:22, 71:14, 81:13
**leave** [1] - 32:14
**leaves** [1] - 26:6
**led** [2] - 57:24, 89:17
**ledger** [1] - 13:17
**left** [2] - 10:15, 95:24
**legacy** [1] - 77:4
**legal** [2] - 22:8, 41:5
**lend** [1] - 8:7
**leniency** [1] - 85:20

**less** [11] - 44:24, 59:18, 59:20, 64:13, 64:14, 67:11, 73:13, 75:10, 84:25, 88:18
**lessee** [1] - 6:1
**lesser** [1] - 82:6
**letters** [4] - 49:4, 49:12, 49:15, 50:10
**level** [31] - 30:11, 32:9, 32:11, 32:14, 39:25, 40:3, 40:6, 43:12, 44:23, 45:1, 46:11, 47:3, 47:8, 50:23, 50:25, 51:5, 53:4, 53:5, 56:13, 62:18, 68:5, 68:7, 68:13, 69:19, 76:20, 81:25, 82:6, 88:5, 90:11, 90:19
**levels** [7] - 44:14, 44:20, 46:12, 51:14, 51:20, 52:13, 57:9
**liberty** [1] - 93:21
**library** [1] - 78:8
**license** [2] - 5:24, 32:25
**life** [11] - 36:16, 64:18, 70:16, 71:18, 71:21, 77:7, 77:9, 77:16, 84:6, 85:1
**light** [10] - 13:6, 16:10, 20:2, 22:11, 22:13, 23:12, 25:8, 41:3, 76:4, 82:24
**lightly** [1] - 72:3
**likelihood** [3] - 59:15, 67:22, 68:1
**likely** [5] - 46:2, 59:19, 61:10, 63:21, 64:14
**limit** [1] - 75:3
**limitation** [11] - 57:19, 58:2, 58:4, 58:10, 58:11, 58:15, 58:17, 59:24, 60:6, 60:11, 61:13
**limited** [4] - 65:10, 75:10, 75:12, 92:9
**line** [2] - 57:6, 93:1
**links** [1] - 74:18
**list** [1] - 24:5
**listed** [1] - 55:24
**listen** [1] - 48:5
**listened** [1] - 72:20
**listening** [1] - 45:5
**lists** [1] - 50:19
**literally** [4] - 74:16, 74:24, 75:7, 77:11
**litigated** [2] - 72:7, 78:4
**litigation** [1] - 75:22

**LITTLE** [14] - 2:11, 3:7, 16:16, 17:25, 21:12, 28:17, 29:5, 29:13, 29:16, 30:3, 41:8, 47:14, 47:19, 47:24
**live** [1] - 76:11
**lived** [1] - 45:16
**LLC** [2] - 1:17, 1:21
**loaded** [4] - 4:15, 20:10, 24:7, 64:23
**located** [5] - 9:9, 11:5, 11:8, 80:8
**location** [3] - 15:8, 53:17, 93:5
**locked** [4] - 17:4, 18:16, 18:19, 39:17
**logical** [2] - 3:2, 58:18
**logically** [1] - 29:24
**Lomax** [1] - 20:20
**look** [8] - 28:25, 31:4, 50:12, 60:17, 60:18, 69:23, 70:8, 90:11
**looked** [3] - 29:10, 71:6, 78:23
**looking** [14] - 7:2, 7:19, 7:22, 35:9, 56:17, 58:12, 65:6, 65:7, 67:20, 77:14, 77:16, 78:9, 78:20, 78:25
**looks** [1] - 78:21
**love** [2] - 85:17, 86:13
**low** [1] - 68:5
**low-level** [1] - 68:5
**lower** [2] - 55:2, 71:5
**lowest** [1] - 32:10
**Lyles** [4] - 45:7, 45:12, 45:15, 70:19

# M

**magazine** [3] - 13:13, 22:23, 53:18
**mail** [1] - 29:17
**mailed** [1] - 50:15
**main** [1] - 80:11
**maintain** [1] - 65:21
**major** [2] - 80:3, 80:4
**malice** [1] - 11:10
**man** [3] - 84:3, 84:6, 85:10
**mandatory** [7] - 80:15, 80:16, 80:17, 83:16, 88:9, 88:10, 92:11
**manufacturing** [3] - 64:16, 64:21, 64:22
**March** [6] - 1:8, 55:1, 55:3, 56:6, 74:10, 83:4

**marginal** [1] - 62:3
**marijuana** [7] - 5:7, 5:9, 63:9, 64:21, 64:22, 64:25, 65:4
**marked** [1] - 20:14
**Martin** [2] - 1:24, 54:14
**MARYLAND** [1] - 1:1
**Maryland** [16] - 1:9, 1:14, 1:19, 1:22, 4:3, 5:22, 25:23, 26:3, 28:22, 61:7, 63:2, 65:9, 67:14, 69:25, 89:11, 97:7
**Mason** [3] - 61:3, 61:12, 61:21
**master** [1] - 11:9
**match** [2] - 13:12, 34:15
**matching** [1] - 13:14
**material** [2] - 2:16, 19:10
**MATHIAS** [22] - 3:4, 13:1, 16:6, 16:8, 19:24, 26:18, 40:6, 43:15, 49:22, 49:25, 64:5, 65:2, 65:6, 65:11, 65:15, 68:17, 68:23, 69:5, 69:15, 73:17, 93:9, 96:1
**Mathias** [13] - 1:13, 2:6, 3:2, 12:25, 19:23, 26:17, 40:5, 43:14, 64:4, 68:18, 69:13, 94:12, 95:25
**matter** [12] - 3:8, 7:1, 17:24, 27:16, 27:22, 33:7, 57:25, 58:1, 59:13, 72:13, 95:1, 97:10
**matters** [3] - 4:11, 5:1, 79:1
**maximum** [2] - 67:12, 94:17
**Md** [1] - 63:8
**mean** [29] - 6:21, 7:7, 14:13, 27:11, 36:11, 38:10, 40:20, 43:21, 47:25, 50:20, 60:1, 67:2, 70:14, 70:18, 73:6, 74:13, 75:4, 75:17, 75:19, 77:1, 77:22, 78:3, 80:2, 80:24, 82:4, 89:4, 93:19, 93:22, 94:14
**meaning** [2] - 5:4, 5:5
**means** [7] - 54:16, 59:7, 59:10, 67:5, 77:5, 89:21, 90:13
**meant** [2] - 43:18,

87:6
**measure** [2] - 89:17, 90:13
**meet** [3] - 6:20, 74:10, 75:14
**meeting** [3] - 6:22, 38:21, 74:17
**members** [2] - 76:16, 76:18
**memo** [3] - 49:13, 49:17, 68:21
**memorandum** [6] - 3:20, 43:18, 48:20, 48:22, 48:25, 49:3
**men** [1] - 84:6
**mention** [1] - 29:25
**mentioned** [2] - 13:5, 49:19, 53:16
**mentioning** [1] - 26:12
**mere** [2] - 9:20, 22:16
**merit** [1] - 68:13
**Merit** [1] - 97:6
**message** [1] - 37:6
**messages** [6] - 13:24, 17:7, 20:17, 36:22, 42:2, 42:5
**met** [2] - 39:24, 84:6
**Mexican** [2] - 42:13, 44:4
**Mexico** [4] - 41:24, 42:16, 80:2, 89:9
**middle** [3] - 11:16, 40:22, 87:18
**might** [21] - 5:8, 7:11, 7:12, 7:14, 8:11, 8:12, 8:25, 12:18, 23:9, 24:19, 26:1, 54:18, 64:15, 67:3, 67:6, 67:13, 75:8, 78:17, 81:5, 81:22, 93:2
**Mill** [2] - 1:18, 38:10
**millimeter** [1] - 17:9
**Mills** [5] - 4:2, 37:21, 38:1, 38:6
**mind** [3] - 28:21, 78:10, 91:24
**mine** [1] - 50:22
**minimis** [1] - 28:22
**minimize** [1] - 79:4
**minimum** [3] - 31:21, 32:1, 46:12
**minimums** [1] - 88:9
**minor** [1] - 60:3
**minute** [1] - 55:19
**minutes** [4] - 17:21, 18:6, 21:1, 70:14
**Mirandized** [1] - 4:10
**miss** [1] - 85:18
**mistake** [1] - 55:8

**mistaken** [1] - 21:17
**mitigating** [1] - 66:4
**mitigation** [1] - 71:4
**mix** [1] - 17:5
**mixture** [4] - 19:16, 33:18, 33:21, 45:11
**modern** [3] - 58:21, 63:10, 63:20
**moment** [2] - 16:18, 83:18
**money** [12] - 14:5, 32:19, 32:20, 33:6, 40:17, 41:15, 42:6, 42:13, 43:11, 83:8, 92:21
**monitoring** [1] - 39:18
**month** [10] - 17:22, 21:17, 34:11, 39:16, 39:17, 39:21, 58:3, 60:5, 75:10, 93:19
**months** [11] - 65:12, 67:2, 67:10, 69:16, 69:20, 76:8, 80:18, 84:13, 85:5, 92:6, 92:7
**morally** [1] - 59:7
**moreover** [3] - 13:18, 14:3, 20:15
**morning** [8] - 2:9, 2:11, 2:15, 4:5, 38:18, 39:3, 77:3, 77:5
**most** [15] - 13:6, 14:25, 15:1, 16:10, 20:2, 22:11, 22:13, 23:12, 37:13, 61:10, 71:18, 74:9, 74:22, 77:21, 78:6
**mother** [1] - 84:12
**motion** [13] - 3:15, 11:22, 12:21, 12:22, 12:24, 19:25, 23:7, 24:16, 27:5, 27:21, 48:20, 49:14, 51:9
**motions** [16] - 2:4, 2:17, 3:1, 13:8, 13:4, 23:17, 24:18, 24:20, 24:21, 40:14, 72:6, 73:4, 79:12, 89:16, 90:4
**Motions** [1] - 1:10
**motive** [1] - 13:23
**move** [4] - 56:24, 85:14, 91:25, 93:9
**movement** [2] - 75:3, 75:7
**moving** [2] - 63:13, 63:15
**MR** [76] - 2:9, 2:11, 3:5, 3:7, 3:12, 3:14,

11:23, 12:1, 12:10, 12:15, 14:22, 16:16, 17:25, 21:12, 24:21, 24:24, 25:11, 27:3, 27:8, 28:17, 29:5, 29:13, 29:16, 30:3, 31:8, 31:23, 41:5, 41:8, 47:14, 47:19, 47:24, 48:16, 49:7, 49:11, 49:14, 49:21, 51:3, 51:11, 51:17, 51:24, 52:1, 52:18, 53:1, 53:9, 54:2, 54:4, 54:7, 54:13, 54:22, 54:25, 55:5, 55:9, 55:12, 56:3, 56:14, 56:22, 57:1, 57:4, 66:6, 66:18, 69:3, 69:12, 73:20, 83:1, 83:5, 83:7, 83:14, 83:18, 93:13, 93:21, 94:2, 94:10, 94:16, 95:3, 95:22, 96:4
**MS** [22] - 3:4, 13:1, 16:6, 16:8, 19:24, 26:18, 40:6, 43:15, 49:22, 49:25, 64:5, 65:2, 65:6, 65:11, 65:15, 68:17, 68:23, 69:5, 69:15, 73:17, 93:9, 96:1
**Mt** [1] - 1:18
**multi** [1] - 38:9
**multi-unit** [1] - 38:9
**multiple** [2] - 25:5, 72:12
**music** [1] - 36:10
**must** [5] - 7:21, 31:3, 31:5, 35:10, 43:1

# N

**Nadine** [1] - 97:5
**NADINE** [1] - 97:18
**name** [5] - 6:1, 14:3, 14:5, 35:17, 61:3
**narcotics** [1] - 71:14
**narcotics-related** [1] - 71:14
**narrative** [1] - 55:4
**National** [1] - 86:4
**nature** [6] - 69:23, 81:6, 86:1, 86:12, 86:23, 88:20
**near** [2] - 22:24, 60:10
**nearly** [1] - 14:8
**necessarily** [2] - 32:9, 43:4
**necessary** [7] - 46:5,

69:17, 73:12, 79:16, 82:22, 89:7, 92:13
**need** [20] - 2:24, 21:7, 24:20, 24:22, 29:9, 29:24, 30:9, 44:17, 53:14, 69:1, 71:23, 71:25, 72:14, 82:7, 87:24, 88:21, 91:12, 93:8, 95:16
**needed** [4] - 7:14, 53:13, 72:11, 89:1
**needs** [5] - 50:21, 69:9, 72:7, 90:8, 95:23
**negative** [2] - 59:11, 70:22
**Nelson** [38] - 34:10, 34:16, 34:24, 35:6, 35:14, 35:21, 40:10, 41:22, 42:7, 42:12, 42:15, 42:18, 42:21, 43:9, 43:20, 43:23, 44:4, 44:10, 44:11, 46:22, 46:24, 72:16, 72:17, 72:19, 72:20, 73:2, 73:5, 79:13, 79:18, 79:24, 79:25, 80:7, 80:15, 81:25, 82:12, 89:3, 89:5, 90:6
**Nelson's** [4] - 39:16, 41:17, 43:1, 46:18
**neophyte** [1] - 89:12
**never** [13] - 5:19, 37:25, 38:4, 42:19, 75:13, 79:21, 82:2, 82:3, 86:9, 86:13, 91:24, 92:3, 93:21
**nevertheless** [1] - 23:14
**new** [9] - 2:5, 2:18, 3:16, 12:24, 13:3, 23:8, 24:15, 42:14, 53:4
**New** [2] - 36:11, 89:10
**Newark** [2] - 42:17, 42:18
**next** [11] - 11:9, 13:13, 18:9, 18:11, 18:13, 35:2, 50:24, 62:22, 70:8, 74:20, 95:17
**night** [4] - 11:16, 15:19, 40:22, 49:18
**Nikki** [1] - 1:24
**nine** [3] - 31:20, 45:18, 57:14
**NO** [1] - 1:4
**no-go** [1] - 67:23
**nobody** [3] - 50:13, 86:13, 89:20

**normalized** [1] - 77:1
**NORTHERN** [1] - 1:2
**note** [15] - 17:18, 27:4, 34:8, 43:17, 49:11, 50:18, 51:11, 54:7, 58:1, 64:11, 69:20, 72:16, 72:23, 78:24, 83:3
**noted** [8] - 32:4, 56:5, 59:5, 61:2, 63:8, 63:10, 86:25, 95:13
**notes** [4] - 24:19, 57:24, 58:14, 65:3
**Notes** [1] - 1:25
**nothing** [15] - 6:23, 7:3, 7:23, 8:3, 32:19, 33:5, 37:23, 38:23, 52:3, 52:4, 56:7, 65:3, 81:24, 96:1, 96:4
**notice** [1] - 95:19
**noting** [1] - 57:18
**nuanced** [2] - 5:2, 88:22
**number** [10] - 8:5, 9:24, 18:18, 31:16, 32:17, 50:5, 50:10, 50:11, 55:25, 78:25
**Number** [1] - 2:3
**numbers** [2] - 49:19, 50:22

# O

**obey** [1] - 71:8
**object** [2] - 51:6, 82:25
**objected** [1] - 30:20
**objection** [1] - 30:18
**objections** [5] - 26:19, 30:16, 30:23, 48:2, 48:18
**objects** [1] - 44:8
**obligated** [1] - 83:22
**observable** [1] - 22:21
**observation** [2] - 38:5, 38:15
**observed** [3] - 38:20, 38:25, 77:12
**obtain** [2] - 45:19, 46:24
**obtained** [3] - 32:6, 34:13, 46:3
**obtaining** [2] - 20:18, 34:3
**obviously** [20] - 6:4, 17:10, 17:20, 18:8, 24:3, 27:4, 30:13, 31:5, 40:21, 41:5, 67:19, 71:23, 76:15,

79:14, 80:3, 80:11, 84:25, 90:16, 95:8, 95:20
**occasion** [4] - 5:6, 36:8, 38:7, 38:18
**occasionally** [1] - 75:7
**occasions** [5] - 25:6, 38:7, 45:21, 46:1, 75:17
**occurred** [5] - 18:8, 54:1, 60:20, 63:19, 86:10
**occurring** [2] - 11:16, 71:14
**October** [2] - 93:17, 94:6
**OF** [3] - 1:1, 1:3, 97:1
**offended** [1] - 60:21
**offender** [11] - 25:14, 26:5, 26:19, 27:4, 48:23, 53:6, 56:19, 62:1, 63:4, 66:1, 70:9
**offenders** [7] - 58:19, 58:25, 59:3, 60:2, 60:4, 60:12
**offense** [34] - 23:23, 24:7, 29:12, 30:12, 32:11, 40:3, 40:6, 43:12, 44:14, 44:20, 44:23, 47:8, 50:23, 50:25, 51:4, 53:4, 53:5, 53:15, 53:19, 57:10, 57:19, 58:13, 59:17, 60:15, 61:23, 62:4, 64:24, 67:18, 69:19, 69:22, 69:24, 70:4, 71:17, 72:11
**offenses** [20] - 25:5, 25:14, 25:17, 26:4, 52:16, 55:23, 58:3, 58:5, 58:6, 58:8, 58:9, 58:17, 59:23, 60:3, 60:4, 60:8, 60:10, 67:7, 67:24, 71:13
**office** [8] - 30:24, 46:11, 50:14, 77:3, 77:5, 77:8, 77:9, 77:17
**Office** [2] - 1:17, 1:21
**Officer** [3] - 1:23, 1:24, 4:21
**officer** [2] - 79:2, 94:7
**officers** [6] - 4:7, 4:24, 17:2, 21:14, 22:19, 33:2
**OFFICIAL** [2] - 97:1, 97:18
**often** [4] - 52:1, 60:17,

78:5, 94:21
**old** [4] - 14:17, 79:6, 84:14, 84:25
**older** [1] - 58:19
**once** [2] - 4:7, 75:10
**one** [82] - 4:24, 5:2, 5:7, 6:10, 9:12, 11:17, 12:19, 13:3, 14:18, 15:5, 16:12, 19:9, 19:10, 21:13, 21:21, 22:15, 24:3, 24:8, 25:6, 28:12, 29:3, 29:17, 29:18, 32:4, 32:17, 37:10, 38:7, 38:19, 39:21, 40:9, 41:10, 41:22, 47:15, 52:22, 56:13, 56:19, 58:5, 58:8, 59:23, 59:25, 60:9, 63:5, 63:22, 64:12, 65:1, 65:2, 65:7, 65:10, 65:14, 65:24, 66:16, 66:19, 66:20, 68:7, 68:19, 68:20, 68:23, 68:25, 70:10, 71:17, 74:20, 77:14, 77:21, 78:6, 78:9, 79:25, 80:24, 81:13, 81:15, 81:19, 83:18, 84:6, 85:9, 89:9, 90:1, 91:15, 94:25
**One** [3] - 86:18, 92:6, 92:9
**one-point** [1] - 63:22
**onerous** [1] - 61:24
**ones** [3] - 40:18, 68:4, 72:21
**ongoing** [1] - 45:3
**open** [1] - 18:22
**opening** [1] - 19:3
**operated** [1] - 14:4
**operating** [1] - 32:18
**operation** [1] - 88:20
**opportunities** [1] - 85:24
**opportunity** [6] - 27:12, 70:18, 83:21, 84:5, 84:18, 85:7
**opposed** [1] - 37:3
**opposite** [1] - 9:8
**opposition** [1] - 49:2
**Oracle** [1] - 35:18
**ordeal** [1] - 86:9
**order** [4] - 50:1, 82:25, 84:16, 95:14
**orders** [1] - 14:5
**organization** [3] - 44:11, 69:24, 70:23
**organized** [1] - 29:2
**original** [5] - 16:9,

49:12, 54:24, 54:25, 56:6
**otherwise** [3] - 36:1, 89:21, 92:23
**ought** [1] - 63:16
**ounce** [1] - 19:15
**outlined** [4] - 21:9, 68:4, 70:3, 71:7
**outset** [1] - 30:9
**outside** [7] - 4:9, 28:23, 74:5, 74:24, 77:12, 84:8, 84:19
**overall** [4] - 34:5, 86:25, 89:3, 92:5
**overdosed** [1] - 70:20
**overdoses** [1] - 87:22
**overheard** [1] - 6:17
**overlap** [1] - 2:23
**overlook** [1] - 90:19
**overlooked** [1] - 26:16
**overrepresentation** [6] - 53:24, 56:8, 60:19, 66:13, 68:14
**overrepresents** [2] - 67:21, 68:7
**oversight** [1] - 83:5
**overstates** [1] - 81:7
**overwhelming** [1] - 40:19
**Owings** [5] - 4:2, 37:21, 38:1, 38:5, 38:6
**own** [5] - 76:12, 76:22, 77:16, 85:11, 91:23
**owner** [4] - 9:25, 11:19, 13:25

## P

**p.m** [1] - 96:7
**package** [1] - 87:19
**packaged** [1] - 23:23
**packaging** [1] - 19:9
**page** [12] - 31:11, 31:17, 42:3, 43:17, 50:19, 50:21, 50:22, 50:24, 56:17, 94:1, 97:11
**pandemic** [1] - 86:10
**paper** [8] - 48:12, 48:20, 48:25, 50:5, 50:9, 73:14, 79:10, 83:3
**papers** [9] - 8:5, 14:19, 25:1, 29:23, 41:2, 48:14, 49:4, 49:19, 76:17
**paperwork** [1] - 55:14
**paragraph** [25] - 29:3, 30:25, 42:4, 42:11,

51:17, 53:23, 54:8, 54:20, 55:7, 55:20, 56:1, 56:5, 56:8, 57:11, 57:12, 57:17, 62:23, 65:2, 66:10, 66:11, 66:15, 66:20
**paragraphs** [2] - 50:23, 55:24
**parameters** [1] - 8:19
**parking** [1] - 38:21
**parole** [3] - 67:4, 67:5, 68:11
**paroled** [1] - 90:24
**parse** [1] - 46:4
**parsed** [1] - 47:25
**parsing** [1] - 29:9
**part** [14] - 14:4, 37:13, 38:24, 46:20, 47:2, 64:12, 64:24, 70:22, 88:2, 90:6, 90:9, 90:10, 90:12, 90:16
**participate** [3] - 30:15, 92:14, 92:16
**participates** [1] - 87:16
**participating** [1] - 89:15
**participation** [1] - 63:11
**particular** [11] - 11:2, 15:18, 15:19, 28:8, 38:18, 57:25, 60:18, 84:21, 88:15, 89:6
**particularly** [4] - 24:17, 68:5, 76:13, 87:8
**partner** [3] - 4:2, 10:13, 10:15
**partners** [2] - 7:11, 10:12
**party** [2] - 28:25, 37:24
**passenger** [1] - 9:17
**past** [2] - 70:14, 73:10
**patience** [1] - 86:16
**patient** [1] - 95:11
**patiently** [1] - 83:20
**paucity** [1] - 11:3
**pay** [1] - 42:13
**peculiar** [1] - 58:7
**pegged** [1] - 88:12
**penalty** [2] - 59:2, 59:5
**people** [29] - 23:1, 28:7, 29:15, 41:23, 58:17, 58:23, 70:1, 70:17, 70:24, 75:24, 76:21, 84:9, 86:13, 87:7, 87:9, 87:10, 87:12, 87:16, 87:18, 87:21, 87:24, 88:1,

91:6, 91:12, 91:13, 91:18, 92:22, 94:22
**per** [3] - 33:8, 36:6, 92:21
**perceive** [1] - 76:20
**percent** [2] - 80:19, 82:11
**perhaps** [10] - 8:19, 29:25, 31:8, 77:17, 77:18, 87:1, 87:13, 91:11, 94:19
**period** [20] - 57:19, 57:22, 58:4, 58:10, 58:11, 58:15, 58:17, 59:24, 60:6, 60:16, 60:20, 60:21, 61:13, 72:25, 75:1, 75:25, 76:6, 76:12, 94:18, 94:20
**periods** [1] - 58:2
**person** [9] - 19:14, 29:18, 41:23, 59:19, 61:6, 61:23, 82:3, 86:21, 95:4
**personal** [4] - 74:17, 76:14, 78:14, 94:5
**personally** [1] - 86:4
**persuade** [3] - 91:7, 91:8
**persuaded** [1] - 67:14
**pertains** [1] - 30:14
**Philander** [2] - 6:12, 72:23
**phone** [5] - 30:19, 37:25, 39:18, 42:7, 85:9
**physically** [3] - 5:18, 44:7, 87:6
**pick** [2] - 24:8, 42:18
**picked** [1] - 76:15
**picking** [2] - 42:16, 89:9
**pictures** [1] - 38:11
**piece** [1] - 70:2
**pieces** [1] - 22:25
**pistol** [3] - 17:6, 18:12, 93:3
**place** [15] - 6:23, 18:24, 24:8, 26:24, 31:9, 35:17, 62:15, 62:16, 62:17, 81:15, 81:17, 85:2, 85:3, 85:22, 91:9
**placed** [3] - 10:16, 17:19, 55:3
**places** [1] - 74:21
**Plaintiff** [2] - 1:3, 1:12
**planning** [2] - 37:18, 45:8
**plausible** [4] - 11:15,

11:24, 12:2, 12:8
**playoffs** [1] - 35:16
**plea** [5] - 67:13, 80:17, 80:18, 81:23, 89:18
**pleading** [3] - 3:17, 52:23
**pleadings** [2] - 16:17, 42:24
**pleas** [1] - 79:13
**pled** [3] - 6:13, 72:16, 80:17
**pocket** [1] - 4:13
**point** [34] - 15:15, 17:10, 18:16, 19:8, 22:22, 27:9, 27:11, 28:2, 32:12, 39:17, 50:9, 51:6, 53:2, 54:11, 56:8, 57:8, 57:18, 58:5, 58:8, 59:23, 60:10, 63:22, 63:23, 65:13, 65:14, 65:25, 68:20, 73:7, 73:10, 78:25, 79:5, 81:25, 90:18
**points** [26] - 51:5, 53:23, 56:10, 57:8, 57:11, 57:13, 61:1, 61:25, 62:20, 62:21, 62:25, 63:25, 64:1, 65:20, 66:9, 66:11, 66:12, 66:15, 66:16, 66:18, 66:19, 66:21, 67:25, 77:11, 90:1
**poison** [3] - 70:20, 87:7, 87:12
**police** [9] - 9:7, 9:9, 10:17, 17:3, 17:20, 17:21, 17:22, 18:7, 32:25
**policy** [6] - 53:22, 57:6, 58:1, 60:14, 64:9, 66:13, 66:22, 67:1
**portion** [3] - 31:3, 37:6, 55:4
**portions** [2] - 30:7, 30:17
**position** [8] - 19:1, 33:4, 40:12, 42:12, 43:10, 58:11, 58:16, 80:23
**possess** [2] - 13:24, 86:18
**possessed** [6] - 14:9, 14:14, 16:24, 51:19, 52:3, 53:12
**possessing** [1] - 11:12
**possession** [27] - 5:12, 5:16, 6:9,

10:15, 11:19, 15:16, 16:4, 20:21, 21:23, 21:24, 22:2, 23:1, 23:19, 25:23, 26:3, 51:5, 51:14, 62:24, 63:14, 65:9, 67:16, 67:17, 67:24, 86:19, 86:21
**possessor** [2] - 15:13, 15:20
**possibilities** [1] - 20:25
**possible** [4] - 2:20, 25:2, 55:16, 63:12
**possibly** [5] - 2:23, 16:11, 42:16, 71:3, 85:8
**post** [1] - 3:18
**post-trial** [1] - 3:18
**potential** [1] - 59:20
**potentially** [2] - 5:2, 15:8
**power** [1] - 23:1
**practice** [2] - 89:16, 90:4
**predicate** [2] - 25:14, 26:20
**preferred** [1] - 60:2
**preliminary** [1] - 82:25
**premise** [1] - 14:23
**premises** [2] - 8:2, 15:6
**preparation** [1] - 72:24
**prepare** [1] - 93:6
**preponderance** [1] - 47:6
**presence** [4] - 8:10, 8:13, 14:24, 22:23
**Present** [1] - 1:23
**present** [5] - 15:8, 22:10, 48:10, 51:21, 85:20
**presented** [5] - 19:13, 20:15, 25:21, 44:3, 77:18
**presentence** [13] - 25:9, 30:6, 30:11, 30:12, 30:17, 42:3, 44:22, 47:8, 48:12, 50:13, 69:2, 93:16, 93:25
**presents** [1] - 18:23
**preserve** [3] - 27:15, 85:12
**preserved** [2] - 28:10, 28:16
**pretrial** [1] - 64:5
**pretty** [3] - 41:1, 43:16, 53:17

**previous** [2] - 11:14, 20:16
**previously** [2] - 6:13, 63:3
**primarily** [1] - 89:1
**primary** [1] - 32:19
**printed** [1] - 5:19
**prism** [3] - 7:20, 7:23, 35:9
**Prisons** [4] - 54:19, 95:1, 95:9, 95:10
**probation** [10] - 30:24, 46:10, 50:14, 52:20, 57:23, 68:11, 69:6, 71:12, 94:1, 94:7
**PROBATION** [3] - 55:21, 55:23, 69:8
**Probation** [2] - 1:23, 1:24
**probationer** [1] - 10:3
**probative** [2] - 39:11, 59:20
**problem** [1] - 87:20
**problems** [1] - 92:23
**proceed** [1] - 29:21
**Proceeding** [2] - 2:1, 96:7
**proceeding** [5] - 5:15, 37:18, 50:3, 62:11, 96:6
**proceedings** [1] - 97:10
**proceeds** [1] - 31:17
**process** [3] - 16:9, 85:14, 86:10
**product** [1] - 46:24
**productive** [1] - 92:1
**productively** [2] - 29:24, 47:18
**professional** [1] - 77:3
**professors** [3] - 29:17, 29:18, 47:15
**program** [2] - 92:15, 92:17
**programming** [1] - 92:1
**programs** [1] - 63:11
**prohibited** [2] - 86:21, 92:19
**promote** [1] - 72:9
**promptly** [2] - 95:12, 95:18
**prong** [2] - 44:7, 67:23
**proof** [4] - 12:4, 12:16, 12:19, 16:3
**proper** [4] - 24:5, 25:14, 54:13, 54:15
**properly** [6] - 23:2, 52:17, 64:6, 66:10, 66:12, 84:5

**proportionality** [2] - 79:9, 80:10
**proposal** [1] - 25:9
**proposed** [3] - 47:7, 74:6, 83:12
**protect** [1] - 91:23
**protection** [2] - 19:6, 82:21
**proud** [1] - 86:6
**proven** [2] - 22:5, 47:5
**provide** [2] - 56:2, 72:10
**provided** [2] - 33:1, 63:3
**provisions** [1] - 52:12
**proximity** [5] - 13:12, 18:17, 20:7, 22:23, 95:7
**PSR** [3] - 41:9, 41:19, 42:11
**PSRs** [1] - 79:21
**public** [2] - 63:16, 82:21
**punish** [1] - 91:6
**punished** [1] - 60:4
**punishment** [3] - 72:9, 72:10, 88:8
**punishments** [3] - 63:3, 63:10, 63:14
**punitive** [1] - 63:14
**purchase** [1] - 14:6
**purchaser** [2] - 5:24, 15:23
**purchasing** [1] - 45:7
**pure** [2] - 33:19, 33:23
**purpose** [1] - 39:4
**purposes** [17] - 2:22, 25:15, 26:5, 29:8, 29:12, 46:5, 47:9, 57:15, 61:18, 68:15, 69:18, 71:5, 73:12, 79:17, 80:10, 81:13, 82:23
**pursuant** [3] - 3:18, 16:17, 97:8
**pursue** [1] - 39:12
**pursuing** [1] - 50:4
**put** [18] - 9:10, 14:5, 14:7, 17:20, 18:6, 20:25, 28:24, 43:12, 45:22, 50:8, 57:14, 64:1, 65:13, 71:4, 72:6, 75:18, 76:17, 79:5
**puts** [1] - 32:8
**putting** [3] - 14:3, 28:3, 34:14

## Q

**qualifies** [3] - 25:23, 26:9, 29:7
**qualify** [1] - 25:18
**qualms** [1] - 84:23
**quantities** [11] - 7:18, 31:11, 31:20, 44:4, 45:3, 45:19, 46:7, 46:19, 46:24, 69:25, 88:9
**quantity** [10] - 2:23, 4:17, 29:25, 31:5, 31:7, 32:7, 44:8, 44:13, 47:5, 47:8
**quarrel** [1] - 56:9
**quest** [1] - 29:1
**questioned** [2] - 4:10, 4:20, 5:20
**questioning** [1] - 53:25
**questions** [6] - 14:13, 14:18, 21:7, 21:9, 39:1, 40:25
**quick** [2] - 51:4, 85:24
**quite** [4] - 6:5, 7:10, 45:9, 88:5

## R

**raid** [2] - 17:2, 21:17
**rainy** [1] - 2:15
**raised** [8] - 28:6, 38:25, 40:12, 42:8, 53:21, 55:18, 70:11, 79:10
**ram** [2] - 4:7, 11:17
**ran** [1] - 81:16
**range** [5] - 73:23, 74:1, 74:5, 82:17, 82:18
**rap** [1] - 78:20
**rare** [1] - 77:25
**rarely** [1] - 78:1
**rat** [1] - 70:20
**rather** [8] - 15:21, 22:8, 22:12, 30:23, 58:18, 63:14, 63:22, 66:19
**rational** [10] - 12:3, 13:7, 14:8, 14:14, 16:2, 16:12, 20:3, 21:2, 22:14, 59:25
**re** [1] - 68:12
**re-incarceration** [1] - 68:12
**reach** [1] - 53:20
**reached** [3] - 40:1, 67:13, 73:7
**reaching** [1] - 37:19

**read** [4] - 29:23, 44:18, 50:10, 85:22
**readily** [1] - 87:12
**ready** [4] - 19:12, 24:10, 48:5, 94:24
**real** [2] - 73:3, 85:24
**really** [18] - 12:7, 13:3, 14:18, 17:18, 29:24, 31:4, 40:15, 41:1, 44:8, 44:9, 56:9, 70:16, 70:18, 71:1, 72:21, 78:13, 81:23, 85:18
**realm** [1] - 80:9
**Realtime** [1] - 97:5
**reason** [4] - 11:18, 27:20, 90:8, 92:23
**reasonable** [18] - 12:4, 12:12, 12:14, 12:16, 12:19, 13:8, 16:4, 20:4, 22:14, 23:22, 31:5, 34:2, 35:22, 39:5, 44:1, 47:6, 71:3, 71:9
**reasonably** [12] - 41:17, 41:20, 42:23, 43:22, 43:24, 44:2, 44:10, 44:12, 44:25, 46:7, 46:19, 47:2
**reasoning** [1] - 64:12
**reasons** [13] - 12:20, 19:21, 39:23, 48:24, 52:13, 58:20, 59:22, 60:24, 66:13, 73:25, 82:16, 87:10, 94:9
**rebuttal** [3] - 14:21, 16:8, 21:11
**recalculated** [1] - 69:21
**received** [4] - 27:4, 48:19, 49:4, 72:17
**recent** [2] - 20:9, 20:17, 26:13, 67:3
**recently** [2] - 21:18, 74:23
**receptive** [1] - 84:4
**recess** [2] - 47:10, 48:6
**Recess** [1] - 48:8
**recidivism** [4] - 59:15, 59:21, 67:23, 68:1
**reckless** [1] - 28:21
**recklessness** [1] - 11:10
**recognizance** [1] - 94:5
**recognize** [4] - 16:20, 66:24, 89:8, 91:17
**recognized** [1] - 26:21
**recognizes** [1] - 61:20

**recognizing** [1] - 78:6
**recollection** [2] - 21:13, 21:16
**recommend** [1] - 95:7
**recommendation** [7] - 69:21, 73:21, 79:14, 93:13, 94:17, 94:22, 94:25
**recommendations** [2] - 83:17, 93:11
**recommending** [2] - 71:2, 82:17
**reconvene** [1] - 47:10
**record** [16] - 26:18, 26:22, 27:10, 27:12, 27:15, 28:2, 28:15, 28:18, 28:24, 51:4, 63:1, 72:18, 79:18, 79:19, 86:14, 95:15
**recorded** [1] - 87:3
**records** [5] - 72:15, 79:22, 82:8, 94:4, 94:8
**recovered** [8] - 5:11, 7:4, 9:24, 10:17, 32:16, 33:12, 33:17, 34:9
**recovery** [2] - 13:12, 13:14
**Redd** [2] - 26:11, 29:7
**REDD** [1] - 26:12
**reduce** [2] - 57:13, 68:8
**reduced** [2] - 58:11, 58:16
**reducing** [1] - 57:11
**reduction** [2] - 57:12, 68:2
**reference** [13] - 6:24, 7:3, 7:8, 7:15, 31:12, 31:14, 35:18, 36:20, 36:24, 37:6, 52:6, 62:6, 63:7
**referenced** [1] - 37:9
**references** [1] - 42:9
**referred** [1] - 55:6
**referring** [2] - 7:13, 63:9
**refers** [1] - 7:18
**reflect** [2] - 59:19, 64:14
**reflected** [3] - 7:2, 7:9, 64:8
**regard** [37] - 3:21, 3:22, 4:10, 5:17, 6:16, 6:22, 12:5, 12:21, 12:22, 12:23, 15:17, 16:4, 25:22, 27:3, 27:23, 28:3, 28:5, 31:24, 32:6,

36:3, 44:21, 45:3, 53:16, 53:22, 58:1, 58:2, 58:24, 59:20, 61:20, 66:10, 69:1, 75:22, 76:14, 81:4, 83:15

**regarding** [2] - 4:11, 42:5

**regardless** [2] - 65:19, 65:22

**regards** [1] - 36:16

**registered** [2] - 11:19, 13:25

**Registered** [1] - 97:6

**regroup** [1] - 48:6

**regulations** [3] - 92:16, 92:18, 97:11

**rehabilitation** [1] - 63:17

**reject** [1] - 23:14

**related** [5] - 7:21, 58:22, 71:14, 71:15

**relating** [1] - 57:23

**relationship** [2] - 45:4, 78:14

**relatively** [2] - 36:13, 68:5

**release** [10] - 57:24, 60:23, 67:2, 83:12, 90:20, 92:8, 92:13, 93:18, 94:3, 94:5

**released** [4] - 57:25, 60:22, 67:5, 93:17

**releases** [1] - 68:11

**relevant** [1] - 17:12

**reliable** [2] - 37:13, 39:13

**relies** [3] - 17:7, 18:17, 37:23

**relive** [1] - 44:17

**relying** [1] - 46:17

**remain** [1] - 50:23, 86:12

**remains** [1] - 60:11

**remark** [1] - 89:13

**remarked** [2] - 87:1, 90:15

**remember** [2] - 42:5, 51:20

**remorseful** [1] - 73:5

**renew** [1] - 26:19

**renewing** [2] - 24:19, 26:22

**repeat** [1] - 91:4

**repeating** [1] - 44:16

**repetitive** [1] - 45:6

**report** [16] - 4:24, 25:9, 30:6, 30:11, 30:13, 32:25, 42:3, 44:22, 48:12, 50:13,

50:18, 57:24, 69:2, 93:16, 93:25, 94:9

**report's** [1] - 30:17

**reported** [2] - 38:23, 97:9

**REPORTER** [2] - 97:1, 97:18

**Reporter** [2] - 97:5, 97:6

**reports** [1] - 47:8

**reprehensible** [1] - 59:8

**represented** [2] - 64:20, 79:14

**represents** [1] - 33:10

**request** [1] - 12:20, 48:20, 49:1, 49:3, 49:5, 50:8, 56:24, 63:24, 73:15, 74:4

**requested** [1] - 48:24

**requests** [2] - 44:22, 93:11

**require** [2] - 27:25, 53:3

**required** [4] - 12:8, 12:10, 92:12, 92:24

**requires** [1] - 23:9

**research** [1] - 27:25

**residence** [4] - 4:1, 46:16, 46:18, 93:4

**resident** [1] - 15:14

**residents** [2] - 6:2, 11:18

**residing** [2] - 8:2, 9:25

**resolve** [1] - 94:16

**resolved** [1] - 48:23

**resources** [1] - 95:5

**respect** [9] - 6:6, 7:3, 7:18, 7:25, 13:10, 15:5, 20:5, 31:10, 31:11, 33:16, 35:16, 36:25, 37:15, 37:20, 39:12, 39:14, 51:4, 51:7, 51:12, 52:20, 53:6, 57:17, 64:11, 64:21, 72:10, 76:18, 81:1, 84:16, 84:22, 85:14

**respectful** [1] - 77:21

**respectfully** [2] - 13:2, 19:25

**respond** [2] - 27:13, 32:4

**responded** [1] - 40:15

**responsibility** [13] - 70:13, 70:15, 73:4, 73:5, 73:7, 77:23, 79:8, 80:21, 81:4, 81:8, 89:15, 89:22, 89:24

**responsible** [6] - 46:6, 46:8, 81:11, 87:9, 87:21, 88:11

**rest** [4] - 14:19, 25:21, 47:11, 64:18

**restricted** [1] - 91:25

**result** [2] - 61:10, 68:15

**resulted** [2] - 63:22, 73:23

**resulting** [1] - 68:10

**results** [1] - 53:23

**resumed** [1] - 50:16

**retrial** [1] - 81:6

**return** [1] - 73:11

**reupped** [2] - 38:2, 39:10

**revealed** [1] - 4:12

**revealing** [1] - 45:9

**reviewed** [4] - 35:13, 48:15, 83:12, 83:14

**reviewing** [1] - 28:25

**revised** [1] - 48:12

**revocation** [1] - 68:10

**revoked** [1] - 67:4

**rewarding** [1] - 77:6

**Ricks** [1] - 10:10

**rides** [1] - 45:9

**rifle** [3] - 17:6, 20:8, 23:20

**rights** [4] - 75:24, 81:5, 85:13, 89:22

**riveting** [1] - 87:3

**RMR** [1] - 97:18

**Road** [1] - 38:10

**road** [1] - 75:15

**Robinson** [1] - 63:8

**robustly** [1] - 23:13

**role** [1] - 23:5

**roles** [2] - 88:18, 88:22

**room** [1] - 64:24

**Roper** [1] - 59:2

**routine** [1] - 7:12

**Rule** [5] - 3:19, 11:22, 23:6, 24:12, 24:13

**rule** [2] - 23:8, 61:6

**ruled** [3] - 13:4, 27:18, 28:7

**rules** [2] - 92:15, 92:17

**ruling** [4] - 22:9, 28:19, 31:4, 53:5

**run** [1] - 74:20

**Run** [1] - 38:10

**running** [1] - 35:19

**safety** [1] - 91:24

**sale** [1] - 23:24

**sales** [1] - 20:10

**salient** [2] - 14:25, 15:1

**Sanger** [1] - 1:23

**satisfied** [3] - 45:17, 45:20, 45:25

**satisfy** [1] - 79:17

**saw** [13] - 10:13, 13:19, 13:20, 16:25, 38:10, 43:6, 44:1, 68:20, 68:24, 70:24, 77:13, 77:15, 78:8

**scale** [1] - 13:16

**scales** [1] - 20:13

**scared** [1] - 77:11

**scene** [1] - 5:11

**scheme** [1] - 94:15

**science** [1] - 58:23

**scope** [2] - 45:13, 86:23

**score** [1] - 64:3

**scuttlebutt** [1] - 79:19

**seal** [7] - 31:16, 48:20, 48:21, 49:1, 49:3, 49:5, 49:8

**search** [14] - 3:25, 4:11, 4:12, 9:6, 32:6, 32:13, 32:16, 33:12, 34:10, 34:13, 38:9, 39:16, 81:15, 81:17

**searched** [1] - 17:3

**seated** [2] - 83:25, 84:1

**second** [3] - 48:11, 67:23, 83:4

**see** [22] - 2:14, 2:16, 2:19, 3:2, 18:11, 18:18, 21:7, 21:14, 26:23, 41:20, 48:24, 50:12, 55:9, 65:11, 68:10, 70:22, 76:8, 86:5, 88:3, 90:18, 94:4, 94:7

**seeking** [3] - 46:11, 66:1, 66:3

**seem** [2] - 25:16, 73:11

**seized** [10] - 5:15, 19:10, 32:12, 32:17, 33:19, 33:22, 34:25, 41:17, 93:3, 93:4

**sell** [2] - 45:15, 87:19

**Seller** [1] - 86:5

**selling** [1] - 18:3

**sells** [1] - 19:14

**send** [1] - 14:5

**sense** [2] - 37:4, 80:9

**sentence** [23] - 42:11,

56:4, 58:16, 60:5, 61:14, 61:17, 62:9, 62:10, 62:25, 63:5, 63:21, 66:2, 69:16, 71:2, 72:5, 74:1, 79:16, 81:10, 82:19, 91:2, 91:15, 92:6, 94:18

**sentenced** [4] - 61:8, 61:9, 62:8, 67:10

**sentences** [7] - 54:3, 56:4, 78:19, 82:7, 90:22, 91:3, 91:11

**sentencing** [23] - 2:20, 43:17, 48:19, 48:21, 48:25, 49:2, 49:13, 59:15, 61:8, 61:15, 61:16, 67:10, 72:14, 73:20, 74:14, 82:23, 86:17, 87:1, 90:9, 90:14, 91:6, 91:13, 96:6

**sentencings** [2] - 2:6, 79:21

**separate** [1] - 2:24

**separately** [2] - 2:25, 30:2

**September** [2] - 93:17, 94:5

**series** [2] - 31:12, 31:17

**serious** [8] - 68:12, 69:22, 70:3, 76:1, 78:21, 79:3, 79:22, 90:17

**seriousness** [3] - 53:24, 67:22, 82:20

**serve** [1] - 90:23

**services** [1] - 92:15

**serving** [2] - 71:18, 82:11

**set** [2] - 3:20, 27:14

**Seventh** [2] - 9:23, 10:5

**several** [4] - 5:4, 67:24, 74:2, 94:9

**severe** [1] - 62:18

**shall** [1] - 47:10

**share** [1] - 86:3

**shared** [1] - 4:2

**sheer** [1] - 32:7

**sheet** [2] - 50:19, 78:21

**Sheriff** [1] - 20:14

**shocking** [1] - 87:23

**shoes** [1] - 22:24

**short** [2] - 41:25, 84:14

**show** [5] - 8:6, 22:1, 38:8, 70:6, 94:4

**S**

**safe** [1] - 4:15

**showed** [1] - 5:23
**shower** [2] - 75:9, 85:8
**shown** [1] - 24:2
**shows** [3] - 54:20, 55:7, 71:3
**shrouds** [1] - 15:22
**shut** [1] - 74:21
**side** [1] - 23:16
**sides** [1] - 9:8
**significance** [1] - 81:7
**significant** [11] - 9:5, 24:2, 34:22, 45:2, 72:7, 74:6, 76:10, 80:7, 82:14, 88:7, 90:5
**significantly** [1] - 76:7
**signifying** [1] - 80:1
**silent** [1] - 34:19
**similar** [3] - 20:23, 72:15, 72:16
**similarities** [1] - 26:23
**similarity** [1] - 34:23
**similarly** [3] - 19:24, 24:13, 91:14
**Simmons** [1] - 59:2
**simple** [1] - 65:9
**simply** [18] - 5:1, 7:19, 11:4, 14:23, 15:9, 15:12, 16:14, 21:1, 24:13, 27:14, 28:10, 33:7, 36:21, 39:24, 61:24, 73:13, 73:25, 79:5
**sincerely** [1] - 43:19
**single** [3] - 22:16, 32:3, 79:1
**sitting** [2] - 83:20, 86:7
**situated** [1] - 91:14
**situation** [8] - 6:2, 8:7, 8:21, 51:13, 58:7, 61:19, 75:20, 92:4
**Sixth** [1] - 9:6
**size** [1] - 70:2
**sizeable** [2] - 23:23, 23:24
**slapped** [2] - 10:13, 10:14
**slightly** [1] - 61:4
**small** [4] - 19:14, 19:15, 36:14
**smaller** [1] - 46:4
**smarter** [1] - 88:4
**Smith** [2] - 1:18, 9:20
**smoked** [2] - 81:20, 81:23
**smoking** [2] - 5:8, 5:9
**so-called** [1] - 90:12
**social** [1] - 36:16

**socialize** [1] - 36:9
**sole** [1] - 15:13
**solely** [1] - 90:11
**solitary** [1] - 75:18
**someone** [6] - 13:22, 18:20, 20:25, 42:16, 43:4, 68:1
**sometime** [1] - 77:2
**sometimes** [3] - 53:8, 89:23, 90:18
**somewhat** [3] - 29:2, 31:9, 76:16
**somewhere** [1] - 80:8
**son** [2] - 38:14, 84:14
**soon** [1] - 50:2
**sorry** [4] - 31:15, 65:6, 73:22, 83:1
**sort** [11] - 7:15, 18:23, 30:20, 31:2, 31:3, 51:22, 52:5, 65:17, 88:20, 94:13
**sorts** [1] - 8:1
**sound** [1] - 3:2
**source** [3] - 42:13, 44:5, 45:21
**Spanish** [1] - 80:1
**special** [2] - 92:20, 92:24
**specific** [4] - 7:1, 30:16, 31:14, 71:23
**specifically** [5] - 3:21, 6:16, 6:25, 8:3, 21:21
**specifics** [1] - 31:25
**speculative** [5] - 36:7, 36:18, 36:22, 37:7, 37:15
**spend** [1] - 26:1
**spending** [1] - 72:25
**spent** [3] - 71:18, 71:20, 83:19
**sports** [1] - 40:18
**spread** [2] - 75:3, 91:21
**Spruce** [1] - 33:12
**Spruill** [5] - 6:12, 6:15, 33:12, 33:19, 33:23, 34:1, 34:3, 34:6, 34:17, 34:21, 35:1, 35:20, 36:4, 36:9, 36:25, 37:3, 37:21, 37:24, 37:25, 38:1, 38:5, 38:6, 38:9, 38:12, 38:17, 38:20, 38:22, 39:1, 39:5, 39:9, 45:4, 45:8, 45:12, 45:18, 46:2, 72:23, 73:2, 79:13, 79:18, 80:16, 81:9, 81:10, 81:14,

82:4, 82:12, 89:1, 89:8, 90:6
**squad** [1] - 4:6
**stacks** [1] - 42:6
**stage** [1] - 90:14
**stages** [1] - 77:7
**standard** [7] - 15:2, 15:3, 16:21, 23:14, 83:16, 92:12
**standing** [1] - 9:8
**standpoint** [2] - 63:18, 77:24
**star** [1] - 35:18
**start** [6] - 31:9, 40:9, 57:17, 57:19, 87:5, 87:10
**starting** [1] - 31:14
**starts** [2] - 31:16, 32:5
**stash** [1] - 34:4
**stashes** [1] - 49:15
**State** [2] - 35:17, 63:8
**state** [8] - 5:22, 25:17, 28:21, 61:5, 63:20, 64:8, 78:22, 90:24
**statement** [12] - 4:20, 5:16, 6:17, 6:19, 6:23, 7:1, 30:17, 30:25, 33:1, 65:19, 83:22
**statements** [1] - 81:3
**STATES** [2] - 1:1, 1:3
**States** [12] - 1:13, 2:2, 2:7, 8:20, 9:5, 9:16, 9:20, 9:22, 10:5, 10:10, 97:6, 97:12
**station** [1] - 17:3
**status** [4] - 10:7, 10:8, 25:10, 94:3
**statute** [1] - 29:10
**statutes** [1] - 86:22
**stay** [1] - 91:2
**stenographically** [1] - 97:9
**stenographically-reported** [1] - 97:9
**Stenotype** [1] - 1:25
**step** [2] - 84:3, 90:6
**Sterling** [1] - 4:21
**stiff** [1] - 78:19
**still** [10] - 10:7, 32:14, 44:2, 65:13, 67:16, 69:21, 70:13, 73:9, 82:10
**stopped** [1] - 88:15
**store** [1] - 18:24
**stored** [1] - 19:17
**story** [1] - 84:14
**strategy** [1] - 75:2
**straw** [1] - 15:23
**Street** [3] - 1:14, 1:21,

33:13
**street** [4] - 19:14, 88:3, 88:23, 89:2
**strip** [1] - 42:10
**struck** [1] - 74:12
**structure** [2] - 57:15, 59:15
**struggling** [1] - 25:16
**studied** [1] - 85:22
**stuff** [2] - 81:20, 87:17
**style** [1] - 20:23
**subject** [1] - 63:5
**subjected** [1] - 59:5
**submission** [1] - 26:20
**submit** [11] - 12:22, 14:19, 19:25, 34:22, 34:24, 37:12, 41:2, 51:7, 51:15, 62:19, 92:18
**submits** [1] - 69:16
**submitted** [3] - 14:15, 44:15, 50:2
**subsection** [1] - 56:19
**subsequent** [3] - 3:17, 3:20, 63:2
**substance** [7] - 63:12, 63:15, 71:12, 92:16, 92:18, 92:19
**substances** [5] - 71:7, 71:8, 71:10, 71:11, 71:22
**substantial** [3] - 75:21, 76:4, 76:5
**succeed** [1] - 88:19
**succeeded** [1] - 88:23
**suffered** [1] - 76:6
**sufficiency** [2] - 21:21, 23:19
**sufficient** [24] - 8:11, 8:13, 8:14, 9:3, 9:14, 9:18, 10:3, 10:9, 10:18, 10:23, 11:6, 12:13, 18:14, 18:15, 22:1, 22:9, 22:14, 23:21, 46:21, 69:17, 79:16, 82:22, 84:11
**sugar** [1] - 70:2
**suggest** [5] - 18:8, 18:14, 33:5, 39:23, 62:15
**suggested** [2] - 68:20, 81:24
**suggesting** [4] - 12:15, 46:11, 68:21, 89:20
**suggestion** [1] - 2:17
**suggests** [2] - 30:11, 30:13
**Suite** [1] - 1:18

**sums** [1] - 46:4
**super** [1] - 85:9
**supervised** [3] - 83:12, 92:8, 92:13
**supervision** [4] - 57:9, 60:21, 71:16, 92:11
**supplement** [1] - 16:18
**supplemental** [1] - 48:21
**supplies** [1] - 10:24
**supply** [2] - 42:14, 44:5
**supplying** [2] - 41:22, 43:8
**support** [1] - 12:13
**supported** [4] - 13:11, 19:2, 20:6, 44:22
**supporting** [1] - 47:4
**supports** [4] - 42:22, 45:17, 46:1, 47:1
**suppose** [4] - 52:7, 57:21, 80:20, 93:22
**supposedly** [1] - 36:24
**Supreme** [4] - 26:1, 26:14, 59:1, 59:4
**surely** [1] - 23:4
**surpasses** [1] - 47:3
**surrounding** [1] - 2:21
**surroundings** [1] - 59:9
**surveillance** [5] - 38:4, 38:7, 40:20, 40:21, 45:22
**surveillanced** [1] - 45:24
**susceptibility** [1] - 59:6
**suspended** [2] - 90:25, 91:1
**sustaining** [2] - 47:7, 72:12
**sympathetic** [4] - 70:10, 70:12, 77:17, 91:17
**sympathy** [1] - 85:19
**system** [5] - 63:21, 73:10, 74:13, 78:3, 89:12

**T**

**tactical** [1] - 4:5
**Taisha** [1] - 70:21
**takedown** [1] - 44:7
**tape** [1] - 87:2
**taught** [1] - 29:17
**Taurus** [1] - 17:6
**teaches** [1] - 47:15

technical [1] - 66:8
tempered [1] - 76:16
temporarily [1] - 11:20
ten [15] - 41:23, 58:6,
58:18, 59:24, 60:22,
72:17, 72:23, 79:13,
81:9, 88:11, 90:22,
90:23, 90:24, 90:25,
91:1
ten-year [3] - 81:9,
90:22, 91:1
tentatively [1] - 26:8
term [2] - 41:6, 72:7
terms [17] - 7:10,
32:13, 36:11, 36:12,
37:13, 40:1, 48:3,
57:6, 58:21, 60:17,
63:25, 75:2, 75:12,
78:14, 79:23, 80:24,
92:1
terrible [1] - 88:14
terribly [3] - 25:1,
26:16, 26:17
test [8] - 11:22, 12:7,
12:9, 13:5, 16:14,
21:2, 22:11
testified [5] - 6:10,
6:13, 6:19, 21:14,
38:19
testify [1] - 13:18
testimony [9] - 5:3,
21:13, 33:8, 33:15,
33:25, 36:8, 45:2,
70:4, 81:22
testing [1] - 92:18
text [9] - 7:5, 13:24,
17:7, 20:17, 36:21,
37:6, 42:1, 42:5,
42:7
THE [110] - 1:1, 1:1,
1:11, 2:2, 2:8, 2:14,
3:6, 3:8, 3:13, 11:22,
11:24, 12:7, 12:12,
12:25, 14:21, 16:7,
16:15, 17:24, 19:23,
21:11, 21:20, 24:22,
24:25, 25:12, 26:23,
27:7, 28:5, 29:1,
29:6, 29:14, 29:19,
30:5, 31:19, 40:5,
41:3, 41:7, 43:14,
44:21, 47:16, 47:21,
47:25, 48:11, 48:17,
49:9, 49:13, 49:16,
49:23, 50:5, 50:6,
50:15, 50:17, 51:9,
51:16, 51:18, 51:25,
52:15, 52:25, 53:7,
53:11, 54:3, 54:5,
54:11, 54:20, 54:23,

55:2, 55:6, 55:11,
55:16, 55:22, 56:1,
56:4, 56:16, 56:23,
57:3, 64:4, 65:1,
65:4, 65:8, 65:12,
66:5, 66:7, 66:19,
68:18, 68:25, 69:4,
69:6, 69:10, 69:13,
73:14, 73:19, 82:24,
83:3, 83:6, 83:10,
83:15, 83:19, 83:24,
83:25, 84:2, 86:16,
93:11, 93:16, 93:24,
94:3, 94:11, 94:21,
95:4, 95:23, 96:3,
96:5
themselves [2] - 35:8,
66:24
theories [1] - 31:19
theory [5] - 5:16, 19:2,
37:2, 39:8, 64:16
thereby [1] - 62:9
therefore [10] - 7:20,
18:4, 19:5, 36:1,
40:3, 43:24, 44:11,
62:25, 68:6, 94:24
they've [1] - 88:12
thin [1] - 38:3
thinking [2] - 28:1,
45:13
thinks [1] - 26:16
Thirteen [4] - 16:19,
19:22, 21:24, 24:16
Thomas [1] - 10:5
thoroughly [3] -
14:11, 14:20, 21:5
three [29] - 41:12,
43:25, 45:10, 53:23,
57:11, 61:1, 62:18,
62:20, 62:21, 62:25,
63:23, 65:13, 65:20,
66:11, 66:12, 74:15,
75:17, 76:9, 78:25,
84:9, 84:12, 85:4,
86:2, 86:3, 86:7,
86:17, 90:18, 92:9
Three [3] - 86:19,
92:7, 92:9
three-and-a-half [4] -
74:15, 85:4, 86:3,
86:7
three-level [1] - 62:18
three-point [3] -
63:23, 78:25, 90:18
throughout [2] -
40:24, 72:24
thrust [1] - 3:23
tied [1] - 35:10
tier [1] - 80:13
ties [1] - 8:3

tilting [1] - 23:16
timely [1] - 90:1
today [13] - 2:4, 3:23,
26:8, 28:14, 65:8,
65:21, 70:14, 74:14,
83:20, 85:2, 86:22,
91:11, 95:15
together [13] - 3:1,
29:25, 30:2, 34:6,
34:7, 36:17, 38:5,
44:3, 45:24, 46:22,
47:13, 59:16, 75:14
token [1] - 32:23
took [8] - 6:23, 10:15,
62:15, 62:16, 62:17,
76:22, 81:15, 89:8
tool [2] - 10:23, 18:13
tools [3] - 13:15,
20:11
top [4] - 39:25, 49:10,
80:13, 82:17
Toronto [2] - 35:17,
35:18
tortuous [1] - 75:5
total [8] - 11:2, 37:12,
50:25, 57:8, 57:13,
57:14, 63:24, 92:20
totally [7] - 26:25,
35:25, 36:6, 36:17,
36:22, 37:1, 74:21
touched [2] - 8:15,
8:16
touching [1] - 9:21
tough [4] - 84:15,
85:5, 85:9, 86:7
towards [1] - 63:11
towed [1] - 17:2
trade [7] - 10:22,
10:23, 13:15, 18:13,
20:11, 36:23, 64:19
traffic [2] - 87:8, 87:24
trafficking [9] - 20:22,
21:25, 25:19, 25:24,
26:4, 40:19, 44:11,
69:24, 70:23
tragedy [1] - 78:16
transaction [5] - 19:4,
19:7, 21:15, 35:11,
79:1
transactional [1] -
52:23
transactions [1] -
19:20
transcript [3] - 24:17,
97:9, 97:11
Transcription [1] -
1:25
transfer [2] - 36:4,
36:7
transferred [2] -

35:24, 95:12
transfers [3] - 25:24,
35:5, 35:8
transition [1] - 95:6
transitional [2] -
94:18, 94:20
translating [1] - 46:4
trash [4] - 9:8, 9:11,
9:12
trauma [1] - 77:10
traumatizing [1] -
77:13
treat [3] - 60:11,
61:21, 68:13
treated [4] - 62:5,
63:16, 66:21, 67:8
treatment [6] - 60:2,
61:23, 63:13, 63:17,
92:17
trial [39] - 2:5, 2:18,
3:8, 3:16, 3:18, 5:3,
5:23, 6:7, 6:10, 6:12,
12:24, 13:3, 17:8,
19:13, 21:13, 23:8,
24:15, 25:16, 33:15,
35:12, 38:8, 38:19,
40:14, 40:24, 44:18,
71:2, 72:5, 72:17,
72:24, 72:25, 80:20,
80:25, 81:5, 81:19,
81:21, 82:13, 85:12,
87:2, 89:19
tried [3] - 40:13, 40:14
trier [5] - 13:7, 14:14,
16:2, 20:3, 21:2
triers [1] - 16:12
trip [1] - 42:9
trips [5] - 31:20,
37:21, 39:8, 39:9,
45:18
troubled [1] - 53:11
true [5] - 18:6, 43:4,
45:21, 64:15, 97:9
truly [1] - 73:5
trunk [12] - 17:4,
17:19, 18:16, 18:22,
19:3, 19:10, 20:8,
23:20, 24:1, 24:3
trust [2] - 6:20, 13:22
try [6] - 16:18, 83:24,
88:21, 89:4, 91:8,
94:16
trying [4] - 24:25,
57:15, 79:4, 79:5
turning [1] - 91:4
turns [1] - 9:11
two [54] - 4:19, 6:2,
6:18, 7:11, 7:24, 8:1,
9:7, 9:12, 10:12,
12:8, 14:8, 17:12,

17:15, 18:6, 18:25,
22:17, 23:1, 29:15,
31:19, 31:21, 31:23,
34:14, 36:20, 38:7,
45:10, 45:23, 46:12,
49:15, 51:5, 51:6,
51:13, 51:19, 52:13,
56:4, 57:8, 57:13,
58:5, 58:8, 58:20,
59:16, 59:22, 59:23,
60:10, 66:16, 66:17,
66:18, 66:19, 74:20,
75:19, 79:12, 84:13,
86:8, 90:1, 95:14
two-point [1] - 51:6
type [13] - 7:11, 8:6,
15:4, 27:1, 33:22,
35:10, 35:25, 45:6,
60:17, 68:3, 68:10,
71:21, 86:9
types [2] - 64:19,
71:19
TYRELL [1] - 1:5
Tyrell [1] - 1:16

## U

U.S.C [1] - 97:8
ultimately [2] - 87:21,
91:14
unclear [2] - 31:9,
95:24
under [34] - 2:24, 8:6,
11:14, 23:14, 24:12,
24:13, 25:17, 25:19,
26:5, 31:16, 33:4,
49:7, 55:3, 55:25,
56:16, 56:18, 58:2,
58:9, 58:13, 58:14,
58:17, 59:2, 59:3,
59:14, 60:4, 61:13,
61:24, 65:9, 67:19,
82:23, 91:15, 91:18,
92:12, 94:3
undercover [2] - 79:1,
88:4
underlying [3] - 25:13,
52:9, 52:11
understate [1] - 88:13
understood [2] -
53:21, 79:22
unique [1] - 70:18
unit [1] - 38:9
UNITED [2] - 1:1, 1:3
United [12] - 1:13, 2:2,
2:6, 8:20, 9:5, 9:16,
9:20, 9:22, 10:5,
10:10, 97:6, 97:12
units [1] - 38:12
unjust [1] - 23:10

**unless** [5] - 21:7, 29:22, 29:23, 51:21, 55:13
**unwarranted** [2] - 72:14, 91:12
**up** [43] - 6:7, 7:12, 9:10, 19:3, 19:11, 24:8, 24:10, 27:9, 27:18, 28:14, 28:17, 29:24, 31:18, 32:1, 32:8, 34:15, 35:13, 35:21, 36:6, 36:10, 36:11, 39:17, 42:16, 42:18, 50:7, 54:14, 62:7, 63:3, 63:18, 63:24, 64:9, 65:13, 68:15, 70:25, 73:24, 75:19, 76:15, 78:19, 80:10, 80:24, 89:9, 89:21, 90:3
**upbringing** [1] - 76:21
**updated** [1] - 69:7
**upheld** [1] - 20:1
**users** [1] - 45:6

## V

**vaccinated** [2] - 84:10, 85:24
**vague** [2] - 52:5, 52:13
**valid** [1] - 81:2
**value** [3] - 7:2, 39:11, 59:20
**variance** [2] - 74:4, 74:5
**variances** [1] - 76:4
**variety** [1] - 2:22
**various** [2] - 45:6, 46:4
**vast** [1] - 70:6
**vehicle** [4] - 7:14, 9:17, 17:4, 18:20
**vehicles** [1] - 20:12
**verdict** [11] - 13:11, 20:1, 20:6, 23:10, 23:16, 24:11, 32:9, 82:24, 83:6, 83:7, 93:1
**versa** [1] - 37:3
**versus** [1] - 2:2
**VI** [6] - 56:10, 57:7, 66:2, 67:21, 68:7, 68:9
**vials** [1] - 19:11
**Vic** [1] - 20:9
**vice** [1] - 37:3
**victims** [1] - 92:22
**Victoria** [4] - 17:3, 17:16, 20:8, 21:16
**video** [2] - 38:7, 74:18

**viewed** [2] - 34:6, 66:3
**viewing** [4] - 13:5, 16:10, 20:1, 80:22
**vigorously** [2] - 78:4, 84:4
**violating** [1] - 93:18
**violation** [4] - 57:23, 60:20, 62:8, 62:10
**violence** [3] - 25:18, 26:10, 29:8
**violent** [2] - 77:13, 86:14
**Virginia** [4] - 61:3, 61:5, 61:14
**VIs** [1] - 79:20
**visible** [1] - 22:21
**visit** [2] - 38:2, 43:4
**visits** [1] - 95:8
**visual** [1] - 38:15
**vocational** [1] - 92:15
**voice** [1] - 87:4
**vs** [1] - 1:4

## W

**wait** [1] - 55:19
**waived** [2] - 54:10, 55:24
**waiver** [5] - 28:6, 55:6, 55:11, 55:12, 61:7
**wake** [1] - 32:15
**walking** [1] - 38:14
**walsh** [3] - 3:6, 16:15, 20:23
**Walsh** [10] - 1:20, 1:21, 2:12, 21:11, 21:23, 28:16, 29:14, 41:7, 44:8, 48:9
**WALSH** [14] - 2:11, 3:7, 16:16, 17:25, 21:12, 28:17, 29:5, 29:13, 29:16, 30:3, 41:8, 47:14, 47:19, 47:24
**walsh-Little** [3] - 3:6, 16:15, 20:23
**Walsh-Little** [10] - 1:20, 1:21, 2:12, 21:11, 21:23, 28:16, 29:14, 41:7, 44:8, 48:9
**WALSH-LITTLE** [14] - 2:11, 3:7, 16:16, 17:25, 21:12, 28:17, 29:5, 29:13, 29:16, 30:3, 41:8, 47:14, 47:19, 47:24
**wants** [3] - 39:12, 65:23, 95:20
**warn** [1] - 81:16

**warrant** [9] - 3:25, 4:4, 9:6, 32:6, 32:13, 34:10, 38:10, 39:16, 81:15
**Washington** [1] - 1:18
**ways** [3] - 70:9, 76:25, 77:14
**weapon** [6] - 5:25, 10:6, 10:7, 51:19, 53:12, 53:14
**weapons** [2] - 7:21, 9:24
**weapons-related** [1] - 7:21
**wee** [1] - 4:5
**week** [3] - 75:8, 93:19, 95:17
**weeks** [4] - 14:8, 75:19, 94:14, 95:14
**weigh** [1] - 23:11
**weight** [1] - 23:16
**West** [5] - 1:21, 61:3, 61:4, 61:5, 61:14
**whatsoever** [1] - 71:25
**wheaton** [2] - 36:8, 81:11
**Wheaton** [6] - 6:10, 13:18, 33:25, 36:9, 45:24, 70:21
**whereby** [1] - 62:10
**whole** [2] - 5:4, 66:3
**wholesaler** [1] - 24:9
**willing** [2] - 45:14, 89:18
**wire** [1] - 72:20
**wiretap** [2] - 37:22, 45:22
**wiretaps** [1] - 45:5
**wish** [5] - 29:21, 77:18, 83:23, 84:18, 86:8
**witness** [4] - 5:7, 6:10, 16:25, 81:11
**witnesses** [4] - 5:5, 5:6, 48:5, 72:25
**woman** [1] - 84:18
**wondering** [1] - 78:15
**word** [4] - 7:9, 35:21, 78:16, 91:13
**words** [3] - 30:19, 34:17, 63:13
**works** [1] - 78:3
**world** [1] - 86:11
**worse** [1] - 91:23
**worth** [2] - 85:2, 94:14
**write** [1] - 85:23
**writing** [3] - 30:8, 93:6, 95:14
**writings** [1] - 80:1

**written** [1] - 16:17
**wrote** [2] - 64:13, 86:3

## Y

**year** [9] - 58:3, 58:14, 60:5, 63:6, 65:10, 81:9, 84:14, 90:22, 91:1
**years** [42] - 57:20, 58:4, 58:6, 58:10, 58:18, 59:24, 59:25, 60:6, 60:9, 60:22, 62:17, 63:3, 69:16, 72:17, 72:23, 73:12, 74:15, 74:16, 74:24, 75:15, 76:9, 77:21, 79:6, 79:7, 79:14, 82:12, 82:18, 84:9, 84:12, 84:25, 85:5, 86:8, 88:10, 90:24, 90:25, 91:1, 92:8, 92:9
**yesterday** [1] - 27:5
**young** [4] - 58:23, 58:24, 70:12, 77:11
**younger** [2] - 58:19, 64:13
**yourself** [3] - 83:21, 87:7, 88:22

## Z

**Zoom** [2] - 47:17, 75:11

## §

**§** [1] - 97:8